

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6000
www.potteranderson.com

Philip A. Rovner
Partner
Attorney at Law
provner@potteranderson.com
302 984-6140 Direct Phone

July 11, 2023

**VIA E-FILING AND HAND DELIVERY**

The Honorable Christopher J. Burke
J. Caleb Boggs Federal Building
844 N. King Street
Wilmington, DE 19801

      Re:    *British Telecommunications PLC, et al. v. Palo Alto Networks, Inc.*
                D. Del. C.A. No. 22-1538-CJB

Dear Judge Burke:

Plaintiffs British Telecommunications plc and BT Americas, Inc. (collectively, BT) submit this letter in response to the two questions posed by this Court in its June 29, 2023 Oral Order (D.I. 45).

    **(a)**    **Which Supreme Court or Federal Circuit case is most similar to the challenged claim(s)?**

*SRI Int'l v. Cisco Sys., Inc.,* 930 F.3d 1295 (Fed. Cir. 2019) is the case most similar to the challenged claims.[1] Indeed, U.S. Patent No, 6,711,615 (the "'615 Patent") at issue in *SRI* is strikingly similar to the challenged claims.[2] 930 F.3d 1295 (Fed. Cir. 2019). *See also*,

---

[1] The patents at issue in this case, U.S. Patents No. 7,159,237 (the "'237 Patent") and 7,895,641 (the "'641 Patent) (collectively, the Schneier Patents) share the same specification. For ease of reference, this letter will cite exclusively to the '641 Patent, but the arguments apply with equal force to both Schneier Patents.

[2] This similarity between the claims of the '615 and patents-at-issue are not happenstance. They are a result of both patents addressing a similar technological area – the detection of unknown threats and use of that information to protect against distributed attacks. *Compare* '615 Patent, 2:61-64 ("The scheme of communication network monitors also protected networks from more global attacks. For example, an attack made upon one network may cause other entities to be alerted") with '641 Patent at issue, 2:35-38 ("Furthermore, data filtering and analysis can include cross-product analysis, which allows the probe/sentry system to correlate and recognize such multiple sensor readings as reflecting the same happening."). While the '615 Patent itself was not considered during the prosecution of the Schneier Patents at issue in this case (nor should it have been, as there was closer prior art), the commercial embodiment of the research that led to the '615 Patent, known as EMERALD, was. *See id*. at 1301 ("EMERALD 1997…describes in detail SRI's early research in intrusion detection technology…"). Indeed, the United States Patent Office found the claims of the '641 Patent valid over three different prior art references

The Honorable Christopher J. Burke
July 11, 2023
Page 2

Plaintiff's Opposition to Defendant's Motion to Dismiss Under Rule 12(b)(6), D.I. 19, at pp. 16-17.  More specifically, the Federal Circuit found the '615 Patent directed to patentable subject matter under Step 1 of Alice.  *See SRI* at 1304 (holding that the claims "are not directed to using a computer as a tool – that is, automating a conventional idea on a computer," but rather improve "the technical functioning of the computer and computer networks by reciting a specific technique for improving computer security").  Claim 1 of the '615 Patent, for example, is similar from a 35 U.S.C. §101 perspective to representative claim 1 of the "641 Patent, as the elements from each claim are—at least individually—analogous to each other:[3]

1. Both the '615 and '641 patents require a network monitoring system:  A computer-automated method…comprising" ('615); "A system…comprising" ('641);

2. Both the '615 and '641 patents disclose elements to capture certain specific network data:  "deploying a…network" ('615);"a sensor…network" ('641) [4];

3. Both the '615 and '641 patents identify suspicious traffic based on specific network data:  "detecting…protocols" ('615); "a filtering…filtering" ('641);

4. Both the '615 and '641 patents report detected security issues to a higher hierarchical system element: "generating…, and" ('615); "a communication…system" ('641)); and

5. Both the '615 and '641 patents process received information on suspicious traffic at the higher hierarchical level: "automatically…monitors." ('615); "a receiver…system" ('641).

However, there are two differences between these representative claims which illustrate that the Schneier Patents require even more specific technological steps than the '615 Patent.  First, whereas the '615 Patent generally requires detecting suspicious activities from certain network data, without any identification of "how" such detecting happens, the Schneier Patents provide a far more detailed sequence of steps, including positive and negative filtering of status data, and initial analysis of post-filtering residue at the probe.  Indeed, unlike the Schneier Patents, the '615 Patent says nothing about looking at post-filtering residue.  Second, the '615 Patent explains that the received reports are "integrated" at the hierarchical monitor, but, again, it does

---

that relate to EMERALD.   More specifically, the '641 Patent cites the following EMERALD related references on its face: 1) U. S. Patent No. 6,704,874; 2) "Experience with EMERALD to Date"; and 3) "EMERALD: Event Monitoring Enabling Responses to Anomalous Live Disturbances."  In other words, the technological similarities between the research that led to the '615 patent and the patents-at-issue was contemporaneously acknowledged by the patent office when it allowed the '237 and '641 Patents over the EMERALD prior art.

[3] BT will include a claim chart further illustrating this mapping in its July 13, hearing submission.

[4] Even more so when including dependent claim 14 of the '641 Patent, which requires a plurality of probes, each of which would be associated with sensors.

not say how.  The Schneier Patents on the other hand further processes the post-filtering residue to determine which suspicious events are actual malicious events and provides feedback to the probe.  Neither of these things occur in the '615 Patent.  The distinction between the level of specificity in the '615 Patent and the Schneier Patents' claims becomes even more pronounced when dependent claims 10 (requiring a second computerized analysis of the post-filtering residue at the SOC) and 14 (requiring cross-probe correlation at the SOC) are considered.  Accordingly, both the '615 and the Schneier Patents claim technological solutions to deficiencies in prior art security devices, and the Federal Circuit's reasons for upholding the validity of the '615 Patent in *SRI* apply with equal or greater force to the patents-at-issue here as, for example, the Schneier Patents' claims require far more "how" than the claims of the '615 Patent.

   (b)   What is your view on how this "lack of how" argument can be relevant to the Section 101 eligibility calculus—and how much "how" the claims need to contain in order to suggest eligibility?

The Federal Circuit considers whether the claims disclose a suitably specific solution to the problem being addressed, and not simply whether the claim is specific enough about each and every element within the claim.  This distinction between the level of specificity in the solution as compared to the level of specificity in the individual elements that comprise the solution can be most readily seen when the solution to a problem lies in a novel architecture, combinations, or ordering of steps.  In such cases, the novelty of the invention often does not necessarily lie in any specific element of the claim, but rather in how each of the individual elements are used together, how they are oriented, or how they are ordered.  The Federal Circuit frequently finds claims to be patent eligible under these circumstances, even where certain elements in isolation could be characterized as having a "lack of how."  *See*, *e.g. SRI* at 1302-06 (finding claims patentable despite certain lack of specificity with regard to each individual step); *Thales Visionix, Inc. v. United States*, 850 F.3d 1343, 1345-46 (Fed. Cir. 2017) (finding claims regarding particular configuration of sensors and particular method of using raw data from sensors were patent eligible despite the claim's silence as to how to determine the orientation or the process and formulas used to make certain calculations); *BASCOM Glob. Internet Serv., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349-1350 (Fed. Cir. 2016) (holding claims were patent eligible because "the patent describes how its particular arrangement of elements is a technical improvement over the prior art ways of filtering such content" despite finding that "[f]iltering content on the Internet was already a known concept.").

The Schneier Patents claim a novel architecture with specific processing steps occurring on specific data, at specific locations, and in a specific sequence.  It is this claimed architecture that allows for improved detection and response to new and constantly evolving attacks on computer networks.  More specifically, status data is positively and negatively filtered at the probe; post-filtering residue is initially analyzed at the probe; potentially suspicious activity is sent to a secure operations center for one or two additional rounds of automated and/or manual analysis; and feedback is sent back to the probe, which updates the capabilities of the probe.  The Schneier Patents claim those aspects of the inventive architecture that actually solves the problems identified by the patent, which is a more than sufficient disclosure of "how."  The inventors—having made a pioneering invention (which must be taken as true in this context, *see* D.I. 1, ¶34)

are entitled to the full breadth of their contribution to the art.  *See Classen Immunotherapies, Inc. v. Biogen IDEC*, 659 F.3d 1057, 1073 (Fed. Cir. 2011) ("A pioneering invention, that meets the substantive criteria of patentability, may indeed warrant broad scope.").  Accordingly, the level of specificity in the claims of the Schneier Patents, which is analogous to (if not greater than) the level of specificity in the SRI claims, is more than sufficient to support patentability.

We thank the Court for its attention to this matter and are available at the Court's convenience should Your Honor have any questions.

    Respectfully,

    */s/ Philip A. Rovner*

    Philip A. Rovner

cc: Counsel of Record (via E-File)