# EXHIBIT 1

```
                                    1

 1           IN THE UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF DELAWARE

 3
 4   ATTENTIVE MOBILE, INC.,        )
 5                    Plaintiff,    )
                                    ) C.A. No. 22-1163-CJB
 6   v.                             )
 7   317 LABS, INC., d/b/a EMOTIVE, )
 8                    Defendant.    )
     - - - - - - - - - - - - - - - -
 9   ATTENTIVE MOBILE, INC.,        )
10                    Plaintiff,    )
                                    ) C.A. No. 23-87-CJB
11   v.                             )
12   STODGE INC., d/b/a POSTSCRIPT, )
13                    Defendant.    )
     - - - - - - - - - - - - - - - -
14   BRITISH TELECOMMUNICATIONS PLC )
     and BT AMERICAS, INC.,         )
15                    Plaintiffs,   )
                                    ) C.A. No. 22-1538-CJB
16   v.                             )
17   PALO ALTO NETWORKS, INC.,      )
18                    Defendant.    )
19
                            J. Caleb Boggs Courthouse
20                          844 North King Street
                            Wilmington, Delaware
21
                            Friday, July 14, 2023
22                          9:45 a.m.
                            Motions Hearing
23
24   BEFORE:  THE HONORABLE CHRISTOPHER J. BURKE
              UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
25
```

```
                                    2
 1   APPEARANCES:
 2       MORRIS NICHOLS ARSHT & TUNNELL LLP
         BY:  MICHAEL FLYNN, ESQUIRE
 3
               -and-
 4
         KING & SPAULDING LLP
 5       BY:  JONATHAN WEINBERG, ESQUIRE
         BY:  BRITTON DAVIS, ESQUIRE
 6       BY:  RYAN A. SCHMID, ESQUIRE
 7               For the Plaintiff
                 Attentive Mobile, Inc.
 8               In C.A. No. 22-1163-CJB
 9       ASHBY & GEDDES
         BY:  JOHN G. DAY, ESQUIRE
10
               -and-
11
         ORRICK HERRINGTON & SUTCLIFFE LLP
12       BY:  RICHARD MARTINELLI, ESQUIRE
13               For the Defendant
                 317 Labs, Inc.
14
15       MORRIS NICHOLS ARSHT & TUNNELL LLP
         BY:  MICHAEL J. FLYNN, ESQUIRE
16
               -and-
17
         KING & SPAULDING LLP
18       BY:  JONATHAN WEINBERG, ESQUIRE
         BY:  BRITTON DAVIS, ESQUIRE
19       BY:  RYAN SCHMID, ESQUIRE
20               For the Plaintiff
                 Attentive Mobile, Inc.
21               In C.A. No. 23-87-CJB
22
         POTTER ANDERSON & CORROON LLP
23       BY:  ANDREW BROWN, ESQUIRE
         BY:  BINDU PALAPURA, ESQUIRE
24
               -and-
25
```

```
                                    3
 1   APPEARANCES CONTINUED:
 2       MORRISON FOERSTER
         BY:  EUGENE NOVIKOV, ESQUIRE
 3
                 For the Defendant
 4               Stodge, Inc.
 5       POTTER ANDERSON & CORROON LLP
         BY:  PHILIP A. ROVNER, ESQUIRE
 6
               -and-
 7
         PROSKAUER ROSE LLP
 8       BY:  NOLAN GOLDBERG, ESQUIRE
         BY:  BALDASSARE VINTI, ESQUIRE
 9       BY:  EDWARD WANG, ESQUIRE
10               For the Plaintiff
                 BT Americas
11
         FARNAN, LLP
12       BY:  BRIAN E. FARNAN, ESQUIRE
13             -and-
14       WEIL GOTSHAL & MANGES
         BY:  ANISH DESAI, ESQUIRE
15       BY:  PRIYATA PATEL, ESQUIRE
         BY:  THOMAS YU, ESQUIRE
16
                 For the Defendant
17               Palo Alto Networks
18
         ***  PROCEEDINGS  ***
19
09:38:58 20       DEPUTY CLERK:  All rise.
09:38:58 21       THE COURT:  It looks like our IT staff is still
09:38:58 22   looking at some computer stuff.  Why don't I go ahead and
09:38:58 23   give you a chance to finish up with that, and just let me
09:38:58 24   know when we're ready to proceed and we'll go from there.
09:38:58 25       Okay.  I'll take a recess.
```

```
                                    4
09:49:56  1       DEPUTY CLERK:  All rise.
09:53:21  2       THE COURT:  Please be seated.  Good morning,
09:53:24  3   again.  Take two.
09:53:27  4       Good to be with you all today.  And I know we
09:53:29  5   have all of counsel for our parties here and the court
09:53:33  6   reporter.  And we thank our court reporter for all her
09:53:35  7   service.
09:53:35  8       And so, why don't we go on the record.  And as
09:53:38  9   we do, why don't I just say a few things for the record.
09:53:42 10   And the first is that we're here today, as the parties know,
09:53:45 11   for a 101, Section 101 setting at least, in three cases.
09:53:51 12   Two of them are related.
09:53:54 13       The two related cases involve the same
09:53:59 14   Plaintiff, that's Attentive Mobile Inc.  The first of those,
09:54:03 15   Civil Action Number 22-1163-CJB.  The Defendant there is 317
09:54:13 16   Labs, Inc. doing business as Emotive.
09:54:15 17       And in Civil Action Number 23-87-CJB, the
09:54:21 18   Defendant is Stodge, Inc. doing business as Postscript.
09:54:24 19       And, then, in our last case, that case is *BT*
09:54:30 20   *Americas Inc. vs. Palo Alto Networks, Inc.* It's Civil Action
09:54:35 21   Number 22-1538-CJB here in our court.
09:54:40 22       And we're here today to address motions filed by
09:54:43 23   the respective Defendants in the respective cases seeking
09:54:47 24   dismissal of the respective Complaints, Section 101 claims.
09:54:52 25       Okay.  Before we go further, let's have counsel
```

5

09:54:55 1 for the parties identify themselves for the record. I think
09:54:58 2 our Attentive Mobile cases are first. And so, we'll ask
09:55:04 3 counsel for Plaintiff's side, and particularly start with
09:55:08 4 Delaware counsel, to identify themselves.
09:55:09 5       MR. FLYNN: Good morning, Your Honor. Michael
09:55:11 6 Flynn from Morris Nichols on behalf of Attentive Mobile.
09:55:13 7 With me today is Jonathan Weinberg, Ryan Schmid and Britton
09:55:17 8 Davis from King & Spalding.
09:55:18 9       Mr. Weinberg will be arguing today for
09:55:21 10 Attentive. And in the gallery is Troy Lieberman from
09:55:23 11 Attentive Mobile.
09:55:24 12       THE COURT: Okay. Thank you. Welcome to you
09:55:26 13 all.
09:55:26 14       Let's have Defendants' counsel in both of the
09:55:30 15 cases identify themselves. And, again, we'll start first
09:55:35 16 with Delaware counsel.
09:55:37 17       MR. BROWN: Good morning, Your Honor. Andy
09:55:38 18 Brown from Potter Anderson on behalf of Defendant,
09:55:41 19 Postscript. With me today are my colleagues, Bindu
09:55:45 20 Palapura, also from Potter, gene Novikov from Morrison
09:55:50 21 Foerster, and Vanessa Katz from Postscript.
09:55:52 22       THE COURT: And who will be arguing?
09:55:54 23       MR. BROWN: Mr. Novikov will be arguing.
09:55:57 24       THE COURT: Thank you. We'll do the same for
09:56:00 25 Emotive's counsel, and we'll start with Delaware counsel.

6

09:56:01 1       MR. DAY: Good morning, Your Honor. John Day
09:56:02 2 from Ashby & Geddes for Emotive. With me, Richard
09:56:07 3 Martinelli from Orrick. And Mr. Martinelli will be
09:56:09 4 presenting on behalf of Emotive.
09:56:11 5       THE COURT: All right. Thank you.
09:56:13 6       And going in the back of the courtroom, let's
09:56:16 7 have introductions for our last case, which is the BT
09:56:21 8 Americas case. And we'll begin with Delaware counsel. You
09:56:24 9 can stay back there. You don't have to come all the way up
09:56:26 10 to the podium.
09:56:27 11       Mr. Rovner.
09:56:27 12       MR. ROVNER: Good morning, Your Honor. Phil
09:56:29 13 Rovner from Potter Anderson for the BT Plaintiffs. And with
09:56:31 14 me, my co-counsel from the Proskauer firm in New York, Nolan
09:56:35 15 Goldberg and Balda Vinti. Also, Edward Wang from Proskauer
09:56:41 16 as well.
09:56:43 17       As we said in our email to the Court that
09:56:45 18 Mr. Goldberg will be arguing on behalf of BT.
09:56:49 19       THE COURT: Thank you and welcome.
09:56:52 20       We'll do the same for counsel on Defendant's
09:56:53 21 side, starting with Delaware counsel.
09:56:54 22       Mr. Farnan.
09:56:54 23       MR. FARNAN: Good morning, Your Honor. Brian
09:56:56 24 Farnan on behalf of Defendant. With me is Anish Desai,
09:56:58 25 Priyata Patel, and Tom Yu. And Mr. Desai will be arguing.

7

09:57:02 1       THE COURT: Okay. Thank you, counsel. Good
09:57:04 2 morning again to all.
09:57:06 3       All right. Counsel, so just by way of ground
09:57:09 4 rules, I think we worked this all out ahead of time. So, we
09:57:12 5 said the Attentive Mobile cases are going to go first. I
09:57:16 6 allocated 30 minutes per side for arguments. We've got two
09:57:20 7 different Defendants, although, obviously, the issues are
09:57:23 8 related. So, we'll keep track of time up here, and I'll let
09:57:27 9 you know when you've got about five minutes left in your
09:57:30 10 time.
09:57:30 11       And then after we hear arguments in that case,
09:57:34 12 we'll hear arguments in the BT case. Maybe we'll take like
09:57:40 13 a short break just to let counsel get things switched out at
09:57:43 14 counsel table, hear arguments in the BT case. And then
09:57:47 15 before we adjourn then for lunch, I always like to try to
09:57:53 16 take advantage of the fact that we've got a lot of folks
09:57:56 17 here who are thoughtful about the Section 101 issues which,
09:57:59 18 as you all know, our court deals with to a great degree.
09:58:03 19       And I appreciate the parties' letters. And in
09:58:07 20 the letters, I sometimes ask the parties, Hey, you're not
09:58:11 21 only here to address any of the key cases that are most
09:58:14 22 significant to their own motion, but also just some general
09:58:17 23 concepts of Section 101 law that can be challenging. They
09:58:20 24 did that in those letters. It was really helpful. And they
09:58:23 25 pointed me to some case law that I either hadn't read or if

8

09:58:27 1 I had read it, I had forgotten. So, I thank them.
09:58:30 2       And so, I did want to ask you a couple of
09:58:33 3 questions, just generally about the law, after we finish our
09:58:36 4 arguments specifically in these cases. And one question
09:58:39 5 that I'd like to get, if you have any thoughts, the benefit
09:58:43 6 of your thoughts about is just kind of a general one. I
09:58:46 7 wanted to mention it now, just so you can think about it
09:58:49 8 while you have a break in the proceedings this morning.
09:58:51 9       And that is, you know, is there any concept with
09:58:56 10 regard to Section 101 jurisprudence and particularly how
09:59:01 11 that jurisprudence is supposed to work at the Rule 12 stage,
09:59:04 12 that you think that courts or litigants are generally
09:59:10 13 getting wrong? Or do you think that the law is really
09:59:13 14 telling us we should be thinking about it in a certain way
09:59:17 15 or looking at it in a certain way, but you think that maybe
09:59:23 16 courts generally or litigants generally really aren't quite
09:59:27 17 looking at it in the right way, the way that the Federal
09:59:30 18 Circuit really is telling us to do it, and the Supreme Court
09:59:32 19 is telling us to do it.
09:59:33 20       I guess another way of phrasing this is: What
09:59:35 21 do you think is kind of the most misunderstood key principle
09:59:38 22 about Section 101 law that you wish courts would get right?
09:59:42 23 And I say that because I want to try to make sure I'm always
09:59:44 24 thinking about these things in the right way and trying to
09:59:47 25 get the issues right. And they are challenging issues, as

9

```
09:59:49  1   we will see today with our motions.
09:59:51  2          All right.  So, not that you have to have any
09:59:54  3   thoughts on that.  But if you do, that's a question I think
09:59:57  4   I would like the answer to.
09:59:58  5          So, let's begin with our Attentive Mobile
10:00:01  6   motions, and I'll turn to Defendant's counsel, as it's their
10:00:05  7   motions, and that's how it was worked out who was going to
10:00:08  8   go first.
10:00:11  9          MR. NOVIKOV:  Good morning, Your Honor.  Gene
10:00:14 10   Novikov of Morrison Foerster for Postscript.  I'm going to
10:00:17 11   take the lead.  I'm going to try to save seven minutes or so
10:00:21 12   for my colleague, Mr. Martinelli, and then five minutes for
10:00:25 13   myself to come back and say more things after Mr. Weinberg
10:00:30 14   is done.  So, I'm going to try to do 18 here and see how I
10:00:34 15   do.
10:00:34 16          THE COURT:  Okay.  That's impressive.
10:00:36 17          All right.  Why don't we begin, and I'll stop
10:00:39 18   you with any questions.
10:00:40 19          MR. NOVIKOV:  Okay.  I think the right place to
10:00:42 20   start in evaluating questions of eligibility for these sorts
10:00:47 21   of software patents is looking at the specification to
10:00:51 22   figure out what problem in the prior art the inventors were
10:00:55 23   trying to solve and what improvement their patent was
10:00:59 24   offering.
10:00:59 25          So, this is the problem statement from the
```

10

```
10:01:02  1   specification.  It says, The problem that the inventors were
10:01:06  2   trying to solve was that the process for users to respond to
10:01:11  3   online offers and promotions was too long, and people would
10:01:16  4   lose interest, and the vendor or the online vendor would
10:01:19  5   lose their business.
10:01:20  6          And --
10:01:21  7          THE COURT:  And if you could go back, because I
10:01:23  8   think, you know, this portion of the spec is going to be key
10:01:26  9   in Column 1.  I wonder, though, whether, and I guess the
10:01:32 10   question is whether you're short selling all that is being
10:01:36 11   said here.
10:01:36 12          So, certainly, I think, as you've noted in the
10:01:39 13   briefing, there is a focus here on kind of the
10:01:47 14   time-consuming nature of the prior art process.  You know,
10:01:52 15   and let's try to save time.  Let's try to make this go
10:01:56 16   quicker.
10:01:57 17          And like for a Defendant in a Section 101 case,
10:01:59 18   it makes sense that you would be focusing on that.  I'll let
10:02:01 19   you go on to that.
10:02:03 20          Doing something quicker on a computer is not
10:02:06 21   necessarily the kind of thing that might save the Plaintiff
10:02:09 22   on eligibility issues.  But isn't there also the component
10:02:12 23   in here where the patent is essentially saying, Look, the
10:02:19 24   way that computers worked with regard to this sign-up
10:02:23 25   process was that they worked in a certain way, and that way
```

11

```
10:02:27  1   isn't optimal.  And so, we are going to make the computers
10:02:31  2   work in a different way to function in a different way.
10:02:34  3          Couldn't it be said that that's what's also
10:02:37  4   being conveyed?
10:02:38  5          MR. NOVIKOV:  I appreciate that distinction, and
10:02:40  6   I agree with the Court that the advance that's being
10:02:44  7   proffered here isn't limited to just making things go faster
10:02:48  8   or moving more efficiently.  But the thing that I do want to
10:02:53  9   point out is that the improvement that's being offered here
10:02:56 10   isn't to a particular server, or a particular network or
10:03:01 11   even a particular piece of software.  It is saying the way
10:03:06 12   that we are executing this notion of enrolling in an online
10:03:12 13   promotion using computers isn't very good, and we're going
10:03:16 14   to do it differently.
10:03:18 15          And so, it is not, I don't think, an improvement
10:03:21 16   to any particular computer functionality.  It is saying,
10:03:27 17   We've got this thing that's going on in the Internet, and
10:03:30 18   we're going to try to figure out a way to do that better.
10:03:33 19   And I think that that's different from an improvement to
10:03:38 20   computer functionality in the way that the Federal Circuit
10:03:41 21   has noted it.
10:03:42 22          So, this might be a good place to address the
10:03:44 23   *DDR Holdings* analogy that came up in the letter briefing.
10:03:49 24   Right.  So, in *DDR Holdings*, the invention was an
10:03:51 25   improvement to the routine conventional function of an
```

12

```
10:03:55  1   Internet hyperlink protocol.  And the invention was an
10:03:59  2   improvement to the way that hyperlinks worked.  Right.
10:04:02  3          Ordinarily, you click on a hyperlink, and it
10:04:05  4   would go from one page to another page perhaps on a
10:04:08  5   different server.  And they had invented a new type of link,
10:04:12  6   right.  And it would work differently.  Rather than
10:04:14  7   transporting the user to a different website on a different
10:04:17  8   server, it would automatically generate a brand new hyper
10:04:22  9   website, a new type of link analogous to the new database
10:04:25 10   that the Federal Circuit found embodied in the *Enfish*
10:04:29 11   claims.
10:04:29 12          Now, in the supplemental letter brief that was
10:04:32 13   filed at Docket 43, the analogy that they draw to the *DDR*
10:04:37 14   *Holdings* goes as follows.  They say, In *DDR Holdings*, you
10:04:40 15   have a new type of hyperlink that overwrote the conventional
10:04:44 16   sequence of events.  Their invention overrides the
10:04:46 17   conventional sequence of events "ordinarily triggered by the
10:04:51 18   click of an advertisement in the prior art mobile sign-up
10:04:54 19   systems."
10:04:55 20          And I think that's pretty telling because it
10:04:58 21   seems to me to be an admission that they aren't improving
10:05:01 22   the way that a computer works or a particular computer
10:05:03 23   technology.  They're improving the abstract idea of signing
10:05:08 24   up for promotional offers on the Internet, right.  And the
10:05:12 25   way that they're doing it is by deploying this deeplinking
```

13

10:05:16  1   technology that they admit in their patents and in their
10:05:18  2   briefs is conventional, known and standardized.
10:05:22  3        THE COURT:  And I think maybe what you're saying
10:05:23  4   is, you know, there could be different ways in which one
10:05:28  5   attempts to utilize computers and computer software in an
10:05:32  6   unconventional way.  One way to do it is to literally create
10:05:37  7   or talk about creating because sometimes in these patents,
10:05:40  8   although they say, We're doing or creating something
10:05:42  9   specific, they may not always explain exactly how, but it's
10:05:46 10   to create a new type of functionality.  A new type of -- you
10:05:53 11   know, a particular way that software works that maybe has
10:05:58 12   not been created before.
10:06:01 13        But we know, you know, and this may be more of a
10:06:06 14   step two thing, but we know that another way in which you
10:06:08 15   can utilize computer technology, including software
10:06:13 16   unconventionally for purposes of 101 law, is by utilizing
10:06:17 17   otherwise known elements in an unconventional combination.
10:06:20 18        And like I think when you're analogizing this to
10:06:23 19   *DDR*, you're talking about the first thing, not a new way to
10:06:26 20   use computers or software.  But the other side may be
10:06:29 21   focusing on the second thing, which it is a combination of
10:06:34 22   both ways.  Isn't that a different way to do it?
10:06:38 23        MR. NOVIKOV:  Absolutely.  So, I think one thing
10:06:41 24   that Federal Circuit law that has been clear about is you
10:06:45 25   have a problem, at least to start with, when you're

14

10:06:48  1   deploying computer technology that you admit, at least in
10:06:52  2   pieces, in components, is known conventional to solve -- to
10:06:56  3   kind of improve a business process like this.  And so, the
10:06:59  4   move that people make, exactly as you say, is, Well, we may
10:07:03  5   be deploying conventional computer components to solve a
10:07:08  6   business process, but we are arranging those components in a
10:07:12  7   way that's new and in a way that hasn't been done before,
10:07:15  8   right.
10:07:15  9        And that's the *Finjan* case, the *BASCOM* case, and
10:07:20 10   those are cases that say you've got some assertedly new
10:07:21 11   configuration of elements or some change to the way that the
10:07:27 12   components interact with each other that takes it out of the
10:07:30 13   realm of abstract idea.
10:07:31 14        And, of course, that's how the Court thought
10:07:33 15   about the question in the *Nielsen* case that Your Honor
10:07:36 16   highlighted for us in the Order preceding this hearing, like
10:07:39 17   is there an arrangement that's sufficiently specific and
10:07:43 18   particularized to give the Court assurance that what's being
10:07:45 19   patented is new?  And that's what they're trying to do here.
10:07:48 20        THE COURT:  And to make it more specific in
10:07:50 21   terms of the graphic you have up on Slide 6, which I think
10:07:53 22   comes from the other side's brief is, like, no question,
10:07:58 23   were integration tags known?  They were.  Were websites
10:08:00 24   known?  They were.  Was the concept of using URI with a
10:08:02 25   deeplink known?  Yes, no question.  Was the concept of

15

10:08:04  1   transferring data utilized or, you know, customized text
10:08:06  2   messages, was that all known?  Yes.
10:08:11  3        I don't think they're even contesting that, and
10:08:15  4   they're saying, Yeah, but the way we're putting it all
10:08:17  5   together here, that was new.
10:08:18  6        MR. NOVIKOV:  That's right.  And I think we are
10:08:21  7   asking the Court to look beyond the terms that they're using
10:08:27  8   and putting up on the screen in this diagram here and to
10:08:33  9   consider what this actually all amounts to.
10:08:36 10        So, I'm going to skip past this because I think
10:08:39 11   we are sort of on the same page that, you know, the
10:08:42 12   click-to-text server is just a server.  The client server,
10:08:45 13   we don't really know what it is at all.  We just kind of
10:08:47 14   infer that it serves web pages.  The browser is a browser in
10:08:50 15   the diagram.  It's actually in the patent.  Any sort of
10:08:55 16   interface that a user has on a computer.  And then the
10:08:58 17   notion of an integration tag is completely abstract.
10:09:03 18        I would love to hear today if there's going to
10:09:06 19   be something that they're going to ask for in claim
10:09:08 20   construction that's going to make it anything other than
10:09:10 21   just code on a web page.  But I think if you look at this,
10:09:13 22   all of that in mind, all you have here in -- it's the part
10:09:18 23   that I've circled in red -- is you're serving a web page
10:09:22 24   that collects some user data, right.  And all you have in
10:09:26 25   this second piece, which is really the solution that they're

16

10:09:30  1   claiming they developed to their problem, is this known
10:09:34  2   conventional, indeed, standardized way of switching between
10:09:38  3   one application to another using a deeplink, right.
10:09:43  4        There are -- there's a listing in the '074
10:09:46  5   patent, not just of the protocol, but of press coverage of
10:09:50  6   the way that you would do this in the Android system and the
10:09:55  7   MAC IOS system.  And then all you have in part three is
10:09:57  8   receiving a text.
10:09:59  9        THE COURT:  Can you just go back to the excerpt,
10:10:01 10   though?  Is it just the use of the URI with the deeplink?  I
10:10:04 11   mean, the patent talks about custom-generated deeplinks, and
10:10:08 12   my sense is that the custom-generated part of what this
10:10:12 13   patent says it's about is a nod towards, yeah, we're using,
10:10:18 14   you know, deeplink technology via URIs.
10:10:21 15        MR. NOVIKOV:  So --
10:10:21 16        THE COURT:  But we're doing it in a way that
10:10:23 17   customizes the resulting message.  What do we mean by that?
10:10:29 18   Well, we're going to be utilizing some data that is
10:10:31 19   particular to the user or the public website at issue.
10:10:33 20        Isn't it fair that it's more than just URIs and
10:10:36 21   deeplinks?
10:10:37 22        MR. NOVIKOV:  So, a deeplink is, to some degree,
10:10:43 23   customized by its nature because it's going to point
10:10:43 24   somewhere in particular.
10:10:46 25        THE COURT:  From one app to another you're

17

| | |
|---|---|
| 10:10:49 | 1 saying? |
| 10:10:50 | 2 MR. NOVIKOV: That's right. I take the one app |
| 10:10:52 | 3 to a specified place in the second app. I take Your Honor's |
| 10:10:54 | 4 point that the notion here is that it is going to customize |
| 10:10:58 | 5 based on some data that is received from the user. |
| 10:11:03 | 6 Note that it's not actually a requirement of all |
| 10:11:05 | 7 of the claims they're asserting. So, query how integral a |
| 10:11:09 | 8 part of their invention it really is. |
| 10:11:11 | 9 THE COURT: And on that, let me stop you there, |
| 10:11:12 | 10 because I think I saw on your slides, I may be conflating |
| 10:11:16 | 11 the cases, but am I right that some of your slides, maybe |
| 10:11:19 | 12 near the end, talk about how, well, you know, Look, the '887 |
| 10:11:24 | 13 patent, Claim 1 says this, but not necessarily these other |
| 10:11:27 | 14 independent claims? |
| 10:11:28 | 15 MR. NOVIKOV: That's right. |
| 10:11:29 | 16 THE COURT: I guess my question is: In your |
| 10:11:30 | 17 briefing, did you ever say, Wait a second, it's not okay to |
| 10:11:33 | 18 just use any one of these independent claims referenced in |
| 10:11:36 | 19 the Complaint because, Look, this independent claim doesn't |
| 10:11:39 | 20 have this component, which the Plaintiff is now relying on. |
| 10:11:42 | 21 I don't think you did that. |
| 10:11:43 | 22 MR. NOVIKOV: That's fair, Your Honor. I mean, |
| 10:11:45 | 23 we did make a point that this was not an accurate |
| 10:11:51 | 24 representation of all of the claims. And I think there is |
| 10:11:54 | 25 one or two examples in both Defendants' briefs that say that |

18

| | |
|---|---|
| 10:12:00 | 1 specific things are not found in the claims. I concede that |
| 10:12:05 | 2 the particular granular comparison that's in the slides is |
| 10:12:08 | 3 not in the briefs. |
| 10:12:09 | 4 THE COURT: Let me let you continue. |
| 10:12:10 | 5 MR. NOVIKOV: The only point I was going to make |
| 10:12:12 | 6 is -- additional point is if we had claimed advances, Well, |
| 10:12:18 | 7 we're going to provide a personalized link, there is Federal |
| 10:12:23 | 8 Circuit case law, I think it is *TLI*, but I'm going to |
| 10:12:27 | 9 double-check that and maybe get up and just say the name of |
| 10:12:30 | 10 the case after everybody is done, that a personalized URL is |
| 10:12:34 | 11 not sufficient. |
| 10:12:36 | 12 And that makes sense. Like the notion that |
| 10:12:39 | 13 you're going to point somebody to a place on the Internet |
| 10:12:42 | 14 based on something that they tell you doesn't feel to me |
| 10:12:45 | 15 like something that ought to get across the threshold. |
| 10:12:49 | 16 THE COURT: Is it clear, Mr. Novikov, that as to |
| 10:12:52 | 17 the first couple steps of your -- that the embedding of |
| 10:12:58 | 18 integration tags in web pages such that when those web pages |
| 10:13:03 | 19 are accessed, the tag sends data back to a server, was that |
| 10:13:07 | 20 known? |
| 10:13:08 | 21 MR. NOVIKOV: I mean, I think the notion of |
| 10:13:16 | 22 embedding some code in a web page that causes some user data |
| 10:13:20 | 23 to be sent back, I think it has to be true that that was |
| 10:13:26 | 24 known. Especially whereas here, the types of user data that |
| 10:13:31 | 25 are identified as being transmitted back is basically |

19

| | |
|---|---|
| 10:13:35 | 1 anything about the user at all. Other information |
| 10:13:41 | 2 identifying the user or user mobile device, the user viewing |
| 10:13:44 | 3 history, click history, user status, cookies. |
| 10:13:46 | 4 I mean, it doesn't, again, feel to me like the |
| 10:13:50 | 5 notion that you have put some code in a web page that it's |
| 10:13:53 | 6 going to send the user data back is something that they can |
| 10:13:57 | 7 credibly say wasn't a known thing. |
| 10:14:00 | 8 THE COURT: And maybe this gets to an issue, a |
| 10:14:01 | 9 step two issue I wanted to ask you about, which is, again, |
| 10:14:04 | 10 we talked about the difference between establishing that |
| 10:14:08 | 11 each individual piece of software or hardware that's |
| 10:14:10 | 12 referenced in the claim is known versus the difference |
| 10:14:12 | 13 between demonstrating or having the record demonstrate that |
| 10:14:16 | 14 the ordinary combination of those steps, the software or |
| 10:14:18 | 15 hardware, related steps are known. |
| 10:14:21 | 16 You cite *TLI* a bunch in your briefs, I think, |
| 10:14:25 | 17 for the idea that, you know, the way -- the ordinary use of |
| 10:14:29 | 18 the technology itself can't be -- can't help with regard to |
| 10:14:33 | 19 eligibility. But I think there what I'm looking for in the |
| 10:14:36 | 20 record is, Show me something in the record that says, Yeah, |
| 10:14:41 | 21 yeah, see, people were using integration tags embedded in |
| 10:14:45 | 22 websites that when accessed generated URIs with deeplinks |
| 10:14:51 | 23 that created custom text messages with user data and website |
| 10:14:55 | 24 data that related to some of the users. Show me that that |
| 10:14:58 | 25 was ordinary, not just the individual components, but show |

20

| | |
|---|---|
| 10:15:01 | 1 me that utilization of technology was ordinary. |
| 10:15:04 | 2 In your briefing when you're getting to that, |
| 10:15:07 | 3 that ordered combination argument you also make in step two, |
| 10:15:10 | 4 I don't see you citing anything for that. I mean, was it |
| 10:15:13 | 5 ordinary to use all these things in a computer software |
| 10:15:17 | 6 based way at the time? |
| 10:15:18 | 7 MR. NOVIKOV: I think -- well, so the place |
| 10:15:24 | 8 where I would go for this is the idea which was, obviously, |
| 10:15:34 | 9 that piece at least, which is the core of the solution that |
| 10:15:37 | 10 was admitted to be known. |
| 10:15:40 | 11 How does the deeplink work? Well, the deeplink |
| 10:15:43 | 12 is a link in an app or on a web page that is placed there, |
| 10:15:48 | 13 is served to the mobile device by a server, and it sends you |
| 10:15:53 | 14 somewhere else. |
| 10:15:53 | 15 I agree with the Court that there isn't |
| 10:15:56 | 16 something in the specification that you could point to and |
| 10:15:59 | 17 have a cite to that says, Well, all of this was known. I |
| 10:16:03 | 18 think if that had been in the specification, you wouldn't |
| 10:16:06 | 19 have -- this wouldn't have gotten past the Patent Office to |
| 10:16:11 | 20 begin with. |
| 10:16:11 | 21 THE COURT: We might not be here; right? We |
| 10:16:13 | 22 might not be here today; right? |
| 10:16:15 | 23 MR. NOVIKOV: Right. But I think what -- I |
| 10:16:21 | 24 think it is pretty easy to recognize, given how generic the |
| 10:16:24 | 25 descriptions of all of these elements are, that all that has |

21

10:16:28 1 happened here is they have taken deeplinking technology, and
10:16:31 2 they have put it in the middle of, on one hand, serving a
10:16:36 3 web page that has some code on it that causes some user data
10:16:43 4 to be sent back.  And, on the other hand, receiving a text
10:16:45 5 and responding to the text by enrolling a user in a
10:16:49 6 promotion.
10:16:49 7       I really genuinely, in my heart, do not think
10:16:53 8 that it is oversimplifying the claims to say that they are
10:16:58 9 directed to causing a mobile device to send user data to a
10:17:03 10 server with any sort of generic code on it.  Use this
10:17:06 11 standard deeplinking protocol to pre-fill a text message and
10:17:11 12 receive a pre-filled text message and enroll the user in a
10:17:15 13 promotion.
10:17:16 14       Before the buzzer goes off for me, I appreciate
10:17:20 15 the concern that the granular comparison between the claims
10:17:23 16 and the description wasn't in the link.  I do want to
10:17:26 17 make -- I do want to linger for just a second, if the Court
10:17:29 18 will allow me, on the notion that if what is supposed to
10:17:35 19 provide sort of the how here and differentiate the claims
10:17:39 20 from an abstract idea, the claims of two of the three
10:17:42 21 patents don't say anything about multiple servers that could
10:17:46 22 affect server or client server.
10:17:49 23       And one of them doesn't say anything about an
10:17:51 24 integration tag at all.  And, in fact, says that the means
10:17:55 25 for displaying the promotion can go straight to the mobile

22

10:17:59 1 device from the only server in the claim.
10:18:02 2       And so, if that's what's supposed to make the
10:18:04 3 claims not abstract, then at least the '897 and the '074
10:18:09 4 patent don't.
10:18:10 5       THE COURT:  And there that's a question of
10:18:11 6 waiver, though.  And you can, you know, when you get up for
10:18:13 7 rebuttal, if you can point me to somewhere in your briefing,
10:18:17 8 including in the reply brief, where you made that case.  No,
10:18:22 9 it's not enough to just treat these three independent claims
10:18:24 10 the same for purposes of 101.  You actually have to look at
10:18:28 11 them individually, because even if they're right about that
10:18:30 12 the one claim or one patent is directed to "X," Look, it
10:18:33 13 doesn't have "Y."
10:18:35 14       I'm not sure you did make that case, but if you
10:18:39 15 didn't, it would be waived.  If you did, though, I want to
10:18:41 16 know.  So, feel free to let me know when you get up for
10:18:43 17 rebuttal.
10:18:43 18       We'll stop you there.  I have some questions,
10:18:45 19 but maybe I can ask them to Mr. Martinelli and give you a
10:18:48 20 chance in rebuttal to add to them as well.
10:18:50 21       Okay?
10:18:51 22       MR. NOVIKOV:  Thank you, Your Honor.
10:18:52 23       MR. MARTINELLI:  Good morning, Your Honor.
10:18:54 24 Richard Martinelli for Emotive.
10:19:00 25       THE COURT:  Good morning.

23

10:19:00 1       MR. MARTINELLI:  So, I want to go back to where
10:19:02 2 you started with the background of the patent and really
10:19:06 3 grappling with:  How do you distinguish between, I think,
10:19:09 4 using a computer as a tool, so using known processes in a
10:19:13 5 computer to just implement an abstract idea, or a business
10:19:18 6 plan or something that humans would normally do from
10:19:21 7 something that's inventive and actually like integrates new
10:19:24 8 technology?
10:19:24 9       And I think in this case, it's pretty easy
10:19:27 10 because you can analogize things to real-world situations.
10:19:31 11 So, this is a way to get people to be engaged with
10:19:35 12 promotions and to respond more efficiently, and more fluidly
10:19:41 13 and with less friction.
10:19:43 14       That's a business problem.  That's a human
10:19:45 15 problem.  That existed before the Internet.
10:19:48 16       And we talk about in our briefs the fact that
10:19:50 17 there were things like postage-paid cards.  So, let's think
10:19:56 18 about that scenario and how it compares to what we're
10:20:00 19 talking about here with the same problem on the Internet.
10:20:04 20       Now, if you recognized, well, you know, it's
10:20:08 21 kind of a hassle for somebody to go and realize, I want to
10:20:11 22 get a subscription to Time, and fill out my address on the
10:20:15 23 subscription to Time or to renew my subscription to Time and
10:20:20 24 go out and get a stamp and do all of those things.
10:20:22 25       You say, Hey, postage-paid cards exist.

24

10:20:28 1 Printing technology exists.  Printed technology exists where
10:20:32 2 you can customize that printing so it says, you know, Judge
10:20:37 3 Burke, we've got an offer for you.  That's things that have
10:20:39 4 happened for a while.
10:20:40 5       If you said, Oh, well, nobody's ever sent you,
10:20:44 6 know, a customized message to Judge Burke with a postage
10:20:48 7 stamp on it using all this existing printing technology,
10:20:53 8 that's still just an abstract idea.  That's still just a
10:20:55 9 business method.  That's something that isn't creating new
10:20:59 10 technology.
10:21:00 11       That's what we have here, right, the ability to
10:21:05 12 have an integration tag which is, just as counsel said, some
10:21:09 13 code that sends information back.  The patent talks about
10:21:12 14 cookies.  Cookies are old.  Cookies get information about a
10:21:15 15 user and send it back to a server so that the server knows
10:21:16 16 about the user.
10:21:19 17       THE COURT:  Was it known to utilize integration
10:21:22 18 tags or their equivalent embedded in web pages such that
10:21:26 19 when one accesses the page, it would automatically send that
10:21:29 20 data back to a server?
10:21:30 21       MR. MARTINELLI:  That's what a cookie does.  So,
10:21:32 22 the cookies are ways to embed information about a user in
10:21:34 23 their browser.  And so, when you go to a new web page, the
10:21:38 24 page can say, Let me look at this user's cookies and send
10:21:42 25 that information back so, oh, I know, because Judge Burke

25

10:21:46 1  went to Amazon, and Amazon put a cookie, I can read Amazon's
10:21:52 2  cookie and see that, you know, he likes -- I don't know.  I
10:21:54 3  don't want to guess what you like -- fishing.  So, that was
10:21:58 4  known.
10:21:58 5        Then, the other part that's known is the
10:22:00 6  customization of the deeplink, right.  So, deeplinks were
10:22:05 7  customizable.  They didn't invent a way to put specific text
10:22:09 8  into the message that's created on the SMS.  That was part
10:22:13 9  of the standard.  They don't purport to invent advantages or
10:22:17 10 new forms of deeplinks.  They take existing deeplinks.
10:22:20 11       So, what you have is just like my real-world
10:22:23 12 analogy where you say, Okay, well, we can print things that
10:22:25 13 are individualized and postage stamps exist.  Let's just
10:22:29 14 send somebody a printed postcard with their information on
10:22:32 15 it.
10:22:33 16       So, I think when you look at it that way and you
10:22:35 17 compare those two situations, you can see there's no
10:22:39 18 technological innovation that's happening.  You're using
10:22:43 19 existing tools to do a business process.
10:22:45 20       THE COURT:  And let me just stop you there.  I
10:22:47 21 think what you said so far is, Look, is the concept of
10:22:49 22 embedding an integration tag on a website such as that when
10:22:53 23 one accesses it, user-related data is sent back to a server,
10:22:57 24 was that known and used and done at the time?  Yes, it's the
10:23:00 25 concept essentially of using cookies on a web.  On a web,

26

10:23:03 1  that was well known.
10:23:04 2        Is the concept of not only just utilizing a URI
10:23:07 3  with a deeplink where you go from one app to another, but
10:23:09 4  having that to create a custom text message, was that known?
10:23:12 5  Sure it was.
10:23:13 6        Hearing you say that, you know, Mr. Martinelli,
10:23:17 7  he sounds very thoughtful.  I wouldn't be and couldn't be
10:23:20 8  citing to Mr. Martinelli's argument, right.  I would need to
10:23:24 9  make sure I have in the record is clear enough.
10:23:26 10       I mean, essentially what's happening at this
10:23:28 11 stage is you are relying on the clear kind of, you know,
10:23:33 12 no-doubt-about-it presence of an affirmative defense that
10:23:35 13 wipes out, you know, the patent affirmative defense.  The
10:23:40 14 patent never even really needed to talk about the Complaint.
10:23:42 15 So, it's like I need the record to show me.
10:23:44 16       Is there record evidence that each of those two
10:23:46 17 separate pieces we just talked about were well known in that
10:23:49 18 way?
10:23:49 19       MR. MARTINELLI:  Yeah, and I think counsel cited
10:23:51 20 it in his slides.  It's just citing to the patent where, you
10:23:55 21 know, it -- when you asked the question about what's the
10:23:59 22 part that people get wrong in doing 101 analysis?  I think
10:24:03 23 it's often like rigidly tying to the, I must only look at
10:24:07 24 step one during step one.  And I must only look at step two
10:24:10 25 during step two, because I think it's more complex than

27

10:24:13 1  that.
10:24:13 2        When you go to say, Okay, where's the beef?
10:24:15 3  Where's the technology?  What did they invent?  You go back
10:24:18 4  to the specification.  And when they say, Oh, did you invent
10:24:21 5  a way to send information back to a user or from a user?
10:24:28 6  They say, No, we just used cookies.
10:24:28 7        Did you invent a way to create a customized
10:24:31 8  link?  No, just used existing deeplinks.
10:24:33 9        So, that's where the:  Is there something more
10:24:35 10 and really focus on what technology was invented that comes
10:24:39 11 in and really emphasizes the fact that there is no
10:24:44 12 technological solution.
10:24:46 13       It's also the thing that addresses *DDR*, where in
10:24:48 14 *DDR* at least, there was the new form of web page that merges
10:24:53 15 two different web pages together.  That's a new form of web
10:24:57 16 page technology.
10:24:59 17       Here, there's no allegation that there's any new
10:25:03 18 technology.  It's just using these tools that exist in a way
10:25:08 19 that accomplishes this abstract business core.
10:25:11 20       THE COURT:  You say that there's no allegation,
10:25:13 21 but, again, this may depend on whose burden is it, and why.
10:25:18 22 But you know, if I'm unclear, if I'm unsure, if the record
10:25:25 23 doesn't clearly say "X," you know, do I hold that against
10:25:27 24 the patentee?
10:25:28 25       MR. MARTINELLI:  Yeah.  And when I say

28

10:25:29 1  "allegation," I mean reading the words of the patent.  When
10:25:32 2  you look in the patent, the patent doesn't even purport to
10:25:35 3  say that they're inventing new technology in these places.
10:25:38 4        That's what we cited to, and we presented that
10:25:42 5  case.  They didn't respond with any evidence to contradict
10:25:46 6  it and say, Oh, no.  In fact, here's the place where we
10:25:49 7  invent new technology.
10:25:50 8        And I think there's a little bit of an issue of
10:25:53 9  proving a negative, right.  We read the patent.  The patent
10:25:57 10 says all of this is conventional.  We put it in our briefs
10:25:59 11 that all of this is conventional.  And what more can we do?
10:26:05 12 They didn't point to anything and say, No, this is the heart
10:26:07 13 of it.
10:26:07 14       And I do want to get to one additional issue
10:26:10 15 that's unique to my motion and my effort to rely on *Bot M8*
10:26:16 16 to show that there's a fundamental inconsistency in the way
10:26:20 17 that they're pleading the case against Emotive.  And what
10:26:24 18 they say their patents actually taught in the claims.  And
10:26:24 19 that gets right to the heart of what I've highlighted here.
10:26:31 20       We didn't have the benefit of this
10:26:33 21 lawyer-created formulation of what the patent is about when
10:26:37 22 we did our brief.  This came in in response to Postscript's
10:26:42 23 brief.
10:26:42 24       And here, and also in Attentive's briefing at
10:26:47 25 Page 3, they basically say, What we have is a system where

**29**

10:26:52  1  the integration tag goes on to a web page.  The web page
10:26:56  2  goes on to on a browser to a specific user.  That user data
10:27:00  3  comes back to the click-to-text server.  And then that user
10:27:04  4  data and that information that comes back is used to
10:27:07  5  generate a custom deeplink.
10:27:09  6          Now, there's no dispute about how Emotive's
10:27:13  7  service operates.  We don't create a deeplink in this
10:27:17  8  dynamic fashion.  Our customers create a deeplink with
10:27:22  9  whatever sort of message they want to put in the message
10:27:25 10  field in advance of ever serving anything to any customer.
10:27:28 11          So, we get a deeplink.  The customer decides
10:27:33 12  what the subscribe word should be.  They put the subscribe
10:27:36 13  word in.  And that's a static link that goes out to all the
10:27:39 14  customer -- all the users that the customer wants to serve
10:27:41 15  it to.
10:27:42 16          They show that in the Complaint.  We've shown
10:27:45 17  how that's all they plead about, what's in the Complaint.
10:27:48 18  But the claims require this customization that they're now
10:27:52 19  relying on to show how they have a complicated system that's
10:27:55 20  inventive.  And what they've pled is that Emotive doesn't
10:27:59 21  have that.  And in the MB case, when you have a pleading
10:28:03 22  that's directly contradicted by what you say your claim is,
10:28:07 23  when there's a contradiction between what you say you're
10:28:10 24  accusing and what your claim requires, dismissal is
10:28:12 25  appropriate, and that's why we asked for that.

**30**

10:28:15  1          THE COURT:  And, again, because what it sounds
10:28:18  2  like here, part of what you were saying, it sounds like a
10:28:21  3  non-infringement argument.  But --
10:28:23  4          MR. MARTINELLI:  It's a pleading argument
10:28:26  5  because they pled that the way the -- in the Complaint, the
10:28:32  6  way Emotive system operates -- is that the business that
10:28:36  7  wants to create the deeplink using our service creates that
10:28:40  8  ahead of time and chooses a subscribe word.  That's in the
10:28:45  9  Complaint.  If you look at our briefing, we point where that
10:28:47 10  is.
10:28:47 11          There's nothing in the Emotive system, and they
10:28:50 12  don't plead anything that shows that the customization that
10:28:54 13  they show here that they're now relying on as being their
10:28:57 14  invention is performed by Emotive.  In fact, the pleading
10:29:01 15  shows that Emotive works a different way.  It doesn't do
10:29:03 16  this real-time customization.  It has preset links.
10:29:07 17          THE COURT:  Okay.  And maybe on rebuttal, you
10:29:11 18  could point me in your briefing where you made these points,
10:29:14 19  and so I can make sure I take it into account.  I guess
10:29:18 20  one -- and you've used almost all of the rebuttal time, but
10:29:21 21  I know, in fairness, we have two Defendants here.  We want
10:29:23 22  to make sure that they're able to make independent points
10:29:27 23  about their cases.  So, I'll give the Defendants' side and
10:29:29 24  the Plaintiff's side a few extra minutes.
10:29:32 25          The one last question I need to ask you is:  You

**31**

10:29:34  1  know, I think the asserted abstract ideas that the claims
10:29:40  2  are directed to, in Defendants' view, you have slightly
10:29:43  3  different ideas.  But I'll just use Postscript's for now,
10:29:46  4  but they're similar.  You know, something like you've said,
10:29:52  5  streamlining the process for a customer to enroll in a
10:29:55  6  marketing promotion providing a pre-filled and pre-addressed
10:29:59  7  request.
10:30:01  8          Postscript's here is the same.  That's what they
10:30:03  9  address.  That's what these claims focus on.  That's what
10:30:05 10  this patent is all about.  It's simply about the broad
10:30:08 11  concept of streamlining the process for a customer to enroll
10:30:10 12  in a marketing promotion by providing a pre-filled and
10:30:14 13  pre-addressed request.
10:30:15 14          And if you look at everything about the patent,
10:30:16 15  the patent's title, its abstract, its background, it's
10:30:20 16  saying, We're about something more narrow than that.  Right.
10:30:24 17  We're about the use of these custom-generated deep links to
10:30:28 18  do that.
10:30:29 19          And I guess the thing that I have trouble
10:30:32 20  reconciling is, you know, if a patent's title was popcorn
10:30:38 21  and it's -- you know, its abstract says, We're about
10:30:42 22  popcorn.  And the claim says, Popcorn, popcorn, popcorn.
10:30:45 23          And then the Defendant said, This is a patent
10:30:47 24  about food.  It would just seem off.  Like, how can the
10:30:51 25  focus of the thing not include reference to the thing that

**32**

10:30:56  1  the patentee keeps saying the patent is all about?
10:30:59  2          Is there anything you can say in response as to
10:31:01  3  why it is fair to say the patent is mostly directed to the
10:31:04  4  kind of more abstract idea that you're talking about?
10:31:08  5          MR. MARTINELLI:  I think the way to get at that
10:31:10  6  is if you take an abstract idea, like we articulated it in
10:31:14  7  the briefs, you can't get a patent for just applying it to
10:31:17  8  every new piece of technology that comes along.  And here,
10:31:21  9  that's what they did.
10:31:22 10          So, what you're pointing to where they're
10:31:24 11  saying, No, it's a custom message in this context of an SMS,
10:31:28 12  well, that's just applying that abstract idea of creating a
10:31:31 13  custom message just like a postcard and applying it to using
10:31:35 14  an SMS on a computer.
10:31:37 15          If ten years from now everybody's using AR/VR
10:31:41 16  and somebody says, Oh, I want to create a custom message
10:31:44 17  that uses the AR/VR environment to do it and just takes that
10:31:48 18  same idea and says, Oh, here's how in the AR/VR environment,
10:31:52 19  you create a custom message.  That would have the same
10:31:54 20  problem.
10:31:55 21          So, I think fundamentally when you look at it,
10:31:57 22  the concept over and over again streamlining and making
10:32:01 23  things go smoothly.  The only technology that actually makes
10:32:04 24  things go smoothly in here is the deeplinks, which they
10:32:07 25  admit they didn't invent, right.  Like that's really where

33

10:32:09 1 the technology gives you the smooth interaction because it
10:32:13 2 gives you a link that you click. It opens up your SMS tool
10:32:18 3 and then you hit send.
10:32:19 4       That's what a deeplink does. That's the heart
10:32:23 5 of the smoothness that they want to do. And I think
10:32:26 6 applying that to just the world of a mobile phone where you
10:32:30 7 have an SMS isn't anymore of an eligible concept than if you
10:32:34 8 applied it to postcards, or if you applied to the telegraph
10:32:37 9 or if you applied it to any other technology that happens to
10:32:40 10 come along.
10:32:41 11       THE COURT: Okay. All right.
10:32:42 12       Thank you, Mr. Martinelli. We'll leave it
10:32:44 13 there. I'll give the Defendants' side an additional five
10:32:48 14 minutes, the Plaintiff's side as well.
10:32:50 15       Let me hear from Plaintiff's counsel.
10:32:56 16       MR. WEINBERG: Good morning, Your Honor.
10:32:57 17 Jonathan Weinberg for Plaintiff, Attentive Mobile. It's a
10:33:03 18 little bit tough to respond to all of that. There's a lot
10:33:05 19 going on there. There's a lot of trial mixing between the
10:33:10 20 101 doctrines.
10:33:12 21       But I think that, ultimately, what the argument
10:33:14 22 here is that each one of these components was a known web
10:33:19 23 technology, and, therefore, it would have been obvious to
10:33:23 24 arrange them together in this combination to make a new
10:33:28 25 sign-up system. And that's, obviously, an obviousness

34

10:33:32 1 analysis. It's not a 101 analysis.
10:33:34 2       101 analysis asks something different. It says:
10:33:37 3 Is this a result? Are you trying to patent the idea of
10:33:41 4 mobile sign-up where it does not matter what process or
10:33:46 5 machinery that result is accomplished? And I'd like the --
10:33:50 6       THE COURT: Streamlining mobile sign-up,
10:33:53 7 streamlining email, that's what the Defendants are saying
10:33:55 8 essentially is this is all about. It's directed to, you
10:33:58 9 know, streamlining a process where a customer can enroll in
10:34:01 10 a marketing promotion.
10:34:03 11       MR. WEINBERG: Well, I think that's true.
10:34:04 12 That's the way they phrase it.
10:34:06 13       THE COURT: That's how they're framing it.
10:34:07 14       MR. WEINBERG: The same way. But that's a goal,
10:34:09 15 right. You want to build a better mousetrap. The goal is
10:34:11 16 not -- it's not directed to the idea of improving
10:34:15 17 mousetraps. It's new implementation of a mousetrap.
10:34:18 18       So, this is a new improved mobile sign-up
10:34:20 19 system. And I think that where Mr. Novikov starts is
10:34:24 20 exactly the place to start. What did the inventors say the
10:34:27 21 problem was? What was the prior art and how did they
10:34:30 22 improve upon it?
10:34:31 23       The phrasing that I like from the Federal
10:34:34 24 Circuit is how a solution specifically improves the function
10:34:36 25 of the prior art systems. And, here, the pleadings have a

35

10:34:40 1 very clear invention narrative, right. They discuss at
10:34:46 2 least two prior art systems for getting mobile sign-ups.
10:34:49 3 That is a website approach and vendor application approach.
10:34:55 4       If you look at the specification, the Complaint
10:34:56 5 and the articles attached to the Complaint, at least in the
10:34:59 6 Postscript Complaint, those do lay that out. So, it's worth
10:35:04 7 just taking a moment to say what those prior art systems
10:35:06 8 were and how this is different.
10:35:09 9       The traditional system is a website. So, you're
10:35:11 10 browsing, you click on a link that redirects you to another
10:35:17 11 website where you have to enter in the information, your
10:35:19 12 phone number. Because of the laws involved here, it has to
10:35:23 13 be a verification. So, the system would send you a text
10:35:27 14 message saying, Please reply yes in order to subscribe. You
10:35:32 15 reply yes, and then you would be subscribed.
10:35:35 16       And so, we counted that. That's 13 taps, and
10:35:38 17 that's a problem. The Complaint talks about that in
10:35:43 18 Paragraph 37 about how it requires the user to enter a phone
10:35:45 19 number. It messages.
10:35:46 20       The other approach is you download an
10:35:49 21 application, and you enter in a user name, a password. You
10:35:53 22 sign up and it's able to then send you messages. This is
10:35:57 23 discussed in the articles that were attached to the
10:36:01 24 Complaint at Footnotes 4, 5 and 6, this vendor application
10:36:05 25 approach.

36

10:36:05 1       Now, both of these had problems. All right.
10:36:07 2 The problems are also laid out in the pleadings, again, in
10:36:10 3 the specification, the Complaint and the articles. For
10:36:13 4 example, the introduction, which we talked about, said it
10:36:16 5 was burdensome to type out all these numbers for your phone
10:36:19 6 number. The Complaint, Paragraph 37, says you also had
10:36:23 7 typos in those phone numbers. This was a problem.
10:36:25 8       And so, there was --
10:36:27 9       THE COURT: Just to stop you there, and I guess
10:36:30 10 he talked about this, Mr. Novikov, a little bit. There's
10:36:33 11 one way to look at what like Column 1 is saying, that what
10:36:39 12 it is emphasizing in terms of what is different or what the
10:36:44 13 patent does is simply about saving time and saving typing or
10:36:54 14 taps.
10:36:56 15       There may be another way to look at it that,
10:36:58 16 yeah, it's about that, but it's also about a fundamentally
10:37:04 17 different way that computers are working to get you to a
10:37:08 18 place in which you might be saving time. The Defendant is
10:37:15 19 emphasizing, I think, the former. Let's save time. Let's
10:37:17 20 do it faster. Right. I think you're emphasizing the
10:37:22 21 latter.
10:37:22 22       Is it an improvement in computer functionality?
10:37:26 23 If it is the latter, exactly how is it the latter?
10:37:30 24       MR. WEINBERG: Well, so I'd just like to make a
10:37:33 25 distinction there between the two inquiries. The

37

10:37:36 1   specificity is this specific combination and a separate
10:37:38 2   inquiry recognized by the Federal Circuit as:  Is this a
10:37:43 3   specific improvement to technology?  Is this a new
10:37:45 4   technology?
10:37:46 5          So, those are separate.  And we've been talking
10:37:48 6   about the specificity inquiry.
10:37:50 7          If we switch over to the technical invention
10:37:53 8   inquiry, as you already noted, and *BASCOM* is probably most
10:37:58 9   familiar to you, that arranging known components in a new
10:38:02 10  combination that achieves an improvement is an inventive
10:38:06 11  concept.  Because, as the Supreme Court recognized in *KSR*,
10:38:10 12  all inventions ultimately are some combinations of known
10:38:13 13  components.  And there's no requirement that in order to be
10:38:16 14  eligible, one of these components has to be a new kind of
10:38:20 15  deeplink, or a new kind of text messaging application, a new
10:38:23 16  kind of server.
10:38:25 17         Software applications are patent eligible.  We
10:38:29 18  see that throughout the case law.  Even *DDR* was the first
10:38:33 19  post-Alice case to discuss the technical requirement,
10:38:37 20  introduce the technical requirement into the jurisprudence.
10:38:41 21         And what was that?  It was a web application,
10:38:43 22  right.  It wasn't a new kind of computer, a new kind of
10:38:45 23  chip.
10:38:46 24         The next case to talk about it was *Enfish*.  That
10:38:49 25  was a new database application.  It wasn't a new operating

38

10:38:52 1   system or a new processor.  And it goes on and on and on,
10:38:56 2   and it makes sense.
10:38:57 3          Just as an aside, too, maybe this is something
10:39:00 4   we can discuss later, I think the technical invention
10:39:03 5   inquiry was not only difficult to apply, but also seems a
10:39:06 6   bit contrary to Supreme Court case law.
10:39:09 7          *Bilski*, for example, an improvement to business
10:39:12 8   method not involving computers at all.  Is it eligible?  So,
10:39:15 9   it's not exactly clear what this inquiry is even about, but
10:39:18 10  I'll save my quantification for another time.
10:39:22 11         THE COURT:  I guess maybe what I'm trying to get
10:39:25 12  at is, you know, in different ways, I think the law is
10:39:28 13  asking us, and maybe this is more often a step two, but it's
10:39:37 14  asking us to try to understand what is the difference
10:39:43 15  between the assertedly inventive claim from the way
10:39:47 16  computers were used before?
10:39:50 17         And maybe the reason why it's asking us that
10:39:52 18  question is we know that just saying, Do it on a computer,
10:39:57 19  it would be faster on a computer, isn't enough for the
10:40:00 20  Supreme Court.  And so, if you can demonstrate that the
10:40:05 21  utilization of computer software was unconventional, maybe
10:40:13 22  that's a way of demonstrating it's not just like pending, do
10:40:16 23  it on a computer, i.e., abstract idea, plus nothing that
10:40:23 24  matters.  It's about pending something significant vis-à-vis
10:40:26 25  the way that the computer is used.

39

10:40:29 1          I guess I'm wondering what you think it is that
10:40:31 2   was the significant functionality add that the claims
10:40:36 3   utilized vis-à-vis the way prior computer systems worked.
10:40:41 4   It seems like Column 1 is saying, Prior system you would
10:40:44 5   click on something and it would take you to a page in which
10:40:46 6   you had to type in a lot of info.
10:40:48 7          Here, we're utilizing a system where you click
10:40:51 8   on something, and a custom text message is generated
10:40:54 9   vis-à-vis certain technology.
10:40:56 10         The other side would say, Well, that's kind of
10:41:00 11  the same things.  I think you're saying, No, they're a
10:41:02 12  different thing.
10:41:05 13         How are they different?  In what way are they
10:41:07 14  meaningfully different?
10:41:08 15         MR. WEINBERG:  I guess I'm not sure why they
10:41:09 16  would be the same thing at all.  The do-it-on-the-computer
10:41:12 17  claim just says, I want to take an abstract concept, do it
10:41:16 18  faster by using a computer.
10:41:17 19         But now, these prior art systems also used
10:41:20 20  computers.  So, how could this be a do-it-on-a-computer
10:41:24 21  claim?  They're all using computers.  They're using them in
10:41:28 22  a different way.
10:41:28 23         That's exactly what the 101 inquiry is supposed
10:41:31 24  to be guarding against.  It's supposed to say, Look, you can
10:41:33 25  only patent one specific new way, a better mousetrap.

40

10:41:36 1          And so, if you could put up our favorite diagram
10:41:40 2   showing -- and just to be clear about what this diagram is,
10:41:43 3   this is not meant to be a place to show exactly every single
10:41:47 4   limitation of all three patents across all embodiments.
10:41:50 5   This is an exemplary embodiment according to the '887
10:41:54 6   patent.
10:41:54 7          And so, to the extent that there's some
10:41:57 8   variances, it's not the point of this technological exhibit.
10:42:02 9   What this is trying to show is that if all we wanted to
10:42:05 10  claim was sending a pre-filled request, then we would just
10:42:10 11  have Number 7, right.  At the bottom, that's a custom
10:42:13 12  message that is sending a pre-filled request from.
10:42:15 13         THE COURT:  You're saying, We're about a
10:42:17 14  particular way of getting there --
10:42:17 15         MR. WEINBERG:  Right.
10:42:19 16         THE COURT:  Of making that happen.
10:42:20 17         MR. WEINBERG:  Right, right.  Yeah.
10:42:21 18         And if you look at Mr. Novikov's slides, by the
10:42:23 19  time you get to Slide Number 2, I think they've already lost
10:42:26 20  that argument.  Because even if you just say, Just one of
10:42:30 21  the ways that you get there is by using a deeplink to a text
10:42:34 22  messaging application that creates a pre-filled message.
10:42:38 23         By itself, that is different than the prior art.
10:42:42 24  It can't be disputed at this junction in the proceedings
10:42:46 25  that that's unconventional.  We have that in the pleading

41

10:42:49  1   over and over.  It's unconventional.  It results in a
10:42:52  2   specific fact issue.
10:42:52  3          There's no argument that's generic.  We have
10:42:55  4   other ways, other prior art systems that don't use the deep
10:43:00  5   links to pre-fill the requests.  And, therefore, it's not a
10:43:04  6   generic way to make a subscription request.  And so, because
10:43:09  7   even just that one limitation standing on its own is
10:43:12  8   non-generic, non-conventional, I think we pass the
10:43:16  9   specificity of right test.
10:43:17  10         THE COURT:  Just looking at your slide here, I
10:43:19  11  don't think you're disputing that integration tags were
10:43:21  12  known at the time, or that websites were known at the time
10:43:24  13  or that the concept of transferring back user data from one
10:43:29  14  place to another was not known.
10:43:32  15         What I wonder, though, you know, Mr. Martinelli
10:43:34  16  says, embedding integration tags into a web page such that
10:43:38  17  when a user accesses the web page, user data is then sent
10:43:41  18  back to the server, he says that was known.  That's like
10:43:44  19  using cookies in a website, and the record is clear that
10:43:46  20  that was all known.
10:43:47  21         Do you agree?
10:43:48  22         MR. WEINBERG:  I don't know.  That's a fact
10:43:51  23  issue about whether or not that was conventional.  But
10:43:54  24  the --
10:43:55  25         THE COURT:  You think there's at least a fact

42

10:43:58  1   issue.  It's not clear that it is.  You think it's a
10:44:00  2   disputed question.
10:44:02  3          MR. WEINBERG:  Well, standing here, I don't
10:44:03  4   know.  I can't say that, but I will say that our briefing
10:44:05  5   did not rely on the non-conventionality of any one piece in
10:44:09  6   isolation.
10:44:10  7          THE COURT:  Right, but I'm adding pieces
10:44:12  8   together.  I'm adding pieces one, two and three together,
10:44:15  9   right.
10:44:15  10         So, I'm saying:  Were integration tags known?
10:44:18  11  Yes.  I don't think you're disagreeing.
10:44:20  12         Now, I'm kind of adding together the taking of
10:44:23  13  the integration tags, embedding it into a web page and then
10:44:26  14  having user data that relates to that integration tag be
10:44:30  15  sent back to a server when someone accesses the web page.
10:44:32  16  So, I'm putting together steps one through three, and I'm
10:44:35  17  asking:  Was the combination of those steps known?  I think
10:44:37  18  you're saying, I don't know.  Maybe not.  It's not clear in
10:44:40  19  the record that it was.
10:44:41  20         MR. WEINBERG:  It's not clear -- perhaps it was,
10:44:43  21  perhaps it wasn't.  But the idea of doing that, so why do
10:44:46  22  you have that step here, for example?  If your browser is an
10:44:52  23  IOS browser versus an Android browser, you're going to have
10:44:54  24  to have a different kind of custom deeplink.  So, some of
10:44:58  25  the information that gets passed along might be:  What kind

43

10:45:01  1   of phone do you have?  Right.
10:45:04  2          So, this is some data that comes back across in
10:45:06  3   order to create that custom URI.
10:45:07  4          THE COURT:  Is the point of sending user data
10:45:10  5   back to the server because we may use that user data in that
10:45:13  6   custom-generated text message?  Is that part of the point of
10:45:16  7   it?
10:45:17  8          MR. WEINBERG:  I believe so, yes.
10:45:18  9          THE COURT:  And we're not required to use that
10:45:21  10  user data, right, because we could also use information
10:45:26  11  about the particular web page, at least per Claim 1 of the
10:45:26  12  '887; right?
10:45:28  13         But wouldn't you when you generate the custom
10:45:29  14  text message?
10:45:30  15         MR. WEINBERG:  I don't want to get into claim
10:45:33  16  construction, but the phrase user data is defined in the
10:45:35  17  specification to include perhaps specifically referring to
10:45:38  18  the web page and things like that.  That will get deep into
10:45:41  19  claim construction.  But, yeah, part of it --
10:45:43  20         THE COURT:  Well, I'm just talking about like if
10:45:45  21  we're using Claim 1 of the '887 as a representative claim, I
10:45:48  22  think, isn't the claims requirement that the message body
10:45:56  23  includes an identifier associated with at least one of the
10:46:00  24  web page or the user data; right?
10:46:01  25         MR. WEINBERG:  Yeah.

44

10:46:03  1          THE COURT:  You don't have to use the user data
10:46:05  2   in a custom text message.  We could use data relating to the
10:46:09  3   website that the user -- actually, it seems like the claims
10:46:12  4   differentiate between those two things; is that right?
10:46:14  5          MR. WEINBERG:  Potentially, yes.  As I said,
10:46:16  6   this is an embodiment.  You couldn't capture both of those
10:46:19  7   necessarily.
10:46:20  8          THE COURT:  Sure.
10:46:20  9          MR. WEINBERG:  But this is something that once
10:46:22  10  we get past the pleadings -- so, we -- the parties can
10:46:25  11  discuss the claim construction and discuss, as the Court
10:46:28  12  becomes more familiar with this technology, what the claims
10:46:30  13  require and so forth.
10:46:32  14         But the emphasis that we made is that, Look,
10:46:35  15  this entire combination was not known.  This is a better
10:46:41  16  mousetrap.  Yes, the component pieces, software existed,
10:46:45  17  computers existed, servers existed, but that can't be the
10:46:48  18  test for patent eligible improvements.
10:46:51  19         THE COURT:  I think the thing I'm trying to get
10:46:53  20  at with my questions is I definitely understand your point
10:46:56  21  that, like, for example, at step two, this is an ordered
10:46:59  22  combination case.  It's not enough simply to look at the
10:47:02  23  case and say, Well, this particular element of the claim was
10:47:04  24  known.  This particular element of the claim was known.
10:47:07  25         It's the putting together of all of them by way

45

10:47:09 1  of a computer software package that does one, then the next,
10:47:13 2  then the next, then the next.  That was new and different.
10:47:16 3        I think that's a part of your argument.  Am I
10:47:19 4  wrong?
10:47:19 5        MR. WEINBERG:  That's correct, but it's not
10:47:20 6  limited to step two.
10:47:21 7        THE COURT:  No, okay.  But for all significant
10:47:25 8  purposes, but now what I'm trying to explore is exactly
10:47:28 9  which of the combination of elements are you saying was
10:47:30 10 unconventional?
10:47:33 11       Like, for example, you could be saying, Look, I
10:47:36 12 give it to you.  Step one up there on the screen, that was
10:47:39 13 conventional.  Step two is conventional.  Step three
10:47:42 14 conventional.  And even putting together steps one, two and
10:47:46 15 three was conventional.  And then step four was
10:47:48 16 conventional, and steps five, six and seven.  And even
10:47:51 17 putting five, six and seven together was conventional.
10:47:51 18       But you know what wasn't conventional?  Putting
10:47:56 19 together one, two, three, four, five, six and seven all
10:47:56 20 together.  You could be saying that.
10:47:57 21       Or you could be saying, No no, no.  Look, yes,
10:47:59 22 putting together all those steps, that was unconventional.
10:48:02 23 But independently, it was unconventional to do one, two and
10:48:05 24 three together.  It was unconventional to do four, five, six
10:48:07 25 and seven together.  And it was surely unconventional to put

46

10:48:10 1  them all together.
10:48:11 2        You could be making different arguments about
10:48:13 3  exactly which combinations are unconventional use of
10:48:18 4  computer technology to solve a computerized problem.  I'm
10:48:20 5  just trying to figure out which one you're saying or which
10:48:23 6  argument you're making.
10:48:23 7        Do you know what I mean?
10:48:25 8        MR. WEINBERG:  Yeah, I understand.  I think the
10:48:26 9  problem, the reason I keep coming back to the full
10:48:28 10 combination is simply because that's the easiest thing for
10:48:31 11 me to prove, and it will be sufficient to get past this
10:48:33 12 motion.  So, that's why I seem to be hedging a little bit on
10:48:39 13 saying that specific pieces of it might be unconventional.
10:48:42 14       THE COURT:  Okay.
10:48:42 15       MR. WEINBERG:  Certainly, I would point to the
10:48:44 16 end there, as Mr. Novikov's slide identified it, using a
10:48:48 17 deeplink to create a custom text message whereby the user
10:48:53 18 can subscribe with one click was unconventional.  That's key
10:49:00 19 to all of the claims across the patents.  They all have that
10:49:04 20 limitation.  And that by itself was not a conventional use
10:49:09 21 of deeplinking technology.  Deeplinks existed, just they
10:49:13 22 were not used this way to create sign-ups.
10:49:15 23       THE COURT:  What way weren't they used?
10:49:16 24       MR. WEINBERG:  Deeplinks were used, meaning the
10:49:19 25 concept of transitioning from one application to another --

47

10:49:21 1        MR. WEINBERG:  Yeah.
10:49:22 2        THE COURT:  -- even on a mobile messaging
10:49:23 3  application, that was known and used, but what wasn't used
10:49:26 4  was?  How would you frame it?
10:49:28 5        MR. WEINBERG:  Let me step back one second.
10:49:32 6        THE COURT:  Sure.
10:49:33 7        MR. WEINBERG:  A deeplink, typically you would
10:49:34 8  have seen it -- you go to a web page, for example, your
10:49:37 9  banking site's web page.  And it says, you know, it would be
10:49:40 10 better if you used the application.
10:49:41 11       So, you have a little link at the top.  You
10:49:43 12 click on it and it opens up your application, the mobile
10:49:46 13 app.  That's a deeplink.  So, that's a general technology
10:49:49 14 like the Internet or --
10:49:53 15       THE COURT:  Right.
10:49:54 16       MR. WEINBERG:  The idea of having a deeplink
10:49:56 17 that was given to you by this tech server that will open up
10:50:01 18 a text messaging application, pre-address it and pre-fill in
10:50:05 19 the information needed to subscribe to something, and then
10:50:11 20 you were to subscribe by sending it, that use of deeplinking
10:50:16 21 technology was not conventional.
10:50:18 22       THE COURT:  It seems like there you're talking
10:50:20 23 about three things together:  Deeplinking technology, to
10:50:22 24 generate a text message and that the text message had custom
10:50:26 25 data in it, data that's particularly associated with your

48

10:50:31 1  user or perhaps the website that the user was looking for.
10:50:33 2        It's those three pieces that together were not
10:50:36 3  known and being done?
10:50:36 4        MR. WEINBERG:  Can I clarify that third piece
10:50:39 5  just a little bit?  I would say that the text message is
10:50:43 6  sendable to subscribe to a service.
10:50:45 7        THE COURT:  Okay.  So, the use of deeplinking to
10:50:48 8  get to a tech message that was sendable to subscribe a
10:50:53 9  service, that was unconventional?
10:50:54 10       MR. WEINBERG:  Right.  That was unconventional
10:50:56 11 and it's not generic.  So, I want to make sure that when I
10:51:01 12 use the terms generic and conventional, I'm maybe using them
10:51:04 13 in a slightly different way than my colleagues here are.
10:51:07 14       When I say generic, I mean inherent, common to
10:51:10 15 the genus, right.  Every solution has this limitation
10:51:15 16 because it's generic.
10:51:15 17       THE COURT:  Every computer can collect data.
10:51:17 18 Every computer can process data.  Every computer can send
10:51:20 19 data.
10:51:20 20       MR. WEINBERG:  Right.
10:51:21 21       THE COURT:  That would be the kind of generic
10:51:22 22 use of the user technology that the Federal Circuit says,
10:51:26 23 I'm not going to add.
10:51:26 24       MR. WEINBERG:  The *Customedia* that they cited in
10:51:31 25 their last brief, in order to get information down from one

**49**

```
10:51:32  1   computer to another computer, you'll need two computers, a
10:51:34  2   sending computer, and a receiving computer.  So, and those
10:51:38  3   are generic limitations.
10:51:39  4         THE COURT:  So, I did want to, since you
10:51:40  5   mentioned it, one of my questions was about Customedia.
10:51:43  6   What is the cleanest, easiest to understand way to
10:51:47  7   distinguish the decision there from what's going on here?
10:51:50  8         MR. WEINBERG:  Customedia was a very easy
10:51:53  9   decision, I think, because the claims there were directed to
10:51:58 10   sending advertisements to a user, right.  I think the
10:52:02 11   Federal Circuit said directed to the idea of using a
10:52:08 12   computer to deliver targeted advertisements to a user.
10:52:13 13         THE COURT:  Well, the Plaintiff there has
10:52:14 14   suggested that the claim's add of having a particular
10:52:18 15   section of the receiving, I think it was the server, devoted
10:52:22 16   to only advertising data was kind of the extra piece that
10:52:26 17   was relevant.  The Federal Circuit said, No, that wasn't
10:52:30 18   enough.
10:52:31 19         MR. WEINBERG:  Yeah, that was a step two.  They
10:52:33 20   didn't address it too much.  They touched on step two.
10:52:36 21         But at step one, the reason why this was an easy
10:52:38 22   decision is because the idea of the delivering
10:52:43 23   advertisements.  And what did they add?  They added a
10:52:45 24   sending computer and a receiving computer.
10:52:48 25         And so, those are generic limitations, but
```

**50**

```
10:52:50  1   they're both required in order to computerize the idea of
10:52:53  2   sending advertising data.  And there was nothing else.
10:52:56  3         And so, it's our position that when you're doing
10:52:59  4   this analysis, it's okay to weed out generic limitations
10:53:02  5   because generic limitations simply spell out the abstract
10:53:06  6   idea.  And that's all there was in Customedia.
10:53:08  7         There was a bit of additional dicta in
10:53:14  8   Customedia about user experience and stuff that was cited in
10:53:19  9   the letter brief.  And then there was the step two inventive
10:53:23 10   concepts raised by the patentee there which said, We store a
10:53:27 11   dedicated area.  And I don't think the Federal Circuit said
10:53:30 12   much about that other than it's not inventive.  They didn't
10:53:34 13   really explain why.  I think it's only one paragraph.
10:53:37 14         THE COURT:  Step two is definitely shorter than
10:53:39 15   Paragraph 1.  I thought maybe that concept of dedicated
10:53:42 16   storage was addressed in both steps.
10:53:45 17         But, I mean, is a difference that -- I mean, one
10:53:50 18   of the pieces that, you know, we look to -- the Federal
10:53:53 19   Circuit looks to is:  What does the patent say about whether
10:53:59 20   or not the addition, the limitation in question, really was
10:54:05 21   an unconventional, a step forward?  Is there a difference in
10:54:08 22   the patents that way?
10:54:08 23         MR. WEINBERG:  Yeah.  So, I'll get back to your
10:54:09 24   question then.
10:54:11 25         The conclusion, the analysis the District Court
```

**51**

```
10:54:16  1   provided for Customedia is that you only had generic
10:54:18  2   limitations.  You did the same analysis here.  Again, we're
10:54:21  3   asking:  Are these only generic limitations or are they
10:54:24  4   conventional limitations?
10:54:25  5         We conclude on the pleadings that these are
10:54:29  6   unconventional.  We conclude just by looking at them and on
10:54:32  7   the pleadings, because there are other alternative systems.
10:54:35  8   This is not generic.
10:54:37  9         And so, there's a distinction from how
10:54:40 10   Customedia was clearly just a generic limitation.
10:54:42 11         THE COURT:  You mentioned the pleadings.  You
10:54:44 12   know, and there are a number of paragraphs, I think, in the
10:54:46 13   pleadings where they attempt to address the issue of
10:54:49 14   unconventionality.
10:54:49 15         Now, I think you'd agree if you had ten
10:54:51 16   paragraphs in the Complaint, but every one of them said the
10:54:53 17   following:  The claims amount to the unconventional use of
10:54:56 18   computer technology to solve a problem in the computer
10:54:59 19   process, and then the next paragraph said the same thing,
10:55:02 20   and the next paragraph said the same thing, the other side
10:55:04 21   would say, and they'd be right, that those are conclusory
10:55:07 22   assertions.
10:55:08 23         You can't simply say "X" is unconventional.  You
10:55:11 24   would have to say something more like, invoke facts, like
10:55:15 25   "X", the use of "X", the computer will, obviously, do this
```

**52**

```
10:55:18  1   as unconventional, for example, or let me explain why.
10:55:21  2   Because, see, what computers were doing at the time was A, B
10:55:24  3   and C.  What they weren't doing, what it was difficult to do
10:55:27  4   was, you know, C, D, E and F.  And here's how the patent is
10:55:32  5   when the inventors did that.
10:55:33  6         If I'm looking in your Complaint, what's the
10:55:35  7   best place where you'd say, This isn't just a conclusory
10:55:38  8   statement about unconventionality, this is actual specific
10:55:41  9   factual allegations that make it plausible that this was the
10:55:45 10   unconventional use of computers?  What's the best place to
10:55:48 11   look to?
10:55:48 12         MR. WEINBERG:  So, absolutely.  I think that the
10:55:51 13   legal standard is plausible.  So, it's conclusory and it's
10:55:55 14   not plausible, then that might be an issue.  But we're
10:55:58 15   looking at:  We gave this conclusion.  Is it plausible?
10:56:01 16         I would just say that Paragraphs 36 and 37 of
10:56:04 17   the Complaint discuss shortcomings of the way the systems
10:56:08 18   were being done, systems were being implemented at the time.
10:56:12 19   And by saying that, at the time there was this website
10:56:19 20   methodology, there was a vendor application methodology, and
10:56:23 21   that caused typos.  I think the implication there is that by
10:56:27 22   providing a system where that was not the website
10:56:30 23   methodology, that did not involve causing typos to occur,
10:56:36 24   and that was less burdensome is unconventional.
10:56:39 25         I would also encourage the Court to also
```

53

10:56:44 1 consider the article that we referenced in the Complaint
10:56:47 2 for Postscript. There's four articles at Footnotes 4, 5 and
10:56:52 3 6. The article at Footnote 4 calls the system novel, and
10:56:58 4 that's verification on a fact issue from the pleadings.
10:57:03 5        And the article at Footnote 5 calls a key
10:57:09 6 differentiator.
10:57:10 7        Footnote 6 includes a line, this idea of this
10:57:13 8 streamlined process sounds simple, but took months for
10:57:17 9 engineers to develop. And so, that third-party verification
10:57:22 10 is part of the Complaint, part of the pleadings, and that
10:57:26 11 suggests that what we're saying here is absolutely true.
10:57:29 12        THE COURT: I think, you know, sometimes when
10:57:31 13 we're asked to look at allegations that something was novel
10:57:34 14 or a differentiator, you know, obviously, there's a
10:57:36 15 difference between novelty and eligibility that the lines
10:57:39 16 get blurred sometimes. But I think, at a minimum, one would
10:57:43 17 have to make it clear enough that the reference to novelty
10:57:48 18 by an accomplisher is really a reference to the different or
10:57:53 19 unconventional ways that computer software was being used to
10:57:56 20 solve a problem. That's why it's done.
10:57:59 21        So, novelty, as it gets to relevant
10:58:03 22 particularity or specificity in the 101 context, is
10:58:08 23 relevant. Novelty in terms of this is a new, abstract idea
10:58:11 24 isn't.
10:58:11 25        And I guess the question, like, I think your

54

10:58:14 1 cite in Paragraph 51 of the Complaint is: How do I know
10:58:15 2 what's being talked about there? You know, what kind of
10:58:18 3 novelty? In what way were they saying it's novel?
10:58:21 4        MR. WEINBERG: Well, the articles do describe
10:58:24 5 the entire two-tap system, and they say -- they go through
10:58:27 6 how this is an improvement. You see that in, for example,
10:58:30 7 the article at Footnote 4 at Page 1. It says it allows
10:58:33 8 brands to lay out the shortest possible path to sign up.
10:58:36 9 It's talking about the two-tap solution.
10:58:38 10        Same thing in Footnote 4 at Page 4, it talks
10:58:41 11 about how its click-through rate is increased by 30 percent.
10:58:46 12 The ROI increased by 25. Tenfold increase in revenue per
10:58:46 13 messaging.
10:58:51 14        And the fact that this was -- these praises come
10:58:56 15 immediately after description of the "two-tap system,"
10:59:00 16 suggests that they, at least plausibly, that's the standard
10:59:03 17 here, are talking about that innovation.
10:59:07 18        THE COURT: Did you talk much in your briefs
10:59:08 19 about the particular content of these articles at length at
10:59:13 20 Footnotes 4, 5 and 6. I know you referenced *Berner* 51
10:59:17 21 sometimes, but did you get into that?
10:59:18 22        MR. WEINBERG: We quoted the articles in the
10:59:20 23 sections discussing conventionality. And I know the other
10:59:23 24 side pushed back quite a bit about novelty not being
10:59:28 25 important here. But novelty is the question when it comes

55

10:59:31 1 to conventionality in step two, and that's the question that
10:59:33 2 you just asked about.
10:59:36 3        So, we did quote them, I think, in both briefs,
10:59:40 4 all three articles.
10:59:41 5        THE COURT: You have a couple minutes left,
10:59:42 6 Mr. Weinberg, about five minutes or so, so let me just let
10:59:45 7 you continue.
10:59:47 8        MR. WEINBERG: All right. If there's a specific
10:59:50 9 question on your mind, I'm more than happy to address it.
10:59:53 10 Otherwise, I'll guess at it with other questions that were
10:59:56 11 asked.
10:59:56 12        THE COURT: No. I mean, I have a few questions
10:59:58 13 left, but I want to make sure that you get a chance to make
11:00:03 14 the points you wish before you sit down. If there's
11:00:06 15 anything further you want to add, any other followup to
11:00:09 16 questions you wish to add?
11:00:11 17        MR. WEINBERG: Maybe the last item I'd like to
11:00:13 18 make clear is that you see this argument a few times that
11:00:19 19 the invention, the specific implementation of the invention
11:00:22 20 is abstract and because it is an embodiment of the
11:00:27 21 higher-level abstract idea. And that's backwards, right.
11:00:32 22        Every implementation is going to go through the
11:00:35 23 steps required to implement the higher-level abstract idea.
11:00:40 24 They have to show the opposite, that our specific limitation
11:00:44 25 essentially preempts or, I don't want to use the word

56

11:00:47 1 preempt, but essentially tries to claim the whole abstract
11:00:51 2 idea and adds only generic conventional and field of use
11:00:54 3 limitations. And so, the proof is backwards. I just wanted
11:00:57 4 to point that out.
11:00:58 5        THE COURT: You mentioned preemption. Maybe
11:01:01 6 that's the last question I have which is, you know, that's
11:01:02 7 the concern that drives the 101 inquiry.
11:01:07 8        The other side has said that these claims are
11:01:09 9 directed simply to streamlining a process for a customer to
11:01:12 10 enroll in a marketing promotion by providing a pre-filled
11:01:15 11 and pre-addressed request. So, that's the idea assertedly
11:01:20 12 at issue. We're going to streamline the process for
11:01:22 13 somebody enrolling in a marketing promotion by way of a
11:01:25 14 pre-filled and pre-addressed request.
11:01:26 15        So, the way I think about it is, maybe this is
11:01:30 16 right or wrong, there must be lots of ways in the world that
11:01:33 17 one could do something, patent something that relates to
11:01:38 18 that idea. Lots of ways to try to streamline the process
11:01:41 19 for enrolling in a promotion where you use a pre-filled or
11:01:44 20 pre-addressed request.
11:01:45 21        I wonder how much of that whole that a
11:01:50 22 representative claim here takes up. And I think if it could
11:01:53 23 be shown that there's at least a question that the
11:01:58 24 representative claim takes up not an undue amount of that
11:02:01 25 whole, that might be very helpful for a patentee.

**57**

| | |
|---|---|
|11:02:04|1|On the other hand, if it seemed like the|
|11:02:06|2|representative claim and what it covered takes up quite a|
|11:02:09|3|lot or nearly all of that whole, maybe a portion is for the|
|11:02:15|4|patentee.  I guess, my question is:  Based on what's in the|
|11:02:19|5|record from a preemption perspective, what could I glean|
|11:02:23|6|from how much of the whole a claim like Claim 1 of the '887,|
|11:02:27|7|might be said to take up and how much it doesn't?  Do you|
|11:02:30|8|know what I'm saying?|
|11:02:31|9|MR. WEINBERG:  Yeah, a lot to unpack there.  I|
|11:02:33|10|would say preliminarily the Federal Circuit has held many|
|11:02:38|11|times that a narrow abstraction idea is still an abstract|
|11:02:42|12|idea.|
|11:02:42|13|The flip side of that is even if we take a large|
|11:02:44|14|part of the art, the point of a patent is to monopolize some|
|11:02:49|15|piece of the art.  So, if we're entitled to a larger piece,|
|11:02:53|16|because that's what's disclosed that that was the|
|11:02:55|17|improvement, I think that's not necessarily going to be|
|11:03:01|18|viewed to be ineligibility.|
|11:03:03|19|The prior art method of accomplishing this same|
|11:03:09|20|goal, I think, are what I would point to most first and|
|11:03:12|21|foremost.  The two different, the old website approach and|
|11:03:15|22|the vendor application approach, which have been done and|
|11:03:20|23|used widely.|
|11:03:21|24|THE COURT:  What you're calling "the vendor|
|11:03:22|25|application approach," it's described where?|

**58**

| | |
|---|---|
|11:03:24|1|MR. WEINBERG:  It's mentioned briefly in the|
|11:03:26|2|specification, the application at the end of that|
|11:03:30|3|introduction paragraph.|
|11:03:31|4|THE COURT:  Where is it mentioned?  I asked it|
|11:03:36|5|because my memory of Column 1 is that it was talking about|
|11:03:39|6|one prior art approach, but I think you're suggesting it|
|11:03:42|7|references two different ones.  And I'm not sure how to|
|11:03:45|8|distinguish.|
|11:03:52|9|MR. WEINBERG:  So, for example, redirected to|
|11:03:54|10|the vendor's application or website, I think it's probably|
|11:03:57|11|what I'm referring to at Line 43.  But probably the best|
|11:04:02|12|discussion of it is in the Complaint and in the articles|
|11:04:06|13|that talk extensively about the vendor applications.|
|11:04:10|14|THE COURT:  Which maybe before we -- I'll ask|
|11:04:14|15|you when the other side is done with their rebuttal if|
|11:04:18|16|there's a particular part of the Complaint that you would|
|11:04:21|17|say makes reference to a different prior art strategy other|
|11:04:25|18|than the one being described in Column 1.|
|11:04:27|19|MR. WEINBERG:  Yeah.|
|11:04:28|20|THE COURT:  Here's where we talk about it,|
|11:04:31|21|Column 1.  If you have it now, let me know.  But if not --|
|11:04:33|22|MR. WEINBERG:  Well, the articles are part of|
|11:04:34|23|the Complaint.|
|11:04:35|24|THE COURT:  I think the problem, though, is I|
|11:04:37|25|think you're relying fairly heavily today on the particular|

**59**

| | |
|---|---|
|11:04:43|1|content, particular articles footnoted in the|
|11:04:43|2|Complaint.  And maybe you did, but I read the briefs very|
|11:04:48|3|carefully.  I'm not sure that I appreciated the particular|
|11:04:51|4|substance of a particular article footnoted in the Complaint|
|11:04:55|5|and why it was discussing a certain prior art strategy for|
|11:04:58|6|using computer functionality that's different from what's|
|11:05:00|7|described in Column 1, for example.  So, I want to make sure|
|11:05:03|8|I understand that.|
|11:05:03|9|MR. WEINBERG:  So, are you talking about the|
|11:05:05|10|vendor application approach or the website approach?|
|11:05:09|11|THE COURT:  Well, to be honest, I'm not sure I|
|11:05:11|12|understand the distinction.  In other words, when I look at|
|11:05:13|13|Column 1, I understand that that's the best place in the|
|11:05:16|14|patent where the patentee is telling me, Here's what the|
|11:05:19|15|prior art was doing.  Here's why it had some downsides.|
|11:05:22|16|Here's what we're going to do different.|
|11:05:24|17|And it talks about known methods allowing a user|
|11:05:27|18|to open a vendor's application or website.  And it goes on|
|11:05:31|19|to say that what happens is then you open that application|
|11:05:37|20|or website and you provide payment information via the|
|11:05:41|21|application or website to complete a transaction.|
|11:05:44|22|But that approach has a downside because you|
|11:05:48|23|have to pause your prior activities maybe on a mobile device|
|11:05:52|24|and then you're redirected to the vendor's application or|
|11:05:54|25|website.  So, you're on your mobile device, then you get|

**60**

| | |
|---|---|
|11:05:58|1|redirected to this separate page, you know, et cetera.  And|
|11:06:00|2|that's tough because you lose focus.  And maybe it's also|
|11:06:03|3|tough because you've got to type in a lot of info, and you|
|11:06:05|4|get distracted, or you might mistype stuff.|
|11:06:08|5|That's a prior art approach using computers that|
|11:06:10|6|has some downsides.  We're going to fix them.  I'm looking|
|11:06:14|7|at it as like one approach.  It's talked about at Column 1.|
|11:06:18|8|I think you're telling me there's two different|
|11:06:20|9|approaches that we think are pretty relevant to the|
|11:06:22|10|Complaint, that one and another one.  And I'm saying,|
|11:06:25|11|Where's that other one?|
|11:06:25|12|Do you know what I'm asking?|
|11:06:26|13|MR. WEINBERG:  Yeah, yeah.  Certainly, I would|
|11:06:28|14|say Column 1 is not a hundred percent clear and with two|
|11:06:31|15|different approaches.  It becomes a little more clear when|
|11:06:34|16|you read down the rest of the Complaint in those articles|
|11:06:37|17|which have extensive discussion of vendor application being|
|11:06:41|18|another approach.|
|11:06:42|19|But either way, even if the Court were to find|
|11:06:44|20|that this vendor application was not specifically or|
|11:06:46|21|sufficiently articulated, it still -- the one prior art|
|11:06:52|22|approach, the website approach where you're filling in your|
|11:06:54|23|phone number is still --|
|11:06:54|24|THE COURT:  Are you distinguishing -- are you|
|11:06:57|25|saying two because you're distinguishing between a reference|

61

1 to a vendor application versus a vendor website?

2         MR. WEINBERG:  Yes.

3         THE COURT:  Okay.

4         MR. WEINBERG:  So, each of those -- those are

5 two different approaches, and they generated different

6 problems?

7         MR. WEINBERG:  Well, so a vendor application

8 would be you go to a website, and you go to an app store,

9 and you download an application for your bank, and you

10 create an account.  And you -- it does have its own

11 burdensome problems.  It works differently than going to a

12 website, filling in your phone number, receiving a text

13 message, replying yes to it.  Those are two different kinds

14 of systems.

15         THE COURT:  Are they different in a material way

16 for our purposes here?

17         MR. WEINBERG:  Well, only in that they are two

18 different ways from each other and from the claimed method

19 of accomplishing the same desired goal of enrolling

20 customers.

21         THE COURT:  Got it.  Okay.

22         MR. WEINBERG:  And --

23         THE COURT:  Sorry.  You're out of time.  Let me

24 stop you there because I do want to -- is there anything,

25 very briefly, that you want to add before you end?

62

1         MR. WEINBERG:  Yeah.  I just wanted to, before I

2 sat down, to make the point that I think that the two

3 different ways in which the Defendants are describing the

4 abstract idea of streamlining the sign-up process is one.

5 And streamlining the sign-up process using pre-filled

6 requests is really the same.  Because in this context when

7 you're making a request, the only way to streamline it is to

8 ask less of the user.

9         So, that's just kind of a play on words.

10 They're talking about the goal of the invention and not

11 about what the invention is directed to.

12         THE COURT:  Okay.  All right.  Thank you.

13         MR. WEINBERG:  Thank you.

14         THE COURT:  All right.  Let me give

15 Plaintiff's -- sorry, Defendant's counsel five minutes more.

16         MR. NOVIKOV:  I'm going to try to keep it under

17 five minutes, if I can.  I, too, was wondering, as I was

18 reading the Plaintiff's briefs, what it was they were

19 asserting was unconventional about the arrangement as are

20 cited in the claims.

21         And I was glad to hear Mr. Weinberg articulate

22 it.  And what he said, and I tried to write it down, was

23 using a deeplink to create a custom text message that a user

24 can use to subscribe to a service.

25         That can't possibly be it.  The notion of using

63

1 a deeplink to create a custom text message is in the record.

2 That was known.  Being able to pre-populate an SMS message

3 was something specific as part of that standardized thing

4 that they're making use of.

5         THE COURT:  So, I think you're saying custom

6 text messages generated by a deeplink was known.  How do you

7 know that?  Look at the Other Publications portion of the

8 patent.  Look at these words I've highlighted.

9         I do see the words, and I at least see they say

10 how to pre-populate an SMS message.  I don't really know

11 that these tell me that deeplink-generated text messages

12 with custom user data was conventional.

13         Do they tell me that?

14         MR. NOVIKOV:  Sure.  I don't know whether --

15 certainly, these words do not tell you that the text message

16 that is populated has custom user data.

17         I would point Your Honor to the *Secured Mail*

18 case that's cited all over both sides' briefing that says in

19 2001, a personalized URL, which is what that would be, was

20 perfectly generic and conventional.

21         THE COURT:  And I know, obviously, that

22 Defendants are handicapped at this 101 stage because one can

23 only rely on the record, and the record really is the

24 Complaint and exhibits attached thereto, et cetera.

25         But I also wonder if, like, that's part of the

64

1 point like it might be true that you can show me pretty

2 clearly, if you have an expert declaration you could append

3 to a summary judgment motion, Hey, look, it's totally

4 conventional.

5         But that's not what we're doing at the Rule 12

6 stage.  I wonder, you know, how come maybe that's what's

7 going on here.

8         MR. NOVIKOV:  I totally understand the concern

9 that, you know, you've got these three pieces.  You have

10 user data coming back, you've got a deeplink supposedly

11 based on that, and you have the SMS being used to subscribe

12 somebody.

13         I totally understand the Court's concern that

14 there's nothing in the record that one can point to and say,

15 Ah-hah, that was conventional.  And I appreciate that we're

16 asking the Court to make a little bit of a leap.

17         But I would just say the Court asked

18 Mr. Weinberg, in 2017, was it known and conventional to have

19 a web page that uses a cookie to send back user data?  And

20 Mr. Weinberg said, I don't know it's a fact issue.

21         And I understand why he took that position.  I'm

22 not faulting him in any way, but I would just say that that

23 is the sort of assertion that the Court does not have to

24 accept as raising a plausible fact issue.

25         THE COURT:  Do you think the record makes it

65

1 clear that his assertion, that it could be a fact issue, is
2 incorrect?  Does the record clearly show me that utilizing
3 integration tags and or a Third Circuit equivalent cookies
4 and a website that are then sent back to the server when one
5 accesses it was well known at the time?
6 MR. NOVIKOV:  I think -- absolutely.  I mean, I
7 think the patent discusses the notion of sending of cookies,
8 which are things that are sent back from a web page to a
9 server.  It doesn't explain what they are.  Doesn't claim to
10 invent them.
11 I think the Court might look at the *Bridge and
12 Post* case, which is also cited in the briefing, which has a
13 really nice discussion of how using a combination of
14 perfectly conventional things where there's nothing about
15 the claims or the specification that suggests that there's
16 anything new going on in that technical combination is an
17 inference that the Court can draw.
18 THE COURT:  Mr. Novikov, you're almost at the
19 end.  If you want to make one last point.
20 MR. NOVIKOV:  The only point that I would make
21 is the Court sort of issued what I took to be a friendly
22 implicit challenge to Mr. Weinberg to explain how these
23 claims leave any room to use deeplinking to subscribe people
24 to promotions on the Internet.  And the answer came back
25 sort of inconclusive.

66

1 And I, too, think that if you look at these
2 claims, you will find that it does occupy that field.  And
3 while that's not dispositive, I think it is something the
4 Court should consider.
5 THE COURT:  Okay.  Thank you, Mr. Novikov.  And
6 thanks to counsel for both sides for their arguments.
7 We'll transition to our second argument.  But
8 because we've got some moving pieces here to move around,
9 why don't I take a short five-minute break to let everybody
10 stretch their legs, accomplish that and use the restroom if
11 you need to.
12 So, the Court will be in recess.  We'll come
13 back, say, around 11:20.
14 Okay.  Thank you.
15 DEPUTY CLERK:  All rise.
16 (A brief recess was taken.)
17 THE COURT:  Please be seated.  All right.
18 Now, we'll turn to our third case, but our
19 second set of cases, which is case one, the BT case.  Again,
20 it's the Defendant's Rule 12 motion.
21 So, I will start and turn to counsel for each
22 side.  We allocated 20 minutes for argument for each side.
23 Again, I'll let you know, again, when you have about five
24 minutes left.
25 MR. DESAI:  Your Honor, we have some printed

67

1 copies, if you'd like.
2 THE COURT:  Please feel free to hand them up.
3 Thank you.
4 MR. DESAI:  Good morning, Your Honor.  Anish
5 Desai representing movant, Palo Alto Networks.  The
6 improvement in the asserted patents here is not a technical
7 solution.  The patents claim a generic computing device
8 called a probe that collects, filters, analyzes and
9 transmits data.  The solution is adding a human to analyze
10 data, status data to figure out whether the data is benign
11 or a threat, and then updating the computer based on the
12 human's analysis.
13 This is not a mischaracterization or a
14 oversimplification.  That is what is in the claims, and
15 that's how the invention -- the improvement is described in
16 the specification.
17 THE COURT:  I guess on that front, I know you
18 said in your briefing, in terms of what the claims are
19 about, the improvements, what makes this kind of a "good
20 invention" from the patentee's perspective as described in
21 the claim, you focus on the human elements, the human SOC.
22 But, I mean, wouldn't it be correct to say that the
23 invention is really about the combination of the
24 computerized elements at the probe, plus the human element
25 at the SOC and adding those two together?

68

1 I think the other side would say it's about more
2 than that.  But even at a minimum, isn't it about computers
3 plus humans in those ways?
4 MR. DESAI:  And that's how we described it in
5 our motion, which is collecting, filtering, analyzing and
6 transmitting data and then making modifications based on the
7 human feedback.
8 THE COURT:  I think that's what they call kind
9 of the two-level review process.
10 MR. DESAI:  Sure.  It's a computer that analyzes
11 data.  It doesn't tell you how it analyzes it.  It just
12 filters, analyzes to identify security-related events.  And
13 then for data that doesn't filter, which let's be honest,
14 it's the good and the bad filter.  And if it doesn't hit a
15 good or a bad filter, you send it to the human.
16 THE COURT:  "Bad" meaning like the filter will
17 know in advance, this particular type of attack is known.
18 We see it.  That's bad.  Block it.
19 There will be certain data that is not bad and
20 understood, I guess, to be good that passes.  That's the
21 type of initial filtering step you're saying we have?
22 MR. DESAI:  Yeah.  You can see that in the
23 Complaint, Your Honor, where they talk about the accused
24 product, and they accuse what are called in the Complaint
25 white lists and black lists in the accused products.  And

69

11:28:09 1   those are terms that, I think, are a little bit out of
11:28:12 2   favor, but they're used in the Complaint.
11:28:14 3          And that's what the filtering is.  It's
11:28:16 4   traditional, the good and the bad list.
11:28:19 5          THE COURT:  And I think, at a very base level, I
11:28:21 6   think like your side is saying, Judge, the way you should
11:28:24 7   look at the representative claim here -- and just for what
11:28:27 8   it's worth, I've been using the '237 patent just as kind of
11:28:30 9   like, I guess, a guide.
11:28:32 10         MR. DESAI:  Yes.
11:28:33 11         THE COURT:  I've been using Claim 18, at least
11:28:35 12  if I was using one claim, but I know there's a correlation.
11:28:38 13  I think what your side is saying is, Judge, really, these
11:28:42 14  representative claims, it's as if they said filter data.
11:28:48 15  Then analyze some additional data.  Then have a human
11:28:53 16  analyze data.  And, you know, that sounds a lot like, you
11:28:56 17  know, ineligible claims, very functional-sounding kind of
11:29:00 18  claims that the Fed Circuit has disclaimed the claims.
11:29:05 19         But the other side, of course, was saying, Well,
11:29:07 20  there's a greater particularity here that matters.  And
11:29:12 21  there certainly are a lot of additional words in the claims,
11:29:15 22  right, some of which we'll talk about.  I know the
11:29:19 23  Plaintiff, I think, will say might make a difference here.
11:29:22 24         But why, I guess, would you say it's fair to
11:29:26 25  look at the claims in that very kind of basic way as opposed

70

11:29:29 1   to what the Plaintiff might say is, Well, look at the
11:29:32 2   particular way in which we're doing some of those things?
11:29:35 3          MR. DESAI:  Right.  So, we have the claim right
11:29:36 4   up here.  We can start with Claim 1 or Claim 18, I don't
11:29:39 5   think it really matters for these functional steps.
11:29:42 6          I mean, collecting status data from a component
11:29:44 7   of the network, right.  I don't think there's anything more
11:29:47 8   there than just collecting data.  Status data is extremely
11:29:51 9   broad.  It's not any particular type of data.
11:29:54 10         And then you're analyzing the status data to
11:29:57 11  identify a security-related event.  Look at the data and
11:30:00 12  see:  Is it benign or is it a threat?  Doesn't tell you how
11:30:03 13  to do it.
11:30:04 14         And then it says the analysis includes
11:30:06 15  filtering.  Filtering is a well-known, routine activity.
11:30:14 16         And then when you're done with the filtering,
11:30:17 17  there's stuff that may not be good and may not be bad
11:30:20 18  because the computer doesn't know what to do with it.  And
11:30:22 19  the solution that the patent proposes, the distinguishing
11:30:27 20  feature is go to the human, right.  And so, we're invoking a
11:30:32 21  human.
11:30:32 22         THE COURT:  Well, before we get to the human,
11:30:35 23  you know, there is this kind of two-stage kind of
11:30:41 24  filtering/analysis process that happens at the probe level.
11:30:44 25  There's the initial filter.  But then there's the read or

71

11:30:49 1   the second stage of analysis that -- the taking this residue
11:30:53 2   data it's called, we're going to have the probe analyze that
11:30:57 3   a second -- anew or take this data and analyze it in a
11:31:02 4   different way.
11:31:03 5          Now, I know you can say, Hey, that's just
11:31:06 6   analyzed data plus filter data.  But if there's some
11:31:12 7   evidence, and I'll ask the Plaintiff this, I don't think
11:31:17 8   there's a ton of discussion about this analysis
11:31:20 9   post-filtering data in the patent.  But if there's some
11:31:22 10  evidence in the record that might suggest that computers
11:31:25 11  really weren't, in terms of computers working on network
11:31:29 12  security issues, weren't really at the time filtering and
11:31:32 13  then going back and doing a second-level analysis on residue
11:31:35 14  data, that was different and new.  Computers weren't working
11:31:39 15  that way.
11:31:40 16         Could that be enough to potentially save the
11:31:43 17  claim here maybe in step two?
11:31:44 18         MR. DESAI:  I think -- see, I think what's
11:31:46 19  fundamental about this probe in the claim and how it was
11:31:51 20  described by the Plaintiff itself is that the probe here is
11:31:59 21  narrowing the information that the user will have to review.
11:32:05 22  Okay.  And it's doing it using well-known filtering and data
11:32:13 23  discrimination analysis techniques.
11:32:14 24         And the key here is you can see at the bottom of
11:32:20 25  this Slide 5 of the '237 patent, Column 3, Lines 4 to 19,

72

11:32:29 1   the purpose of this is to reduce the volume of data that the
11:32:31 2   human has to review.  Okay.  And we have the *Electric Power*
11:32:39 3   *Systems* case that tells us -- *Electric Power Group*, merely
11:32:43 4   requiring the selection of manipulation of information to
11:32:45 5   provide a humanly comprehensible amount of information
11:32:48 6   useful for users by itself does not transform an otherwise
11:32:53 7   abstract process.
11:32:54 8          And all they're doing with this probe is using
11:33:00 9   well-known analysis to reduce the amount of information for
11:33:03 10  the human to review.  And let's be clear, the probe is
11:33:07 11  simply a generic computing device that is automating
11:33:11 12  analysis that a human could otherwise perform.
11:33:14 13         And here's why.  BT cannot reasonably dispute
11:33:18 14  that a human can analyze status data to identify a
11:33:22 15  security-related vendor.  Okay.  That's the essence of the
11:33:26 16  patent, having a human analyze the status data and figuring
11:33:30 17  out benign or a threat.
11:33:32 18         And at Page 11 of their opposition, BT admits
11:33:38 19  that a human can analyze the status data to determine good
11:33:42 20  or bad.  So, they said, "The analyst or analyst systems at
11:33:46 21  the SOC are well equipped to determine whether residual
11:33:50 22  status data is benign or constitutes a threat."
11:33:53 23         THE COURT:  But I want to focus, again, though,
11:33:56 24  on my question which is really about this concept of a
11:33:58 25  filtering process that doesn't just do a good or bad.  It

---

**73**

```
11:34:01   1   does a good or a bad, and it has this kind of middle ground
11:34:04   2   of data that it collects, and then having the probe do an
11:34:07   3   additional level of analysis on that residual data.
11:34:12   4          Now, I think it's the case that other than that
11:34:15   5   part of Column 8 that you've cited here, I don't think that
11:34:17   6   really talks about, otherwise, this additional step of
11:34:21   7   taking a hard look at the post-residue data.
11:34:24   8          Do you agree?
11:34:26   9          MR. DESAI:  Well, I think this is right above
11:34:27  10   the highlighted portion.
11:34:28  11          THE COURT:  Right.  This is part of Column 8.
11:34:31  12          MR. DESAI:  This is it.
11:34:32  13          THE COURT:  It's not like it talks about it
11:34:34  14   here, and it talks about it in the abstract, and it talks
11:34:34  15   about it in the background section.  This is it.  This is
11:34:37  16   it.
11:34:37  17          But it's not like it -- but I understand this
11:34:39  18   part of the patent that you've got highlighted to be saying,
11:34:42  19   Look, when we're talking about analysis on residue data, the
11:34:46  20   type of analysis we're doing is a type of data
11:34:50  21   discrimination analysis, a type of analysis that computers
11:34:53  22   do.
11:34:54  23          I don't understand it to be saying that
11:34:56  24   computers were doing this combination of steps, filtering
11:35:00  25   for good and bad, and then analyzing post-residue data after
```

**74**

```
11:35:05   1   that regularly at the time.
11:35:08   2          Does that seem correct?
11:35:09   3          MR. DESAI:  Well, I think the principle of the
11:35:13   4   background of the patent tells us that probes were analyzing
11:35:17   5   data to identify good or bad, right.  And the point being
11:35:21   6   here is the probe doesn't do anything special in a
11:35:26   7   technological way with this other data other than the claim
11:35:30   8   saying the abstract idea of analyzing it further and then
11:35:34   9   send it to the human.
11:35:35  10          THE COURT:  But I guess my question is:  How
11:35:37  11   come a filtering process plus an additional level of
11:35:42  12   analysis of a subset of that, you know, either filtered or
11:35:49  13   non-filtered data, whatever you want to call it, how come
11:35:51  14   that can't be the unconventional use of computer technology?
11:35:54  15   Let's put those two known steps together in a way that
11:35:57  16   computers weren't doing at the time.
11:35:59  17          MR. DESAI:  I think, Your Honor, the problem
11:36:00  18   there is you have filtering and analysis of data, okay,
11:36:03  19   which are both abstract ideas.  Okay.  We cannot -- there's,
11:36:09  20   you know, a plethora of Federal Circuit cases that will say
11:36:11  21   that filtering and analysis of data are abstract ideas.
11:36:16  22          Now, the question is:  That's what this claim is
11:36:20  23   directed to.  Is there something more in the claim that
11:36:20  24   claims beyond those abstract ideas of using a computer as a
11:36:27  25   tool to do these abstract concepts of filter and analyze
```

**75**

```
11:36:32   1   data.
11:36:32   2          THE COURT:  Well, we know sometimes the cases
11:36:34   3   turn on whether there's enough of a record telling us that
11:36:36   4   the combination of known steps was, in fact, asserted to be
11:36:43   5   unconventional.  Sometimes it seems like even when you have
11:36:46   6   a multi-step claim in a patent that seems like it is
11:36:50   7   basically doing very -- you know, kind of basic-sounding
11:36:54   8   computer-like steps, if the patent or the record tells us
11:36:58   9   enough to say, Hey, that was interesting, and new and
11:37:00  10   different from the way computers were working, sometimes it
11:37:03  11   can be saved.
11:37:04  12          And, I guess, as a lead-in to the other side,
11:37:06  13   they'll say, Look, the best case to analogize this case to
11:37:09  14   is SRI.  And if you look at SRI, I mean, that claim, the way
11:37:13  15   those monitors were being used, I don't think anyone was
11:37:15  16   asserting that what the monitors were doing at any of those
11:37:18  17   steps was an unusual or different way that computer monitors
11:37:23  18   had been used or worked.  It seemed like the Federal Circuit
11:37:25  19   there was just saying, But the combination was said to be
11:37:28  20   unconventional, and the patent said that, and that was
11:37:31  21   enough.
11:37:32  22          So, I guess it's a lead-up to say:  How do you
11:37:34  23   distinguish this case from SRI?
11:37:36  24          MR. DESAI:  And before I get to SRI in one
11:37:38  25   moment --
```

**76**

```
11:37:38   1          THE COURT:  Sure.
11:37:38   2          MR. DESAI:  -- I think we have to look at the
11:37:40   3   specification and what it describes as the improvement.
11:37:44   4   Okay.  And you will not see here that it's -- the
11:37:47   5   improvement is the probe collecting and analyzing the data.
11:37:53   6   The improvement is categorically the human that's being
11:37:57   7   supplemented.
11:37:58   8          THE COURT:  I grant you that the patent is, from
11:38:01   9   the Plaintiff's perspective, not great in the sense that it
11:38:04  10   focuses a lot on human analog, doing human analysis that
11:38:08  11   seems like it's saying computers can do, too, though may be
11:38:12  12   doing it at a seminal point in time or doing it in a more
11:38:15  13   efficient way.
11:38:15  14          What I'm leading, though, at asking about the
11:38:18  15   post-residue data and that piece and what it adds is there
11:38:21  16   is cited in the patent this Notice of Allowability from the
11:38:25  17   examiner.  And in the Notice of Allowability, it does seem
11:38:27  18   to say, at least in the examiner's view, that while
11:38:29  19   filtering, positive and negative filtering via computer
11:38:32  20   probes was done, that the piece of adding the second step of
11:38:35  21   analyzing post-residue data was new, and different, and
11:38:38  22   unusual and significant enough to the examiner that it
11:38:41  23   seemed like it made a difference in terms of at least the
11:38:44  24   patentability step.  I don't know whether at 101, or 102, or
11:38:48  25   103.
```

77

| | |
|---|---|
| 11:38:48 | 1 But what about that?  Isn't that telling me what |
| 11:38:50 | 2 the patent doesn't quite tell me about this post residue -- |
| 11:38:53 | 3 MR. DESAI:  Right.  So, that's -- I think the |
| 11:38:55 | 4 file history issue is simply the examiner saying, This was |
| 11:38:57 | 5 missing in the particular prior art that was before the |
| 11:39:00 | 6 examiner.  I do not believe you can take that Notice of |
| 11:39:05 | 7 Allowability and say -- reach the conclusion, Well, this is |
| 11:39:08 | 8 the invention, the improvement. |
| 11:39:11 | 9 There's, obviously -- you know, we do a lot of |
| 11:39:14 | 10 work in IPRs, and there's a distinction between pointing out |
| 11:39:17 | 11 what's missing in a particular piece of prior art versus how |
| 11:39:20 | 12 the patentee itself in the specification describes the |
| 11:39:24 | 13 improvement.  And here, it's replete that the -- it's the |
| 11:39:28 | 14 security analysis. |
| 11:39:29 | 15 Now, but let me turn to SRI because I think |
| 11:39:32 | 16 that's a good cite -- |
| 11:39:32 | 17 THE COURT:  Before you get into that, one last |
| 11:39:34 | 18 question about that, because I think what you're getting |
| 11:39:35 | 19 into is like a common problem with regard to 101 motions at |
| 11:39:38 | 20 the Rule 12 stage.  We don't have a great record.  Right. |
| 11:39:41 | 21 And it's like who to blame or who to benefit for the fact |
| 11:39:44 | 22 that we don't have a great record, that we have maybe |
| 11:39:46 | 23 sometimes these tiny pieces that if looked at one way, well, |
| 11:39:51 | 24 could it support a fact question at step two about whether |
| 11:39:54 | 25 "X" is the unconventional use of computer technology? |

78

| | |
|---|---|
| 11:39:56 | 1 Maybe.  Or maybe looked in a different way, no, it's not |
| 11:39:59 | 2 clear what it said. |
| 11:40:00 | 3 You know, the patent is not great about this, |
| 11:40:01 | 4 and it's kind of like:  Who do you ding for the fact that we |
| 11:40:06 | 5 might not have a better record about that or who do you give |
| 11:40:09 | 6 the benefit of the doubt to? |
| 11:40:10 | 7 Is there anything you want to say about that? |
| 11:40:12 | 8 MR. DESAI:  I will say in this case the record |
| 11:40:15 | 9 shouldn't matter for this reason.  The claim is -- it's a |
| 11:40:20 | 10 bare claim of analyzed leftover or unknown data.  That's it. |
| 11:40:27 | 11 It does not tell you in any way, shape or form how you're |
| 11:40:31 | 12 going to identify a security-related event from that data. |
| 11:40:35 | 13 It is -- that is the type of abstract claiming analyzing |
| 11:40:40 | 14 data using a computer as a tool to do exactly what a human |
| 11:40:44 | 15 can do without adding more. |
| 11:40:46 | 16 THE COURT:  So, this is a great jumping off |
| 11:40:48 | 17 point to SRI.  How did SRI -- was anything different that |
| 11:40:51 | 18 was happening? |
| 11:40:51 | 19 MR. DESAI:  There is a major difference between |
| 11:40:53 | 20 this case and SRI.  And they made it very clear that BT is |
| 11:40:57 | 21 hanging their hat on SRI.  There's no debating that. |
| 11:41:00 | 22 But it is a superficial argument based on the |
| 11:41:04 | 23 fact that the general subject matter is related to network |
| 11:41:07 | 24 security.  And the most important facts here that BT |
| 11:41:10 | 25 overlooks is that there is nothing in the SRI spec, the |

79

| | |
|---|---|
| 11:41:14 | 1 claims or the Federal Circuit opinion, that the improvement |
| 11:41:17 | 2 involved a human solution. |
| 11:41:19 | 3 That is a major distinction, and that's clear |
| 11:41:22 | 4 what we have here for the '237 and '641 patents.  And if you |
| 11:41:26 | 5 look at -- |
| 11:41:27 | 6 THE COURT:  And I grant you that and I |
| 11:41:28 | 7 understand that.  You know, we've got a human who's playing |
| 11:41:31 | 8 a role here, and maybe the patent says a significant role in |
| 11:41:33 | 9 the invention.  But even if one looked at this invention |
| 11:41:36 | 10 simply by looking at the computerized probe and the work |
| 11:41:40 | 11 it's doing, how would you differentiate the work that the |
| 11:41:42 | 12 computerized probes are doing in this invention from the |
| 11:41:44 | 13 work that the monitors were doing in SRI. |
| 11:41:47 | 14 MR. DESAI:  So, I think just before I answer |
| 11:41:49 | 15 that question -- |
| 11:41:49 | 16 THE COURT:  Sure. |
| 11:41:50 | 17 MR. DESAI:  -- I'd just like to point out there |
| 11:41:52 | 18 is a significant contradiction in BT's briefing that makes |
| 11:41:56 | 19 the distinction between SRI and BT's patents clear.  At |
| 11:42:00 | 20 Page 11 of their brief, as we already pointed out, it's very |
| 11:42:04 | 21 clear that the human can perform the analysis of the claim |
| 11:42:08 | 22 status data to determine good or bad.  That's essential for |
| 11:42:11 | 23 their patent, right, that the human can do this analysis, |
| 11:42:15 | 24 the security analysis, right, the security analyst. |
| 11:42:19 | 25 And it says -- I already read you the quote on |

80

| | |
|---|---|
| 11:42:21 | 1 Page 11 of their brief.  Three pages later on Page 14 of the |
| 11:42:25 | 2 brief, BT tries to align itself with *SRI*, and they quote |
| 11:42:29 | 3 this aspect of the Federal Circuit.  They said, "But the |
| 11:42:31 | 4 Federal Circuit has held that the human mind is not equipped |
| 11:42:36 | 5 to detect suspicious activity in computer networks." |
| 11:42:39 | 6 That's the finding in *SRI*.  Okay.  And that is a |
| 11:42:45 | 7 clear contradiction.  On the one hand, they're saying for |
| 11:42:48 | 8 their own patent, the human can handle -- is well equipped |
| 11:42:54 | 9 to detect benign or a threat.  But in *SRI*, a human cannot. |
| 11:43:03 | 10 The only way to resolve this contradiction is |
| 11:43:07 | 11 that the BT patent, as it says on its face over and over |
| 11:43:10 | 12 over again, is about -- directed to the human determining |
| 11:43:16 | 13 from status data whether data is good or bad, and then |
| 11:43:21 | 14 updating the probes.  The human telling the probe, This is |
| 11:43:22 | 15 what you should do with that data. |
| 11:43:22 | 16 Okay.  And in *SRI*, the record showed, based on |
| 11:43:26 | 17 the quote that BT included in its own brief, that a human |
| 11:43:30 | 18 could not do the specific analysis of the specific data |
| 11:43:34 | 19 claimed to automatically detect a large-scale attack.  That |
| 11:43:38 | 20 was a significant part of the *SRI* finding, that a human |
| 11:43:42 | 21 could not do the analysis.  And that is the exact opposite |
| 11:43:48 | 22 of what we have in this case. |
| 11:43:49 | 23 BT and *SRI* are not the same.  BT's patents are |
| 11:43:54 | 24 directed to a human solution.  *SRI* was about a technical |
| 11:43:58 | 25 solution. |

81

| | |
|---|---|
| 11:43:58 | 1   THE COURT:  Okay.  Mr. Desai, I want to let you |
| 11:44:01 | 2   save a few minutes for rebuttal.  Is there anything you wish |
| 11:44:04 | 3   to add before you do that? |
| 11:44:05 | 4   MR. DESAI:  Your Honor, I think I covered the |
| 11:44:07 | 5   major point about SRI.  I just -- I would like to say there |
| 11:44:10 | 6   is a bit of an issue with respect to the housekeeping on |
| 11:44:14 | 7   what's claims and what's representative. |
| 11:44:17 | 8   In our motion, we had said Claim 18 of the '237 |
| 11:44:20 | 9   was representative.  It was not disputed in BT's opposition. |
| 11:44:26 | 10  Okay. |
| 11:44:26 | 11  There is a slide in their slide deck, I don't |
| 11:44:29 | 12  know if they're going to cover it, where there is now an |
| 11:44:32 | 13  argument that Claims 1, and 10 and 14 for the '641 are |
| 11:44:35 | 14  representative.  Claims 18, 23 and 25 are representative of |
| 11:44:39 | 15  the '237.  That's not in their opposition brief. |
| 11:44:41 | 16  THE COURT:  Right.  The one that we didn't |
| 11:44:43 | 17  discuss that I think was probably fairly raised in the |
| 11:44:45 | 18  Plaintiff's brief is they're citing at Claim 14 and its use |
| 11:44:49 | 19  across probe correlation.  We can talk about that, to the |
| 11:44:53 | 20  extent you had planned to talk about that on rebuttal. |
| 11:44:56 | 21  MR. DESAI:  Yeah. |
| 11:44:57 | 22  THE COURT:  I think that concept is probably |
| 11:44:59 | 23  fairly raised as an alleged additional distinguisher.  So, |
| 11:45:02 | 24  we can talk about that on rebuttal.  Okay? |
| 11:45:05 | 25  MR. DESAI:  Sure. |

82

| | |
|---|---|
| 11:45:05 | 1   THE COURT:  Okay.  Thank you. |
| 11:45:13 | 2   MR. GOLDBERG:  Your Honor, if I can hand up some |
| 11:45:15 | 3   printouts? |
| 11:45:16 | 4   THE COURT:  You may.  Thank you. |
| 11:45:17 | 5   MR. GOLDBERG:  Thank you so much. |
| 11:45:24 | 6   THE COURT:  Mr. Goldberg. |
| 11:45:25 | 7   MR. GOLDBERG:  Your Honor, at step one, you look |
| 11:45:27 | 8   at what the claim is directed to, its character as a whole. |
| 11:45:32 | 9   You don't selectively highlight certain keywords emphasizing |
| 11:45:36 | 10  some parts of the spec, but not other parts of the spec. |
| 11:45:39 | 11  So, I want to go through this a little bit more |
| 11:45:43 | 12  rigorously starting with what the patent says the problem |
| 11:45:46 | 13  was the inventors were trying to solve.  And really the key |
| 11:45:49 | 14  here is that in the prior art, the security devices, like |
| 11:45:53 | 15  firewalls, they were inadequate to detect and respond to |
| 11:45:57 | 16  threats that weren't yet known. |
| 11:45:59 | 17  So, they could use filter-based signature |
| 11:46:01 | 18  matching, for example, to find a known virus.  But if a |
| 11:46:05 | 19  virus didn't yet have a signature, which is sort of like a |
| 11:46:08 | 20  pattern, it would pass through the device, and it would harm |
| 11:46:11 | 21  the network. |
| 11:46:12 | 22  MR. GOLDBERG:  Now, these devices were managed |
| 11:46:14 | 23  locally by local system administrators.  And what the patent |
| 11:46:18 | 24  explains, these administrators were ill equipped to identify |
| 11:46:21 | 25  these new threats.  In part, because they didn't have the |

83

| | |
|---|---|
| 11:46:24 | 1   tools, and experience and the intelligence, meaning |
| 11:46:29 | 2   information, that they would need to identify these threats. |
| 11:46:31 | 3   And the way these devices worked is they would, |
| 11:46:35 | 4   you know, block the known data viruses, allow the known into |
| 11:46:38 | 5   traffic, and the rest would just get logged.  So, you know, |
| 11:46:40 | 6   a big pile of what they describe as audit information, sort |
| 11:46:43 | 7   of all this unknown traffic.  And there's really no |
| 11:46:46 | 8   effective way of mining that adequately enough. |
| 11:46:49 | 9   Now, and these devices, because they were |
| 11:46:51 | 10  managed locally, had very limited visibility.  So, you |
| 11:46:56 | 11  couldn't see what was going on in other networks or other |
| 11:46:58 | 12  parts of the network they were tied to. |
| 11:47:00 | 13  Now, the first point I'd like to make here, and |
| 11:47:02 | 14  I'll discuss this, you know, in some detail as we get deeper |
| 11:47:05 | 15  in the presentation, but the patent discloses using local |
| 11:47:09 | 16  system administrators as part of the prior art.  As, you |
| 11:47:13 | 17  know, they first indicated, the invention has to be more |
| 11:47:16 | 18  about just incorporating a human, because incorporating a |
| 11:47:18 | 19  human, the local administrator was already in the record. |
| 11:47:21 | 20  It's described in the spec, and the patent disparages that |
| 11:47:24 | 21  solution as ineffective. |
| 11:47:26 | 22  THE COURT:  Only because the system |
| 11:47:28 | 23  administrator didn't have the time.  The system -- |
| 11:47:31 | 24  presumably if the system administrator had the time to do |
| 11:47:34 | 25  what the human at the SOC could do, they could have done it. |

84

| | |
|---|---|
| 11:47:37 | 1   MR. GOLDBERG:  It's more than time, Your Honor. |
| 11:47:38 | 2   The patent explains they also lack tools.  They lack the |
| 11:47:42 | 3   expertise, and they lack the intelligence. |
| 11:47:44 | 4   And so, you know, yes, part of it is the big |
| 11:47:47 | 5   pile of data at the SOC, but it's also technical and |
| 11:47:50 | 6   complicated.  So, it kind of does align with what *SRI* said |
| 11:47:53 | 7   about the human mind.  And so, the human mind by itself is |
| 11:47:55 | 8   not enough.  It's why at the SOC in our solution we have the |
| 11:47:59 | 9   analyst system in the '641 claim which is shown as Socrates |
| 11:48:03 | 10  in Figure 1, Your Honor. |
| 11:48:05 | 11  So, even when you have an analyst in the process |
| 11:48:06 | 12  or an analyst system, it's not just any old human.  The SOC |
| 11:48:10 | 13  has resources that aren't available locally, and the |
| 11:48:13 | 14  invention makes those resources available in a way they |
| 11:48:15 | 15  weren't previously. |
| 11:48:17 | 16  THE COURT:  But, I mean, if you look at, like, |
| 11:48:18 | 17  the '237 at Claim 18, which the other side focuses on, none |
| 11:48:23 | 18  of this is claimed.  I mean, all that's claimed is a human |
| 11:48:27 | 19  at the SOC provides "feedback" based on information. |
| 11:48:33 | 20  You know, there's no particular claim |
| 11:48:36 | 21  requirements that the human be super smart, or be utilizing |
| 11:48:41 | 22  particular claimed resources that the system administrator |
| 11:48:44 | 23  had a use for.  It's just human analyzed data give feedback. |
| 11:48:46 | 24  Is it anything more than that? |
| 11:48:49 | 25  MR. GOLDBERG:  Well, Your Honor, and I would |

85

1  first start with regard to the '641, Claim 1. It's an
2  analyst system, not an analyst. But even here, right, it's
3  the point of the analyst being at the SOC. And the patent
4  describes the analyst in a very specific way as somebody who
5  specializes in identifying these types of threats and has
6  access to tools.
7      So, I refer Your Honor, it's Column 2, it's
8  Line 35. And so, you know, the invention, in part, is more
9  than the analyst. It's how you get the information to the
10 analyst. It's what information is sent to the analyst in
11 particular, what you're asking them to do, and then the
12 feedback step that follows the analyst.
13     So, each of these steps, and not just the
14 analyst itself as to the benefit to the invention, increases
15 the functionality of the invention.
16     THE COURT: Let me ask you this, though. I'm
17 not saying they are, but if the claims had four limitations
18 or representative claims, four limitations. And the first,
19 literally all that the claim said for limitation one was
20 filter data.
21     And then limitation two, all that it said was
22 analyze data.
23     And then at step three, it said send data to
24 human for analysis.
25     And at step four, it was human provide feedback

86

1  on data.
2      If that's literally all that was in the claim,
3  would that kind of a claim pass muster under Section 101?
4  And if not, exactly what's different about what's claimed
5  here in these patents?
6      MR. GOLDBERG: So, Your Honor, your analogy
7  would apply to a situation where you had an Excel
8  spreadsheet running on a computer, and you decided at
9  step one you're going to filter all entries under the letter
10 B. And then at step two, you're going to sort it. And then
11 you're going to pass it to a human to say, Hey, does this
12 look good to you? Okay. I'm going to display it. That's
13 straight using the computer as a tool.
14     In our case, there are a series of steps that
15 occur in defined positions in defined sequence for the
16 purpose of improving the underlying system itself. The
17 security device is enabled to do things it couldn't
18 otherwise do.
19     And so, you know, I get the example, and in
20 certain circumstances, like the Excel spreadsheet, that's
21 the quintessential, you know, taking a human process. You
22 know, we all sort of manipulate data in that way and put it
23 on a computer to make it go better, faster and easier. It
24 doesn't disrupt how the computer operates. It doesn't
25 enable new functionality.

87

1  Our invention does. And what the patent
2  describes is you start -- and if I can refer Your Honor to
3  Figure 1. If you look at the prior art, Your Honor, as
4  described in the patent, it's just the firewall, for
5  example, element 1010 protecting a customer network.
6      And what we've done here is added an entire
7  second network here. It's a security-focused network that
8  exists including the probe, and the probe does the first
9  part of the residue analysis. So, that's, you know, as you
10 had correctly said, the Notice of Allowance, which has to be
11 taken as true in this context. The analysis of the residue
12 was the patentable distinction.
13     That occurs in two places, right. The first
14 part is the probe. And then we have communication to the
15 secure operation center where we have in the '641, the
16 analyst system, or the analyst in '237, Claim 18.
17     And so, you know, when they referred earlier --
18     THE COURT: Can I just ask as a factual matter:
19 Is the assertion that what the data that the analyst is
20 looking at at the SOC or the S-O-C, is the data they're
21 looking at the residual data that the probe has already
22 analyzed?
23     MR. GOLDBERG: So, the Plaintiff's point, Your
24 Honor, is there's two statements of analysis or processing
25 at the probe. First, you're going to filter status data,

88

1  and you're doing positive and negative filtering of status
2  data.
3      That's not the traffic itself. It's information
4  that's either generated from or relates to traffic. And
5  you're selecting or discarding certain status information.
6      And then you have the residual status
7  information, okay, and that's what the Notice of Allowance
8  is all about.
9      Now, if you look at it from a preemption point
10 of view, you --
11     THE COURT: I want to get back to my question.
12 I understand you have data that's being filtered. And some
13 data is being filtered out as being fine, and some data is
14 being highlighted or filtered out as being problematic, and
15 some data is just being allowed. Not an issue, it's fine.
16     And then there is some categorization of
17 residual data --
18     MR. GOLDBERG: Yes.
19     THE COURT: -- that the probe then engages in
20 some additional analysis of.
21     MR. GOLDBERG: Yes, Your Honor.
22     THE COURT: Then there's a second later step in
23 which some type of data is sent to the human at the SOC.
24 What data is being sent? Is it just that residual data that
25 has been analyzed by the probe or is it additional data

89

11:53:23  1  beyond --

11:53:23  2        MR. GOLDBERG:  It's a subset of that, Your

11:53:25  3  Honor.  So, you have the residue.  You identify possible

11:53:28  4  security events at the probe.  And then you send the

11:53:31  5  information link of possible events up to the analyst or

11:53:34  6  analyst system in the SOC.

11:53:36  7        Now, in the dependent claims, you'll have a

11:53:38  8  level of computerized analysis which could include

11:53:42  9  cross-correlation.  So, it's either two or three independent

11:53:44  10  claims.

11:53:46  11        The residue is basically broken up and analyzed

11:53:48  12  two or three times, Your Honor.  And that's really what I

11:53:50  13  would argue is the crux of the invention.

11:53:52  14        THE COURT:  Are the said identified events that

11:53:53  15  are sent off to the human in the SOC, are they events that

11:53:57  16  relate to data that was in the residual data or are they

11:54:03  17  events that relate to data that was in the residual data and

11:54:03  18  in some other kind of data that was in the probe that was

11:54:05  19  assessed?

11:54:06  20        MR. GOLDBERG:  As described by the claims, Your

11:54:07  21  Honor, it's a subset of residue data that's been selected

11:54:10  22  through the first level of analysis as being potentially a

11:54:14  23  problem.

11:54:14  24        THE COURT:  You mentioned the Notice of

11:54:17  25  Allowance and Paragraph 6, I think, is the part of where

90

11:54:18  1  it talks about at least what was seen as the patentable

11:54:21  2  distinction by the examiner.  Again, you know, I think in

11:54:26  3  reading that paragraph, I think the thing the examiner is

11:54:29  4  focusing on, I think what the examiner is basically saying

11:54:32  5  is:  Did prior art computer systems do positive and negative

11:54:36  6  filtering to look for problematic data from a network

11:54:40  7  security perspective?  Yes.

11:54:41  8        But what they didn't do, those probes or

11:54:43  9  computers, what they didn't do is they didn't then reassess

11:54:47  10  some middle ground of data that was identified as either a

11:54:50  11  positive and negative like this patent does.  And so, in

11:54:55  12  light of that, we're going to allow these claims.

11:54:59  13        That second stage of post-residue data analysis

11:55:03  14  added on to the positive or negative filtering stage is

11:55:07  15  what's being described in Paragraph 6.

11:55:08  16        Is that correct?

11:55:09  17        MR. GOLDBERG:  I would clarify that in two ways,

11:55:13  18  Your Honor.  First, signature matching is a form of positive

11:55:15  19  or negative filtering that's not what's claimed here.  It's

11:55:18  20  filtering of status data.  So, I'm not sure he's necessarily

11:55:21  21  conceding that filtering status data positively and

11:55:23  22  negatively is what's known in the art, although I do think

11:55:26  23  it was.  But I don't think that's what he's talking about

11:55:29  24  here.

11:55:29  25        What he's talking about is residue data.  It's

91

11:55:31  1  what they describe as the millions of lines of audit

11:55:34  2  information of unknown data that's just logged and never

11:55:37  3  looked at.  And the way -- what the invention does is looks

11:55:40  4  at it multiple times in multiple places.  So, that's what

11:55:43  5  he's referring to here about the residue, Your Honor.

11:55:45  6        THE COURT:  But to my larger point, is what the

11:55:47  7  examiner basically is saying is the thing that is key, the

11:55:50  8  thing that is important about why I'm going to say this

11:55:53  9  patent is going to get granted is it's not just positive or

11:55:57  10  negative filtering, it's positive and negative filtering

11:56:00  11  plus additional analysis of post-residue data?

11:56:03  12        MR. GOLDBERG:  That's correct, Your Honor.

11:56:03  13        THE COURT:  Okay.  Now, in your Complaint when

11:56:05  14  you cite to this, I don't know, the paragraph in which you

11:56:07  15  cite to it, it seems like it's focused more on the

11:56:11  16  additional concept which is captured in some of the

11:56:13  17  dependent claims, a cross-probe analysis.  The idea that I

11:56:16  18  think prior art systems, and I forget how you say it in the

11:56:19  19  claim, weren't utilizing data from different points in the

11:56:22  20  network.

11:56:22  21        MR. GOLDBERG:  Mm-hmm.

11:56:22  22        THE COURT:  Is the whole cross-probe analysis

11:56:27  23  piece being talked about by the examiner, or is that some

11:56:30  24  additional piece of unconventional use that you're adding

11:56:34  25  when you talk about it?

92

11:56:35  1        MR. GOLDBERG:  It's an additional piece, Your

11:56:37  2  Honor.  So, additional, but related might be a better way of

11:56:40  3  describing it.  So, what the patent does, it solves multiple

11:56:42  4  problems.  One of which is finding unknown threats.

11:56:46  5        And the other piece is allowing the locally

11:56:48  6  managed device to benefit from things going on in other

11:56:51  7  networks.  And that's part of why we introduce this

11:56:55  8  hierarchical level, much as like they did in *SRI*.

11:56:57  9        With cross-probe correlation, what the dependent

11:56:59  10  claims add is you'll have your positive and negative

11:57:01  11  filtering of status data.  You'll have a first analysis at

11:57:04  12  the probe that can find the possible security events.

11:57:07  13  You'll send that over the line to the SOC.

11:57:09  14        The SOC will now do additional computerized

11:57:12  15  analysis of the residue using what it's learned from other

11:57:15  16  locations.  So, while it's unknown to you, it might be known

11:57:18  17  to your competitor.  And so, you can now benefit from that.

11:57:22  18  And then an even smaller refined subset goes to the analyst,

11:57:26  19  so it's a third layer of analysis of the residue --

11:57:30  20        THE COURT:  So, the cross-probe correlation

11:57:33  21  discussed in Claim 14, that happens electronically, and it

11:57:35  22  happens at the SOC?

11:57:36  23        MR. GOLDBERG:  That's correct, Your Honor.

11:57:38  24        THE COURT:  It's not an example.  I know Claim

11:57:39  25  14 requires that it be computer based.

93

| | |
|---|---|
| 11:57:39 | 1   MR. GOLDBERG:  Yeah. |
| 11:57:41 | 2   THE COURT:  I wasn't sure I understood it |
| 11:57:43 | 3   happened at the SOC as opposed to earlier in the probe. |
| 11:57:45 | 4   MR. GOLDBERG:  And, you know, my notes are tied |
| 11:57:47 | 5   to the '641, unfortunately, but the '641, Claim 14 depends |
| 11:57:51 | 6   on Claim 10.  And Claim 10 makes clear it's a computerized |
| 11:57:54 | 7   analysis. |
| 11:57:54 | 8   THE COURT:  Yeah, Claim '237, similar, although |
| 11:57:57 | 9   actually in Claim 14 there, it says computer based. |
| 11:57:59 | 10   MR. GOLDBERG:  Yes. |
| 11:57:59 | 11   THE COURT:  So, I guess a related question: |
| 11:58:03 | 12   You're talking about the steps of the *Alice* analysis.  What |
| 11:58:06 | 13   are these claims directed to? |
| 11:58:07 | 14   I think probably fairly in your brief, there's |
| 11:58:11 | 15   probably three pieces that you highlight as being -- no, I'm |
| 11:58:16 | 16   sorry -- maybe four, depending on how you look at it, that |
| 11:58:19 | 17   you highlight as being important to the claimed solution |
| 11:58:22 | 18   depending on whether we're talking about independent or |
| 11:58:24 | 19   dependent claims. |
| 11:58:25 | 20   I think you highlight the fact that the claims |
| 11:58:27 | 21   utilize the positive and negative filtering aspects that the |
| 11:58:31 | 22   probe does.  I think you highlight that the claims utilize |
| 11:58:35 | 23   an additional analysis of residue data that is either |
| 11:58:39 | 24   identified as a positive or negative by the filter.  You |
| 11:58:42 | 25   identify certainly and talk about how the claims require the |

94

| | |
|---|---|
| 11:58:45 | 1   use of the human analyst as to that residue data. |
| 11:58:50 | 2   And then you talk about how, fourth, in certain |
| 11:58:53 | 3   dependent claims, the concept of cross-probe correlation, |
| 11:58:56 | 4   which I think I understand to mean, we're not just going to |
| 11:58:59 | 5   be necessarily getting data from one probe, but from |
| 11:59:01 | 6   multiple probes, which might be helpful if multiple probes |
| 11:59:04 | 7   are seeing the same problem. |
| 11:59:05 | 8   And those four components, I think, are all |
| 11:59:07 | 9   things you talk about and highlight.  I guess for a step one |
| 11:59:11 | 10   perspective, what are these claims directed to?  What's the |
| 11:59:14 | 11   focus of the patent?  It seemed to me that in looking at the |
| 11:59:17 | 12   patent and the early columns in it, not a lot of discussion |
| 11:59:22 | 13   of that analysis, of post filtering.  Ironically, the thing |
| 11:59:25 | 14   the examiner said is the key to allowance, it's not a |
| 11:59:29 | 15   discussion about cross-probe correlation. |
| 11:59:31 | 16   Really most of the focus seems to be on, I |
| 11:59:33 | 17   think, what you call in your briefing this two-level |
| 11:59:36 | 18   analysis.  We do some filtering at the probe.  We do some |
| 11:59:40 | 19   analysis by humans at the SOC. |
| 11:59:41 | 20   Is that fair? |
| 11:59:42 | 21   MR. GOLDBERG:  I don't think so, Your Honor.  I |
| 11:59:44 | 22   think, first of all, I wouldn't describe it as two-level |
| 11:59:47 | 23   analysis.  I would describe it as a two-level architecture. |
| 11:59:53 | 24   And, you know, going back to Figure 1 here, originally we |
| 11:59:58 | 25   just didn't have any of the -- even the locations in which |

95

| | |
|---|---|
| 12:00:01 | 1   to do the multiple steps of analysis.  All those were tied |
| 12:00:05 | 2   together. |
| 12:00:06 | 3   But the big piece, Your Honor, that wasn't on |
| 12:00:07 | 4   the list, and this may have been a function of just our |
| 12:00:10 | 5   drafting, but I do think we covered it is the feedback |
| 12:00:12 | 6   element.  So, this is designed to improve the computer |
| 12:00:16 | 7   system over time.  So, not only does the system detect |
| 12:00:19 | 8   unknown threats, but the feedback now allows for the filters |
| 12:00:23 | 9   to be updated over time so what's unknown can be treated as |
| 12:00:26 | 10   known going forward. |
| 12:00:27 | 11   So, it improves the device in multiple ways.  I |
| 12:00:30 | 12   think the feedback step is very important because that's |
| 12:00:33 | 13   what takes all the analysis, whether it's one step of an |
| 12:00:36 | 14   analysis or two or three, and takes it back to the lower |
| 12:00:40 | 15   level to improve the operation of the prior art security |
| 12:00:43 | 16   system. |
| 12:00:43 | 17   So, I think the feedback element, Your Honor, is |
| 12:00:46 | 18   important.  And so, that's what I meant when I said earlier, |
| 12:00:49 | 19   you know, what happens before the analyst is important.  The |
| 12:00:51 | 20   analyst is important.  And what happens after the analyst is |
| 12:00:53 | 21   equally important, and that's the feedback step. |
| 12:00:56 | 22   THE COURT:  But would you acknowledge that in |
| 12:00:58 | 23   the claims and, again, I've been using Claim 18 as an |
| 12:01:02 | 24   example of the '237.  If we look to see what does the claim |
| 12:01:06 | 25   really require of that human at the SOC -- |

96

| | |
|---|---|
| 12:01:11 | 1   MR. GOLDBERG:  Mm-hmm. |
| 12:01:11 | 2   THE COURT:  -- and if the other side were to |
| 12:01:13 | 3   say, you know what, all it requires and all -- the only |
| 12:01:16 | 4   thing that can be said it actually requires is that the |
| 12:01:19 | 5   human analyze the data.  That's it. |
| 12:01:24 | 6   MR. GOLDBERG:  Mm-hmm. |
| 12:01:25 | 7   THE COURT:  And then the human provide feedback |
| 12:01:28 | 8   on the data.  There's no more specific narrowing of |
| 12:01:32 | 9   particularized requirements.  Anything that amounts to |
| 12:01:36 | 10   analysis of data by the human and feedback on the data, that |
| 12:01:39 | 11   would count for purposes of the claims; is that correct? |
| 12:01:41 | 12   MR. GOLDBERG:  I think -- so, Your Honor's |
| 12:01:44 | 13   focusing very tightly on that one limitation.  What I would |
| 12:01:48 | 14   say, you take a step back -- |
| 12:01:49 | 15   THE COURT:  Just answer my question.  I want to |
| 12:01:50 | 16   know what the limitation means, in your view, before we get |
| 12:01:52 | 17   to how maybe it's combined with other limitations or |
| 12:01:55 | 18   wherever you're going to go.  Is it fair to say that that is |
| 12:01:58 | 19   all that it could mean, each of those limitations? |
| 12:02:00 | 20   MR. GOLDBERG:  Well, and it's fair, Your Honor, |
| 12:02:03 | 21   but I think the only reason why that's possible in the first |
| 12:02:05 | 22   step are the steps that precede it.  So, again, to turn to |
| 12:02:09 | 23   the prior art for a second just to draw the distinction |
| 12:02:11 | 24   here. |
| 12:02:12 | 25   Originally, you had a local system administrator |

97

12:02:15 1 and they couldn't do the job. So, why couldn't they do the
12:02:18 2 job? And it's volume, as Your Honor said, time and
12:02:20 3 expertise.
12:02:20 4       So, you know, yes, what's happening -- we didn't
12:02:24 5 invent a particular way for the analyst to work. No one
12:02:27 6 claimed we did. We didn't invent a particular way of doing
12:02:29 7 filtering in isolation or anything in isolation.
12:02:32 8       We have an architecture and we plug this all
12:02:34 9 together. And as a result, the human, the analyst, can be
12:02:38 10 involved meaningfully in the process and improve the machine
12:02:41 11 in the way the prior art said they could.
12:02:45 12       So, you know, yes, what they're doing within
12:02:45 13 their space may not be inventive, but the fact that they're
12:02:48 14 able to do it is a function of the architecture.
12:02:50 15       THE COURT: Just so, you know, I think the thing
12:02:52 16 that I'm struggling with a bit is that I think Mr. Desai
12:02:57 17 when he gets up is going to say, Judge, I think you can
12:03:00 18 fairly read a claim like Claim 18 to be a claim that
12:03:03 19 essentially says computer filters data. Computer analyzes
12:03:10 20 some of that data.
12:03:11 21       MR. GOLDBERG: Mm-hmm.
12:03:12 22       THE COURT: Human analyzes that extra -- some of
12:03:15 23 that data. Human provides feedback on data.
12:03:18 24       And he's going to say, If that's what it can
12:03:20 25 fairly be read as, that one, two, three, four, that's like

98

12:03:23 1 abstract idea, plus abstract idea, plus abstract idea, plus
12:03:27 2 abstract idea. And, you know, they'll talk about -- you
12:03:30 3 know, I think is it Greenberg that the other side cites?
12:03:34 4       MR. GOLDBERG: Rosenberg.
12:03:35 5       THE COURT: Rosenberg, sorry, that the other
12:03:37 6 side cites as their most relevant case. Right. I think if
12:03:39 7 you look at that claim, essentially if you look at it, what
12:03:41 8 it kind of looks like is collected, transmitted, processed
12:03:45 9 data, filtered it.
12:03:46 10       You know, they're saying that's what this is.
12:03:48 11 This is filter data, analyze some of that data, human
12:03:51 12 analyze that same data, human provide feedback on that data.
12:03:55 13       I think what I need to hear from you is: Why is
12:03:58 14 that not right? Why is this about something different than
12:04:01 15 that? What would you say?
12:04:03 16       MR. GOLDBERG: Well, Your Honor, look, whether
12:04:04 17 it's Ankara or BASCOM, you know, specific series of steps at
12:04:10 18 specific locations for specific purposes is patentable
12:04:13 19 subject matter. And to turn to maybe In Re: Rosenberg,
12:04:16 20 which I think, you know, Your Honor mentioned as a good way
12:04:19 21 of distinguishing this situation -- let me get to the claim
12:04:24 22 here, Your Honor.
12:04:27 23       So, this is a perfect example when you have a
12:04:30 24 process that a human used to perform, and we've computerized
12:04:33 25 it for speed or efficiency. And here, you know, the

99

12:04:37 1 computer, as a result of these steps, functions in exactly
12:04:41 2 the same way it did before.
12:04:44 3       There's no disruption. There's no enablement or
12:04:47 4 new functionality. We were just taking data from these
12:04:50 5 various sites and moving them around, you know, more quickly
12:04:53 6 then previously. You know, the computer system itself, you
12:04:57 7 know, is not disrupted in any way. It's not expanded in any
12:05:01 8 way. And here, given the risk of preempting essentially
12:05:05 9 computerization of clinical trials.
12:05:07 10       So --
12:05:07 11       THE COURT: Nor here is the computer disputed or
12:05:10 12 expanded -- the use of the computer is disrupted or
12:05:13 13 expanded, to use your words, in a way that distinguishes
12:05:15 14 what's going on to say what was happening In Re: Rosenberg.
12:05:19 15       MR. GOLDBERG: Yeah, Your Honor. So, in our
12:05:20 16 case, a prior art system, as described in the spec, which
12:05:23 17 was unable to be managed -- find new threats and was managed
12:05:27 18 locally is now enabled to be managed remotely to identify
12:05:31 19 new threats, unknown threats in real time in a way that
12:05:33 20 works and balances all the constraints of a modern network.
12:05:37 21 And the patent explains that in the prior art, all the prior
12:05:39 22 art device did was either log, or, in the case of Notice of
12:05:44 23 Allowance, discard this big pile of residue.
12:05:46 24       Well, that's what you would expect to happen in
12:05:48 25 the ordinary course. We disrupted that by now you're going

100

12:05:50 1 to take this residue, and you're going to analyze two or
12:05:53 2 three times at different locations and defined hierarchy for
12:05:57 3 different things. So, in that sense, it's very distinct
12:06:00 4 from In Re: Rosenberg, Your Honor.
12:06:01 5       And if I can focus just a little bit, Your
12:06:04 6 Honor, on the SRI claim.
12:06:06 7       THE COURT: Yeah. I guess that's maybe the last
12:06:07 8 piece we'll have, because you're close to the end of your
12:06:09 9 time.
12:06:10 10       MR. GOLDBERG: Understood, Your Honor.
12:06:11 11       THE COURT: Tell me more about -- now,
12:06:12 12 particularly, if you'll address -- I asked Mr. Desai to
12:06:17 13 distinguish the claim. He talks about the fact that we have
12:06:18 14 a human component here in our claim. And he talks about the
12:06:21 15 SRI Court's conclusion with regard to the claim at issue
12:06:25 16 there, that the human mind wasn't equipped to do the kind of
12:06:29 17 work that the claimed monitors were doing.
12:06:32 18       MR. GOLDBERG: Mm-hmm. So, I think what
12:06:35 19 Mr. Desai is talking about is really the automatically
12:06:36 20 receiving and integrating the report step of the '615 and
12:06:39 21 talking about what happens at our SOC. And really I have
12:06:43 22 four responses to that, Your Honor.
12:06:45 23       The first, again, I know we're focused on the
12:06:47 24 '237 claim here, but in the '641, we don't have an analyst.
12:06:51 25 We have an analyst system. And I do believe we mentioned

101

12:06:53 1  that in our briefing, Your Honor.

12:06:54 2          The dependent claims, including 14, have

12:06:57 3  additional computerized analysis at the SOC.  And so, I have

12:07:01 4  a hard time seeing -- I have never seen any case law

12:07:04 5  supporting that you can have computerized analysis of the

12:07:07 6  SOC, but then, because you add a human step, that somehow

12:07:10 7  negates everything else in the claims, Your Honor.

12:07:13 8          So, even if you have to have automatically

12:07:16 9  necessarily requires computerized, and I'm not sure it does,

12:07:20 10 we have that in the dependent claims, Your Honor, it lines

12:07:24 11 up perfectly.  So, yes, we do.  We have an extra step.

12:07:27 12         Again, and I've never seen any case law that

12:07:30 13 says -- putting aside the computerized step, I've never seen

12:07:33 14 any case law that says, Your Honor, that you can't have a

12:07:35 15 human in the process, if the idea here is the human helps

12:07:39 16 improve the operation of the machine.

12:07:41 17        It's the reverse of a typical 101 case.  In the

12:07:44 18 101 case, you've got a human process and you're

12:07:47 19 computerizing it.  Here, you've got a process a human can't

12:07:50 20 participate in, which is what the spec says.  As a result of

12:07:53 21 the invention, the human is able to participate in the

12:07:56 22 process, and the machine's input is the result, Your Honor.

12:07:59 23        THE COURT:  When the probe, the claimed probe is

12:08:03 24 filtering data positively or negatively, is that something a

12:08:07 25 human could do?

102

12:08:07 1          MR. GOLDBERG:  You know, I don't think so, Your

12:08:09 2  Honor.  This is incredibly technical stuff.  I mean, if you

12:08:13 3  had an abstract, you know, one piece of data, and you had

12:08:18 4  this, you know, one thing trying to match it to, maybe.

12:08:22 5  Practically, no, if it's visible like that way.

12:08:24 6          In the context of the computer network, Your

12:08:27 7  Honor, I think what *SRI* said is, you know, human minds are

12:08:30 8  not equipped to do this in any meaningful sense in the

12:08:33 9  securities context.  You can maybe try to do some small

12:08:36 10 slice of something, but that's not what this is about, Your

12:08:36 11 Honor.

12:08:38 12         So, let me answer as no.

12:08:40 13         THE COURT:  Could a human analyze post-residue

12:08:42 14 data in a way that the probe, the claimed probe does?

12:08:44 15         MR. GOLDBERG:  I would say no, Your Honor.

12:08:46 16         THE COURT:  Could not?

12:08:47 17         MR. GOLDBERG:  No.  And, again, that would be --

12:08:50 18         THE COURT:  Why?

12:08:50 19         MR. GOLDBERG:  Well, and the patent explains

12:08:52 20 that, and that's where in the background that there's just

12:08:55 21 too much of it at that point, and there's not the tools and

12:08:58 22 context needed in order to process this information.

12:09:01 23         THE COURT:  Could a human do it if the human

12:09:04 24 just had more time?

12:09:04 25         MR. GOLDBERG:  I don't think so, Your Honor.

103

12:09:06 1  They would still lack the intelligence the hierarchical

12:09:09 2  structure creates.

12:09:09 3          THE COURT:  Okay.  All right.  I think we're at

12:09:12 4  your time, Mr. Goldberg.  Thank you.

12:09:15 5          Why don't I hear a couple minutes of rebuttal

12:09:19 6  from the other side.

12:09:22 7          Mr. Desai.

12:09:25 8          MR. DESAI:  Sure.  I had their slides up here.

12:09:28 9  There was a claim here quickly.  Well, just let me start

12:09:30 10 with the post-filtering residue analysis.  Okay.

12:09:33 11         This is a black-box generic analysis.  Okay.

12:09:38 12 The human gets information.  That's what the claim says.  It

12:09:42 13 says transmit information.  It doesn't say what it's

12:09:47 14 getting.  Could be all the residue data, could be some of

12:09:49 15 it.  Right.  That's --

12:09:51 16         THE COURT:  I mean, it seems pretty clear.  It's

12:09:53 17 like the filter filtering out certain data and then it says

12:09:57 18 certain data is good.  Then there's this post-residue data

12:10:00 19 which is like this in-between data.  The other side says

12:10:04 20 it's that post-residue data which is analyzed by the probe.

12:10:06 21 But then whatever is sent to the human is going to be some

12:10:10 22 subset of that.

12:10:10 23         You disagree?

12:10:12 24         MR. DESAI:  I disagree that's in the claim.

12:10:13 25 Absolutely.

104

12:10:13 1          THE COURT:  What do you think is happening in

12:10:15 2  the claim?

12:10:15 3          MR. DESAI:  It says transmit information.

12:10:17 4  That's what it says.  If we -- I'm sorry, if we could switch

12:10:20 5  over to -- I'm sorry.  Sorry, Your Honor.  Apologies for

12:10:24 6  that.

12:10:24 7          THE COURT:  And that information, you're saying

12:10:27 8  it might be information about that post-residue data, but it

12:10:30 9  could be information about maybe data that was filtered; is

12:10:33 10 that right?

12:10:33 11         MR. DESAI:  If we look at all three of these

12:10:36 12 claims up here, if we look at Step C, transmitting

12:10:39 13 information about said identified events.  It could be all

12:10:43 14 of the residue data.  It could be some of it.  It's -- the

12:10:46 15 idea that this claim is specific in that way is just wrong.

12:10:50 16 It's not there.

12:10:51 17         THE COURT:  All right.  I'm not even sure why it

12:10:54 18 might matter, though if it did matter, could it be said

12:10:56 19 arguably that that's a claim-construction-type issue?

12:10:58 20         MR. DESAI:  I don't think so, and it does matter

12:11:00 21 because I think what we heard is that the human can't

12:11:04 22 analyze the same data as the probe.  And, again, that's

12:11:08 23 clearly wrong in this patent.

12:11:09 24         THE COURT:  Do you think it's wrong to say that

12:11:12 25 a human can't filter data in the way that the probe is meant

105

12:11:15 1  to do it?

12:11:16 2       MR. DESAI:  Not in the way this patent is

12:11:18 3  claiming it.

12:11:18 4       THE COURT:  Why do you say that?

12:11:19 5       MR. DESAI:  The patent is simply saying, Here is

12:11:21 6  status data.  Is it good or is it bad?  A human could

12:11:23 7  absolutely do that.  If you look at their Complaint, they've

12:11:26 8  pointed to, for example, status data being an IP address,

12:11:28 9  right.  A human can certainly check an IP address against a

12:11:33 10  good and a bad list.  No question about it.

12:11:36 11       The issue is:  Can it do it as quick as a

12:11:38 12  computer?  Well, we know that's not -- that's using a

12:11:41 13  computer as a tool.

12:11:42 14       So, the idea that the filtering and the res --

12:11:47 15  and the analysis by the probe are somehow different than the

12:11:50 16  analysis that the human is doing is wrong.

12:11:51 17       THE COURT:  To go back, though, so take this

12:11:53 18  point, right.  Can a human filter data in a way or in a

12:11:57 19  manner that the claim is requiring the probe?

12:11:59 20       And then go back to *SRI*, when *SRI* is talking

12:12:02 21  about the work on the monitors, and it says, you know, *Cisco*

12:12:06 22  also submits the asserted claims are so general that they

12:12:08 23  encompass steps that people can both do in their minds,

12:12:11 24  allegedly confirming the practical abstract concept.

12:12:14 25       We disagree.  This is not the type of human

106

12:12:16 1  activity that 101 is meant to exclude.  Indeed, we tend to

12:12:19 2  agree, tend to agree, not even super conclusive, with *SRI*

12:12:23 3  that the human mind is not equipped to detect suspicious

12:12:27 4  activity by using network monitors and analyzing network

12:12:31 5  packets as recited by the claims.

12:12:35 6       I mean, obviously, a human wouldn't be using a

12:12:37 7  monitor, right.  It's whether the human would be doing the

12:12:39 8  same thing that the computer is doing in the same way.  How

12:12:43 9  do you distinguish what's going on there from what's maybe

12:12:46 10  known or unknown about the filtering process?

12:12:48 11       MR. DESAI:  Right.  The way I distinguish what's

12:12:50 12  going on in *SRI* from what's going on in this case is the

12:12:53 13  patent specification and the language in this case, which is

12:12:56 14  different than what's in SRI.

12:12:57 15       In this case, it is talking about the positive

12:13:01 16  and negative filtering, okay, which the Complaint itself

12:13:05 17  acknowledges is a white list and a black list.  Okay.  And

12:13:09 18  there's no volume amounts.  There's no scale issue here.

12:13:12 19  None of that is in this claim.

12:13:13 20       And the issue is simply:  Can a human do the

12:13:17 21  filtering of an IP address by comparing it to a white list

12:13:21 22  or a black list?  Categorically, they can.  The only

12:13:24 23  difference with the probe is it can do it faster, like all

12:13:24 24  computers can do things faster than humans.

12:13:29 25       THE COURT:  If I was citing to something for

107

12:13:31 1  that purpose, and I can't cite to Mr. Desai's oral argument,

12:13:34 2  what do I cite in the record for that proposition?

12:13:36 3       MR. DESAI:  The fact that a human can do --

12:13:39 4       THE COURT:  The type of filtering that's

12:13:40 5  claimed, like what part of the record do I cite?  What part

12:13:42 6  of the patent?

12:13:43 7       MR. DESAI:  There's the part of the patent that

12:13:48 8  we -- for some reason the computer wanted access to the

12:13:51 9  camera.  Let me -- it would be this part of the patent right

12:13:54 10  here which just says what's positive filtering and what's

12:13:58 11  negative filtering.  It's selecting good information and

12:14:00 12  discarding bad information.  And the part of their Complaint

12:14:04 13  that talks about a white list and a black list, and these

12:14:08 14  are -- there's also a case, I believe we cited cases, that

12:14:11 15  say filtering is just, you know, conventional routine

12:14:15 16  activity that people have done for who knows how long,

12:14:19 17  right.

12:14:19 18       And this is not some special type of filtering.

12:14:22 19  This is literally good and bad filtering.  Okay.

12:14:28 20       Let me -- I think they didn't cover it.  You

12:14:32 21  have their slide, though, BT Slide Number 5.  And this was a

12:14:38 22  slide that caught my eye that I really wanted to show Your

12:14:40 23  Honor.  And they didn't show it, but I'm going to show it.

12:14:45 24  Let me get to it really quick.

12:14:47 25       Right.  It says, "The inventors realized that

108

12:14:51 1  any successful solution needed to balance several competing

12:14:51 2  interests."

12:14:56 3       So, this is what the inventors realized.  This

12:14:58 4  is their slide.  If you take a look at every single one of

12:15:01 5  those citations, it's about the security analyst.

12:15:03 6       The first bullet, there's a quote from that

12:15:06 7  portion, 24, 20.  It says, "Security analysts can escalate

12:15:09 8  the handling of the incident."

12:15:11 9       2, 13 to 18, that's talking about analyze by

12:15:16 10  trained security analysts.

12:15:16 11       3, 22 is just simply "reduce volume of data

12:15:20 12  for -- worthy of analysis.  We've talked about how just

12:15:23 13  simply taking computer and reducing what a human should

12:15:25 14  review is not patent eligible.  There's case law that --

12:15:29 15  Federal Circuit case law that says that explicitly.

12:15:32 16       And then the last one is, "Security analysts are

12:15:35 17  personalized personnel specializing in the analysis of

12:15:37 18  network attacks."  These are the quotes from what they put

12:15:42 19  in their slide about what the inventors realized.  It is not

12:15:45 20  about post-filtering residue analysis.

12:15:46 21       And if you go to the specification, the

12:15:49 22  beginning like you mentioned, Your Honor, that is not what

12:15:52 23  the patent describes as the improvement.  And we have to be

12:15:55 24  guided here, according to the Federal Circuit, by what the

12:16:00 25  specification tells us is the improvement, not the

**109**

12:16:05  1    after-the-fact discussion.

12:16:07  2         THE COURT:  Okay.  Mr. Desai, you're about at

12:16:09  3    your time.  So, thank you.  I appreciate the arguments from

12:16:12  4    both sets of counsel.

12:16:13  5         Okay.  Before I adjourn for lunch and to think

12:16:17  6    more about what's been said today, I did mention that I

12:16:21  7    wanted to -- you know, I've got a bunch of smart folks who

12:16:25  8    work in patent litigation and have thought about Section 101

12:16:28  9    issues a lot.  I don't know what number these 101 motions

12:16:32  10   are in terms of that I've decided, but I don't think I'm at

12:16:36  11   a hundred, but I might be past, you know, 50.  So, it's

12:16:39  12   something I do a lot.  And yet, obviously, it's a difficult

12:16:43  13   area of the law and it's ever changing.

12:16:46  14        And so, I want to try to get the benefit of the

12:16:49  15   fact that you're all here.  If there's anything you could

12:16:52  16   add to what's already been said that will help me, not only

12:16:57  17   in these cases, but in other cases.  So, I think really the

12:16:59  18   question I'll ask is just the one that I suggested earlier,

12:17:02  19   which is -- you know, I'm not really asking for you to make

12:17:06  20   additional argument about your particular case.  It might be

12:17:09  21   that what you're saying could have some relevance to it, but

12:17:11  22   I'm asking you to be more general.

12:17:12  23        But is there anything about Section 101

12:17:15  24   jurisprudence that you think that Courts generally, maybe

12:17:18  25   today or in general, are not quite getting right all the

**110**

12:17:23  1    time, or they need to be kind of thoughtful about, or is it

12:17:27  2    maybe always analyzed in the right way?

12:17:30  3         Again, like, I'll give you an example just some

12:17:33  4    of the -- when I asked the question about how in the letter

12:17:35  5    briefing, you know, there were some cases or portions of

12:17:38  6    cases that the parties, I mean, which are really helpful.

12:17:42  7    Like in *American Axle*, I think Judge Dyk talks about the

12:17:46  8    concept of how how, you know, is very relevant to,

12:17:51  9    obviously, multiple different components of the, you know,

12:17:55  10   validity or eligibility analyses, but in different ways.

12:17:59  11   And, you know, it's the claimed how that's particularly

12:18:02  12   relevant to eligibility.  It's the specification's assertion

12:18:04  13   of how that's particularly relevant to 112 issues, written

12:18:09  14   description, enablement.  And I don't think I had seen them

12:18:11  15   before.  It's a really helpful way of kind of like, yeah,

12:18:13  16   that's right, of course.

12:18:14  17        Any way, if there's anything like that that

12:18:16  18   you-all have been thinking or like, you know, just to help a

12:18:19  19   federal judge that is doing this a lot, I want to get the

12:18:23  20   benefit of your thoughts.

12:18:24  21        So, let me first turn, and not that there has to

12:18:27  22   be.  We may have said all that can be said really about

12:18:30  23   these issues today.

12:18:31  24        But anything on the Plaintiff's side here on our

12:18:33  25   first case that BT would like to share?

**111**

12:18:36  1         Mr. Goldberg.

12:18:37  2         MR. GOLDBERG:  Nothing comes to mind, Your

12:18:39  3    Honor.

12:18:39  4         THE COURT:  Okay.  All right.

12:18:40  5         And on Defendant's side?

12:18:41  6         Mr. Desai.

12:18:41  7         MR. DESAI:  Your Honor, I have a quick comment,

12:18:43  8    and it has to do with what claims should be addressed in a

12:18:46  9    motion to dismiss.  And I think that's an area of

12:18:49  10   uncertainty as to -- and it is particularly -- there is,

12:18:51  11   obviously, relevance to our cases.  We have noted in our

12:18:55  12   papers that Your Honor can dismiss this Complaint without

12:18:58  13   addressing the dependent claims, and there is some case law

12:19:01  14   from Delaware that confirms that.

12:19:03  15        There's a little guidance from the Federal

12:19:05  16   Circuit.  There's a recent case, I think, where a Plaintiff

12:19:07  17   was requesting that unasserted claims should not be

12:19:10  18   addressed and the Federal Circuit agreed.

12:19:11  19        THE COURT:  Right.  So, that's the -- it begins

12:19:14  20   with a H, I think.  I think it was a post decision, but I

12:19:16  21   think one of the parties cited that.  I think it was

12:19:19  22   Postscript that cited it in.  Somebody cited it in.

12:19:20  23        It's the Federal Circuit case, I think it was

12:19:23  24   Judge Bryson, was basically saying, I think, in that case,

12:19:26  25   it's a little complicated because not only were the other

**112**

12:19:30  1    claims not specifically referenced in the Complaint, but I

12:19:33  2    think at oral argument the patentee was saying, Yeah, we're

12:19:36  3    not asserting that.

12:19:37  4         MR. DESAI:  Yeah.

12:19:38  5         THE COURT:  Harder call might be like what if

12:19:41  6    the Complaints, like they always do, say at least Claim 1,

12:19:44  7    don't say much in the way of what about the other ones.

12:19:47  8    When you don't have that kind of admission, are the other

12:19:49  9    claims in or out for purposes of being eligible to assess?

12:19:53  10        MR. DESAI:  Well, I think the issue there is

12:19:56  11   this is a *Iqbal-Twombly* pleading issue.  I mean, some would

12:20:01  12   say patent cases are not special.  And when you're

12:20:03  13   dismissing a Complaint, you're dismissing what's pled.

12:20:06  14        THE COURT:  And on that front, let me just ask

12:20:07  15   you -- this is a vague question that doesn't necessarily

12:20:09  16   have to do with 101, right, but I think about it sometimes.

12:20:12  17        So, the way I think it works in patent

12:20:13  18   litigation is, you know, the Complaint will say, you know,

12:20:15  19   Patent Number '123, at least Claim 1, and then it

12:20:20  20   states a claim as to why there's, you know, plausible

12:20:23  21   assertion of infringement as to Claim 1 of the '123 patent.

12:20:27  22        And then like it seems like everyone just agrees

12:20:31  23   by way of like mutually asserted structure that the way

12:20:34  24   we're going to do this forward is we're not going to make

12:20:37  25   the patentee go back and amend the Complaint to say Claim 1,

## 113

12:20:41 1 Claim 2 and Claim 3.  The patentee is going to provide
12:20:44 2 infringement contentions.  Everybody knows that they could
12:20:46 3 literally just go back and then attach the contentions and
12:20:48 4 say that's enough to add those claims.
12:20:50 5       But like for other areas of the law, right,
12:20:54 6 wouldn't you be like having to say, plausibly, that like
12:20:58 7 Claim 2 or Claim 3?
12:20:59 8       MR. DESAI:  I think this is a major issue that I
12:21:02 9 don't know how it would get to the Federal Circuit.  But in
12:21:05 10 other areas of the law, especially, you know, you read in
12:21:08 11 the pleadings standards are designed so that you cannot use
12:21:11 12 Complaints as a fishing expedition to look for an additional
12:21:16 13 pleading.  If your operative pleading is deficient because
12:21:21 14 what you've pled is ineligible, the Complaint is dismissed.
12:21:25 15 You may seek leave to amend your Complaint if that's
12:21:29 16 appropriate and if it's not futile, for example.  But those
12:21:32 17 are all pleading issues.
12:21:33 18       And I think what we're mixing up is pleading
12:21:36 19 standards granting patent specifications some sort of
12:21:39 20 special unique pleading standards versus docket control
12:21:43 21 procedures like infringement contentions, which are very
12:21:46 22 different.
12:21:47 23       THE COURT:  Put differently, if you have a
12:21:50 24 particular contract claim and you in your Complaint, List
12:21:52 25 two theories as to why that contract was breached, right,

## 114

12:21:56 1 it's because they've breached Section 1.2 and 1.4.  And then
12:22:01 2 later in the case, you say to the other side, I've got three
12:22:05 3 more that were pressing here in Section 6.2.
12:22:09 4       If the other side were to say, What are you
12:22:10 5 talking about?  That's not alleged in your Complaint.  In
12:22:12 6 your view, would that be kind of an allegation of breach of
12:22:15 7 contract that's not in the case?
12:22:16 8       MR. DESAI:  I think in most breach of contract
12:22:18 9 cases, that motion to dismiss would be decided before the
12:22:21 10 Plaintiff ever has the chance to get that theory.  And
12:22:24 11 patent cases are different in that way where often times the
12:22:28 12 motion to dismiss is hanging around, and then infringement
12:22:32 13 contentions and discovery are ongoing.  And so, that is a
12:22:35 14 major difference, I think, in patent cases.
12:22:37 15       THE COURT:  And back to your original point
12:22:39 16 about the way we've represented claim analysis in 101.  The
12:22:42 17 way I thought of it, tell me if you think this is wrong, is
12:22:44 18 the movant will say, I think Claim 1 is representative.
12:22:48 19       And then we see what the patentee says in the
12:22:50 20 answering brief.  You know, if the patentee talks about
12:22:52 21 Claim 1 and they don't talk about any other claims, well
12:22:56 22 *Berkheimer* would say, Well, they haven't made an argument as
12:22:58 23 to the representativeness of any of those other claims.
12:23:00 24 They just essentially acknowledged it's all about Claim 1.
12:23:03 25 Everybody lives and dies with Claim 1.

## 115

12:23:05 1       MR. DESAI:  Yes.
12:23:05 2       THE COURT:  If the patentee goes on to talk
12:23:07 3 about other claims in the patent and why it is that they add
12:23:11 4 an additional thing that's relevant to the eligibility mix,
12:23:15 5 then fairly the Defendant in the reply brief has got to
12:23:18 6 address those other claims, too, that they've been raised.
12:23:21 7       MR. DESAI:  Yes.
12:23:22 8       THE COURT:  And I guess presumably would say
12:23:24 9 they have been asserted, even if maybe they're not talked
12:23:26 10 about in the Complaint.  Do you think that's all right?
12:23:28 11       MR. DESAI:  The part I question is whether
12:23:30 12 they've asserted --
12:23:31 13       THE COURT:  Yeah.
12:23:32 14       MR. DESAI:  -- which is the pleading standards
12:23:34 15 and whether you need to dismiss allegations that are not in
12:23:38 16 the Complaint.
12:23:39 17       THE COURT:  Okay.  And if the patentee said,
12:23:43 18 Well, whatever we said in the Complaint, I'm saying by
12:23:45 19 raising claim "X" in our brief, we're asserting this.  That
12:23:51 20 sounds like from that recent Federal Circuit case, that
12:23:53 21 might be enough.
12:23:54 22       MR. DESAI:  It might be.  It might be.
12:23:56 23       THE COURT:  All right.  Anything further,
12:23:57 24 Mr. Desai?
12:23:58 25       MR. DESAI:  That was it, Your Honor.

## 116

12:24:00 1       MR. GOLDBERG:  Your Honor, as that was directed
12:24:02 2 primarily at our case, can I rebut briefly?
12:24:05 3       THE COURT:  Sure.  Sure.
12:24:06 4       MR. GOLDBERG:  Thank you.  Your Honor, just the
12:24:07 5 Complaint here has broad statements of infringement with
12:24:10 6 regard to the patents in general and also includes a
12:24:13 7 specific example, but it describes a lot of the
12:24:17 8 functionality like cross-probe correlation in the Complaint
12:24:20 9 expressly.  And I think there's no question that Defendants
12:24:24 10 here were under notice.  That was part of --
12:24:26 11       THE COURT:  I want to try to keep it out of
12:24:28 12 that.  I know what you're saying.  Some of this may have
12:24:30 13 some relation.  Let me talk more generally with you about
12:24:33 14 like the representative analysis claim.
12:24:35 15       Like you think like if you have a Complaint that
12:24:37 16 says, you know, patent '123, at least Claim 1 is infringed
12:24:43 17 and explains why, and then we have an eligibility challenge
12:24:47 18 at the Rule 12 stage, if the Plaintiff doesn't say anything
12:24:51 19 else, like, you know, only talks about Claim 1, doesn't
12:24:55 20 mention anything about any other claims in its briefing or
12:24:57 21 argument, is the way that the judge should view that as,
12:25:00 22 well, only Claim 1 is asserted in the case; that's the only
12:25:03 23 claim I can address at a Rule 12 stage?
12:25:04 24       MR. GOLDBERG:  Well, as Your Honor noted, it's
12:25:08 25 an efficiency claim, right.  And I think there's a standard

117

1 that there's a notice of pleading, so they may just come
2 back around and define a different claim.  It seems like if
3 you have a situation where the parties are on notice that
4 the other claims may be asserted for the functionality
5 that's described, it's probably more efficient to rule on
6 all in one shot.  But whether Your Honor has to is a
7 different question.
8         THE COURT:  I guess I could always ask the
9 Plaintiff, right, at the argument, Look, are you asserting
10 other claims?  And if the Plaintiff says either yes or,
11 well, we could or we might be, that might be enough to keep
12 them in?
13         MR. GOLDBERG:  And the other point, Your Honor,
14 is a bit of inconsistency between this and the Delaware
15 local rules which kind of define time for the
16 Plaintiff to identify which specific claims that are
17 infringed.  It would really be a new standard to force the
18 Plaintiff to identify all the claims they are alleging
19 infringed expressly in the Complaint well ahead of the time
20 specified in our local rules.
21         THE COURT:  No, I understand.  I think it's a
22 question of, Well, what do you do in the interval?  Like
23 what does it mean to not to have done that yet for purposes
24 of what's being asserted?
25         MR. GOLDBERG:  Yeah.

118

1         THE COURT:  Okay.  Thank you, Mr. Goldberg.  I
2 appreciate that.
3         Let me give counsel for the other guys a chance
4 to add anything they'd like to add about 101 law that I
5 should be thinking about generally.  Let me ask in the
6 Attentive cases, the Plaintiff's counsel, if there's
7 anything that they'd like to add.
8         Mr. Weinberg.
9         MR. WEINBERG:  Sure.  It's a very big question,
10 and I think that to say the District Court is getting
11 something inconsistent, the Federal Circuit is getting
12 consistent, I think there's very quibble in that latter
13 camp.  So, it's putting the District Courts in a very
14 difficult spot because the Federal Circuit's opinions are
15 quite panel specific.  And often the briefing, because of
16 that, puts the District Court in a bind.
17         It seems as though Plaintiff's counsel submits a
18 brief that says the word specific over and over again.  The
19 Defendant submits something that says generic and
20 conventional over and over again.
21         THE COURT:  I think the words specific, and
22 particular and concrete are like whatever that means is like
23 a key to 101.
24         MR. WEINBERG:  I think it means that you're
25 about to read a long run-on sentence what the claim is about

119

1 and that appears specific.  I would say that maybe one thing
2 that the District Courts might be able to do to help this
3 out is to be a little bit more deliberate than the parties
4 tend to be on the doctrines that are being applied.  If the
5 Federal Circuit has two lines of case law, one about
6 specificity, for example, and another one about
7 technological inventions, and those are competing threads,
8 and they're being applied separately, they're being called
9 out separately.
10         In the opinions, it should be a bit of an
11 enunciation.  This is what we're applying.  This is why this
12 is most applicable here.  These are the pieces of this
13 particular doctrine.
14         THE COURT:  And in that regard, if we're talking
15 about claims to computer software, or computer
16 functionality, in your view, are there really kind of two
17 lines of authority?  One that would say, Look, there's a
18 path to eligibility that's simply about specificity and
19 particularity separate and apart from unconventionality?
20 And then there's a path that's like an unconventional use of
21 computer technology path, and those are two different paths?
22         Is that what you're suggesting, even in that
23 realm?
24         MR. WEINBERG:  Yeah, this is a bit murky,
25 because they are discussing *Tec.Sec*, for example, Judge

120

1 Taranto says it's two different inquiries that we find
2 relevance to computer-implemented inventions with
3 specificity.  And the technical aspect of it, how this is a
4 technical invention.
5         The specificity stuff comes from 200 years ago.
6 It's from all those, a variety, and those tests that
7 predates *Alice* by a long shot.  *Alice* is more of a
8 procedural mechanism for getting at that underlying
9 question.  The technical --
10         THE COURT:  *Alice* is really what kind of gave us
11 this, you know:  Is it just do it on a computer or is it
12 unconventional use kind or at least -- right?  Is that kind
13 of right?
14         MR. WEINBERG:  So, what I was trying to say was
15 *Alice* is a procedural frame.  Step two, step two is sort of
16 just there to help you work through procedurally to get to
17 the underlining question.  The underlining question is the
18 specificity that you need enough room for something else to
19 improve upon what you did.
20         Alice was a response to a long line of failures,
21 I would say, from the Supreme Court starting in 1972,
22 *Benson*, where they just didn't really grapple with what it
23 means to have a software invention.  And for a long time,
24 the Patent Office was granting things that were just do it
25 on a computer.  Right.

121

1   And so, that's why *Alice* did have to say the
2   goal of automation using a generic computer is -- that
3   doesn't meet the specificity requirement.  It didn't meet
4   those terms.
5          THE COURT:  That's what I was going to say, what
6   you said.  I've always thought of it as like I thought of
7   this whole unconventional use of computer technology piece
8   as being about specificity, or particularity or concreteness
9   to take us out of this result land or abstract idea land in
10  the sense that, like, what the Courts were saying was, We're
11  just going to say that adding do it on a computer or its
12  equivalent is indistinguishable from claim-to-abstract idea.
13         So, if you have claim-to-abstract idea and all
14  you're adding is do it on a computer or words to that
15  effect, it's indistinguishable from this.  And the whole
16  line of case law about are the adds, do they amount to the
17  unconventional use of computer technology, is really about:
18  Are they sufficiently specific enough to take us out of
19  abstract idea land when it comes to computer-based patents.
20         Do you think that's right or wrong?
21         MR. WEINBERG:  I think that's right.
22         THE COURT:  Okay.
23         MR. WEINBERG:  I think that's right.  *Alice* was,
24  I think, the first decision to say that this 101 exception
25  root of it is the breadth of the claim, right.  If you're

122

1   just trying to automate using a generic invention in a
2   generic computer, that's not going to be enough to be more
3   specific than just the abstract idea.  So, that was in
4   *Alice*, and that's -- you're absolutely right to have that.
5          *Alice*, also, of course, had language about the
6   conventional limitations, and that was expanded as its own
7   set of case law.  But what I was suggesting in the District
8   Courts, for example, is that when you're saying that one
9   limitation does not get you anywhere because it's generic, a
10  generic computer, that comes from *Alice*, automation using a
11  computer.  There's no other way to automate, right.  So,
12  it's the generic.  It's the parents.  It's the genus.
13         Whereas, the conventional limitation or
14  exclusivity as such comes from.  That's where it
15  substantially more comes from.  That's a different sort of
16  attack on the claim limitations themselves.
17         And so, just to be a little bit more specific
18  when -- instead of saying, oh, it's all generic conventional
19  activity that was always done and mush it all together, it
20  may encourage more clear case law.  I'm not sure.
21         THE COURT:  Okay.  All right.  Thank you,
22  Mr. Weinberg.  We'll leave it there.
23         Thank you.  Let me ask counsel for Emotive, what
24  would you like to say?
25         MR. MARTINELLI:  I think I would like to respond

123

1   to this issue about computers in particular.  And the issue
2   you have with computers is they can do anything just by
3   writing lines of code.  And I think that's where a lot of
4   this came from.
5          And as somebody who earlier in my career drafted
6   patents and had to actually grapple with what do you do when
7   you write a patent, I sort of know how patent prosecutors
8   think about things.  And the way they think about it is just
9   add words, right.  Like I can just keep adding steps.  And
10  we used to have a thing, and it's funny, I was talking about
11  a younger colleague of mine, and we had error limitations.
12  And error limitations are you put in things in your computer
13  claim like a memory talking to a processor or talking to
14  whatever and you say like, well, yeah, that makes the claim
15  look more robust, right, because I put in things that look
16  specific, but --
17         THE COURT:  More words.
18         MR. MARTINELLI:  -- we laugh to ourselves and
19  say, yeah, but that's all in there any way, but at least
20  like I'm not having a claim that's one line or two lines
21  that's just the function.
22         And I think that's really what a lot of this,
23  you know, post-Internet age 101 law is grappling with.  It's
24  should we be granting the patents to people that are just
25  figuring out like functional ideas and things that are

124

1   real-world processes and applying them to this specific
2   context and allow them to get a patent just because they put
3   in enough words to get a patent?
4          And that's why it's not necessarily about:  Is
5   this new or not?  And novelty and obviousness sort of is a
6   separate aspect.
7          And so, I don't see specificity and technical
8   improvement of the computer as two separate things.  I think
9   they're two different facets of really like looking at the
10  same issue.
11         And the issue is:  Are you improving on the
12  computer or did you just have a concept and say, you know,
13  my client came to me with this business that they have.  The
14  business is just, you know, a new Internet company.  I've
15  got to write them a claim.  And as a clever patent attorney,
16  I'm going to just throw in as much computer words as I can
17  so that can be an argument that I can do that.  And that's
18  why --
19         THE COURT:  If you had to say, like, what
20  amounts to improving a computer, you know, like the easiest
21  way, how do we know if we're improving the computer or
22  improving how a computer works versus not?  Well, the way
23  you know that is blank.
24         MR. MARTINELLI:  Yeah, it's you look at the
25  cases where they find that, and usually there's some new

125

12:35:51 1  computer technology that if you asked a programmer or if you
12:35:55 2  asked a computer engineer:  Is that interesting, they would
12:35:58 3  say, yeah, as a computer engineer, as a software programmer,
12:36:04 4  that's an interesting treat to me.  It's not just me taking
12:36:08 5  somebody's business plan and writing code to do it.
12:36:11 6        So, if you look at things like *Enfish* where it's
12:36:14 7  like, oh, no, entirely new programatic structure for doing,
12:36:19 8  you know, analysis of this data or if you look at the claims
12:36:22 9  where they talk about, oh, well, we're going to put -- I
12:36:25 10  think your *Nielsen* case was like that, we're going to put
12:36:29 11  two monitors or two probes, probes, monitors, sensors like
12:36:34 12  in two different places.
12:36:35 13        THE COURT:  *Baylis* is a case that talks about
12:36:37 14  sensors here and sensors here.
12:36:40 15        MR. MARTINELLI:  Right.  So, I think that idea
12:36:43 16  of specificity and technical innovation are both getting at
12:36:49 17  the same nugget, which is we've created this tool, this
12:36:54 18  computer that you may do anything, right.  And there's --
12:36:58 19  you come to me with any idea and I can write you code to do
12:37:01 20  it.
12:37:02 21        And so, are we going to give every single person
12:37:06 22  a patent on moving some idea they have and embodying that
12:37:11 23  idea in software code?  That led to all of the dot.com cases
12:37:16 24  in the early 2000s, and that's what all this 101 stuff was
12:37:20 25  reacting to.

126

12:37:21 1        And so, the law says, No, let's look and see
12:37:24 2  that you're actually doing something that's interesting from
12:37:25 3  a technical perspective.  And maybe you can do it because
12:37:28 4  you're really getting down into the specificity and say, No,
12:37:32 5  this specific thing is new and unique.  I write a claim that
12:37:36 6  really gets at what's new or you look at it and you say,
12:37:42 7  Yeah, here's the concept.  You know, maybe some of the
12:37:47 8  shorter claims where they find this, here's the concept that
12:37:50 9  is a new technical structure that gets to that concept.
12:37:53 10  It's really like:  What is technically interesting to
12:37:55 11  computer people?
12:37:56 12        THE COURT:  And I think if it turns on that, you
12:37:58 13  know, like is this an add -- is this add -- is this software
12:38:01 14  add technically interesting enough for the computer to
12:38:03 15  account for purposes of non-result, non-abstractness, the
12:38:06 16  challenge at the Rule 12 stage, of course, is that we often
12:38:09 17  don't have necessarily that declaration from that person
12:38:12 18  saying yes or no.  And sometimes it seems like what the
12:38:14 19  courts are doing is:  Well, what do we have?  We've got the
12:38:16 20  patent.
12:38:17 21        So, they're trying to look for:  Does the patent
12:38:19 22  tell me whether a computer person might say that this is
12:38:23 23  enough of an interesting add?  And sometimes it seems like
12:38:24 24  that's how the cases break.
12:38:28 25        It's does the patent tell you enough to make you

127

12:38:29 1  think or give a hint that this is enough to count.
12:38:33 2        MR. MARTINELLI:  And, again, crafty-like --
12:38:35 3  certainly, post-*Alice* crafty patent drafters will do the
12:38:38 4  best that they can to try and make that case in the spec.
12:38:43 5  And people know that they can do it.  And when you look at
12:38:45 6  the spec, if they don't have anything, right, if it's just,
12:38:48 7  well, what am I really saying that's interesting, it's about
12:38:54 8  the end result.  It's not about the way I'm doing it.  It's
12:38:58 9  not about the thing that the computer programmer would think
12:39:01 10  is interesting.
12:39:01 11        That's a huge signal that you've got a 101
12:39:05 12  issue.  And, you know, post-*Alice*, you know, you go and you
12:39:09 13  hammer at your client, and you say:  What can you tell me?
12:39:13 14  Like what did you do that's really interesting and that like
12:39:17 15  a computer programmer would find interesting?  And you try
12:39:19 16  and get that in your spec and you try to put a big red flag
12:39:23 17  on it and say that, Hey, this is something that's not
12:39:25 18  abstract, and it is a real invention.
12:39:27 19        THE COURT:  Okay.  We'll leave it there.
12:39:29 20  Thank you, Mr. Martinelli.
12:39:32 21        And I'll ask Postscript's counsel.  Mr. Novikov.
12:39:32 22        MR. NOVIKOV:  I'll let Mr. Martinelli have the
12:39:36 23  last word.
12:39:36 24        THE COURT:  Well, good enough.  Counsel, thank
12:39:37 25  you for your thoughts, both on these cases, which are

128

12:39:41 1  challenging, and then just on the law generally, which is
12:39:43 2  also challenging.
12:39:44 3        Okay.  So just programmatically what we'll do,
12:39:48 4  we'll take a break.  It's about 12:40.  I'll ask at least
12:39:51 5  one representative for each party to be back in the room by
12:39:55 6  3:00 p.m.  That's like a goal.  I'm hopeful I could be back
12:40:00 7  by 3:00.  I'm positive I'll be back by 4:00, but it could be
12:40:06 8  as early as 3:00.  So, I'd like to have folks here in case
12:40:08 9  we can get started that early.
12:40:10 10        My goal will be to take what I heard, think
12:40:12 11  about it, talk about it.  My goal is to try to provide
12:40:16 12  decision today on these motions, so the parties can have
12:40:19 13  answers and they can use them as answers to move forward in
12:40:22 14  the case.  And I will plan to do that, attempt to do that.
12:40:27 15        It's theoretically possible if I believe that
12:40:29 16  what's been said today changes the equation in a way that I
12:40:32 17  can't fairly do, that then I won't, but my goal will be to
12:40:37 18  provide decisions then which I'll read orally to the
12:40:39 19  parties.  And then we'll conclude, and I think we should be
12:40:43 20  concluding certainly no later than 5:00, perhaps before
12:40:47 21  then.
12:40:47 22        All right.  So, we'll ask at least one
12:40:49 23  representative, and certainly as many of you are welcome to
12:40:52 24  come back as would like, from each party to be here by
12:40:55 25  3:00 p.m.  And I'll try to have my clerk let you know if

129

| | |
|---|---|
| 12:40:59 | 1 we're going to be delayed.  If it's not going to be 3:00, be |
| 12:41:02 | 2 closer to 4:00, I'll have my clerk let you know that.  Let's |
| 12:41:06 | 3 assume we'll come back at 3:00, and I'll take the bench and |
| 12:41:09 | 4 make some decisions then. |
| 12:41:10 | 5          With all that said, the Court will stand in |
| 12:41:12 | 6 recess. |
| 12:41:12 | 7          DEPUTY CLERK:  All rise. |
| 01:08:25 | 8          (Luncheon recess was taken.) |
| 01:09:44 | 9 DEPUTY CLERK:  All rise. |
| 03:01:06 | 10          THE COURT:  You can be seated.  Good afternoon. |
| 03:01:17 | 11 From experience, I know I'm going to need a lot of water. |
| 03:01:21 | 12          So, all right.  Let's go on the record. |
| 03:01:24 | 13          Thank you all, again, as we are back in court |
| 03:01:26 | 14 now, and I am prepared to render my decisions on the motions |
| 03:01:31 | 15 that were argued today in these various cases. |
| 03:01:35 | 16          So, as I begin this afternoon, let me first make |
| 03:01:38 | 17 a few introductory comments.  Today I'll be providing |
| 03:01:41 | 18 decisions in these three cases orally here in court.  For |
| 03:01:45 | 19 those decisions that I announce orally today, I also intend, |
| 03:01:49 | 20 for purposes of clarity and convenience, to later issue a |
| 03:01:53 | 21 written opinion on the docket.  It is simply meant to |
| 03:01:56 | 22 transcribe what I've said here today and also to add |
| 03:01:59 | 23 relevant citations when needed. |
| 03:02:02 | 24          Although I'm issuing decisions orally today, I |
| 03:02:05 | 25 want to assure the parties that the process I've used to |

130

| | |
|---|---|
| 03:02:07 | 1 assess these motions has been a rigorous one.  I personally |
| 03:02:11 | 2 spent between 50 and a hundred hours of my time reviewing |
| 03:02:14 | 3 the briefs in these cases, analyzing the cases and record |
| 03:02:18 | 4 citations therein, and formulating these decisions, to say |
| 03:02:22 | 5 nothing of the time that my law clerks have spent on these |
| 03:02:25 | 6 matters as well. |
| 03:02:26 | 7          My oral decisions today, as you'll see in a |
| 03:02:29 | 8 minute, will be quite lengthy.  And while length is not |
| 03:02:33 | 9 always an indicator of rigorous analysis, I hope that you'll |
| 03:02:36 | 10 conclude in these cases it is. |
| 03:02:37 | 11          Additionally, I should also note that I found |
| 03:02:41 | 12 there to be real efficiencies in holding argument in these |
| 03:02:44 | 13 various cases in which patent eligibility is challenged at |
| 03:02:48 | 14 one time, as we've done today.  In many of the briefs across |
| 03:02:52 | 15 the cases, the same opinions from the United States Court of |
| 03:02:55 | 16 Appeals, from the Federal Circuit or from the Supreme Court |
| 03:02:57 | 17 of the United States have been cited.  And having the |
| 03:03:00 | 18 experience of reading those decisions again and again over |
| 03:03:03 | 19 the span of the last few weeks has been very helpful for me. |
| 03:03:07 | 20 It helps to reinforce, in my mind, what the facts of those |
| 03:03:10 | 21 decisions really are and what aspects of those cases made a |
| 03:03:13 | 22 difference in their outcomes. |
| 03:03:15 | 23          It also helps me to see patterns across the |
| 03:03:19 | 24 various cases.  And I've also benefited by being able to |
| 03:03:24 | 25 discuss issues regarding Section 101 law here today at oral |

131

| | |
|---|---|
| 03:03:25 | 1 argument with a large number of excellent counsel |
| 03:03:27 | 2 representing all of these various parties.  I thank all of |
| 03:03:30 | 3 you for your efforts today. |
| 03:03:32 | 4          The Courts often set out the relevant legal |
| 03:03:35 | 5 standards for review of a Section 101-related Rule 12(b)(6) |
| 03:03:39 | 6 motion at the pleading stage, including in the case of |
| 03:03:42 | 7 *Genedics, LLC vs. Meta Co.*  The Court hereby incorporates by |
| 03:03:47 | 8 reference its discussion in Genedics of these legal |
| 03:03:50 | 9 standards and will follow the standards herein as to all the |
| 03:03:54 | 10 matters that I'll discuss today, unless otherwise noted. |
| 03:03:58 | 11          With that said, let me move on to the first case |
| 03:04:01 | 12 that I'll discuss, which was the case that was argued last |
| 03:04:05 | 13 today during our hearing.  The first case in which I'll |
| 03:04:09 | 14 provide an opinion is British Telecommunications, *PLC vs.* |
| 03:04:13 | 15 *Palo Alto Networks, Inc.*  It's Civil Action 22-1538-CJB. |
| 03:04:20 | 16          The Defendant, Palo Alto Networks, has filed a |
| 03:04:22 | 17 motion to dismiss pursuant to Rule 12(b)(6) arguing that the |
| 03:04:26 | 18 Complaint should be dismissed on Section 101-related subject |
| 03:04:29 | 19 matter eligibility rights. |
| 03:04:31 | 20          Here, Plaintiffs, British Telecommunications PLC |
| 03:04:34 | 21 and BT Americas, Inc. filed suit alleging the infringement |
| 03:04:38 | 22 of two patents, the United States Patent Number 7,159,237 or |
| 03:04:44 | 23 the '237 patent, and U.S. Patent Number 7,895,641, or the |
| 03:04:49 | 24 '641 patent. |
| 03:04:50 | 25          The patents are related.  They share a common |

132

| | |
|---|---|
| 03:04:53 | 1 specification, and they have the same title, which is |
| 03:04:58 | 2 "Method and System For Dynamic Network Intrusion Monitoring |
| 03:05:01 | 3 Detection and Response." |
| 03:05:03 | 4          The '237 patent, as we will see, contains |
| 03:05:06 | 5 certain representative claims.  And so, I will focus on that |
| 03:05:09 | 6 patent alone here. |
| 03:05:10 | 7          The patent has 42 claims in total.  While |
| 03:05:15 | 8 Defendant argues in its briefing that Claim 18 is |
| 03:05:18 | 9 representative for Section 101 purposes, not only the |
| 03:05:22 | 10 independent claims in that patent, but of all independent |
| 03:05:24 | 11 claims in both patents that are being asserted in this case. |
| 03:05:28 | 12 And Plaintiffs never explicitly disputed in the briefing |
| 03:05:31 | 13 that Claim 18 was representative of the other asserted |
| 03:05:34 | 14 independent claims. |
| 03:05:36 | 15          Claim 18 recites a security monitoring system |
| 03:05:39 | 16 for a computer network.  The system utilizes a plurality of |
| 03:05:43 | 17 sensors, a secure operation center or SOC and at least one |
| 03:05:48 | 18 probe.  And that probe is configured to do the following |
| 03:05:52 | 19 five things. |
| 03:05:53 | 20          First, to collect status data from at least one |
| 03:05:56 | 21 sensor that monitors at least one component of the network. |
| 03:06:00 | 22          Second, to analyze that status data, to identify |
| 03:06:04 | 23 potential security-related threats wherein the analysis |
| 03:06:06 | 24 includes an initial filtering process, and then an |
| 03:06:11 | 25 additional analysis of what the patents call "post-filtering |

133

03:06:15 1   residue" which is data that is "either discarded nor
03:06:20 2   selected" by the initial filtering process.
03:06:23 3           Third, to transmit information about the
03:06:26 4   identified events to an analyst associated with the SOC.
03:06:31 5           Fourth, to receive feedback from an analyst
03:06:33 6   based on empirically-derived information reflecting the
03:06:36 7   operation of the security monitoring system.
03:06:38 8           And, fifth, to dynamically modify the analysis'
03:06:42 9   capability of a probe based on that received feedback.
03:06:45 10          In its briefing, to the extent that they ever
03:06:47 11  address a dependent claim in the patents, Plaintiffs mainly
03:06:50 12  focus on the requirement found in Claim 14 of the '237
03:06:54 13  patent that requires that the analyst at the SOC or the SOC,
03:06:59 14  otherwise, utilizes "cross-probe correlation."
03:07:03 15          This is seen, for example, on Pages 5 and 12 of
03:07:08 16  Plaintiff's answering brief in which they make reference to
03:07:10 17  Claim 14 and its computerized use of cross-probe
03:07:15 18  correlation.
03:07:15 19          And likening this, the Court will focus on
03:07:18 20  analyzing Claim 18 of the '237 patent, treating it as a
03:07:21 21  representative claim for all asserted independent claims.
03:07:24 22  And it will also address Claim 14 of that patent in that
03:07:28 23  Plaintiffs have suggested that that claim is representative
03:07:30 24  of any dependent claims that discuss the addition of
03:07:34 25  cross-probe correlation or its equivalent.

134

03:07:36 1           Moreover, as a general matter, when the Court is
03:07:39 2   discussing the specification of one of the two asserted
03:07:41 3   patents, it will make use of the '237 patent specification
03:07:45 4   understanding that that specification is a little different
03:07:48 5   from the '641 patent specification.
03:07:52 6           In step one, Defendant argues that the asserted
03:07:54 7   claims are directed to the abstract idea of "collecting,
03:07:57 8   filtering, analyzing and transmitting data and then making
03:08:02 9   modifications based on human feedback."
03:08:04 10          Plaintiffs don't contest in their briefing that
03:08:07 11  the purported abstract idea here is, in fact, an abstract
03:08:11 12  idea, and the Court concludes that it is.  A claim to an
03:08:14 13  abstract idea has been described by the Federal Circuit as
03:08:18 14  one directed to "a disembodied concept, a basic building
03:08:22 15  block of human ingenuity untethered from any real-world
03:08:26 16  application."  The Defendant's proffered abstract idea seems
03:08:30 17  to fit that characterization.
03:08:31 18          Moreover, the Federal Circuit has explained that
03:08:33 19  certain basic methods of utilizing data like these, standing
03:08:38 20  alone, cannot amount to something more than an abstract
03:08:41 21  idea.  For example, in *International Business Machines Corp.*
03:08:47 22  *Vs. Zillow Group, Inc.,* the Federal Circuit said that,
03:08:50 23  "Identifying, analyzing and presenting certain data to a
03:08:53 24  user is not an improvement specific to a computer."  And
03:08:56 25  that "claims directed to collection of information

135

03:09:00 1   comprehending the meaning of that collected information and
03:09:02 2   indication of the results all in a generic network computer
03:09:07 3   operating in its normal expected manner" are claims directed
03:09:11 4   to an abstract idea.
03:09:14 5           In *Electric Power Group, LLC vs. Alstom, S.A.,*
03:09:17 6   the Federal Circuit said that, "Nearly requiring the
03:09:19 7   selection and manipulation information by itself does not
03:09:23 8   transform" an otherwise abstract idea into something more.
03:09:27 9           In cases like *BASCOM Global Internet Services,*
03:09:30 10  *Inc. vs. AT&T Mobility, LLC,* the Federal Circuit noted that
03:09:35 11  "filtering content is an abstract idea because it is a
03:09:38 12  long-standing, well-known method of organizing human
03:09:40 13  behavior, similar to concepts previously found to be
03:09:45 14  abstract."
03:09:45 15          And in, *In Re:  Rosenberg,* the Federal Circuit
03:09:48 16  explained that the idea of determining whether to "fine
03:09:53 17  tune" a system, including by providing instructions to
03:09:56 18  modify certain procedures or parameters amounts to an
03:09:59 19  abstract idea.
03:10:00 20          So, we know that if it's right to say that all
03:10:02 21  these claims are directed to this collecting data and or
03:10:06 22  analyzing data, and or filtering data, and or transmitting
03:10:10 23  data or modifying data based on analysis, well that
03:10:14 24  cannot be enough to save the claims in step one.
03:10:17 25          But Plaintiffs contend that the '237 patent is

136

03:10:19 1   not actually directed to the broad abstract idea issued here
03:10:23 2   and says is directed to something more particularized.  On
03:10:26 3   that score in their briefing, Plaintiffs assert that the
03:10:29 4   claims are directed to "a specific architecture for
03:10:32 5   detecting and responding to new and constantly evolving
03:10:35 6   attacks on computer networks."
03:10:38 7           What is this more specific architecture that
03:10:41 8   Plaintiffs speak of?  Essentially in places like Pages 3 to
03:10:44 9   6 of their answering brief or in Paragraph 27 of their
03:10:48 10  Complaint and, again, in oral argument here today,
03:10:50 11  Plaintiffs have focused most directly on three different
03:10:53 12  aspects of the claims.
03:10:54 13          First, they note that the claim systems and
03:10:56 14  methods utilize a "tiered analysis" at the probe.  By this
03:11:01 15  they mean that first a probe uses "two different types of
03:11:05 16  filters" to assess status data, a positive and negative
03:11:10 17  filter that selects or discards data respectfully.
03:11:13 18          And, second, that the probe then separately
03:11:15 19  analyzes a middle ground type of data that has never been
03:11:18 20  selected or discarded -- that has neither been selected or
03:11:21 21  discarded by the filter, what the patents refer to as
03:11:24 22  post-filtering residue.
03:11:25 23          Second, Plaintiffs highlight that the claimed
03:11:28 24  systems and methods also use a "two-level review process"
03:11:32 25  and that a computerized analysis of this data occurs first

137

| | |
|---|---|
| 03:11:36 | 1  at the probe level.  But then the information gleaned about |
| 03:11:39 | 2  potential security-related events is sent to a human analyst |
| 03:11:42 | 3  for further review. |
| 03:11:43 | 4       And, third, Plaintiffs know that in certain |
| 03:11:45 | 5  dependent claims like Claim 14, they require that the |
| 03:11:48 | 6  analysis performed at the SOC involves electronic |
| 03:11:53 | 7  cross-probe correlation, which the Court understands to mean |
| 03:11:55 | 8  that, as Plaintiffs suggested in briefing, the system takes |
| 03:11:58 | 9  into account and analyzes status data obtained from multiple |
| 03:12:02 | 10  different probes, not just a single probe. |
| 03:12:04 | 11       The directed to inquiry in step one applies a |
| 03:12:09 | 12  stage one filter to claims considered in light of the |
| 03:12:10 | 13  specification, based on whether their character as a whole |
| 03:12:14 | 14  or their focus is directed to exclude subject matter.  As to |
| 03:12:17 | 15  how that inquiry should proceed, the Federal Circuit |
| 03:12:20 | 16  provides some guidance in *Internet Patents Corp. vs. Active* |
| 03:12:24 | 17  *Network, Inc.* |
| 03:12:25 | 18       There, in order to ascertain at step one whether |
| 03:12:27 | 19  the claim's character as a whole was directed to an abstract |
| 03:12:30 | 20  idea, the Internet Patents Court examined the specification |
| 03:12:34 | 21  of the patent at issue.  In doing so, it cited to what the |
| 03:12:36 | 22  patentee described in the specification as the "innovation |
| 03:12:40 | 23  over the prior art" and the "central, most important aspect" |
| 03:12:46 | 24  of the patent. |
| 03:12:46 | 25       The Federal Circuit has also stated, however, |

138

| | |
|---|---|
| 03:12:49 | 1  that reliance on the specification must always yield to the |
| 03:12:52 | 2  claim language in identifying what a claim is directed to, |
| 03:12:55 | 3  because the concern that derives the judicial exception to |
| 03:13:00 | 4  patentability is one of preemption.  And the claim language |
| 03:13:03 | 5  defines the breadth of each claim. |
| 03:13:05 | 6       In order to attack this step one question, then |
| 03:13:08 | 7  the Court needs to determine:  What is the focus of |
| 03:13:11 | 8  representative Claims 8 and -- 18 and 14 of the '237 patent. |
| 03:13:16 | 9  In looking at the patent specification, it's pretty clear |
| 03:13:19 | 10  that some aspects of the specific architecture touted by |
| 03:13:23 | 11  Plaintiffs are not what the patent itself is saying it's |
| 03:13:26 | 12  particularly focused on. |
| 03:13:27 | 13       For example, it's, of course, true that Claim 18 |
| 03:13:30 | 14  and Claim 14 include reference to, first, how the probe |
| 03:13:34 | 15  separately analyzes post-filtering residue after the initial |
| 03:13:37 | 16  filtering stage has occurred. |
| 03:13:39 | 17       And, second, the analysis of status data by way |
| 03:13:42 | 18  of cross-probe correlation. |
| 03:13:44 | 19       But when one reads the patent, one sees that |
| 03:13:46 | 20  those post-filtering residue and cross-probe correlation |
| 03:13:50 | 21  concepts are actually little mentioned in the specification. |
| 03:13:53 | 22  For example, the only time the specification mentions the |
| 03:13:55 | 23  concept of analyzing post-filtering residue comes in |
| 03:14:00 | 24  Column 8.  Therein a description of an exemplary embodiment |
| 03:14:03 | 25  found in Figure 2.  The patent explains that after the |

139

| | |
|---|---|
| 03:14:06 | 1  system first filters the status data, using a negative |
| 03:14:09 | 2  filter and subsystem and a positive filtering subsystem |
| 03:14:12 | 3  which selects "possibly interesting information" and |
| 03:14:16 | 4  forwards it on to the SOC. |
| 03:14:17 | 5       Then, "data neither discarded by the negative |
| 03:14:20 | 6  filtering subsystem nor selected out as interesting by the |
| 03:14:24 | 7  positive filtering subsystem, form the residue, which is |
| 03:14:28 | 8  sent to anomaly engine 2050 for further analysis.  Anomaly |
| 03:14:32 | 9  engine 2050 determines what residue information may be |
| 03:14:36 | 10  worthy of additional analysis and sends such information" |
| 03:14:39 | 11  for forwarding to the SOC. |
| 03:14:41 | 12       And so far as the Court is aware, the only time |
| 03:14:43 | 13  the specification makes reference to the idea of cross-probe |
| 03:14:45 | 14  correlation comes in a few lines in Column 2 and Column 3. |
| 03:14:50 | 15  In Column 2, for example, the patent states that, |
| 03:14:53 | 16  "Furthermore, data filtering and analysis can include |
| 03:14:56 | 17  cross-product analysis, which allows the probe sentry system |
| 03:14:59 | 18  to correlate and recognize such multiple sensor readings as |
| 03:15:03 | 19  reflecting the same pattern.  Such features ensure that the |
| 03:15:07 | 20  invention is capable of the rapid refinement necessary to |
| 03:15:10 | 21  combat inquiry attacks". |
| 03:15:12 | 22       Additionally, there's a brief reference to |
| 03:15:14 | 23  "cross-correlation" and "cross-analysis" in Column 3 of the |
| 03:15:19 | 24  patent.  But in general, the specification indicates that |
| 03:15:23 | 25  the patent's focus or its character as a whole is not really |

140

| | |
|---|---|
| 03:15:27 | 1  attuned to those two concepts where they're used in some |
| 03:15:27 | 2  accomodation. |
| 03:15:31 | 3       Instead, the patent reads as if its focus is |
| 03:15:34 | 4  instead on the general concept of filtering and analyzing |
| 03:15:37 | 5  status data and doing so via the two-level review process |
| 03:15:40 | 6  that Plaintiffs spoke of in their briefing.  In other words, |
| 03:15:44 | 7  having one computerized review process occur at the probe |
| 03:15:48 | 8  and then another human analyst based review process occur at |
| 03:15:52 | 9  the SOC. |
| 03:15:52 | 10       That the patent's focus is on this two-level |
| 03:15:54 | 11  review process is seen first by looking at the abstract. |
| 03:15:57 | 12  There the patent explains that the inventions described |
| 03:16:00 | 13  therein are about how "a probe attached to a customer's |
| 03:16:03 | 14  network collects status data and other audit information |
| 03:16:07 | 15  from monitored components of the network looking for |
| 03:16:10 | 16  footprints or evidence of unauthorized intrusions or attack. |
| 03:16:13 | 17  The probe filters and analyzes the collected data to |
| 03:16:16 | 18  identify potentially security-related events happening on |
| 03:16:19 | 19  the network, identify events that are transmitted to human |
| 03:16:22 | 20  analysts" for problem resolution." |
| 03:16:25 | 21       After discussing the types of resources that a |
| 03:16:27 | 22  human analyst might use, the abstract concludes by noting |
| 03:16:30 | 23  the feedback from the analyst:  "Problem resolution evidence |
| 03:16:34 | 24  can be used to update the knowledge base available to |
| 03:16:36 | 25  analysts for future attacks and to update the filtering and |

141

| | |
|---|---|
| 03:16:40 | 1  analysis capabilities of the probe in other systems." |
| 03:16:43 | 2          There's no specific mention there of analyzing |
| 03:16:46 | 3  post-filtering residue or the use of cross-probe |
| 03:16:49 | 4  correlation, for example.  So, too, in the patent's |
| 03:16:52 | 5  Background of the Invention section.  There, the patent |
| 03:16:55 | 6  explains how hierarchal computer and network security |
| 03:16:58 | 7  products like firewalls for authentication mechanisms or |
| 03:17:01 | 8  encryption were focused on preventing outside intrusion into |
| 03:17:05 | 9  an internal network.  But the patent explains that because |
| 03:17:07 | 10  those computerized processes don't always work perfectly, |
| 03:17:11 | 11  it's also helpful to have "monitoring detection and response |
| 03:17:15 | 12  in the event of a breach." |
| 03:17:17 | 13          That said, the patent explains that system |
| 03:17:19 | 14  administrators cannot easily play its additional monitoring |
| 03:17:23 | 15  role, and that they "normally do not have the time or |
| 03:17:25 | 16  ability to read through large amounts of constantly updating |
| 03:17:29 | 17  audit information looking for attacks on their systems." |
| 03:17:32 | 18          "They also do not have the time to continuously |
| 03:17:34 | 19  monitor hacker activities looking out for new tactics, tools |
| 03:17:37 | 20  and trends." |
| 03:17:38 | 21          "Finally, they don't have the time to become |
| 03:17:40 | 22  experts on every kind of intrusion and to maintain that |
| 03:17:43 | 23  expertise." |
| 03:17:45 | 24          Therefore, here the patent concludes by noting |
| 03:17:47 | 25  that what's needed is a system that both employs "automatic |

142

| | |
|---|---|
| 03:17:52 | 1  defenses" that work against automated attacks, but that also |
| 03:17:55 | 2  utilizes "human intelligence" and that "takes advantage of |
| 03:18:00 | 3  security intelligence and other knowledgeable databases" in |
| 03:18:04 | 4  order to provide "the kind of intelligent defense offered by |
| 03:18:08 | 5  the present invention." |
| 03:18:09 | 6          In other words, here the patent seems to be |
| 03:18:11 | 7  saying that its focus is on providing the two-level review |
| 03:18:14 | 8  process.  One part computer based, one part human based that |
| 03:18:18 | 9  Plaintiffs speak of. |
| 03:18:20 | 10          This conclusion is also borne out in reviewing |
| 03:18:23 | 11  The Summary of The Invention section of the patent.  As the |
| 03:18:25 | 12  Court's noted, there are a few brief references in Columns 2 |
| 03:18:27 | 13  and 3 in that section to the benefit of the systems taking |
| 03:18:30 | 14  into account cross-probe correlation.  But the entirety of |
| 03:18:34 | 15  the rest of the section which spans Columns 2 through 4 is |
| 03:18:37 | 16  really talking at a high level about the benefits of a |
| 03:18:40 | 17  two-level system for intrusion detection, one that |
| 03:18:42 | 18  incorporates the work of a probe or sentry system that |
| 03:18:45 | 19  filters data and does a preliminary threaded analysis.  And |
| 03:18:48 | 20  one that also incorporates human analysts to further sift |
| 03:18:52 | 21  through that data and provide feedback.  And this section |
| 03:18:54 | 22  doesn't mention specifically the particular benefit of |
| 03:18:56 | 23  having the probe select out and then separately review |
| 03:18:59 | 24  post-filtering residue even once. |
| 03:19:02 | 25          So, this all begs the question:  If the patent's |

143

| | |
|---|---|
| 03:19:04 | 1  focused on the use of a two-level system for detecting |
| 03:19:07 | 2  security threats, does that concept amount only to simply |
| 03:19:11 | 3  "collecting, filtering, analyzing and transmitting data and |
| 03:19:14 | 4  then making modifications based on human feedback?" |
| 03:19:18 | 5          For our purposes here, and the Court will assume |
| 03:19:21 | 6  arguably, yes.  The Court will take this path because these |
| 03:19:24 | 7  portions of the patent seem to be telling us that what the |
| 03:19:26 | 8  claim is about is that having the computerized probe filter |
| 03:19:30 | 9  status data and analyze it, and then later having a human do |
| 03:19:33 | 10  a second-level set of analysis of certain data that's been |
| 03:19:36 | 11  passed along. |
| 03:19:36 | 12          There's nothing more in the claims about how the |
| 03:19:39 | 13  probe or the human analyst must do that filtering analysis |
| 03:19:42 | 14  or what type of feedback or modifications must be provided |
| 03:19:46 | 15  by the analyst.  Moreover, a way of assessing whether claims |
| 03:19:50 | 16  directed to an abstract idea is to ask whether the claim is |
| 03:19:53 | 17  directed to an improvement in computer functionality, or |
| 03:19:56 | 18  instead, the computer is simply being used as tools to aid |
| 03:19:59 | 19  in carrying out the abstract idea itself. |
| 03:20:02 | 20          And here, there's no other indication in the |
| 03:20:04 | 21  patent that either of these two high-level levels of review |
| 03:20:07 | 22  of status data implemented improvement to the way that |
| 03:20:11 | 23  computers work.  For example, Plaintiffs don't contend that |
| 03:20:13 | 24  the claim's use of computer-based positive and negative |
| 03:20:16 | 25  filter or analysis in any way represents a new computerized |

144

| | |
|---|---|
| 03:20:20 | 1  method of performing this type of work.  Indeed, in |
| 03:20:24 | 2  Column 8, the patent suggests that it's not. |
| 03:20:26 | 3          Moreover, as was noted above in the Court's |
| 03:20:28 | 4  discussion of Background of The Invention section of the |
| 03:20:30 | 5  patent, the patent explains that the role of the human |
| 03:20:33 | 6  analyst is to allow the claim system to engage in the type |
| 03:20:36 | 7  of data analysis that a human can do, but the system |
| 03:20:39 | 8  administrators simply don't have the time to do, since they |
| 03:20:42 | 9  can't "read through large amounts of constantly updated |
| 03:20:45 | 10  audit information." |
| 03:20:47 | 11          As Defendant noted in its opening brief, this is |
| 03:20:50 | 12  "not an improvement to computer functionality.  It simply |
| 03:20:53 | 13  supplements one human, the administrator, with another, an |
| 03:20:57 | 14  analyst." |
| 03:20:57 | 15          Now, the Court doesn't necessarily agree with |
| 03:21:01 | 16  Defendant's contention that the patent is directed solely to |
| 03:21:03 | 17  a "human solution not a technical solution."  It would be |
| 03:21:07 | 18  more accurate to say, with its focus on this two-level |
| 03:21:10 | 19  review of status data, the patent's directed to the |
| 03:21:13 | 20  combination of a human solution and a computer-based |
| 03:21:17 | 21  solution.  But when describing claiming this two-level |
| 03:21:20 | 22  solution, it's as if the patent simply said that it was |
| 03:21:23 | 23  claiming the following idea:  Use a computer to filter and |
| 03:21:26 | 24  analyze status data in a manner indistinguishable to how |
| 03:21:31 | 25  computers already do this and then use a human to further |

145

03:21:33 1 analyze status data and provide some feedback on it, nothing
03:21:37 2 more.
03:21:37 3       It's difficult to see how this combined concept
03:21:40 4 that broadly, which simply seems to be about layering
03:21:43 5 together two broad ways of collecting, filtering and
03:21:47 6 analyzing data in order to provide feedback, is meaningfully
03:21:50 7 different from the Defendants' articulation of the abstract
03:21:53 8 idea.  And so, the Court agrees, for our purposes here, that
03:21:56 9 the claims are directed to the proffered abstract idea in
03:22:01 10 Alice's step one.
03:22:02 11       I now turn to step two of the Alice framework.
03:22:05 12 At step two, the Courts are required to assess what else is
03:22:08 13 in the claim, beyond the abstract idea, in order to
03:22:11 14 determine whether the additional elements in the claim,
03:22:14 15 either viewed independently or as an ordered combination,
03:22:17 16 transform the nature of the claim into a patent eligible
03:22:20 17 application of the abstract idea.
03:22:22 18       With respect to computer functionality based
03:22:27 19 claims, like those at issue here, the Federal Circuit has
03:22:29 20 stated that such claims can include an inventive concept
03:22:33 21 where they provide a technological solution to a
03:22:36 22 technological problem.
03:22:38 23       At step two, for the role of the computer to be
03:22:40 24 meaningful in the context of the Section 101 analysis, it
03:22:43 25 must involve more than the performance of well-understood

146

03:22:45 1 routine and conventional activities previously known in the
03:22:49 2 industry.  I will say that I think the step two question
03:22:52 3 here was a difficult one to resolve.  Reasonable minds could
03:22:55 4 disagree about how one should come out.
03:22:58 5       Let me explain, though, why I am determining
03:23:00 6 that the record indicates the presence of a factual disputed
03:23:04 7 step two sufficient to warrant denial of the Defendant's
03:23:06 8 motion.  At times in the briefing and in the Complaint, such
03:23:10 9 as in Paragraph 29 of the Complaint, Plaintiffs note that
03:23:15 10 claim systems ands methods amounted to a "novel"
03:23:17 11 architecture for unearthing and addressing network
03:23:20 12 intrusions.
03:23:20 13       And the Court must accept those allegations of
03:23:22 14 novelty as true at the pleading stage, but that alone
03:23:25 15 wouldn't be enough to get Plaintiffs over the hump at
03:23:28 16 step two.  That's because there's a difference between the
03:23:30 17 concept of novelty and patent eligibility in the patent.
03:23:34 18       The Federal Circuit's explained that whether a
03:23:35 19 particular element or combination of elements is novel
03:23:38 20 doesn't necessarily note whether that element's patent
03:23:41 21 eligible.
03:23:42 22       Put differently, as the Federal Circuit stated
03:23:43 23 in its *Synopsys, Inc. vs. Mentor Graphics*, a claim for a new
03:23:50 24 abstract idea is still an abstract idea.  Nor the Court's
03:23:52 25 view is there any indication that any of the remaining

147

03:23:55 1 components of the representative claims, were they standing
03:23:58 2 alone, would amount to anything other than use of generic
03:24:01 3 computer components to perform well-known computer
03:24:04 4 functions.
03:24:05 5       Claim 18, for example, utilizes sensors, a
03:24:07 6 secure operation center and at least one probe.  But as the
03:24:11 7 Defendant notes, the patent tells us at Column 4 that any
03:24:14 8 such technology utilizing those claim elements, it was well
03:24:17 9 known and commercially available.  So, the use of these
03:24:19 10 computer hardware based limitations in the claims do little
03:24:22 11 more than spell out what it means to apply the abstract idea
03:24:25 12 on a computer.
03:24:26 13       Moreover, Plaintiff's additional step of
03:24:28 14 analyzing post-filtering residue appears to make use of,
03:24:31 15 according to Column 8 of the patent, a type of well-known
03:24:35 16 data discrimination analysis.  And Claim 14's reference to
03:24:39 17 the use of cross-probe correlation is not suggested on its
03:24:42 18 own to be a new use of computer technology.
03:24:45 19       That said, we also note from the Federal
03:24:47 20 Circuit's decision in *BASCOM* that the claim's use of an
03:24:50 21 ordered combination of otherwise known conventional elements
03:24:54 22 can still amount to an inventive concept in step two.  And
03:24:58 23 in the Court's view, there is just enough in the record to
03:25:01 24 render it plausible that the representative claims included
03:25:04 25 inventive concept by way of their use of an ordered

148

03:25:07 1 combination of known elements in an unconventional way as
03:25:11 2 part of the claim security system amendments.
03:25:14 3       Here, it's the claim's combination of the
03:25:17 4 two-level review process with the added more specific step
03:25:21 5 of having the computer probe than additionally analyzed
03:25:25 6 post-filtering residue.  Plus, in at least some dependent
03:25:29 7 claims, the computer's additional use of data obtained from
03:25:31 8 multiple probes that could represent the requisite ordered
03:25:35 9 combination of elements.
03:25:36 10       Of course, one might say, as Defendant does,
03:25:39 11 that the claim's additional assessment of post-filtering
03:25:42 12 residue or the correlation of status data from multiple
03:25:45 13 probes is just another way of piling the use of one abstract
03:25:48 14 idea on to another.  In other words, one could argue that
03:25:50 15 the second post-filtering residue analysis step is just
03:25:54 16 another way of saying analyze data or that the cross-probe
03:25:58 17 correlation step is just another way of saying correlate
03:26:01 18 data, and that both of those things are just additional ways
03:26:03 19 to make use of abstract ideas.
03:26:05 20       And one could also argue, as Defendant does,
03:26:08 21 that claims do not tell us any more about how the claim
03:26:11 22 systems or methods analyze post-filtering residue or how
03:26:14 23 they correlate information from different probes, such that
03:26:17 24 the addition of those other steps cannot provide an
03:26:21 25 inventive concept.

149

03:26:22 1    And it's true, the claims don't provide this
03:26:26 2 additional indication of how the systems or methods do this
03:26:26 3 particular work.  Moreover, they certainly don't describe
03:26:28 4 some further technical means for performing these functions.
03:26:33 5 But the Court is not completely convinced that the way
03:26:36 6 Defendant is looking at these issues is the right way to do
03:26:38 7 so for purposes of its review here.
03:26:41 8    A couple of cases from the Federal Circuit
03:26:44 9 convince the Court that this is so.  Particularly, one.  And
03:26:49 10 there the Court looks to the Federal Circuit's decision in
03:26:51 11 *SRI International, Inc. vs. Cisco Systems, Inc.*, the case
03:26:55 12 that Plaintiffs have identified as the most analogous
03:26:58 13 Federal Circuit opinion to this case.  The Court agrees with
03:27:02 14 Plaintiffs that SRI, although it was decided at the step one
03:27:05 15 stage not at step two, is very helpful to their argument
03:27:08 16 here.
03:27:09 17    In SRI, the representative claim was to a
03:27:11 18 computer-automated method of hierarchically event monitoring
03:27:15 19 and analysis within a network.  The claims preformed this
03:27:18 20 method by, first, deploying more than one network monitor to
03:27:22 21 detect suspicious activity based on analysis of at least one
03:27:25 22 of certain categories of network trafficking.
03:27:28 23    Second, by having those monitors generate
03:27:30 24 reports of suspicious activity.
03:27:32 25    And, third, by having those reports be received

150

03:27:34 1 or integrated by one or more of the monitors.
03:27:38 2    At step one, the SRI Court found that the claim
03:27:40 3 was not simply directed to the abstract idea of collecting
03:27:43 4 and analyzing data.  This was even though the steps of the
03:27:46 5 claims were fairly basic and functional in the requirements
03:27:50 6 in that one aspect of it simply required an analysis of
03:27:53 7 network trafficking.  And another simply required that the
03:27:56 8 monitors "generate reports."
03:27:58 9    And a third only said that the monitors must be
03:28:01 10 "receiving and integrating reports," nothing more.  Yet, the
03:28:05 11 SRI Court didn't conclude that this method, the claims were
03:28:08 12 simply about collecting and analyzing data.  Instead, in
03:28:12 13 determining that the claims, nevertheless, were directed to
03:28:15 14 something more, the Court looked at the patent
03:28:17 15 specification.  The specification explained that the claimed
03:28:20 16 invention solved weaknesses in conventional networks in
03:28:23 17 order to fix a technological problem and provide a
03:28:27 18 "framework for the recognition of more global threats,
03:28:31 19 inter-domain connectivity, including coordinated attempts to
03:28:35 20 infiltrate or destroy connectivity across an entire
03:28:36 21 network."
03:28:38 22    This was enough to ensure the Court that the
03:28:40 23 computers used in the claim were not added simply "as a
03:28:43 24 tool" to automate conventional activity, but instead were
03:28:46 25 claims that improved the functionality of the computers and

151

03:28:49 1 computer networks themselves.
03:28:49 2    The *SRI* Court came to this conclusion, even
03:28:54 3 though the claim did not specify how the network monitors
03:28:58 4 detected suspicious activity or analyzed data beyond the
03:29:01 5 requirement that they use at least one of the categories
03:29:04 6 that they had mentioned in the claim, or how they generated
03:29:07 7 reports of suspicious activity, or how they received and
03:29:12 8 integrated those reports.
03:29:12 9    Despite this, *SRI* concluded that the claims were
03:29:15 10 directed to what is called a "specific technique"
03:29:18 11 "utilizing" -- "using a plurality of network monitors that
03:29:23 12 each analyzed specific types of data on the net and
03:29:29 13 integrating reports from the monitors to solve a
03:29:30 14 technological problem arising in computer networks,
03:29:33 15 identifying hackers or potential intruders to the network."
03:29:37 16    Now, unlike in *SRI*, as I've noted above, the
03:29:39 17 patent specification doesn't say a lot about the claim's
03:29:43 18 additional use of the probes to analyze post-filtering
03:29:46 19 residue or the claim's use of data for multiple probes and
03:29:49 20 how, when combined with the two-level filtering analysis
03:29:53 21 process, this might amount to an unconventional use of
03:29:56 22 computer technology.
03:29:57 23    And as the Court mentioned, there are some
03:29:59 24 references in the specification to these additional concepts
03:30:02 25 in Columns 2, 3 and 8, but they're certainly not highlighted

152

03:30:05 1 or described in a really fulsome manner.  That said, the
03:30:09 2 Complaint does fill in some of these blanks.
03:30:11 3    Paragraph 38 of the Complaint is particularly
03:30:12 4 relevant.  Therein, Plaintiffs state that the architecture
03:30:16 5 of the patent was "novel and unconventional."  And in
03:30:19 6 explaining why that was so, they cite to the examiner's
03:30:22 7 Notice of Allowability regarding the '237 patent.  Therein,
03:30:25 8 the examiner stated that, Typically network security systems
03:30:29 9 "all data is filtered by intrusion detection, firewall,
03:30:33 10 gateway, proxy, sensor, probe, or sentry or some other type
03:30:36 11 of device," such that if "an attack occurs, the data is
03:30:40 12 transmitted for further analysis."
03:30:43 13    The examiner noted that in such systems "all
03:30:45 14 other data is usually blocked or discarded."  The Notice of
03:30:51 15 Allowability also states that "prior art does not disclose
03:30:53 16 or suggest data to be either discarded by a negative or
03:30:56 17 positive is the residue that is sent for further analysis."
03:31:00 18 The Court understands this to be an indication that while it
03:31:04 19 was conventional for intrusion detection systems to use a
03:31:07 20 filtering system like that described in the claims -- that
03:31:09 21 is, one that filters status data into positive or negative
03:31:15 22 categories to be either further reviewed, because it's known
03:31:17 23 to be threatening or otherwise discarded -- those systems
03:31:20 24 were not using probes to then additionally further analyze
03:31:23 25 data that fell somewhere in between those two poles or what

153

1 the patents here describe as "residue" data.

2     Additionally, Paragraph 38 of the Complaint

3 states that the computer-based use of and correlation of

4 data from different probes was also "a significant

5 improvement to existing computer security technology at the

6 time." In that, "previous conventional security systems

7 were constrained to pattern matching at a single point in

8 the network."

9     So, as in *SRI*, here the record provides at least

10 some, not a lot, but at least some factual support for the

11 idea that the claims could contain a specific solution to a

12 problem faced in the computer's network security field, and

13 that the solution is at least significant, though not

14 exclusively, rooted in computer technology.

15     That so, as in *SRI*, even though the claims don't

16 specify every detail of how the claimed systems in the

17 patents protect against network intrusion. And as in *SRI*,

18 even though the claims looked at one mode, it might be said

19 to simply be about collecting, and filtering and analyzing

20 data. It seems like that may not be the right way to view

21 it at step two. Instead, it seems like the claims could be,

22 maybe should be, viewed, at least at the pleading stage, as

23 plausibly employing a "specific technique" to assess status

24 data, one that utilizes a partly computerized, two-level

25 filtering system and uses the computerized probe to

154

1 additionally assess residue data in combination with that

2 two-level system in a way that wasn't being done before.

3 And that, also, in some dependent claims makes use of data

4 for multiple probes in a way that computerized programs

5 weren't doing.

6     One last point about *SRI*. Defendant knows that

7 one of the justifications, though not the only one that the

8 Federal Circuit used in that case to support its decision,

9 was that the Court tended to agree with the Plaintiff that

10 "the human mind is not equipped to detect suspicious

11 activity by using network monitors and analyzing network

12 packets as recited by the claims."

13     And Defendant contrasts that with the scenario

14 here, arguing that it is clear from the record that the

15 human mind is equipped to do everything that Claim 18 can do

16 in a similar way that a non-human could do. Obviously, some

17 elements of Claim 18 do involve a human analyst, so it seems

18 hard to dispute Defendant's contention as to those elements.

19 But the claim does have other elements such as the probe's

20 use of positive and negative filtering.

21     Now, it may be the case that a human could play

22 that filtering role in a similar way to what the probe does

23 here, but I don't have a great record to support that

24 assertion. And I can't wholly rely on the arguments of

25 counsel on that point.

155

1     I'm not saying that a better record on this

2 issue in and of itself would make the difference in

3 Defendant's favor in a case dispositive stage of the case.

4 All I'm saying is that if it were, that stage would be the

5 right stage to fully assess the record on that issue, not

6 the pleadings stage.

7     In addition to *SRI*, the representative claims

8 here also don't seem all that different to the Court than

9 the claims at issue in *Thales Visionix Inc. vs. United*

10 *States*, another Federal Circuit case. Claim 22 in *Thales*

11 was exemplary and it was briefed. In two lines, it recited

12 a method of determining an object's orientation based on the

13 outputs of two inertial sensors that were mounted

14 respectively on the objects and moving reference point.

15     The specification explained how conventional

16 methods retracting an object's motion were flawed, and that

17 the patent's invention provided multiple advantages,

18 including increased accuracy, the ability to operate without

19 requiring hardware and simple installation.

20     And in finding of step one, the claim and

21 another representative claim were not directed to the

22 abstract idea of using laws of nature governing motion to

23 track two objects. The Federal Circuit noted that, instead,

24 the "claims specify a particular configuration of inertial

25 sensors and a particular method of using the raw data from

156

1 the sensors in order to more accurately calculate the

2 position and orientation of an object on a moving platform."

3     Now, the Federal Circuit said this even though

4 like here, Claim 22 did not specify how to determine the

5 orientation of the object or what process or formulas were

6 used to do that. The claim just said that the use of "based

7 on" signals from their respective two sensors. Nor do the

8 claims say how those sensors work to provide signals.

9     And the sensors used in *Thales*, like the probes

10 and sensors used here, were conventional in the art.

11 Nevertheless, it was enough for the Federal Circuit that the

12 configurations of the sensors was a "particular" one. It

13 was used in a "particular method" for collecting data.

14     In other words, sufficient particularity was

15 demonstrated by the fact that the sensors were specified to

16 be placed in two different positions, an object and a moving

17 reference frame, so long as the patent or the record helped

18 make clear how that particular arrangement solved the

19 technological problem. Similarly, here, it's at least

20 plausible that the claims at issue contain a similar level

21 of particularity, and that a probe is used to do positive

22 and negative filtering, and then is used a second time to

23 assess residual status in it. And then in certain claims

24 data from multiple purposes is utilized.

25     As noted above, the record contains indication

157

```
03:36:42  1  in support of combination of steps taken together with the
03:36:44  2  rest of the elements of the claims at issue, amounted to
03:36:47  3  unconventional ways to use computerized probes in order to
03:36:50  4  solve a problem in computer securities.
03:36:52  5         Lastly, the Court knows that the Supreme Court
03:36:56  6  has stated the eligibility analysis is driven by the concern
03:36:59  7  of preemption. The preemption analysis in turn compels a
03:37:03  8  Court to assess whether the claims at issue attempt to
03:37:06  9  preempt every application or at least a great many
03:37:10 10  applications of the abstract at issue.
03:37:13 11         And, here, in the Court's view, the record
03:37:15 12  provides at least some indication that the claims don't
03:37:17 13  preempt all of this and perhaps don't even preempt very many
03:37:21 14  of these of "collecting, filtering, analyzing and
03:37:24 15  transmitting data and then making modifications based on
03:37:27 16  human feedback."
03:37:28 17         Paragraph 38 in the Complaint tells us that one
03:37:31 18  could simply collect and analyze status data by simply using
03:37:34 19  a positive and negative filter without, also, as the claims
03:37:37 20  do, then using the probe again to reassess residual data
03:37:40 21  that didn't fall into the positive or negative categories of
03:37:44 22  the first filtering stage.
03:37:45 23         And it also tells us that one could collect,
03:37:47 24  filter and analyze data only by using one probe instead of,
03:37:50 25  as in certain dependent claims here, by obtaining and
```

158

```
03:37:54  1  correlating information from multiple probes. The extent to
03:37:57  2  which the claims do not preempt the field of the abstract
03:38:00  3  idea is a fact question, not inevitable to resolution at the
03:38:03  4  Rule 12 stage, at least based on this record.
03:38:06  5         So, for all these reasons, the Court denies
03:38:10  6  Defendant's motion at step two of the *Alice* analysis without
03:38:13  7  prejudice to Defendant's ability to re-raise the issue at
03:38:16  8  the case dispositive motion stage.
03:38:18  9         Okay. I'll now move on to the second and third
03:38:27 10  cases which are related. Attentive Mobile, Inc. is the
03:38:30 11  Plaintiff in both cases. And in Civil Action 22-1163-CJB,
03:38:34 12  the Defendant is 317 Labs, Inc., doing business as Emotive.
03:38:38 13  I'll refer to the Defendant there as Emotive and to the case
03:38:42 14  as the Emotive case.
03:38:43 15         And in Civil Action Number 23-87-CJB, the
03:38:47 16  Defendant is Stodge, Inc. doing business as Postscript.
03:38:50 17  I'll refer to that Defendant as Postscript and to the case
03:38:53 18  as the Postscript case.
03:38:55 19         In these cases, we have Defendants' Rule
03:38:56 20  12(b)(6) motions. Most of, though not all of the motions in
03:38:59 21  the Emotive case and the entirety of the motion in the
03:39:02 22  Postscript case is premised on the ground that the operative
03:39:05 23  Complaint should be dismissed on a Section 101 eligibility
03:39:08 24  basis. The Court will address only those Section 101
03:39:11 25  grounds for dismissal now and will deny the motions as they
```

159

```
03:39:14  1  relate to Section 101 for the reasons I'll set out herein.
03:39:18  2         Plaintiff asserts in its Complaint in the
03:39:22  3  Emotive case that Defendant infringes at least independent
03:39:24  4  Claim 1 of the United States Patent Number 11,416,887, which
03:39:28  5  I'll refer to as the '887 patent, and independent Claim 15
03:39:32  6  of United States Patent Number 11,416,897, which I'll refer
03:39:36  7  to as the '897 patent.
03:39:38  8         In the Postscript case, Plaintiff asserts that
03:39:41  9  Defendant infringes at least those two claims, as well as
03:39:44 10  independent Claim 23 of the United States Patent Number
03:39:47 11  11,553,074 or the '074 patent. The three asserted patents
03:39:52 12  share the same title, same inventors and nearly identical
03:39:55 13  specification.
03:39:56 14         In their briefing, both Defendants agree that
03:39:58 15  the respective asserted independent claims call out or
03:40:01 16  respective Complaints are representative of each other and
03:40:04 17  of all asserted claims for Section 101 purposes. And so,
03:40:07 18  they treated those claims interchangeably throughout their
03:40:10 19  arguments in the briefs.
03:40:12 20         For its part, Plaintiff took issue in its
03:40:13 21  briefing with the idea that these three claims might be
03:40:16 22  representative of all the claims in the patents for
03:40:19 23  Section 101 purposes. But aside from the brief mention that
03:40:23 24  the content of a few dependent claims of the '887 patent in
03:40:26 25  its answering brief in the Postscript case, Plaintiff didn't
```

160

```
03:40:28  1  really make a meaningful argument as to the distinctiveness
03:40:31  2  of the dependent claims.
03:40:34  3         In any event, for ease of reference, the Court
03:40:36  4  will focus on Claim 1 of the '887 patent in rendering its
03:40:40  5  decision today. The Court need not trouble itself further
03:40:43  6  with the question of whether this claim is representative of
03:40:45  7  all the asserted claims in the case. That's because since
03:40:49  8  the Defendant's motion rose and fell with its arguments
03:40:50  9  about three listed independent claims, and since the Court
03:40:54 10  is concluding here that Claim 1 and those other two listed
03:40:57 11  claims are not claims to an abstract idea, the Court is
03:41:00 12  necessarily finding that the motions should be dismissed as
03:41:03 13  to all asserted claims of the patents.
03:41:05 14         One other procedural note before I begin with
03:41:09 15  the *Alice* two-step analysis. In the briefing at least,
03:41:11 16  certain parties, particularly Emotive, appeared to cite to
03:41:14 17  at least some materials that may not have been referenced in
03:41:18 18  the Complaint in the case, or attached to the Complaint or
03:41:20 19  integral to the Complaint. To the extent they did so, the
03:41:23 20  Court knows that I cannot take such material into account in
03:41:26 21  resolving the motion to dismiss, and so I will not do so
03:41:29 22  here.
03:41:29 23         I'll now turn to the *Alice* analysis at step one.
03:41:32 24  At this step, the two Defendants have similar, though
03:41:35 25  slightly different articulations of the abstract idea that
```

161

| | |
|---|---|
| 03:41:38 | 1 Claim 1 is purportedly directed to. Emotive framed its |
| 03:41:42 | 2 abstract idea a few different ways in the briefing, but the |
| 03:41:45 | 3 articulation that's probably most faithful to its briefing |
| 03:41:48 | 4 is "providing a streamline process to sign up for marketing |
| 03:41:52 | 5 promotions or services." |
| 03:41:54 | 6       Postscript, for its part, asserts that the |
| 03:41:56 | 7 abstract idea at issue is "streamlining the process for a |
| 03:42:00 | 8 customer to enroll in a marketing promotion by providing a |
| 03:42:03 | 9 pre-filled and pre-addressed request." |
| 03:42:05 | 10      In other words, Postscript's asserted abstract |
| 03:42:08 | 11 idea is a bit narrower than Emotive's is in that Postscript |
| 03:42:12 | 12 is allowing the method of streamlining issue must be |
| 03:42:14 | 13 accomplished via the use of a pre-filled and pre-addressed |
| 03:42:17 | 14 request. But overall the two asserted abstract ideas at |
| 03:42:20 | 15 issue are fairly similar. |
| 03:42:22 | 16      For ease of reference today, the Court will |
| 03:42:23 | 17 utilize Postscript's abstract idea when discussing these |
| 03:42:27 | 18 issues and will assume, for the sake of argument, that both |
| 03:42:30 | 19 Defendants were pointing to that articulation as the concept |
| 03:42:32 | 20 that the claims are directed to. |
| 03:42:34 | 21      I note that in doing so, I'm essentially doing |
| 03:42:36 | 22 Emotive a favor, because the proposed abstract idea is even |
| 03:42:39 | 23 broader than Postscript's. And so, it would suffer from |
| 03:42:42 | 24 even worse step one problems of the type I'm about to |
| 03:42:45 | 25 describe when analyzing the abstract idea that Postscript |

162

| | |
|---|---|
| 03:42:48 | 1 says it is directed to. |
| 03:42:50 | 2       So, the next question is: Is streamlining a |
| 03:42:52 | 3 process for a customer to enroll in a marketing promotion by |
| 03:42:56 | 4 providing a pre-filled and pre-addressed request an abstract |
| 03:43:00 | 5 idea? Here, there's no dispute that it is. And in its |
| 03:43:03 | 6 briefing, Plaintiff essentially acknowledges that this "bare |
| 03:43:07 | 7 idea may be abstract," but goes on to argue that Claim 1 is |
| 03:43:11 | 8 not, in fact, directed to that. |
| 03:43:13 | 9       Instead, Plaintiff argues that the claim is |
| 03:43:15 | 10 directed to a specific "improved mobile sign-up system that |
| 03:43:20 | 11 merely involves this idea." With that understood, the Court |
| 03:43:23 | 12 next must assess whether Claim 1 is actually directed to the |
| 03:43:27 | 13 abstract idea at issue. To do that, we need to understand |
| 03:43:30 | 14 the claim and what it covers. |
| 03:43:33 | 15      Claim 1 is a claim to a "non-transitory process |
| 03:43:37 | 16 or readable mean storing code" that causes a "click-to-text |
| 03:43:42 | 17 server" to do the following. First, send to a client server |
| 03:43:46 | 18 an integration tag that is "configured to be served with a |
| 03:43:50 | 19 web page" posted by that client server. |
| 03:43:54 | 20      The integration tag causes any mobile device |
| 03:43:56 | 21 that hosts that web page via first application to send user |
| 03:43:59 | 22 data to either the client server or the click-to-text |
| 03:44:03 | 23 server. |
| 03:44:04 | 24      Second, once the mobile device executes the |
| 03:44:05 | 25 integration, the click detect server sends "a uniform |

163

| | |
|---|---|
| 03:44:09 | 1 resource identifier or URI, which is the type of link to the |
| 03:44:14 | 2 mobile device." This URI is described as "deeplink to a |
| 03:44:18 | 3 messaging application different from the first application." |
| 03:44:22 | 4       The claim goes on to explain that once the |
| 03:44:24 | 5 mobile device detects the user interacting with a |
| 03:44:28 | 6 "promotional message associated with the web page" that the |
| 03:44:31 | 7 URI causes the mobile device to "automatically transition |
| 03:44:35 | 8 from the first application to the messaging application" and |
| 03:44:39 | 9 "automatically populate a custom message in the messaging |
| 03:44:43 | 10 application that includes an address associated with the |
| 03:44:45 | 11 click detect server and a message product that includes an |
| 03:44:48 | 12 identifier associated with at least one of the web page or |
| 03:44:52 | 13 the user data." |
| 03:44:53 | 14      The claim goes on to explain that once the |
| 03:44:57 | 15 mobile device detects that the user has hit the send button |
| 03:44:59 | 16 of the messaging, then the mobile device "sends the custom |
| 03:45:02 | 17 message to the click-to-text server." |
| 03:45:05 | 18      Third, the click detect server receives the |
| 03:45:09 | 19 custom message. |
| 03:45:10 | 20      Fourth, the server then enrolls the mobile |
| 03:45:11 | 21 device in a promotion associated with the promotional |
| 03:45:14 | 22 message that the user accessed on the web page. |
| 03:45:17 | 23      An embodiment of how this process works is seen |
| 03:45:21 | 24 in Figures 2A to C of the patents. Those figures depict a |
| 03:45:25 | 25 user's mobile phone wherein the user is looking at a web |

164

| | |
|---|---|
| 03:45:28 | 1 page and clicking on a promotional link on the web page. |
| 03:45:31 | 2 Once the user does so, the mobile device automatically |
| 03:45:34 | 3 transitions from the web page to a messaging app. |
| 03:45:37 | 4       In the messaging app, the text message computer |
| 03:45:39 | 5 that's been automatically populated with text asking the |
| 03:45:42 | 6 companies to subscribe the user to the product service and |
| 03:45:45 | 7 with the advertising company's phone number listed as the |
| 03:45:47 | 8 location where the message will be sent. |
| 03:45:49 | 9       And the figures demonstrate how by hitting the |
| 03:45:53 | 10 send button on the messaging app, the user can send a |
| 03:45:55 | 11 message. It is then enrolled in or subscribed to the |
| 03:45:57 | 12 service. |
| 03:46:01 | 13      Understanding what's claimed in Claim 1, we now |
| 03:46:04 | 14 have to determine what that claim is directed to. As I've |
| 03:46:06 | 15 explained earlier, the Federal Circuit requires that the |
| 03:46:09 | 16 Court examine the patents, particularly the patent |
| 03:46:11 | 17 specification, to assess what is the focus of the claim or |
| 03:46:16 | 18 what is its character as a whole. Is the claim's focus or |
| 03:46:21 | 19 character as a whole simply about the general concept of |
| 03:46:25 | 20 "streamlining the process for a customer to enroll in a |
| 03:46:28 | 21 marketing promotion by providing a pre-filled and |
| 03:46:31 | 22 pre-addressed request" or is it about something more than |
| 03:46:34 | 23 that or different than that? |
| 03:46:36 | 24      In engaging in the step one inquiry, here the |
| 03:46:39 | 25 Court is particularly mindful of the guidance from the |

165

1 Federal Circuit. In cases like *McRO, Inc. vs. Bandai Namco*
2 *Games America*. In *McRO*, the Federal Circuit instructed
3 Courts to be careful to avoid oversimplifying claims by
4 looking at them generally and failing to account for the
5 specific requirements found therein.
6     In the Court's view, that is what Defendants
7 have done by way of their assertions that the claims are
8 only directed to the abstract idea at issue. The Court
9 comes to this conclusion because the patent specification
10 tells us time and time again in many different ways that how
11 everyone might articulate what Claim 1 is directed to, that
12 concept needs to take into account the fact that the claim
13 makes use of what the patent refers to as a custom-generated
14 deeplinking process.
15     More specifically, what's key to the patent is
16 that in response to a user clicking on a website's
17 promotional advertising and using a first application, a URI
18 generated by the claim's click-to-text server then deep
19 links to a second messaging application in which a custom
20 enrollment message with data related to that user or the
21 website that the user visited is automatically populated to
22 the messaging. And this concept is central to the focus of
23 Claim 1 is evident from many parts of the patents. Of
24 course, the concept is found in text in Claim 1 itself, but
25 it's also highlighted consistently in various other parts of

166

1 the patent as well.
2     To start, just look at the patent's title. That
3 title is "Methods and Apparatuses for Mobile Device
4 Messaging-Based Communications Using Custom-Generated
5 Deeplinks and Based on the Hypertext Transfer Protocol,
6 HTTP."
7     The title makes clear that the patent's claims
8 are not simply broadly about the concept of streamlining a
9 customer's enrollment process by providing a pre-filled and
10 pre-addressed request in any old way one wishes to.
11 Instead, they're about doing so in a more particular way,
12 one that must make use of what the patent refers to in
13 shorthand as custom-generated deep links.
14     Before going further, let's understand what is
15 deeplink or a deeplink associated with a URI. In Column 3,
16 the specification describes deeplinking as a type of link
17 used in mobile applications that allows the linking of one
18 mobile application to another mobile application. And it
19 explains that deeplinking can use a URI that links to a
20 mobile application or to a specific location within a mobile
21 application.
22     So, in other words, using a URI will accomplish
23 deeplinking is a method of using computer technology to
24 automatically transition from one mobile to another. I
25 should also note that Defendants assert and Plaintiff does

167

1 not dispute that the concept that deeplinking was known in
2 the art at the time of the patents. Indeed, this seems to
3 be indicated in Column 3 of the patent.
4     Where else does the patent indicate that the
5 concept of custom-generated deeplinking is central to what
6 Claim 1 is about? Well, the abstract tells us this. It
7 prominently notes that the claims involve a response to user
8 input sending an HTT response message, including the "URI of
9 the second user interface and the purchase information to
10 deeplink to the second user interface, and to cause the
11 second user interface to be rendered at the mobile device
12 with the purchase information pre-populated in an input
13 field in the text messaging. This description makes up half
14 of the abstract's text.
15     The summary section of the patent also indicates
16 the prominence of what's called a custom-generated deeplink.
17 A good portion of its text, which runs for about 40 lines,
18 are just about the same process of sending a URI purchase
19 information to deeplink to the second user interface and to
20 cause a pre-populated text message, including user data or
21 website data to be generated.
22     And if there was any doubt remaining about
23 whether Claim 1 was directed to a concept that has to
24 include some reference to custom-generated deeplink, it
25 comes in the background section of the patent at Column 1.

168

1 There, the patentees are explaining what is the problem that
2 the invention hopes to solve and how it intends to do so.
3     The patent notes that known computer methods
4 allow a mobile device user to be able to open a vendor's app
5 or vendor's website in order to select a product for
6 service, a field in which the user could provide payment
7 information in order to complete a transaction. But the
8 patents explain that with these known methods, the user
9 often had to pause the server's previous activities such as
10 viewing a website or reading an email on the mobile device
11 because the computer automatically redirected them to the
12 vendor's app or website. When the user got there, signing
13 up for the product or services often required lots of user
14 input, such as many different clicks of screen tips in order
15 to complete the transaction.
16     The patent explains that this "time consuming
17 and burdensome process results in many users leaving the
18 purchase before the transaction is completed." And
19 Plaintiff's complaints also add that sometimes users would
20 fail to complete these purchases, not just due to lost
21 interest, but also due to too many mistyped numbers.
22     Accordingly, in the Background Section of the
23 patents, the patent even concludes by stating that, "A need
24 exists for methods and apparatus for dynamic application
25 deeplink to transition from one user interface to another

169

03:51:50  1  user interface at a mobile device for continuing and
03:51:53  2  improved user experience and engagement when interacting
03:51:56  3  with the mobile device."
03:51:57  4       So, sure, the claims certainly involve the
03:52:00  5  concept of "streamlining a process for a customer to enroll
03:52:04  6  in a marketing promotion by providing a pre-filled and
03:52:08  7  pre-addressed requests." But as the Federal Circuit
03:52:10  8  explained in *Enfish LLC vs. Microsoft Corp.*, the step one
03:52:14  9  inquiry "cannot simply ask whether the claims involve a
03:52:18  10 patent eligible concept because essentially every routinely
03:52:21  11 patent eligible claim" does so at some level.
03:52:24  12      For that reason, in *Enfish* the Federal Circuit
03:52:28  13 cautioned District Courts not to "describe the claims at
03:52:31  14 such a high level of extraction" so that the description is
03:52:35  15 "untethered from the language of the claims" in a way that
03:52:39  16 "all but ensures the exceptions to Section 101 follow the
03:52:42  17 rule."
03:52:43  18      In the Court's view, that's what Defendants have
03:52:46  19 done here. They've identified an abstract concept that
03:52:49  20 Claim 1 involves, not the concept that Claim 1 is directed
03:52:52  21 to.
03:52:53  22      Another way to understand that this is what's
03:52:55  23 going on here is by realizing that there truly are many
03:52:59  24 possible ways of streamlining the process for customer
03:53:02  25 enrollment in a marketing promotion by providing the

170

03:53:04  1  customer with a pre-filled and pre-addressed request, that
03:53:07  2  the patents are surely not directed to or about all of them.
03:53:11  3       For example, Defendants discuss some of those
03:53:13  4  possible ways in their briefing. One of which doesn't even
03:53:15  5  require the use of computer technology. On this, the
03:53:19  6  Defendants note that for years magazines would include
03:53:21  7  pre-populated forms with a mailing address, pre-typed
03:53:24  8  message stating that the sender wishes to subscribe to a
03:53:28  9  magazine and prepaid postage. All the customer would have
03:53:30  10 to do is subscribe is to send that pre-filled, pre-addressed
03:53:33  11 request.
03:53:33  12      And one can surely posit many other ways, even
03:53:37  13 many other computerized ways of streamlining a customer's
03:53:40  14 enrollment process by providing the customer with a
03:53:42  15 pre-filled and pre-addressed request that don't involve the
03:53:45  16 claim solution. Perhaps, a company, for example, could send
03:53:49  17 an email to a customer that includes a pre-filled,
03:53:52  18 pre-addressed enrollment form attached such that all the
03:53:55  19 customer needs to do is print out the attachment and send
03:53:58  20 the form away in U.S. mail to the company, or a company
03:54:01  21 could enable a user to download an app, and it could click
03:54:04  22 on a promotional request, which would generate a pop-up
03:54:07  23 screen that the user saw that was pre-populated with the
03:54:09  24 user's information. Or the user might click a promotional
03:54:12  25 link on a web page that takes the user to a request, and

171

03:54:15  1  then a screen pops up that asks if the user would like their
03:54:18  2  personal information auto-filled into the request.
03:54:22  3       In asserting that all Claim 1 is directed to is
03:54:24  4  streamlining the process for a customer to enroll in a
03:54:27  5  marketing promotion by providing a pre-filled and
03:54:30  6  pre-addressed request, Defendants are essentially suggesting
03:54:33  7  that the patent's really directed to a general concept that
03:54:36  8  would cover any and all of these solutions or others.
03:54:40  9       And, obviously, for the reasons the Court has
03:54:42  10 set out previously, that's just not so. The particular way
03:54:46  11 that Claim 1 goes about providing a pre-filled and
03:54:49  12 pre-addressed request, that is by utilizing a process that
03:54:52  13 obtains user data via integration tags embedded in websites
03:54:56  14 and employing a URI that deep links from one mobile app to
03:55:00  15 another message app, and where the message app's
03:55:02  16 automatically populated by a text message that contains user
03:55:05  17 information or web page information.
03:55:08  18      That's not an afterthought in the claim.
03:55:10  19 Instead, it's the start of the claim.
03:55:13  20      Now, it is understandable why the Defendant in
03:55:16  21 these issues might not want to include the concept of
03:55:19  22 custom-generated deeplinking in its assertion about what
03:55:22  23 Claim 1 is directed to, even though it seems like every part
03:55:25  24 of the patent is telling us that that concept surely is a
03:55:27  25 part of the patent's focus. After all, the more that the

172

03:55:30  1  purported abstract idea sounds like it includes reference to
03:55:33  2  a particular type of computer technology that generates a
03:55:37  3  particular type of custom tech message, the more that
03:55:40  4  concept starts to sound like it's not an abstract idea at
03:55:43  5  all. And, certainly, not a longstanding commercial practice
03:55:46  6  that people have been engaging in for generations. Instead,
03:55:49  7  the concept will start to sound a lot more like a particular
03:55:52  8  real-world application of an abstract idea.
03:55:55  9       The Court also notes that in their supplemental
03:55:58  10 briefing, both Defendants cited *Customedia Technologies LLC*
03:56:02  11 *vs. Dish Network Corp.* as the most analogous Federal Circuit
03:56:04  12 case on point. Now, neither Defendant actually cited the
03:56:09  13 *Customedia* in their opening briefs, which is surprising
03:56:11  14 considering Defendants now count the case as the most
03:56:15  15 impactful case in support of their arguments.
03:56:17  16      As a result of this, unfortunately, the
03:56:18  17 Plaintiff never got a chance to brief its thoughts about why
03:56:20  18 that case was on point. That said, though, the Court will
03:56:22  19 address *Customedia* here.
03:56:25  20      The representative claim in *Customedia* was to a
03:56:28  21 data delivery system for providing automatically delivery
03:56:31  22 of multimedia products. The claim did so by using a "remote
03:56:35  23 and counter transaction server for providing multimedia data
03:56:38  24 products on a user" where at least one of those products was
03:56:41  25 "specifically identified advertising data."

173

Additionally, the claim employed a "programmable local receiver unit" that received the data products.  That unit had at least one "individually controlled and reserved advertising data storage section adapted specifically for storing the specific data by undersizing data" that was "monitored and controlled by the remote transaction server."

In step one, the Federal Circuit found that the claim was simply directed to "using a computer to deliver targeted advertising to a user" which was an abstract idea.  Now, the patentee had argued, otherwise, that the claim was instead directed to an improvement in the data delivery system's ability to store advertising by dedicating a section of the computer's memory to such data.

But the *Customedia* Court disagreed noting that "The claimed invention nearly improves the abstract concept of delivering targeted advertising using a computer only as a tool."  It came to this conclusion because the claim did not "enable computers to operate more quickly or efficiently, nor do they solve any technological problem."

In support of that key conclusion, the Court noted that the "specification is silent as to any specific structural or inventive improvements in computer functionality related to this claim system."  Instead, the Court said that the "only improvements identified in the specification are generic speed and efficiency improvements

174

and hurt in applying the use of a computer to end tasks."  In the Court's view, however, Claim 1 in the patents-in-suit here are not on all fours with the representative claim in the patents at issue in *Customedia*.

The Court has reviewed the representative '090 patent that was at issue in *Customedia*.  That patent's title was generic.  It was "System For Data Management and On Demand Rental In The Purchase of Digital Data Products."  Its abstract and other key portions of the patent did not seem to tout the unconventional nature of the claim's assertedly approved way to store advertising data.  Indeed, it appears the patent specification said little about why the assertedly important claimed step of reserving memory to ensure sufficient storage space for advertising data was significant or why it amounted to an improvement in computer functionality.

In contrast here, as the Court has explained, the patent specification focuses resolutely and repeatedly on the importance of using what it calls custom-generated deeplinking to improve the way that mobile electronic devices are able to enroll customers in promotions.  And in Column 1, the patents do appear to indicate that this particular claimed arrangement, that is, the use of integration tags embedded in web pages such that the tag returns user data to a server if a web page is accessed, and

175

then utilization of URIs that deeplink to a pre-filled text message that includes user data or website data, so long as the user clicks on an advertisement on the web page, all amounts to improvement in the way a computer technology worked in the space.

Column 1 indicates that prior to the invention, computerized mobile devices functioned in a different way to attempt to get customers to select the product service.  That is, they agreed to direct the user to a vendor's application or a vendor's website in order to have them provide payment information through the use of many clicks.

Now, after the invention, according to Column 1, the device is functioning in a new and improved and different way, one that utilized the claimed custom-generated deeplinking process to allow users to sign up for promotions while minimizing user input.

Therefore, because Claim 1 is not directed to the abstract idea put forward by Defendants, the motions are denied at step one on that basis.  Although the Court could stop there, for the sake of completion, it notes that even if it was somehow wrong about this step one conclusion, and even if Claim 1 could be said to have been directed to the abstract idea of streamlining the process for a customer to enroll in a marketing promotion by providing a pre-filled and pre-addressed request, the motions would still have been

176

denied in step two.  That's because, for the reasons the Court has expressed, that abstract idea wouldn't fairly take into account other narrowing aspects of the claim, including at least, first, the claim's use of integration tags associated with a web page to collect user data when a user loads the web page via first application.

Second, the claim's click-to-text server creating and sending a URI to the mobile device in response to the device's execution of the integration tag.

And, third, the fact that the URI deep links to a messaging application such that when the user interacts with a promotional message on a website, the URI causes the mobile device to transition from the website app to the messaging app.

The Court understands Defendants' arguments, that each of these individual computer concepts, standing alone, were well known in the computer arms at the time.  For example, the Court's already explained how the patent suggests that the use of URIs with deep links were known, nor that the patentees claim to have invented the integration tags.

The Plaintiff does not argue that the concept of pre-populated text messages in and of itself was not in use then and websites were surely well known at the time.  But, of course, as the Federal Circuit told us in *BASCOM*,

177

04:01:53 1  inventive concept inquiry requires more than recognizing
04:01:56 2  that each claim element by itself was known in the art.
04:01:59 3  Instead, it allows that an inventive concept can be found in
04:02:02 4  a non-conventional and non-generic arrangement of known
04:02:06 5  conventional pieces.
04:02:08 6        In the Court's view, the Defendants seem to
04:02:09 7  ignore this instruction from *BASCOM*.  Instead, they
04:02:13 8  continually note that each additional claim element such as
04:02:16 9  the use of servers, or use of web pages, or the use of an
04:02:19 10 integration tag, or the use of URI from deep links to
04:02:22 11 transition between applications were each, standing alone,
04:02:26 12 well known at the time.
04:02:27 13       But *BASCOM's* point is that even claims that use
04:02:30 14 many individual technological components that themselves
04:02:33 15 were conventional can still be patent eligible if the
04:02:37 16 particular ordered combination of those known elements are
04:02:40 17 used in an unconventional way.
04:02:42 18       In their briefing, Defendants also boldly
04:02:45 19 asserted the particular ordered combination of technology
04:02:48 20 set out in Claim 1.  In fact, amounted to the "ordinary use"
04:02:53 21 of computers at the time or the "ordinary and expected way"
04:02:58 22 computers were being used then.
04:03:00 23       But Defendants certainly do not point to any
04:03:02 24 part of the record that demonstrates that this was so as to
04:03:05 25 the entirety of the ordered combination, and they do not

178

04:03:08 1  cite to any source for such a conclusion.  Instead, they
04:03:12 2  simply fall back on the notion that web pages alone were
04:03:15 3  "ordinary", or that integration tags alone were ordered or
04:03:19 4  the deep links alone were ordered.  But that kind of
04:03:23 5  argument is not enough because it doesn't address the
04:03:25 6  ordered combination of all those known technological steps
04:03:28 7  that are set out in the claim.
04:03:31 8        Indeed, during oral argument today when I asked
04:03:33 9  at least Emotive's counsel as to whether certain
04:03:35 10 combinations or portions of the claimed solution amounted to
04:03:38 11 the unconventional use of computer technology at the time of
04:03:40 12 the patent, counsel at times noted that there may be
04:03:44 13 uncertainty on those points in the record stating that it
04:03:47 14 may be "a little bit of a leap" to draw such conclusions
04:03:50 15 from the record or that conventionality "has to be true."
04:03:55 16       Here, though, Defendants are asking the Court to
04:03:58 17 grant a motion to dismiss based on the uncontroverted
04:04:01 18 presence of a winning affirmative defense.  And so, the
04:04:04 19 record is unclear as to the key points.  Or if the Court is
04:04:07 20 asked to assume that something has to be true, then the
04:04:10 21 motion should not be granted.
04:04:12 22       Moreover, there are some portions of the record
04:04:14 23 that do suggest that the ordered combination of steps in
04:04:17 24 Claim 1 did not amount to the conventional use of computer
04:04:21 25 technology.  For one thing, as I've noted, the patent

179

04:04:23 1  provides some suggestion of this in Column 1's background
04:04:27 2  section when it discusses how a need exists in the art for
04:04:30 3  the use of "methods and apparatus for dynamic application
04:04:34 4  deeplink to transition from one user interface to another
04:04:36 5  user interface and a mobile device."  Because the typically
04:04:40 6  used computerized process for computer promotion sign-up
04:04:43 7  works in a different, less optimal way.  And the Complaints
04:04:46 8  also include some additional allegations about this topic of
04:04:49 9  unconventional use of computer technology.
04:04:51 10       Now, the Court wishes that those allegations had
04:04:56 11 been more robust and that they had included more factual
04:04:58 12 data and supported the idea that the claim's use of the
04:05:00 13 particular ordered combination of steps amounted to the
04:05:03 14 unconventional combination of otherwise known computerized
04:05:06 15 processes.
04:05:08 16       Even still, though, there's enough in the
04:05:10 17 Complaints to at least indicate a plausible, factual dispute
04:05:13 18 on that front.  In part, the Court says so because the
04:05:16 19 Complaint's allegations do state that the claim combination
04:05:19 20 was not "well understood, routine or conventional" at the
04:05:23 21 time.  "Constituted technological improvements over
04:05:27 22 traditional mobile sign-up and mobile messaging systems" and
04:05:30 23 claim "an ordered combination of components interactions in
04:05:33 24 an unconventional manner."
04:05:36 25       And they do, at least at times, go on to allege

180

04:05:38 1  that the invention's use of the technology at issue
04:05:41 2  revolutionized the relevant field, which can be an indicator
04:05:44 3  that they did so because they used computers in a new and
04:05:47 4  different way from what was done before.
04:05:49 5        Moreover, in at least the Postscript case,
04:05:52 6  Plaintiff cited in Footnotes 4 to 6 of the Complaint to
04:05:56 7  certain articles that can also support this notion of
04:05:59 8  unconventionality.  One such article, for example, stated
04:06:02 9  that the patentee had explained that the problem with prior
04:06:05 10 art computer solutions in this space was that "emails are
04:06:08 11 slower, more crowded and a more cumbersome form of text
04:06:12 12 messages.  What's more, people today check and respond to
04:06:14 13 texts at much higher volumes than emails."
04:06:17 14       The article notes that it is "not just the
04:06:20 15 outdated email problem that Attentive's text-based marketing
04:06:23 16 method solves.  Another major loss point in the computer to
04:06:26 17 brand sign-up journey is the need to install new application
04:06:29 18 on one's phone.  People don't really want to download an app
04:06:33 19 anymore, notes Long, the patentee's founder.  That's where
04:06:37 20 Attentive's two-tap sign-up solution comes in."
04:06:40 21       A second article discussed how the claimed
04:06:42 22 two-tap opt-in solution was a " key differentiator" from
04:06:47 23 what other competing platforms were doing technologically in
04:06:49 24 this space.
04:06:51 25       Lastly, as the Court's noted today, the concern

181

04:06:54 1 that drives the Section 101 inquiry is on preemption, what
04:06:57 2 the claim, including its asserted inventive concepts would
04:07:00 3 tie up or preempt too much of all possible systems or
04:07:02 4 methods for putting the abstract idea into practice.
04:07:06 5         Here, as Plaintiff notes in its brief, while
04:07:08 6 Defendants are correct that the abstract idea using
04:07:10 7 pre-filled enrollment requests for prior use of the concept
04:07:13 8 of receiving information about how to contact a customer, it
04:07:16 9 is "not inherent that one must do so by having a
04:07:20 10 click-to-text server transmit an integration tag to a client
04:07:23 11 server which embeds the tag into a web page and serves the
04:07:27 12 combination to a browser, which automatically executes the
04:07:30 13 integration tag to return user data to "the server."
04:07:35 14        And while the Defendant's right that the
04:07:36 15 abstract idea of using pre-filled enrollment requests
04:07:39 16 necessarily requires that the actual creation of such a
04:07:44 17 "request," it is not inherent that one must accomplish that
04:07:47 18 goal by having a click detect server send a custom URI with
04:07:51 19 a deeplink to the browser for the browser to associate URI
04:07:54 20 with the advertisement on the web page, that the URI to
04:07:57 21 deeplink to a messaging application and for the deeplink to
04:08:00 22 cause the application to create a pre-filled request for the
04:08:02 23 custom text message."
04:08:04 24        In making these statements, in the Court's view,
04:08:07 25 Plaintiff, at least in part, is making a preemption argument

182

04:08:09 1 that the particular claim combination is simply one
04:08:12 2 particular way, among many, for "streamlining the process
04:08:15 3 for a customer to enroll in a marketing promotion by
04:08:19 4 providing a pre-filled and pre-addressed request," that it
04:08:23 5 may not, and it would preempt the relevant field.  And the
04:08:25 6 extent to which an order would not do so would amount to a
04:08:29 7 factual dispute that would mitigate enhanced requirements of
04:08:32 8 the motions in step two if the Court had equaled them
04:08:36 9 together.
04:08:36 10        So, for all those reasons, the Court will deny
04:08:39 11 Defendants' motions on Section 101 grounds at step one.  And
04:08:44 12 it simply notes for the record that even if its call as to
04:08:46 13 step one had been wrong, the Court would have still
04:08:50 14 otherwise on this record denied the motion in step two.
04:08:53 15        The Court also notes that it will endeavor to
04:08:55 16 resolve the remainder of Emotive's motion with regard to
04:08:59 17 plausibility issues as soon as it can.  Likely, by the way,
04:09:01 18 in short order that the Court will issue something on that.
04:09:04 19        All right.  With all that said, and many, many
04:09:08 20 minutes, hours, the Court has resolved at least three
04:09:11 21 motions that were pending today.  As I said before, the
04:09:15 22 Court's analysis here today, I will intend to take it and
04:09:19 23 later put it into a written opinion which will simply
04:09:23 24 include the transcript of what I said, will clean up any
04:09:26 25 typos and will add citations that the Court does, indeed,

183

04:09:30 1 have in its notes before it, but simply didn't include today
04:09:33 2 for sake of time.
04:09:35 3         All right.  So, with all that said, I want to
04:09:38 4 say, again, thanks to counsel for their arguments today.  I
04:09:43 5 was thinking to myself that I was going to go home tonight
04:09:45 6 and say to my family, You know, it was really interesting
04:09:48 7 today working, this discussion in Court.  I know when my
04:09:51 8 kids ask me, What was the discussion about and I tell them
04:09:53 9 it was about issues regarding patent eligibility, they're
04:09:57 10 going to be disappointed in that.  They'll say, Dad, that
04:10:02 11 sounds boring.
04:10:02 12        But I don't think it's boring.  I think it's
04:10:04 13 really interesting, and I'm really grateful to counsel for
04:10:06 14 their thoughts and advice, not only on how to resolve these
04:10:09 15 motions, but more generally on the concession of 101 in this
04:10:12 16 context.
04:10:13 17        So, with all that said, unless there's anything
04:10:15 18 further, I know we're late in the day on a Friday, we will
04:10:18 19 end our court hearing here today.  I wish all of our
04:10:22 20 out-of-town folks safe travel as they travel home.  I look
04:10:22 21 forward to talking to you and seeing all of you further in
04:10:27 22 these cases in the future.
04:10:28 23        And with all that said, the Court will stand in
04:10:31 24 recess.  Thank you.
04:10:32 25        DEPUTY CLERK:  All rise.

184

1         (Court was recessed at 4:10 p.m.)
2         I hereby certify the foregoing is a true and
3 accurate transcript from my stenographic notes in the
4 proceeding.
5         /s/ Heather M. Triozzi
          Certified Merit and Real-Time Reporter
6         U.S. District Court
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**'**

**'074** [3] - 16:7, 22:6, 159:14
**'090** [1] - 174:8
**'123** [3] - 112:22, 112:24, 116:19
**'237** [18] - 69:11, 72:3, 79:7, 81:11, 81:18, 84:20, 87:19, 93:11, 96:2, 101:2, 132:1, 132:7, 133:15, 133:23, 134:6, 136:3, 138:11, 152:10
**'615** [1] - 100:23
**'641** [10] - 79:7, 81:16, 84:12, 85:4, 87:18, 93:8, 101:2, 132:2, 134:8
**'887** [8] - 17:15, 40:8, 43:15, 43:24, 57:9, 159:8, 160:2, 160:7
**'897** [2] - 22:6, 159:10

**/**

**/s** [1] - 184:8

**1**

**1** [60] - 10:12, 17:16, 36:14, 39:7, 43:14, 43:24, 50:18, 54:10, 57:9, 58:8, 58:21, 58:24, 59:10, 59:16, 60:10, 60:17, 70:7, 81:16, 84:13, 85:4, 87:6, 95:2, 112:9, 112:22, 112:24, 113:3, 114:21, 114:24, 115:2, 115:3, 116:19, 116:22, 116:25, 159:7, 160:7, 160:13, 161:4, 162:10, 162:15, 162:18, 164:16, 165:14, 166:1, 166:2, 167:9, 168:1, 168:3, 169:23, 171:6, 171:14, 172:1, 174:5, 174:25, 175:9, 175:15, 175:20, 175:25, 177:23, 179:2
**1's** [1] - 179:4
**1.2** [1] - 114:4
**1.4** [1] - 114:4

**10** [3] - 81:16, 93:9
**101** [47] - 4:14, 5:2, 7:20, 8:1, 8:13, 8:25, 10:20, 13:19, 22:13, 26:25, 33:23, 34:4, 34:5, 40:1, 53:25, 56:10, 63:25, 77:2, 77:22, 86:6, 101:20, 101:21, 106:4, 109:11, 109:12, 110:1, 112:19, 114:19, 118:7, 119:1, 122:2, 124:1, 126:2, 127:14, 131:3, 132:12, 146:2, 159:1, 159:2, 159:4, 159:20, 160:1, 169:19, 181:4, 182:14, 183:18
**101-related** [2] - 131:8, 131:21
**1010** [1] - 87:8
**102** [1] - 77:2
**103** [1] - 77:3
**11** [3] - 72:21, 79:23, 80:4
**11,416,887** [1] - 159:7
**11,416,897** [1] - 159:9
**11,553,074** [1] - 159:14
**112** [1] - 110:16
**11:20** [1] - 66:16
**12** [9] - 8:14, 64:8, 66:23, 77:23, 116:21, 117:1, 126:19, 133:18, 158:7
**12(b)(6** [3] - 131:8, 131:20, 158:23
**12:40** [1] - 128:7
**13** [2] - 35:19, 108:12
**14** [15] - 1:21, 80:4, 81:16, 81:21, 92:24, 93:3, 93:8, 93:12, 101:5, 133:15, 133:20, 133:25, 137:8, 138:11, 138:17
**14's** [1] - 147:19
**15** [1] - 159:8
**18** [19] - 9:17, 69:14, 70:7, 81:11, 81:17, 84:20, 87:19, 96:1, 97:21, 108:12, 132:11, 132:16, 132:18, 133:23, 138:11, 138:16, 147:8, 154:18, 154:20

**19** [1] - 72:3
**1972** [1] - 120:24

**2**

**2** [11] - 40:22, 85:10, 108:12, 113:4, 113:10, 139:3, 139:17, 139:18, 142:15, 142:18, 152:3
**20** [2] - 66:25, 108:10
**200** [1] - 120:8
**2000s** [1] - 126:2
**2001** [1] - 63:22
**2017** [1] - 64:21
**2023** [1] - 1:21
**2050** [2] - 139:11, 139:12
**22** [3] - 108:14, 155:13, 156:7
**22-1163-CJB** [4] - 1:5, 2:8, 4:18, 158:14
**22-1538-CJB** [3] - 1:16, 4:24, 131:18
**23** [2] - 81:17, 159:13
**23-87-CJB** [4] - 1:10, 2:21, 4:20, 158:18
**24** [1] - 108:10
**25** [2] - 54:15, 81:17
**27** [1] - 136:12
**29** [1] - 146:12
**2A** [1] - 164:2

**3**

**3** [12] - 29:3, 72:3, 108:14, 113:4, 113:10, 136:11, 139:17, 140:1, 142:16, 152:3, 166:18, 167:6
**30** [2] - 7:9, 54:14
**317** [4] - 1:7, 2:13, 4:18, 158:15
**35** [1] - 85:11
**36** [1] - 52:19
**37** [3] - 35:21, 36:9, 52:19
**38** [3] - 152:6, 153:5, 157:20
**3:00** [6] - 128:9, 128:10, 128:11, 129:3, 129:4, 129:6

**4**

**4** [11] - 36:2, 53:5, 53:6, 54:10, 54:13, 54:23, 72:3, 142:18,

147:10, 180:9
**40** [1] - 167:20
**42** [1] - 132:10
**43** [2] - 12:16, 58:14
**4:00** [2] - 128:10, 129:5
**4:10** [1] - 184:4

**5**

**5** [7] - 36:2, 53:5, 53:8, 54:23, 72:3, 107:24, 133:18
**50** [2] - 109:14, 130:5
**51** [2] - 54:4, 54:23
**5:00** [1] - 128:23

**6**

**6** [9] - 14:24, 36:2, 53:6, 53:10, 54:23, 90:3, 90:18, 136:12, 180:9
**6.2** [1] - 114:6

**7**

**7** [1] - 40:14
**7,159,237** [1] - 131:25
**7,895,641** [1] - 132:1

**8**

**8** [7] - 73:8, 73:14, 138:11, 139:2, 144:5, 147:18, 152:3
**844** [1] - 1:20

**9**

**9:45** [1] - 1:22

**A**

**a.m** [1] - 1:22
**ability** [5] - 24:14, 141:19, 155:21, 158:10, 173:15
**able** [9] - 30:25, 35:25, 63:5, 97:17, 101:24, 119:5, 131:2, 168:7, 174:24
**absolutely** [7] - 14:1, 52:15, 53:14, 65:9, 104:3, 105:10, 122:7
**abstract** [101] - 13:1, 14:16, 15:20, 21:23, 22:6, 23:8, 24:11, 27:22, 31:4, 31:18, 31:24, 32:7, 32:9, 32:15, 39:1, 39:20,

50:8, 54:1, 55:23, 55:24, 56:1, 56:4, 57:14, 62:7, 72:10, 73:17, 74:11, 74:22, 74:24, 75:2, 75:3, 78:16, 98:4, 98:5, 102:6, 106:2, 121:12, 121:15, 121:16, 121:22, 122:6, 127:21, 134:10, 134:14, 134:16, 134:19, 134:23, 135:7, 135:11, 135:14, 135:17, 135:22, 136:4, 137:22, 140:14, 140:25, 143:19, 143:22, 145:10, 145:12, 145:16, 145:20, 147:2, 147:14, 148:16, 148:22, 150:6, 155:25, 157:13, 158:5, 160:14, 161:3, 161:5, 161:10, 161:13, 161:17, 161:20, 161:25, 162:3, 162:7, 162:10, 162:16, 165:11, 167:9, 169:22, 172:4, 172:7, 172:11, 173:12, 173:18, 174:12, 175:21, 176:1, 176:5, 181:7, 181:9, 181:18
**abstract's** [1] - 167:17
**abstraction** [1] - 57:14
**abstractness** [1] - 126:18
**accept** [2] - 65:2, 146:16
**access** [2] - 85:9, 107:11
**accessed** [4] - 18:22, 19:25, 163:25, 175:3
**accesses** [5] - 24:22, 26:1, 41:20, 42:18, 65:8
**accomodation** [1] - 140:5
**accomplish** [3] - 66:13, 166:25, 181:20
**accomplished** [2] - 34:8, 161:16
**accomplisher** [1] - 53:21
**accomplishes** [1] -

27:22
**accomplishing** [2] - 57:22, 61:22
**according** [4] - 40:8, 109:2, 147:18, 175:15
**accordingly** [1] - 168:25
**account** [9] - 30:22, 61:13, 126:18, 137:12, 142:17, 160:23, 165:7, 165:15, 176:6
**accuracy** [1] - 155:21
**accurate** [3] - 18:1, 144:21, 184:6
**accurately** [1] - 156:4
**accuse** [1] - 69:2
**accused** [2] - 69:1, 69:3
**accusing** [1] - 30:2
**achieves** [1] - 37:13
**acknowledge** [1] - 95:25
**acknowledged** [1] - 115:2
**acknowledges** [2] - 106:20, 162:9
**Action** [6] - 4:18, 4:20, 4:23, 131:18, 158:14, 158:18
**Active** [1] - 137:19
**activities** [4] - 60:1, 141:22, 146:4, 168:12
**activity** [12] - 70:18, 80:8, 106:4, 106:7, 107:19, 122:22, 149:24, 150:2, 151:2, 151:7, 151:10, 154:14
**actual** [2] - 52:11, 181:19
**adapted** [1] - 173:7
**add** [25] - 22:23, 39:5, 49:1, 49:17, 50:1, 55:18, 55:19, 62:3, 81:6, 92:13, 101:9, 109:19, 113:7, 115:6, 118:7, 118:10, 123:12, 126:16, 126:17, 127:1, 129:25, 168:22, 183:3
**added** [5] - 50:1, 87:9, 90:17, 148:7, 151:1
**adding** [11] - 42:10, 42:11, 42:15, 67:12, 68:3, 76:23, 78:18, 92:2, 121:14,

121:17, 123:12
**addition** [4] - 50:23, 134:2, 149:2, 155:10
**additional** [36] - 18:9, 28:17, 33:16, 50:10, 69:18, 69:24, 73:6, 73:9, 74:14, 82:1, 88:23, 89:3, 91:14, 91:19, 92:2, 92:4, 92:5, 92:17, 94:1, 101:6, 109:23, 113:15, 115:7, 133:3, 139:13, 141:17, 145:17, 147:16, 148:10, 148:14, 148:21, 149:5, 151:21, 152:2, 177:11, 179:11
**additionally** [7] - 130:14, 139:25, 148:8, 153:2, 153:5, 154:4, 173:4
**address** [22] - 4:25, 7:24, 11:25, 23:25, 31:12, 47:21, 49:23, 51:16, 55:12, 100:15, 105:11, 105:12, 106:24, 115:9, 117:1, 133:14, 133:25, 159:2, 163:13, 170:10, 172:22, 178:8
**addressed** [22] - 31:9, 31:16, 50:19, 56:14, 56:17, 56:23, 111:11, 111:21, 161:12, 161:16, 162:7, 164:25, 166:13, 169:10, 170:4, 170:13, 170:18, 170:21, 171:9, 171:15, 176:3, 182:7
**addresses** [1] - 27:16
**addressing** [2] - 111:16, 146:14
**adds** [3] - 56:5, 76:18, 121:19
**adequately** [1] - 83:11
**adjourn** [2] - 7:18, 109:8
**administrator** [6] - 83:22, 84:1, 84:2, 84:25, 97:3, 144:16
**administrators** [5] - 83:1, 83:2, 83:19, 141:17, 144:11
**admission** [2] - 12:24,

112:11
**admit** [3] - 13:4, 14:4, 33:3
**admits** [1] - 72:21
**admitted** [1] - 20:13
**advance** [3] - 11:9, 29:13, 68:20
**advances** [1] - 18:9
**advantage** [2] - 7:19, 142:5
**advantages** [2] - 25:12, 155:20
**advertisement** [3] - 12:21, 175:6, 181:23
**advertisements** [3] - 49:13, 49:15, 50:1
**advertising** [11] - 49:19, 50:5, 164:10, 165:20, 173:3, 173:7, 173:12, 173:15, 173:19, 174:14, 174:17
**advice** [1] - 183:17
**affect** [1] - 21:25
**after-the-fact** [1] - 109:4
**afternoon** [2] - 129:13, 129:19
**afterthought** [1] - 171:21
**age** [1] - 124:1
**ago** [1] - 120:8
**agree** [10] - 11:9, 20:18, 41:24, 51:18, 73:11, 106:5, 144:18, 154:12, 159:17
**agreed** [2] - 111:21, 175:12
**agrees** [3] - 112:25, 145:11, 149:16
**ahead** [4] - 3:25, 7:7, 30:11, 117:22
**aid** [1] - 143:21
**Alice** [18] - 37:22, 93:15, 120:10, 120:13, 120:18, 120:23, 121:4, 122:1, 122:7, 122:8, 122:13, 127:6, 127:15, 145:14, 158:9, 160:18, 161:1
**Alice's** [1] - 145:13
**align** [2] - 80:5, 84:9
**allegation** [4] - 27:20, 27:23, 28:4, 114:9
**allegations** [7] - 52:12, 53:16, 115:18, 146:16, 179:11, 179:13,

179:22
**allege** [1] - 180:3
**alleged** [2] - 82:1, 114:8
**allegedly** [1] - 106:2
**alleging** [2] - 117:21, 131:24
**allocated** [2] - 7:9, 66:25
**allow** [7] - 21:21, 83:7, 90:15, 124:5, 144:9, 168:7, 175:18
**Allowability** [5] - 76:19, 76:20, 77:10, 152:10, 152:18
**Allowance** [4] - 87:13, 88:10, 90:3, 100:1
**allowance** [1] - 94:17
**allowed** [1] - 88:18
**allowing** [3] - 59:20, 92:8, 161:15
**allows** [5] - 54:10, 95:11, 139:20, 166:20, 177:6
**almost** [2] - 30:23, 65:21
**alone** [9] - 132:9, 134:23, 146:17, 147:5, 176:20, 177:14, 178:5, 178:6, 178:7
**Alstom** [1] - 135:8
**alternative** [1] - 51:10
**Alto** [5] - 3:18, 4:23, 67:8, 131:18, 131:19
**ALTO** [1] - 1:17
**Amazon** [2] - 25:4
**Amazon's** [1] - 25:4
**amend** [2] - 113:3, 113:18
**amendments** [1] - 148:5
**America** [1] - 165:5
**American** [1] - 110:10
**AMERICAS** [1] - 1:14
**Americas** [4] - 3:11, 4:23, 6:11, 131:24
**amount** [12] - 51:20, 57:2, 72:8, 72:12, 121:19, 134:23, 143:5, 147:5, 147:25, 151:24, 179:2, 182:9
**amounted** [6] - 146:13, 157:5, 174:18, 177:23, 178:13, 179:16
**amounts** [8] - 15:12, 96:12, 106:21, 124:23, 135:21,

141:19, 144:12, 175:7
**analog** [1] - 76:13
**analogize** [2] - 23:13, 75:16
**analogizing** [1] - 13:21
**analogous** [3] - 12:12, 149:15, 172:14
**analogy** [4] - 12:1, 12:16, 25:15, 86:9
**analyses** [1] - 110:13
**analysis** [101] - 26:25, 34:4, 34:5, 50:7, 51:3, 51:5, 67:15, 70:17, 71:4, 71:11, 71:16, 72:1, 72:12, 72:15, 73:6, 73:22, 73:23, 73:24, 74:15, 74:21, 74:24, 76:13, 77:17, 79:24, 80:1, 80:2, 80:21, 80:24, 86:2, 87:12, 87:14, 88:2, 88:23, 89:11, 89:25, 90:16, 91:14, 91:20, 91:25, 92:14, 92:18, 92:22, 93:10, 93:15, 94:1, 94:16, 94:21, 94:22, 95:1, 95:4, 95:16, 95:17, 96:13, 101:6, 101:8, 103:13, 103:14, 105:18, 105:19, 108:15, 108:20, 108:23, 114:19, 116:17, 125:11, 130:12, 133:1, 133:3, 136:1, 136:17, 137:3, 137:9, 138:20, 139:11, 139:13, 139:19, 139:20, 140:1, 141:4, 142:22, 143:13, 143:16, 144:3, 144:10, 146:2, 147:19, 148:18, 149:22, 149:24, 150:9, 151:23, 152:15, 152:20, 157:9, 157:10, 158:9, 160:18, 161:1, 182:25
**analysis'** [1] - 133:11
**analyst** [42] - 72:23, 80:2, 84:12, 84:14, 84:15, 85:5, 85:6, 85:7, 85:12, 85:13, 85:15, 85:17, 87:19, 87:22, 89:8, 89:9,

92:21, 94:4, 95:22, 95:23, 97:8, 97:12, 101:2, 101:3, 108:8, 133:7, 133:8, 133:16, 137:5, 140:11, 140:25, 141:1, 143:16, 143:18, 144:9, 144:17, 154:20

**analysts** [6] - 108:10, 108:13, 108:19, 140:23, 141:3, 142:23

**analyze** [27] - 67:12, 69:18, 69:19, 71:5, 71:6, 72:17, 72:19, 72:22, 75:3, 85:25, 96:8, 98:14, 98:15, 100:4, 102:16, 104:25, 108:12, 132:25, 143:12, 145:2, 145:4, 148:19, 148:25, 151:21, 153:2, 157:21, 158:2

**analyzed** [11] - 71:9, 78:13, 85:1, 87:25, 89:3, 89:14, 103:23, 110:5, 148:8, 151:7, 151:15

**analyzes** [10] - 67:11, 68:13, 68:14, 68:15, 97:22, 97:25, 136:22, 137:12, 138:18, 140:20

**analyzing** [26] - 68:8, 70:13, 74:3, 74:7, 74:11, 76:8, 76:24, 78:16, 106:7, 130:6, 133:23, 134:11, 135:1, 135:25, 139:1, 140:7, 141:5, 143:6, 145:9, 147:17, 150:7, 150:15, 153:22, 154:14, 157:17, 162:3

**Anderson** [2] - 5:21, 6:16

**ANDERSON** [2] - 2:22, 3:6

**ANDREW** [1] - 2:23

**Android** [2] - 16:9, 43:1

**ands** [1] - 146:13

**Andy** [1] - 5:20

**anew** [1] - 71:6

**Anish** [2] - 7:2, 67:7

**ANISH** [1] - 3:15

**Ankara** [1] - 98:20

**announce** [1] - 129:22

**anomaly** [2] - 139:11

**answer** [5] - 9:7, 66:2, 79:17, 96:18, 102:15

**answering** [4] - 114:23, 133:19, 136:12, 160:3

**answers** [2] - 128:16

**apart** [1] - 119:22

**apologies** [1] - 104:8

**app** [18] - 17:3, 17:5, 17:6, 20:15, 26:6, 47:16, 61:11, 164:6, 164:7, 164:13, 168:7, 168:15, 170:24, 171:17, 171:18, 176:16, 176:17, 180:21

**app's** [1] - 171:18

**apparatus** [2] - 169:2, 179:6

**Apparatuses** [1] - 166:6

**Appeals** [1] - 130:19

**appear** [1] - 174:25

**APPEARANCES** [1] - 3:1

**aPPEARANCES** [1] - 2:1

**appeared** [1] - 160:19

**append** [1] - 64:5

**applicable** [1] - 119:15

**application** [52] - 16:6, 35:6, 35:24, 36:2, 37:18, 37:24, 38:3, 40:25, 47:3, 47:6, 47:13, 47:15, 47:21, 52:23, 57:25, 58:3, 58:5, 58:13, 59:13, 59:21, 59:22, 59:24, 60:2, 60:20, 60:23, 61:4, 61:10, 61:12, 134:19, 145:20, 157:12, 162:24, 163:6, 163:11, 163:13, 165:20, 165:22, 166:21, 166:23, 166:24, 169:2, 172:11, 175:13, 176:9, 176:14, 179:6, 180:20, 181:24, 181:25

**applications** [1] - 37:20, 58:16, 157:13, 166:20, 177:14

**applied** [5] - 33:11, 33:12, 119:7, 119:11

**applies** [1] - 137:14

**apply** [3] - 38:8, 86:10, 147:14

**applying** [7] - 32:10, 32:15, 32:16, 33:9, 119:14, 124:4, 174:4

**appreciate** [6] - 7:22, 11:8, 21:17, 64:18, 109:6, 118:5

**appreciated** [1] - 59:6

**approach** [16] - 35:6, 35:23, 36:3, 57:24, 57:25, 58:3, 58:9, 59:13, 59:25, 60:8, 60:10, 60:21, 60:25

**approaches** [3] - 60:12, 60:18, 61:8

**appropriate** [2] - 30:3, 113:19

**approved** [1] - 174:14

**AR/VR** [3] - 32:18, 32:20, 32:21

**architecture** [8] - 95:1, 97:11, 97:17, 136:7, 136:10, 138:13, 146:14, 152:7

**area** [3] - 50:14, 109:16, 111:12

**areas** [2] - 113:8, 113:13

**arguably** [2] - 104:22, 143:9

**argue** [5] - 89:16, 148:17, 148:23, 162:10, 176:25

**argued** [2] - 129:18, 131:15, 173:13

**argues** [3] - 132:11, 134:9, 162:12

**arguing** [7] - 5:12, 5:25, 6:1, 6:21, 7:3, 131:20, 154:17

**argument** [30] - 20:6, 26:11, 30:6, 30:7, 33:24, 40:23, 41:6, 45:6, 46:9, 55:21, 66:10, 66:25, 78:25, 81:16, 107:4, 109:23, 112:5, 114:25, 116:24, 117:12, 124:20, 130:15, 131:4, 136:13, 149:18, 160:4, 161:21, 178:8, 178:11, 182:3

**arguments** [14] - 7:9, 7:14, 7:15, 7:17, 8:7, 46:5, 66:9, 109:6, 155:2, 159:22, 160:11, 172:18,

176:18, 183:7

**arising** [1] - 151:17

**arms** [1] - 176:20

**arrange** [1] - 34:2

**arrangement** [5] - 14:20, 62:22, 156:21, 175:1, 177:7

**arranging** [2] - 14:9, 37:12

**ARSHT** [2] - 2:2, 2:15

**art** [40] - 9:25, 10:17, 12:21, 34:24, 35:3, 35:5, 35:10, 39:22, 41:1, 41:7, 57:17, 57:18, 57:22, 58:9, 58:20, 59:8, 59:18, 60:8, 60:24, 77:8, 77:14, 82:17, 83:19, 87:6, 90:8, 90:25, 91:21, 95:18, 97:1, 97:14, 99:19, 99:24, 99:25, 138:1, 152:18, 156:13, 167:5, 177:5, 179:5, 180:13

**article** [7] - 53:6, 53:8, 54:10, 59:7, 180:11, 180:17, 180:24

**articles** [14] - 35:8, 36:1, 36:6, 53:4, 53:5, 54:7, 54:22, 54:25, 55:7, 58:15, 58:25, 59:4, 60:19, 180:10

**articulate** [2] - 62:24, 165:14

**articulated** [2] - 32:9, 60:24

**articulation** [3] - 145:10, 161:6, 161:22

**articulations** [1] - 161:3

**ascertain** [1] - 137:21

**Ashby** [1] - 6:5

**ASHBY** [1] - 2:9

**aside** [3] - 38:6, 101:16, 160:1

**aspect** [5] - 80:6, 120:6, 124:9, 138:1, 150:9

**aspects** [5] - 93:24, 130:24, 136:15, 138:13, 176:6

**assert** [2] - 136:6, 167:3

**asserted** [24] - 31:4, 67:9, 75:7, 105:25, 113:1, 115:12, 115:15, 116:25,

117:7, 118:2, 132:14, 132:16, 133:24, 134:5, 134:9, 159:14, 159:18, 159:20, 160:10, 160:16, 161:13, 161:17, 177:22, 181:5

**assertedly** [5] - 14:13, 38:18, 56:14, 174:14, 174:16

**asserting** [7] - 17:10, 62:22, 75:19, 112:6, 115:22, 117:12, 171:6

**assertion** [7] - 65:1, 65:4, 87:22, 110:15, 112:24, 155:2, 171:25

**assertions** [2] - 51:25, 165:10

**asserts** [3] - 159:5, 159:11, 161:9

**assess** [11] - 112:12, 130:4, 136:19, 145:15, 154:1, 154:4, 155:8, 157:1, 157:11, 162:15, 164:20

**assessed** [1] - 89:22

**assessing** [1] - 143:18

**assessment** [1] - 148:14

**associate** [1] - 181:22

**associated** [9] - 44:1, 48:3, 133:7, 163:9, 163:13, 163:15, 163:24, 166:18, 176:8

**assume** [4] - 129:6, 143:8, 161:21, 178:23

**assurance** [1] - 14:21

**assure** [1] - 130:3

**AT&T** [1] - 135:13

**attach** [1] - 113:6

**attached** [6] - 35:8, 36:1, 64:2, 140:16, 160:21, 170:21

**attachment** [1] - 170:22

**attack** [6] - 68:20, 80:22, 122:19, 138:9, 140:19, 152:14

**attacks** [5] - 108:21, 136:9, 141:3, 141:20, 142:4

**attacks "** [1] - 139:24

**attempt** [4] - 51:16,

128:17, 157:11,
175:11
**attempts** [2] - 13:8,
150:22
**ATTENTIVE** [2] - 1:4,
1:9
**Attentive** [12] - 2:7,
2:20, 4:17, 5:5, 5:9,
5:13, 5:14, 7:8, 9:8,
33:20, 118:9, 158:13
**Attentive's** [3] - 29:2,
180:18, 180:23
**attorney** [1] - 124:18
**attuned** [1] - 140:4
**audit** [5] - 83:9, 91:4,
140:17, 141:20,
144:13
**authentication** [1] -
141:10
**authority** [1] - 119:20
**auto** [1] - 171:5
**auto-filled** [1] - 171:5
**automate** [3] - 122:4,
122:14, 151:2
**automated** [2] - 142:4,
149:21
**automatic** [1] - 142:3
**automatically** [15] -
12:11, 24:22, 80:22,
100:22, 101:11,
163:10, 163:12,
164:5, 164:8,
165:24, 167:2,
168:14, 171:19,
172:24, 181:15
**automating** [1] - 72:14
**automation** [2] -
121:5, 122:13
**available** [4] - 84:16,
84:17, 141:2, 147:12
**avoid** [1] - 165:6
**aware** [1] - 139:15
**Axle** [1] - 110:10

## B

**Background** [3] -
141:8, 144:7, 168:25
**background** [7] -
23:5, 31:18, 73:18,
74:7, 102:23, 168:3,
179:4
**backwards** [2] -
55:24, 56:6
**bad** [18] - 68:17,
68:18, 68:19, 68:21,
68:22, 69:7, 70:20,
72:23, 73:3, 73:4,
74:3, 74:8, 79:25,
80:16, 105:9,

105:13, 107:15,
107:22
**balance** [1] - 108:4
**balances** [1] - 99:23
**Balda** [1] - 6:18
**BALDASSARE** [1] -
3:9
**bandai** [1] - 165:4
**bank** [1] - 61:12
**banking** [1] - 47:12
**bare** [2] - 78:13, 162:9
**BASCOM** [7] - 14:12,
37:11, 98:20,
135:12, 147:23,
177:3, 177:10
**BASCOM's** [1] -
177:16
**base** [2] - 69:8, 141:2
**based** [35] - 17:8,
18:17, 20:9, 57:7,
64:14, 67:14, 68:9,
78:25, 80:19, 82:20,
84:22, 93:3, 93:12,
121:22, 133:9,
133:12, 134:12,
136:1, 137:16,
140:11, 142:11,
143:7, 144:2,
144:23, 145:21,
147:13, 149:24,
153:6, 155:15,
156:9, 157:18,
158:7, 178:20,
180:18
**Based** [2] - 166:7,
166:8
**basic** [5] - 70:3, 75:10,
134:17, 134:22,
150:8
**basic-sounding** [1] -
75:10
**basis** [2] - 159:2,
175:22
**baylis** [1] - 125:16
**become** [1] - 141:24
**becomes** [2] - 44:15,
60:18
**beef** [1] - 27:5
**BEFORE** [1] - 1:24
**begin** [6] - 6:11, 9:8,
9:20, 20:23, 129:19,
160:17
**beginning** [1] - 108:25
**begins** [1] - 111:22
**begs** [1] - 143:3
**behalf** [5] - 5:9, 5:21,
6:7, 6:21, 7:2
**behavior** [1] - 135:16
**bench** [1] - 129:6
**benefit** [11] - 8:8,

28:23, 77:24, 78:9,
85:17, 92:9, 92:20,
109:17, 110:23,
142:16, 142:25
**benefited** [1] - 131:2
**benefits** [1] - 142:19
**benign** [5] - 67:13,
70:15, 72:20, 72:25,
80:12
**Benson** [1] - 120:25
**Berkheimer** [1] -
114:25
**Berner** [1] - 54:23
**best** [6] - 52:10, 52:13,
58:14, 59:16, 75:16,
127:7
**better** [9] - 11:21,
34:18, 40:3, 44:18,
47:13, 78:8, 87:1,
92:5, 155:4
**between** [21] - 16:5,
19:13, 19:16, 21:18,
23:6, 30:1, 33:22,
37:3, 38:18, 44:7,
53:18, 61:3, 77:13,
78:22, 79:22,
103:22, 117:17,
130:5, 146:19,
153:3, 177:14
**beyond** [5] - 15:10,
75:2, 89:4, 145:16,
151:7
**big** [6] - 83:9, 84:7,
95:6, 100:1, 118:12,
127:19
**Bilski** [1] - 38:10
**bind** [1] - 118:19
**Bindu** [1] - 5:22
**BINDU** [1] - 2:23
**bit** [21] - 28:11, 33:21,
36:13, 38:9, 46:15,
48:8, 50:10, 55:2,
64:19, 69:4, 81:9,
82:14, 97:19, 100:8,
117:17, 119:6,
119:13, 120:2,
122:20, 161:14,
178:17
**black** [5] - 69:3,
103:14, 106:20,
106:25, 107:16
**black-box** [1] - 103:14
**blame** [1] - 77:24
**blank** [1] - 125:1
**blanks** [1] - 152:5
**block** [3] - 68:21, 83:7,
134:18
**blocked** [1] - 152:17
**blurred** [1] - 53:19
**body** [1] - 43:25

**Boggs** [1] - 1:19
**boldly** [1] - 177:21
**boring** [2] - 183:14,
183:15
**borne** [1] - 142:13
**Bot** [1] - 28:18
**bottom** [2] - 40:14,
72:2
**box** [1] - 103:14
**brand** [2] - 12:11,
180:20
**brands** [1] - 54:11
**breach** [3] - 114:9,
114:11, 141:15
**breached** [2] - 114:3,
114:4
**breadth** [2] - 122:3,
138:8
**break** [5] - 7:16, 8:11,
66:12, 127:2, 128:7
**BRIAN** [1] - 3:13
**Brian** [1] - 7:1
**Bridge** [1] - 65:14
**brief** [28] - 12:15,
14:25, 22:11, 28:25,
29:1, 49:3, 50:12,
66:19, 79:23, 80:4,
80:5, 80:20, 81:18,
81:21, 93:17,
114:23, 115:8,
115:22, 118:21,
133:19, 136:12,
139:25, 142:15,
144:14, 160:1,
160:3, 172:20, 181:8
**briefed** [1] - 155:14
**briefing** [35] - 10:16,
12:1, 17:20, 20:5,
22:10, 29:2, 30:12,
30:21, 42:7, 63:21,
65:15, 67:21, 79:21,
94:20, 101:4, 110:8,
116:23, 118:18,
132:11, 132:15,
133:13, 134:13,
136:6, 137:11,
140:9, 146:11,
159:17, 159:24,
160:18, 161:5,
161:6, 162:9, 170:7,
172:13, 177:21
**briefly** [3] - 58:4, 62:3,
116:5
**briefs** [15] - 13:5, 18:3,
18:6, 19:19, 23:19,
28:13, 32:10, 54:21,
55:6, 59:5, 62:21,
130:6, 130:17,
159:22, 172:16
**British** [1] - 131:17,

131:23
**BRITISH** [1] - 1:14
**BRITTON** [2] - 2:5,
2:18
**Britton** [1] - 5:10
**broad** [5] - 31:13,
70:12, 116:8, 136:4,
145:8
**broader** [1] - 162:1
**broadly** [2] - 145:7,
166:11
**broken** [1] - 89:14
**BROWN** [3] - 2:23,
5:20, 6:1
**Brown** [1] - 5:21
**browser** [10] - 15:17,
25:1, 29:5, 42:25,
43:1, 181:15, 181:22
**browsing** [1] - 35:13
**Bryson** [1] - 112:2
**BT** [20] - 1:14, 3:11,
4:22, 6:10, 6:16,
6:21, 7:15, 7:17,
66:22, 72:16, 72:21,
78:23, 79:2, 80:5,
80:14, 80:20, 81:1,
107:24, 111:3,
131:24
**BT's** [4] - 79:21,
79:22, 81:1, 81:12
**build** [1] - 34:18
**building** [1] - 134:17
**bullet** [1] - 108:9
**bunch** [2] - 19:19,
109:10
**burden** [1] - 27:24
**burdensome** [4] -
36:8, 53:2, 61:14,
168:20
**Burke** [3] - 24:6, 24:9,
25:3
**BURKE** [1] - 1:24
**business** [17] - 4:19,
4:21, 10:8, 14:6,
14:9, 23:8, 23:17,
24:12, 25:22, 27:22,
30:9, 38:10, 124:16,
124:17, 125:8,
158:15, 158:19
**Business** [1] - 134:24
**button** [2] - 163:18,
164:13
**buzzer** [1] - 21:17
**BY** [20] - 2:2, 2:5, 2:6,
2:9, 2:12, 2:15, 2:18,
2:18, 2:19, 2:23,
2:23, 3:2, 3:6, 3:9,
3:9, 3:10, 3:13, 3:15,
3:16, 3:16

# C

**C.A** [5] - 1:5, 1:10, 1:16, 2:8, 2:21
**calculate** [1] - 156:4
**Caleb** [1] - 1:19
**camera** [1] - 107:12
**camp** [1] - 118:16
**cannot** [10] - 72:16, 74:22, 80:12, 113:14, 134:23, 136:2, 141:17, 149:2, 160:23, 169:12
**capabilities** [1] - 141:4
**capability** [1] - 133:12
**capable** [1] - 139:23
**capture** [1] - 44:9
**captured** [1] - 91:19
**cards** [2] - 23:20, 24:3
**career** [1] - 123:8
**careful** [1] - 165:6
**carefully** [1] - 59:6
**carrying** [1] - 143:22
**case** [103] - 4:22, 6:10, 6:11, 7:14, 7:15, 7:17, 8:3, 10:20, 14:12, 14:18, 18:11, 18:13, 22:11, 22:17, 23:12, 28:8, 28:20, 29:24, 37:21, 37:22, 38:2, 38:9, 44:25, 45:1, 63:21, 65:15, 66:21, 66:22, 72:6, 73:7, 75:16, 76:1, 78:11, 78:23, 80:25, 86:17, 98:9, 99:19, 99:25, 101:7, 101:15, 101:17, 101:20, 101:21, 106:15, 106:16, 106:18, 107:17, 108:17, 108:18, 109:23, 111:3, 111:16, 111:19, 112:1, 112:2, 114:5, 114:10, 115:23, 116:5, 116:25, 119:8, 121:19, 122:10, 122:23, 125:13, 125:16, 127:7, 128:11, 128:17, 131:9, 131:14, 131:15, 131:16, 132:14, 149:14, 149:16, 154:11, 154:24, 155:6, 155:13, 158:11, 158:16,

158:17, 158:20, 158:21, 158:24, 158:25, 159:6, 159:11, 160:3, 160:10, 160:21, 172:15, 172:17, 172:18, 172:21, 180:8
**cases** [45] - 4:14, 4:16, 5:1, 5:5, 5:18, 7:8, 7:24, 8:7, 14:13, 17:14, 31:1, 66:22, 74:23, 75:5, 107:17, 109:20, 110:8, 110:9, 111:14, 112:15, 114:12, 114:14, 114:17, 118:9, 125:3, 126:1, 127:2, 128:3, 129:18, 129:21, 130:6, 130:13, 130:16, 130:18, 130:24, 131:2, 135:12, 149:11, 158:13, 158:14, 158:22, 165:4, 183:25
**categorically** [2] - 76:9, 106:25
**categories** [4] - 149:25, 151:8, 152:25, 157:24
**categorization** [1] - 88:19
**caught** [1] - 107:25
**caused** [1] - 52:24
**causes** [8] - 18:25, 21:6, 162:19, 162:23, 163:10, 176:15
**causing** [2] - 21:12, 53:1
**cautioned** [1] - 169:16
**center** [3] - 87:18, 132:20, 147:9
**central** [3] - 138:1, 165:25, 167:8
**certain** [24] - 8:17, 8:18, 11:3, 39:12, 59:8, 68:22, 82:12, 86:23, 88:8, 94:5, 103:20, 103:21, 132:8, 134:22, 135:1, 135:21, 137:7, 143:13, 149:25, 157:1, 158:3, 160:19, 178:12, 180:10
**certainly** [15] - 10:15, 46:18, 60:16, 63:18,

69:24, 94:3, 105:12, 127:6, 128:23, 129:1, 149:6, 152:3, 169:7, 172:8, 178:1
**Certified** [1] - 184:8
**certify** [1] - 184:5
**cetera** [2] - 60:4, 64:2
**challenge** [3] - 65:25, 116:20, 126:19
**challenged** [1] - 130:16
**challenging** [4] - 8:1, 9:3, 128:4, 128:5
**chance** [6] - 4:1, 22:23, 55:16, 114:13, 118:6, 172:20
**change** [1] - 14:14
**changes** [1] - 128:19
**changing** [1] - 109:16
**character** [6] - 82:11, 137:16, 137:22, 140:3, 164:21, 164:22
**characterization** [1] - 134:20
**check** [3] - 18:12, 105:12, 180:15
**chip** [1] - 38:1
**chooses** [1] - 30:11
**CHRISTOPHER** [1] - 1:24
**circled** [1] - 16:1
**Circuit** [55] - 8:21, 11:23, 12:13, 14:2, 18:11, 35:2, 37:5, 48:25, 49:14, 49:20, 50:14, 50:22, 57:13, 65:6, 69:21, 74:23, 75:21, 79:4, 80:6, 80:7, 108:18, 109:2, 111:19, 111:21, 112:1, 113:12, 115:23, 118:14, 119:8, 130:19, 134:16, 134:21, 134:25, 135:9, 135:13, 135:18, 137:18, 138:3, 145:22, 146:25, 149:11, 149:16, 154:11, 155:13, 156:1, 156:6, 156:14, 164:18, 165:4, 165:5, 169:10, 169:15, 172:14, 173:10, 177:3
**Circuit's** [4] - 118:17, 146:21, 147:23,

149:13
**circumstances** [1] - 86:23
**Cisco** [2] - 105:24, 149:14
**citations** [4] - 108:8, 130:1, 130:7, 183:3
**cite** [12] - 19:19, 20:20, 54:4, 77:19, 91:17, 91:18, 107:4, 107:5, 107:8, 152:9, 160:19, 178:4
**cited** [18] - 26:22, 28:7, 49:2, 50:11, 62:23, 63:21, 65:15, 73:8, 76:19, 107:17, 111:24, 111:25, 130:20, 137:24, 172:13, 172:15, 180:9
**cites** [2] - 98:6, 98:9
**citing** [5] - 20:7, 26:11, 26:23, 81:21, 107:3
**Civil** [6] - 4:18, 4:20, 4:23, 131:18, 158:14, 158:18
**claim** [142] - 15:22, 17:22, 19:15, 22:4, 22:15, 29:25, 30:2, 31:25, 38:18, 39:20, 39:24, 40:13, 43:18, 43:22, 43:24, 44:14, 45:1, 45:2, 56:4, 56:25, 57:2, 57:5, 57:9, 65:12, 67:10, 67:24, 69:10, 69:15, 70:6, 71:20, 71:22, 74:10, 74:25, 75:1, 75:9, 75:17, 78:12, 78:13, 79:24, 82:11, 84:12, 84:23, 85:22, 86:5, 86:6, 91:22, 96:2, 97:21, 98:10, 98:24, 100:9, 100:16, 100:17, 100:18, 101:2, 103:12, 103:15, 104:2, 104:5, 104:18, 104:22, 105:22, 106:22, 112:23, 114:2, 114:19, 115:22, 116:17, 117:1, 117:3, 117:5, 119:3, 121:15, 121:16, 122:3, 122:19, 123:16, 123:17, 123:23, 124:18, 126:8, 133:14,

133:24, 134:1, 134:15, 136:16, 138:5, 138:7, 138:8, 143:11, 143:19, 144:9, 145:16, 145:17, 145:19, 146:13, 147:1, 147:11, 148:5, 148:24, 149:20, 150:5, 151:1, 151:6, 151:9, 154:22, 155:23, 155:24, 156:9, 160:9, 162:12, 162:17, 162:18, 163:7, 163:17, 164:17, 164:20, 165:15, 169:14, 170:19, 171:21, 171:22, 172:23, 172:25, 173:4, 173:11, 173:13, 173:20, 174:1, 174:6, 176:6, 176:23, 177:5, 177:11, 178:10, 179:22, 180:1, 181:5, 182:4
**Claim** [76] - 17:16, 43:14, 43:24, 57:9, 69:14, 70:7, 81:11, 81:21, 84:20, 85:4, 87:19, 92:24, 93:2, 93:8, 93:9, 93:11, 93:12, 96:1, 97:21, 112:9, 112:22, 112:24, 113:3, 113:4, 113:10, 114:21, 114:24, 115:2, 115:3, 116:19, 116:22, 116:25, 132:11, 132:18, 133:15, 133:20, 133:23, 133:25, 137:8, 138:16, 138:17, 147:8, 147:19, 154:18, 154:20, 155:13, 156:7, 159:7, 159:8, 159:13, 160:7, 160:13, 161:4, 162:10, 162:15, 164:16, 165:14, 166:1, 166:2, 167:9, 168:1, 169:23, 171:6, 171:14, 172:1, 174:5, 175:20, 175:25, 177:23, 179:2
**claim's** [14] - 49:17, 137:22, 144:2,

147:23, 148:6,
148:14, 151:20,
151:22, 164:21,
165:21, 174:13,
176:7, 176:10,
179:15
**claim-construction -
type** [1] - 104:22
**claim-to-abstract** [2] -
121:15, 121:16
**claimed** [25] - 18:9,
61:21, 80:22, 84:21,
84:25, 86:7, 90:22,
93:20, 97:9, 100:20,
102:1, 102:17,
107:8, 110:14,
137:1, 150:18,
153:19, 164:16,
173:18, 174:16,
175:1, 175:17,
178:13, 180:24
**claiming** [5] - 16:4,
78:16, 105:6,
144:24, 145:1
**claims** [157] - 5:2,
12:14, 17:10, 17:17,
17:21, 18:2, 18:4,
21:11, 21:18, 21:22,
21:23, 22:6, 22:12,
28:21, 29:21, 31:4,
31:12, 39:5, 43:25,
44:6, 44:15, 46:22,
49:12, 51:20, 56:11,
62:23, 65:18, 66:1,
66:5, 67:17, 67:21,
69:17, 69:20, 69:21,
69:24, 70:3, 75:2,
79:4, 81:10, 81:17,
85:20, 85:21, 89:10,
89:13, 89:23, 90:15,
91:20, 92:13, 93:16,
93:22, 93:23, 93:25,
94:3, 94:6, 94:13,
96:1, 96:14, 101:5,
101:10, 101:13,
104:15, 105:25,
106:8, 111:11,
111:16, 111:20,
112:4, 112:12,
113:7, 114:24,
115:1, 115:6, 115:9,
116:23, 117:7,
117:13, 117:19,
117:21, 119:18,
125:11, 126:11,
132:8, 132:10,
132:13, 132:14,
132:17, 133:24,
134:2, 134:10,
135:3, 135:6,

135:24, 136:2,
136:7, 136:15,
137:8, 137:15,
143:15, 143:18,
145:12, 145:22,
145:23, 147:4,
147:13, 148:2,
148:10, 148:24,
149:4, 149:22,
150:8, 150:14,
150:16, 151:3,
151:12, 152:23,
153:14, 153:18,
153:21, 153:24,
154:6, 154:15,
155:10, 155:12,
156:2, 156:11,
156:23, 157:1,
157:5, 157:11,
157:15, 157:22,
158:3, 158:5,
159:12, 159:18,
159:20, 159:21,
159:24, 159:25,
160:2, 160:5,
160:10, 160:12,
160:14, 160:16,
161:23, 165:6,
165:10, 166:10,
167:10, 169:7,
169:12, 169:16,
169:18, 177:16
**Claims** [2] - 81:16,
138:11
**clarify** [2] - 48:7, 90:20
**clarity** [1] - 129:23
**clean** [1] - 183:2
**cleanest** [1] - 49:9
**clear** [30] - 14:2,
18:19, 26:12, 26:14,
35:4, 38:12, 40:5,
41:22, 42:4, 42:21,
42:23, 53:20, 55:21,
60:17, 60:18, 65:4,
72:13, 78:5, 78:23,
79:6, 79:22, 79:24,
80:10, 93:9, 103:19,
122:23, 138:12,
154:17, 156:21,
166:10
**clearly** [5] - 28:1,
51:13, 64:5, 65:5,
105:1
**clerk** [2] - 129:3, 129:5
**CLERK** [6] - 3:23, 4:4,
66:18, 129:10,
129:12, 184:3
**clerks** [1] - 130:8
**clever** [1] - 124:18
**click** [24] - 12:6, 12:21,

15:15, 19:6, 29:6,
33:5, 35:13, 39:8,
39:10, 46:21, 47:15,
54:14, 162:19,
162:25, 163:3,
163:14, 163:20,
163:21, 165:21,
170:24, 171:2,
176:10, 181:13,
181:21
**click-through** [1] -
54:14
**click-to-text** [8] -
15:15, 29:6, 162:19,
162:25, 163:20,
165:21, 176:10,
181:13
**clicking** [2] - 164:4,
165:19
**clicks** [3] - 168:17,
175:6, 175:14
**client** [8] - 15:15,
21:25, 124:16,
127:16, 162:20,
162:22, 162:25,
181:13
**clinical** [1] - 99:12
**close** [1] - 100:11
**closer** [1] - 129:5
**co** [1] - 6:17
**Co** [1] - 131:10
**co-counsel** [1] - 6:17
**code** [11] - 15:24,
18:25, 19:8, 21:6,
21:13, 24:16, 123:6,
125:8, 125:22,
126:1, 162:19
**colleague** [2] - 9:15,
123:14
**colleagues** [2] - 5:22,
48:16
**collect** [5] - 48:20,
132:23, 157:21,
158:1, 176:8
**collected** [3] - 98:11,
135:4, 140:20
**collecting** [13] - 68:8,
70:9, 70:11, 76:8,
134:10, 135:24,
143:6, 145:8, 150:6,
150:15, 153:22,
156:16, 157:17
**collection** [1] - 135:3
**collects** [4] - 16:2,
67:11, 73:5, 140:17
**Column** [29] - 10:12,
36:14, 39:7, 58:8,
58:21, 58:24, 59:10,
59:16, 60:10, 60:17,
72:3, 73:8, 73:14,

85:10, 139:2,
139:17, 139:18,
140:1, 144:5,
147:10, 147:18,
166:18, 167:6,
168:3, 174:25,
175:9, 175:15, 179:4
**columns** [1] - 94:15
**Columns** [3] - 142:15,
142:18, 152:3
**combat** [1] - 139:24
**combination** [38] -
13:20, 13:24, 19:17,
20:6, 34:2, 37:4,
37:13, 42:20, 44:18,
44:25, 45:12, 46:13,
65:16, 65:19, 68:1,
74:2, 75:7, 75:22,
144:23, 145:18,
146:22, 147:24,
148:4, 148:6,
148:12, 154:4,
157:4, 177:19,
177:22, 178:3,
178:9, 179:1,
179:16, 179:17,
179:22, 180:1,
181:15, 182:4
**combinations** [3] -
37:15, 46:6, 178:13
**combined** [4] - 96:20,
145:6, 151:23
**coming** [2] - 46:12,
64:13
**comment** [1] - 111:10
**comments** [1] -
129:20
**commercial** [1] -
172:8
**commercially** [1] -
147:12
**common** [3] - 48:17,
77:22, 132:3
**communication** [1] -
87:17
**Communications** [1] -
166:7
**companies** [1] - 164:9
**company** [4] - 124:17,
170:19, 170:23
**company's** [1] -
164:10
**compare** [1] - 25:20
**compares** [1] - 23:21
**comparing** [1] -
106:24
**comparison** [2] - 18:5,
21:18
**compels** [1] - 157:10
**competing** [3] - 108:4,

119:10, 181:1
**competitor** [1] - 92:20
**Complaint** [64] -
17:22, 26:17, 29:19,
29:20, 30:8, 30:12,
35:7, 35:8, 35:9,
35:20, 36:2, 36:6,
36:9, 51:19, 52:9,
52:20, 53:4, 53:13,
54:4, 58:15, 58:19,
59:1, 59:5, 59:7,
60:13, 60:19, 64:2,
69:1, 69:2, 69:5,
91:16, 105:10,
106:19, 107:15,
111:15, 112:4,
112:16, 112:21,
113:3, 113:17,
113:18, 114:2,
114:8, 115:13,
115:19, 115:21,
116:8, 116:11,
116:18, 117:22,
131:21, 136:13,
146:11, 146:12,
152:5, 152:6, 153:5,
157:20, 159:1,
159:5, 160:21,
160:22, 180:9
**Complaint's** [1] -
179:22
**Complaints** [6] - 5:2,
112:9, 113:15,
159:19, 179:10,
179:20
**complaints** [1] -
168:22
**complete** [4] - 59:24,
168:10, 168:18,
168:23
**completed** [1] -
168:21
**completely** [2] -
15:20, 149:8
**completion** [1] -
175:23
**complex** [1] - 27:3
**complicated** [3] -
29:22, 84:9, 112:3
**component** [6] -
10:25, 17:23, 44:19,
70:9, 100:17, 132:24
**components** [16] -
14:5, 14:8, 14:9,
14:15, 20:3, 33:25,
37:12, 37:16, 37:17,
94:11, 110:12,
140:18, 147:4,
147:6, 177:17, 180:1
**comprehending** [1] -

135:4
**comprehensible** [1] - 72:8
**computer** [153] - 3:25, 10:23, 11:19, 11:23, 12:25, 13:8, 13:18, 14:4, 14:8, 15:19, 20:8, 23:7, 23:8, 32:17, 36:25, 37:25, 38:21, 38:22, 38:24, 39:1, 39:3, 39:6, 39:19, 39:21, 39:23, 45:4, 46:7, 48:20, 48:21, 49:4, 49:5, 49:15, 50:2, 51:21, 52:3, 53:22, 59:9, 67:14, 68:13, 70:21, 74:17, 75:2, 75:11, 75:20, 76:22, 78:3, 78:17, 80:8, 86:11, 86:16, 87:1, 87:2, 90:8, 93:3, 93:12, 95:9, 97:22, 99:4, 99:9, 99:14, 99:15, 102:9, 105:15, 105:16, 106:11, 107:11, 108:16, 119:18, 119:24, 120:5, 120:14, 121:3, 121:5, 121:10, 121:14, 121:17, 121:20, 121:22, 122:5, 122:13, 122:14, 123:15, 124:11, 124:15, 124:19, 124:23, 124:24, 124:25, 125:4, 125:5, 125:6, 125:21, 126:14, 126:17, 126:25, 127:12, 127:18, 132:19, 135:2, 135:5, 136:9, 141:9, 142:11, 143:20, 143:21, 144:2, 144:15, 144:23, 145:1, 145:21, 146:1, 147:6, 147:13, 147:15, 147:21, 148:8, 149:21, 151:4, 151:17, 151:25, 153:6, 153:8, 153:17, 157:7, 164:7, 167:1, 168:6, 168:14, 170:8, 172:5, 173:11, 173:19, 173:25, 174:4, 174:18, 175:7, 176:19,

176:20, 178:14, 179:2, 179:9, 179:12, 180:13, 180:19
**computer 's** [3] - 148:10, 153:15, 173:16
**computer - automated** [1] - 149:21
**computer -based** [4] - 121:22, 144:2, 144:23, 153:6
**computer - implemented** [1] - 120:5
**computer -like** [1] - 75:11
**computerization** [1] - 99:12
**computerize** [1] - 50:4
**computerized** [26] - 46:7, 68:2, 79:13, 79:15, 89:11, 92:17, 93:9, 99:2, 101:6, 101:8, 101:12, 101:16, 133:20, 137:3, 140:10, 141:13, 143:11, 144:3, 154:2, 154:3, 154:7, 157:6, 170:16, 175:10, 179:9, 179:17
**computerizing** [1] - 101:22
**computers** [36] - 11:2, 11:4, 11:16, 13:8, 13:23, 36:20, 38:11, 38:19, 39:23, 39:24, 44:20, 49:4, 52:5, 52:13, 60:8, 68:5, 71:13, 71:14, 71:17, 73:24, 74:2, 74:19, 75:13, 76:14, 90:12, 107:2, 123:4, 123:5, 144:1, 145:3, 151:1, 151:3, 173:21, 177:24, 177:25, 180:6
**computing** [2] - 67:10, 72:14
**concede** [1] - 18:4
**conceding** [1] - 90:24
**concept** [57] - 8:12, 15:2, 15:3, 25:24, 26:3, 26:5, 31:14, 32:25, 33:10, 37:14, 39:20, 41:16, 47:2, 50:18, 73:2, 81:25, 91:19, 94:6, 106:2,

110:11, 124:15, 126:10, 126:11, 126:12, 134:17, 139:1, 140:7, 143:5, 145:6, 145:23, 146:20, 147:25, 148:3, 149:3, 161:22, 164:22, 165:15, 165:25, 166:2, 166:11, 167:4, 167:8, 168:1, 169:8, 169:13, 169:22, 169:23, 171:10, 171:24, 172:2, 172:7, 172:10, 173:18, 176:25, 177:4, 177:6, 181:10
**concepts** [9] - 8:1, 50:13, 75:3, 135:16, 138:24, 140:4, 152:2, 176:19, 181:5
**concern** [7] - 21:18, 56:10, 64:11, 64:16, 138:6, 157:9, 181:3
**concession** [1] - 183:18
**conclude** [5] - 51:8, 51:9, 128:22, 130:13, 150:14
**concluded** [1] - 151:12
**concludes** [4] - 134:15, 140:25, 142:2, 169:1
**concluding** [2] - 128:23, 160:13
**conclusion** [11] - 51:3, 52:18, 77:10, 100:18, 142:13, 151:5, 165:12, 173:20, 173:23, 175:24, 178:4
**conclusions** [1] - 178:17
**conclusive** [1] - 106:5
**conclusory** [3] - 51:24, 52:10, 52:16
**concrete** [1] - 118:25
**concreteness** [2] - 121:11
**configuration** [2] - 14:14, 156:2
**configurations** [1] - 156:15
**configured** [2] - 132:21, 162:21
**confirming** [1] - 106:2
**confirms** [1] - 111:17
**conflating** [1] - 17:13

**connectivity** [2] - 150:22, 150:23
**consider** [3] - 15:12, 53:4, 66:7
**considered** [1] - 137:15
**considering** [1] - 172:17
**consistent** [1] - 118:15
**consistently** [1] - 166:3
**constantly** [3] - 136:8, 141:19, 144:12
**constituted** [1] - 179:24
**constitutes** [1] - 72:25
**constrained** [1] - 153:10
**constraints** [1] - 99:23
**construction** [5] - 15:23, 43:19, 43:22, 44:14, 104:22
**consuming** [2] - 10:17, 168:19
**contact** [1] - 181:11
**contain** [2] - 153:14, 156:23
**contains** [3] - 132:7, 157:3, 171:19
**contend** [2] - 136:3, 144:1
**content** [4] - 54:22, 59:4, 135:14, 160:2
**contention** [2] - 144:19, 154:21
**contentions** [4] - 113:5, 113:6, 113:24, 114:16
**contest** [1] - 134:13
**contesting** [1] - 15:6
**context** [10] - 32:14, 53:25, 62:9, 87:14, 102:9, 102:12, 102:25, 124:5, 146:2, 183:19
**continually** [1] - 177:11
**continue** [2] - 18:7, 55:10
**CONTINUED** [1] - 3:1
**continuing** [1] - 169:4
**continuously** [1] - 141:21
**contract** [4] - 114:2, 114:3, 114:10, 114:11
**contradict** [1] - 28:8
**contradicted** [1] - 29:25

**contradiction** [4] - 30:1, 79:21, 80:10, 80:13
**contrary** [1] - 38:9
**contrast** [1] - 174:20
**contrasts** [1] - 154:16
**control** [1] - 113:23
**controlled** [2] - 173:6, 173:9
**convenience** [1] - 129:23
**conventional** [47] - 12:3, 12:18, 12:20, 13:5, 14:5, 14:8, 16:5, 28:13, 28:14, 41:11, 42:1, 45:16, 45:17, 45:18, 45:19, 45:20, 45:21, 46:23, 47:24, 48:15, 51:7, 56:5, 63:15, 63:23, 64:7, 64:18, 64:21, 65:17, 107:18, 118:23, 122:9, 122:16, 122:21, 146:4, 147:24, 150:19, 151:2, 152:22, 153:9, 155:18, 156:13, 177:7, 177:8, 177:18, 179:2, 179:23
**conventionality** [4] - 42:8, 55:1, 55:4, 178:18
**conveyed** [1] - 11:7
**convince** [1] - 149:12
**convinced** [1] - 149:8
**cookie** [4] - 24:24, 25:4, 25:5, 64:22
**cookies** [11] - 19:6, 24:17, 24:25, 25:2, 26:3, 27:9, 41:22, 65:6, 65:10
**coordinated** [1] - 150:22
**copies** [1] - 67:4
**core** [2] - 20:12, 27:22
**Corp** [4] - 134:24, 137:19, 169:11, 172:14
**correct** [8] - 45:8, 67:25, 74:5, 90:19, 91:15, 93:1, 96:14, 181:9
**correctly** [1] - 87:13
**correlate** [3] - 139:21, 148:20, 149:1
**correlating** [1] - 158:4
**correlation** [22] - 69:15, 81:22, 89:12,

92:12, 92:23, 94:6, 94:18, 116:11, 133:17, 133:21, 134:3, 137:10, 138:21, 138:23, 139:17, 140:1, 141:7, 142:17, 147:20, 148:15, 148:20, 153:6
**CORROON** [2] - 2:22, 3:6
**counsel** [36] - 4:8, 5:3, 5:6, 5:7, 5:17, 5:19, 6:3, 6:11, 6:17, 6:23, 6:24, 7:4, 7:6, 7:16, 7:17, 9:9, 24:15, 26:22, 33:18, 62:18, 66:9, 66:24, 109:7, 118:6, 118:9, 118:20, 123:1, 127:24, 128:2, 131:4, 155:3, 178:12, 178:15, 183:7, 183:16
**count** [3] - 96:14, 127:4, 172:17
**counted** [1] - 35:19
**counter** [1] - 173:1
**couple** [5] - 8:5, 18:20, 55:8, 103:8, 149:11
**course** [10] - 14:17, 69:22, 100:3, 110:19, 122:8, 126:19, 138:16, 148:13, 166:2, 177:3
**Court** [96] - 6:20, 8:21, 11:9, 14:17, 14:21, 15:10, 20:18, 21:20, 37:14, 38:9, 38:23, 44:14, 51:3, 53:3, 60:22, 64:19, 64:20, 65:1, 65:14, 65:20, 65:24, 66:7, 66:15, 118:13, 118:19, 120:24, 129:8, 130:18, 130:19, 131:10, 133:22, 134:4, 134:15, 137:10, 137:23, 138:10, 139:15, 143:8, 143:9, 144:18, 145:11, 146:16, 149:8, 149:12, 149:13, 149:16, 150:5, 150:14, 150:17, 150:25, 151:5, 152:1, 152:21, 154:12, 155:11,

157:8, 157:11, 158:8, 159:2, 160:6, 160:8, 160:12, 160:14, 160:23, 161:19, 162:14, 164:19, 165:3, 165:11, 171:12, 172:12, 172:21, 173:17, 173:23, 174:2, 174:8, 174:20, 175:22, 176:5, 176:18, 178:19, 178:22, 179:13, 179:21, 182:11, 182:13, 182:16, 182:18, 182:21, 182:23, 183:3, 183:10, 184:1, 184:4, 184:9
**court** [7] - 4:8, 4:9, 4:24, 7:21, 129:16, 129:21, 183:22
**COURT** [180] - 1:1, 1:24, 3:24, 4:5, 5:15, 5:25, 6:2, 6:8, 6:22, 7:4, 9:19, 10:10, 13:6, 14:23, 16:12, 16:19, 17:3, 17:12, 17:19, 18:7, 18:19, 19:11, 20:24, 22:8, 23:3, 24:20, 25:23, 27:23, 30:4, 30:20, 33:14, 34:9, 34:16, 36:12, 38:14, 40:16, 40:19, 41:13, 42:3, 42:10, 43:7, 43:12, 43:23, 44:4, 44:11, 44:22, 45:10, 46:17, 47:1, 47:5, 47:9, 47:18, 47:25, 48:10, 48:20, 48:24, 49:7, 49:16, 50:17, 51:14, 53:15, 54:21, 55:8, 55:15, 56:8, 58:2, 58:7, 58:17, 58:23, 59:2, 59:14, 61:2, 61:6, 61:18, 61:24, 62:1, 62:15, 62:17, 63:8, 63:24, 65:3, 65:21, 66:8, 66:20, 67:5, 67:20, 68:11, 68:19, 69:8, 69:14, 70:25, 73:1, 73:14, 73:16, 74:13, 75:5, 76:4, 76:11, 77:20, 78:19, 79:9, 79:19, 81:4, 81:19, 81:25, 82:4, 82:7, 82:9, 83:25, 84:19, 85:19, 87:21, 88:14, 88:22, 88:25, 89:17, 90:2,

91:9, 91:16, 91:25, 92:23, 93:2, 93:5, 93:11, 93:14, 95:25, 96:5, 96:10, 96:18, 97:18, 97:25, 98:8, 99:14, 100:10, 100:14, 102:1, 102:16, 102:19, 102:21, 103:1, 103:6, 103:19, 104:4, 104:10, 104:20, 105:2, 105:7, 105:20, 107:3, 107:7, 109:5, 111:7, 111:22, 112:8, 112:17, 114:1, 114:18, 115:5, 115:11, 115:16, 115:20, 116:1, 116:6, 116:14, 117:11, 117:24, 118:4, 118:24, 119:17, 120:13, 121:8, 121:25, 122:24, 123:20, 124:22, 125:16, 126:15, 127:22, 128:2, 129:13
**Court's** [15] - 64:16, 100:18, 142:15, 144:6, 147:2, 148:1, 157:14, 165:9, 169:21, 174:5, 176:21, 177:9, 181:3, 182:2, 182:25
**Courthouse** [1] - 1:19
**courtroom** [1] - 6:9
**courts** [4] - 8:15, 8:19, 8:25, 126:22
**Courts** [9] - 110:2, 118:16, 119:5, 121:13, 122:11, 131:7, 145:15, 165:6, 169:16
**cover** [3] - 81:15, 107:23, 171:11
**coverage** [1] - 16:8
**covered** [3] - 57:5, 81:7, 95:8
**covers** [1] - 162:17
**crafty** [2] - 127:5, 127:6
**crafty-like** [1] - 127:5
**create** [16] - 13:9, 13:13, 26:7, 27:10, 29:10, 29:11, 30:10, 32:19, 32:22, 43:6, 46:20, 46:25, 61:13, 63:1, 63:4, 181:25

**created** [5] - 13:15, 20:1, 25:11, 28:24, 125:20
**creates** [3] - 30:10, 40:25, 103:5
**creating** [5] - 13:10, 13:11, 24:12, 32:15, 176:11
**creation** [1] - 181:19
**credibly** [1] - 19:10
**cross** [22] - 89:12, 91:20, 91:25, 92:12, 92:23, 94:6, 94:18, 116:11, 133:17, 133:20, 134:3, 137:10, 138:21, 138:23, 139:16, 139:20, 140:1, 141:6, 142:17, 147:20, 148:19
**cross-analysis** [1] - 140:1
**cross-correlation** [2] - 89:12, 140:1
**cross-probe** [14] - 91:20, 91:25, 92:12, 92:23, 94:6, 94:18, 116:11, 133:17, 133:20, 134:3, 137:10, 138:21, 138:23, 139:16, 141:6, 142:17, 147:20, 148:19
**cross-product** [1] - 139:20
**crowded** [1] - 180:14
**crux** [1] - 89:16
**cumbersome** [1] - 180:14
**Custom** [1] - 166:7
**custom** [39] - 16:14, 16:15, 20:1, 26:7, 29:8, 31:20, 32:14, 32:16, 32:19, 32:22, 39:11, 40:14, 43:2, 43:6, 43:9, 43:16, 44:5, 46:20, 48:2, 63:1, 63:4, 63:8, 63:15, 63:19, 163:12, 163:19, 163:22, 165:16, 165:22, 166:16, 167:8, 167:19, 168:2, 171:25, 172:6, 174:22, 175:18, 181:21, 182:1
**Custom-Generated** [1] - 166:7
**custom-generated**

[12] - 16:14, 16:15, 31:20, 43:9, 165:16, 166:16, 167:8, 167:19, 168:2, 171:25, 174:22, 175:18
**Customedia** [13] - 49:2, 49:8, 50:9, 50:11, 51:4, 51:13, 172:13, 172:16, 172:22, 172:23, 173:17, 174:7, 174:9
**customedia** [1] - 49:11
**customer** [23] - 29:13, 29:14, 29:17, 31:8, 31:14, 34:12, 56:12, 87:8, 161:11, 162:6, 164:23, 169:8, 170:2, 170:4, 170:12, 170:17, 170:20, 170:22, 171:7, 176:1, 181:11, 182:6
**customer's** [3] - 140:16, 166:12, 170:16
**customers** [4] - 29:11, 61:23, 174:24, 175:11
**customizable** [1] - 25:10
**customization** [4] - 25:9, 29:21, 30:15, 30:19
**customize** [2] - 17:7, 24:5
**customized** [4] - 15:4, 17:1, 24:9, 27:10
**customizes** [1] - 16:20

# D

**d/b/a** [2] - 1:7, 1:12
**Dad** [1] - 183:13
**data** [250] - 15:4, 16:2, 16:21, 17:8, 18:22, 18:25, 19:2, 19:9, 20:1, 20:2, 21:6, 21:12, 24:23, 26:1, 29:5, 29:7, 41:16, 41:20, 42:17, 43:5, 43:7, 43:8, 43:13, 43:19, 44:2, 44:4, 44:5, 48:3, 48:20, 48:21, 48:22, 49:19, 50:5, 63:15, 63:19, 64:13, 64:22, 67:12, 67:13, 68:9, 68:14,

68:16, 68:22, 69:17, 69:18, 69:19, 70:9, 70:11, 70:12, 70:13, 70:14, 71:5, 71:6, 71:9, 71:12, 71:17, 71:25, 72:4, 72:17, 72:19, 72:22, 72:25, 73:5, 73:6, 73:10, 73:22, 73:23, 74:3, 74:8, 74:10, 74:16, 74:21, 74:24, 75:4, 76:8, 76:18, 76:24, 78:13, 78:15, 78:17, 79:25, 80:16, 80:18, 80:21, 83:7, 84:8, 85:1, 85:23, 85:25, 86:1, 86:4, 86:25, 87:22, 87:23, 87:24, 88:3, 88:5, 88:15, 88:16, 88:18, 88:20, 89:1, 89:2, 89:3, 89:19, 89:20, 89:21, 89:24, 90:9, 90:13, 90:16, 90:23, 90:24, 91:3, 91:5, 91:14, 91:22, 92:14, 94:1, 94:4, 94:8, 96:8, 96:11, 96:13, 97:22, 97:23, 98:1, 98:12, 98:14, 98:15, 99:7, 102:2, 102:6, 102:17, 103:17, 103:20, 103:21, 103:22, 103:23, 104:11, 104:12, 104:17, 104:25, 105:3, 105:9, 105:11, 105:21, 108:14, 125:11, 132:23, 132:25, 133:4, 134:11, 134:22, 135:1, 135:24, 135:25, 136:1, 136:19, 136:20, 136:22, 137:3, 137:12, 138:20, 139:4, 139:8, 139:19, 140:8, 140:17, 140:20, 142:22, 142:24, 143:6, 143:12, 143:13, 143:25, 144:10, 144:22, 145:2, 145:4, 145:9, 147:19, 148:10, 148:15, 148:19, 148:21, 150:7, 150:15, 151:7, 151:15, 151:22, 152:12, 152:14,

152:17, 152:19, 152:24, 153:3, 153:4, 153:7, 153:23, 154:2, 154:4, 154:6, 156:3, 156:16, 157:2, 157:18, 157:21, 157:23, 158:2, 162:25, 163:16, 165:23, 167:23, 167:24, 171:16, 172:24, 173:1, 173:3, 173:5, 173:7, 173:8, 173:14, 173:16, 174:14, 174:17, 175:3, 175:5, 176:8, 179:15, 181:16
**Data** [2] - 174:10, 174:11
**database** [2] - 12:12, 38:3
**databases** [1] - 142:6
**DAVIS** [2] - 2:5, 2:18
**Davis** [1] - 5:11
**DAY** [2] - 2:9, 6:4
**DDR** [8] - 12:1, 12:2, 12:16, 12:17, 13:22, 27:16, 27:17, 37:21
**deals** [1] - 7:21
**debating** [1] - 78:24
**decided** [4] - 86:11, 109:13, 114:12, 149:17
**decides** [1] - 29:14
**decision** [10] - 49:10, 49:12, 49:25, 111:23, 122:2, 128:15, 147:23, 149:13, 154:11, 160:8
**decisions** [10] - 128:21, 129:7, 129:17, 129:21, 129:22, 130:2, 130:7, 130:10, 130:21, 130:24
**deck** [1] - 81:14
**declaration** [2] - 64:5, 126:20
**dedicated** [2] - 50:14, 50:18
**dedicating** [1] - 173:15
**deep** [10] - 31:20, 41:7, 43:21, 165:21, 166:16, 171:17, 176:13, 176:22, 177:13, 178:7
**deeper** [1] - 83:17

**deeplink** [40] - 15:3, 16:6, 16:13, 16:17, 16:25, 20:14, 25:9, 26:6, 29:8, 29:10, 29:11, 29:14, 30:10, 33:7, 37:18, 40:24, 43:2, 46:20, 47:10, 47:16, 47:19, 63:1, 63:4, 63:9, 63:14, 64:13, 163:5, 166:18, 167:13, 167:19, 167:22, 168:2, 169:3, 175:4, 179:7, 181:22, 181:24
**deeplink-generated** [1] - 63:14
**deeplinking** [17] - 13:3, 21:4, 21:14, 46:24, 47:23, 48:1, 48:10, 66:1, 165:17, 166:19, 166:22, 167:1, 167:4, 167:8, 171:25, 174:23, 175:18
**deeplinks** [10] - 16:14, 16:24, 19:25, 25:9, 25:13, 27:11, 33:2, 46:24, 47:2
**Deeplinks** [1] - 166:8
**Defendant** [31] - 1:8, 2:13, 3:3, 3:17, 4:18, 4:21, 5:21, 7:2, 10:20, 32:1, 36:21, 115:8, 118:22, 131:19, 132:11, 134:9, 144:14, 147:10, 148:13, 148:23, 149:9, 154:9, 154:16, 158:15, 158:16, 158:19, 158:20, 159:6, 159:12, 171:23, 172:15
**defendant** [2] - 1:13, 1:18
**Defendant's** [14] - 6:23, 9:9, 62:18, 66:23, 111:8, 134:19, 144:19, 146:10, 154:21, 155:6, 158:9, 158:10, 160:11, 181:17
**Defendants** [24] - 5:1, 7:10, 30:24, 34:10, 62:6, 63:25, 116:12, 159:17, 161:2, 161:22, 165:9, 167:3, 169:21,

170:6, 170:9, 171:9, 172:13, 172:17, 175:21, 177:9, 177:21, 178:1, 178:19, 181:9
**Defendants'** [9] - 5:17, 18:3, 31:1, 31:5, 33:16, 145:10, 158:22, 176:18, 182:14
**defense** [4] - 26:15, 26:16, 142:7, 178:21
**defenses** [1] - 142:4
**deficient** [1] - 113:16
**define** [2] - 117:5, 117:18
**defined** [4] - 43:19, 86:18, 100:5
**defines** [1] - 138:8
**definitely** [2] - 44:23, 50:17
**degree** [2] - 7:21, 16:25
**DELAWARE** [1] - 1:2
**Delaware** [8] - 1:20, 5:7, 5:19, 6:3, 6:11, 6:24, 111:17, 117:17
**delayed** [1] - 129:4
**deliberate** [1] - 119:6
**deliver** [2] - 49:15, 173:11
**delivering** [2] - 49:25, 173:19
**delivery** [3] - 172:24, 173:14
**Demand** [1] - 174:11
**demonstrate** [3] - 19:16, 38:23, 164:12
**demonstrated** [1] - 156:18
**demonstrates** [1] - 178:2
**demonstrating** [2] - 19:16, 38:25
**denial** [1] - 146:10
**denied** [3] - 175:22, 176:4, 182:17
**denies** [1] - 158:8
**deny** [2] - 159:3, 182:13
**dependent** [16] - 89:10, 91:20, 92:12, 93:22, 94:6, 101:5, 101:13, 111:16, 133:14, 134:2, 137:8, 148:9, 154:6, 158:3, 160:2, 160:5
**depict** [1] - 164:2
**deploying** [4] - 13:3, 14:4, 14:8, 149:23

**DEPUTY** [6] - 3:23, 4:4, 66:18, 129:10, 129:12, 184:3
**derived** [1] - 133:9
**derives** [1] - 138:6
**DESAI** [44] - 3:15, 67:3, 67:7, 68:7, 68:13, 68:25, 69:13, 70:6, 71:21, 73:12, 73:15, 74:6, 74:20, 76:2, 76:5, 77:6, 78:11, 78:22, 79:17, 79:20, 81:7, 81:24, 82:3, 103:11, 104:2, 104:6, 104:14, 104:23, 105:5, 105:8, 106:14, 107:6, 107:10, 111:10, 112:7, 112:13, 113:11, 114:11, 115:4, 115:10, 115:14, 115:17, 115:25, 116:3
**Desai** [10] - 7:2, 7:3, 67:8, 81:4, 97:19, 100:15, 100:22, 100:5, 111:9, 116:2
**desai** [1] - 103:10
**Desai's** [1] - 107:4
**describe** [9] - 54:7, 83:9, 91:4, 94:25, 95:1, 149:6, 153:4, 162:3, 169:16
**described** [19] - 58:3, 58:21, 59:10, 67:18, 67:23, 68:7, 71:23, 83:23, 87:7, 89:23, 90:18, 99:19, 117:8, 134:16, 137:25, 140:15, 152:4, 152:23, 163:5
**describes** [7] - 76:6, 77:15, 85:7, 87:5, 109:1, 116:10, 166:19
**describing** [3] - 62:6, 92:6, 144:24
**description** [6] - 21:19, 54:18, 110:17, 139:2, 167:16, 169:17
**descriptions** [1] - 21:3
**designed** [2] - 95:9, 113:14
**desired** [1] - 61:22
**despite** [1] - 151:12
**destroy** [1] - 150:23
**detail** [2] - 83:17, 153:19

**detect** [12] - 80:8, 80:12, 80:22, 82:18, 95:10, 106:6, 149:24, 154:13, 163:3, 163:14, 163:21, 181:21
**detected** [1] - 151:7
**detecting** [2] - 136:8, 143:4
**detection** [4] - 141:14, 142:20, 152:12, 152:22
**Detection** [1] - 132:6
**detects** [2] - 163:8, 163:18
**determine** [7] - 72:22, 72:24, 79:25, 138:10, 145:17, 156:7, 164:17
**determines** [1] - 139:12
**determining** [5] - 80:15, 135:19, 146:8, 150:16, 155:15
**develop** [1] - 53:12
**developed** [1] - 16:4
**Device** [1] - 166:6
**device** [32] - 19:5, 20:16, 21:12, 22:4, 60:1, 60:3, 67:10, 72:14, 82:23, 86:20, 92:9, 95:14, 99:25, 152:14, 162:23, 163:2, 163:5, 163:8, 163:10, 163:18, 163:19, 163:24, 164:5, 167:14, 168:7, 168:13, 169:4, 169:6, 175:16, 176:11, 176:16, 179:8
**device's** [1] - 176:12
**devices** [6] - 82:17, 82:25, 83:6, 83:12, 174:24, 175:10
**devoted** [1] - 49:18
**diagram** [4] - 15:11, 15:18, 40:4, 40:5
**dicta** [1] - 50:10
**dies** [1] - 115:3
**difference** [14] - 19:13, 19:15, 38:17, 50:20, 50:24, 53:18, 70:1, 77:1, 78:22, 107:1, 114:17, 130:25, 146:19, 155:5
**different** [84] - 7:10, 11:5, 11:22, 12:8,

12:10, 13:7, 13:25, 27:18, 30:18, 31:6, 34:5, 35:11, 36:15, 36:20, 38:15, 39:15, 39:16, 39:17, 39:25, 41:1, 43:2, 45:5, 46:5, 48:16, 53:21, 57:24, 58:10, 58:20, 59:9, 59:19, 60:11, 60:18, 61:8, 61:16, 61:18, 61:21, 62:6, 71:7, 71:17, 75:13, 75:20, 76:24, 78:4, 78:20, 86:7, 91:22, 98:17, 100:5, 100:6, 105:18, 106:17, 110:12, 110:13, 113:25, 114:14, 117:5, 117:10, 119:24, 120:4, 122:18, 124:12, 125:15, 134:7, 136:14, 136:18, 137:13, 145:10, 149:1, 153:7, 155:11, 156:19, 161:3, 161:5, 163:6, 165:1, 165:13, 168:17, 175:10, 175:17, 179:10, 180:7
**differentiate** [3] - 21:22, 44:7, 79:14
**differentiator** [3] - 53:9, 53:17, 180:25
**differently** [5] - 11:17, 12:9, 61:14, 114:1, 146:25
**difficult** [6] - 38:8, 52:6, 109:15, 118:17, 145:6, 146:6
**Digital** [1] - 174:11
**ding** [1] - 78:7
**direct** [1] - 175:12
**directed** [57] - 21:12, 22:15, 31:5, 32:6, 34:11, 34:19, 49:12, 49:14, 56:12, 62:14, 75:1, 80:15, 81:2, 82:11, 93:16, 94:13, 116:4, 134:10, 134:17, 135:3, 135:6, 135:24, 136:4, 136:5, 136:7, 137:14, 137:17, 137:22, 138:5, 143:19, 143:20, 144:19, 144:22, 145:12, 150:6, 150:16, 151:13,

155:24, 161:4, 161:23, 162:4, 162:11, 162:13, 162:15, 164:17, 165:11, 165:14, 168:1, 169:23, 170:5, 171:6, 171:10, 172:1, 173:11, 173:14, 175:20, 175:25
**directly** [2] - 29:25, 136:14
**disagree** [4] - 104:1, 104:2, 106:3, 146:7
**disagreed** [1] - 173:17
**disagreeing** [1] - 42:14
**disappointed** [1] - 183:13
**discard** [1] - 100:1
**discarded** [7] - 133:4, 136:23, 136:24, 139:8, 152:17, 152:19, 153:1
**discarding** [2] - 88:8, 107:15
**discards** [1] - 136:20
**disclaimed** [1] - 69:21
**disclose** [1] - 152:18
**disclosed** [1] - 57:19
**discloses** [1] - 83:18
**discovery** [1] - 114:16
**discrimination** [3] - 72:1, 73:24, 147:19
**discuss** [13] - 35:4, 37:22, 38:7, 44:14, 52:20, 81:20, 83:17, 131:3, 131:13, 131:15, 134:2, 170:6
**discussed** [3] - 36:1, 92:24, 180:24
**discusses** [2] - 65:10, 179:5
**discussing** [6] - 55:1, 59:8, 120:3, 134:5, 140:24, 161:20
**discussion** [11] - 58:15, 60:20, 65:16, 71:11, 94:15, 94:18, 109:4, 131:11, 144:7, 183:10, 183:11
**disembodied** [1] - 134:17
**dish** [1] - 172:14
**dismiss** [8] - 111:12, 111:15, 114:12, 114:15, 115:18, 131:20, 160:24, 178:20

**dismissal** [3] - 5:2, 30:2, 159:3
**dismissed** [4] - 113:17, 131:21, 159:1, 160:15
**dismissing** [2] - 112:16
**disparages** [1] - 83:23
**display** [1] - 86:15
**displaying** [1] - 22:3
**dispositive** [3] - 66:6, 155:6, 158:11
**dispute** [7] - 29:9, 72:16, 154:21, 162:8, 167:4, 179:20, 182:10
**disputed** [6] - 41:2, 42:5, 81:12, 99:14, 132:15, 146:9
**disputing** [1] - 41:14
**disrupt** [1] - 87:2
**disrupted** [3] - 99:10, 99:15, 100:3
**disruption** [1] - 99:6
**distinct** [1] - 100:6
**distinction** [10] - 11:8, 37:3, 51:12, 59:15, 77:13, 79:6, 79:22, 87:15, 90:5, 97:1
**distinctiveness** [1] - 160:4
**distinguish** [7] - 23:6, 49:10, 58:11, 76:1, 100:16, 106:12, 106:14
**distinguisher** [1] - 82:1
**distinguishes** [1] - 99:16
**distinguishing** [4] - 61:2, 61:3, 70:22, 98:24
**distracted** [1] - 60:7
**DISTRICT** [3] - 1:1, 1:2, 1:24
**District** [8] - 51:3, 118:13, 118:16, 118:19, 119:5, 122:10, 169:16, 184:9
**do-it-on-a-computer** [1] - 39:23
**do-it-on-the-computer** [1] - 39:19
**docket** [2] - 113:23, 129:24
**Docket** [1] - 12:16
**doctrine** [1] - 119:16
**doctrines** [2] - 33:23, 119:7

**domain** [1] - 150:22
**done** [21] - 9:17, 14:10, 18:13, 26:2, 48:6, 52:21, 53:23, 57:25, 58:18, 70:19, 76:23, 84:3, 87:9, 107:19, 118:1, 122:22, 130:17, 154:5, 165:10, 169:22, 180:7
**dot.com** [1] - 126:1
**double** [1] - 18:12
**double-check** [1] - 18:12
**doubt** [3] - 26:15, 78:9, 167:25
**down** [6] - 49:3, 55:17, 60:19, 62:5, 62:25, 126:7
**download** [4] - 35:23, 61:12, 170:24, 180:21
**downside** [1] - 59:25
**downsides** [2] - 59:18, 60:9
**drafted** [1] - 123:8
**drafters** [1] - 127:6
**drafting** [1] - 95:8
**draw** [4] - 12:16, 65:20, 97:1, 178:17
**driven** [1] - 157:9
**drives** [2] - 56:10, 181:4
**due** [2] - 168:23, 168:24
**during** [4] - 27:2, 27:3, 131:16, 178:11
**Dyk** [1] - 110:10
**dynamic** [3] - 29:11, 169:2, 179:6
**Dynamic** [1] - 132:5
**dynamically** [1] - 133:11

**E**

**early** [4] - 94:15, 126:2, 128:11, 128:12
**ease** [2] - 160:6, 161:19
**easier** [1] - 87:1
**easiest** [3] - 46:13, 49:9, 124:23
**easily** [1] - 141:17
**easy** [4] - 21:2, 23:12, 49:11, 49:24
**EDWARD** [1] - 3:10
**Edward** [1] - 6:18
**effect** [1] - 121:18

effective [1] - 83:11
efficiencies [1] - 130:15
efficiency [3] - 99:3, 117:3, 174:3
efficient [2] - 76:16, 117:8
efficiently [3] - 11:11, 23:15, 173:22
effort [1] - 28:18
efforts [1] - 131:6
either [15] - 8:3, 60:22, 74:15, 88:7, 89:12, 90:13, 94:1, 99:25, 117:13, 133:4, 143:24, 145:18, 152:19, 152:25, 162:25
Electric [3] - 72:5, 72:6, 135:8
electronic [2] - 137:9, 174:23
electronically [1] - 92:24
element [9] - 45:1, 45:2, 68:2, 87:8, 95:9, 95:20, 146:22, 177:5, 177:11
element's [1] - 146:23
elements [17] - 13:20, 14:14, 21:3, 45:12, 67:24, 68:2, 145:17, 146:22, 147:11, 147:24, 148:4, 148:12, 154:20, 154:21, 154:22, 157:5, 177:19
eligibility [15] - 9:23, 10:25, 19:22, 53:18, 110:13, 110:15, 115:7, 116:20, 119:21, 130:16, 131:22, 146:20, 157:9, 159:1, 183:12
eligible [12] - 33:10, 37:17, 37:20, 38:11, 44:21, 108:17, 112:12, 145:19, 146:24, 169:13, 169:14, 177:18
email [5] - 6:20, 34:10, 168:13, 170:20, 180:18
emails [2] - 180:13, 180:16
embed [1] - 24:25
embedded [4] - 19:24, 24:21, 171:16, 175:2
embedding [5] - 18:20, 18:25, 25:25,

41:19, 42:16
embeds [1] - 181:14
embodied [1] - 12:13
embodiment [5] - 40:8, 44:9, 55:23, 139:2, 164:1
embodiments [1] - 40:7
embodying [1] - 125:25
Emotive [19] - 4:19, 6:5, 6:7, 23:2, 28:20, 29:23, 30:9, 30:14, 30:17, 30:18, 123:1, 158:15, 158:16, 158:17, 158:24, 159:6, 160:19, 161:4, 161:25
EMOTIVE [1] - 1:7
Emotive's [5] - 6:3, 29:9, 161:14, 178:12, 182:19
emphasis [1] - 44:17
emphasizes [1] - 27:14
emphasizing [4] - 36:15, 36:22, 36:23, 82:12
empirically [1] - 133:9
empirically-derived [1] - 133:9
employed [1] - 173:4
employing [2] - 154:1, 171:17
employs [1] - 142:3
enable [3] - 87:3, 170:24, 173:21
enabled [2] - 86:20, 99:21
enablement [2] - 99:6, 110:17
encompass [1] - 106:1
encourage [1] - 53:3, 122:23
encryption [1] - 141:11
end [9] - 17:15, 46:19, 58:5, 62:3, 65:22, 100:11, 127:11, 174:4, 183:22
endeavor [1] - 182:18
Enfish [5] - 12:13, 38:2, 125:9, 169:11, 169:15
engage [1] - 144:9
engaged [1] - 23:14
engagement [1] - 169:5
engages [1] - 88:22

engaging [2] - 165:2, 172:9
engine [2] - 139:11, 139:12
engineer [1] - 125:5, 125:6
engineers [1] - 53:12
enhanced [1] - 182:10
enroll [13] - 21:15, 31:8, 31:14, 34:12, 56:13, 161:11, 162:6, 164:23, 169:8, 171:7, 174:24, 176:2, 182:6
enrolled [1] - 164:14
enrolling [5] - 11:15, 21:8, 56:16, 56:22, 61:22
enrollment [7] - 165:23, 166:12, 170:3, 170:17, 170:21, 181:10, 181:18
enrolls [1] - 163:23
ensure [3] - 139:22, 150:25, 174:17
ensures [1] - 169:19
enter [3] - 35:14, 35:21, 35:24
entire [4] - 44:18, 54:8, 87:9, 150:23
entirely [1] - 125:10
entirety [3] - 142:17, 158:24, 178:3
entitled [1] - 57:18
entries [1] - 86:12
enunciation [1] - 119:14
environment [2] - 32:20, 32:21
equaled [1] - 182:11
equally [1] - 95:24
equation [1] - 128:19
equipped [9] - 72:24, 80:7, 80:11, 83:2, 100:19, 102:11, 106:6, 154:13, 154:18
equivalent [4] - 24:21, 65:6, 121:15, 134:3
error [2] - 123:14, 123:15
escalate [1] - 108:10
especially [2] - 19:2, 113:13
ESQUIRE [21] - 2:2, 2:5, 2:5, 2:6, 2:9, 2:12, 2:15, 2:18, 2:18, 2:19, 2:23, 2:23, 3:2, 3:6, 3:9,

3:9, 3:10, 3:13, 3:15, 3:16, 3:16
essence [1] - 72:18
essential [1] - 79:25
essentially [15] - 11:1, 26:3, 26:13, 34:11, 56:3, 56:4, 97:22, 98:10, 99:11, 115:2, 136:11, 161:24, 162:9, 169:13, 171:9
establishing [1] - 19:13
et [2] - 60:4, 64:2
EUGENE [1] - 3:2
evaluating [1] - 9:23
event [5] - 70:14, 78:15, 141:15, 149:21, 160:6
events [14] - 12:19, 12:20, 68:15, 89:7, 89:8, 89:17, 89:18, 89:20, 92:15, 104:16, 133:7, 137:5, 140:21, 140:22
evidence [6] - 26:19, 28:8, 71:10, 71:13, 140:19, 141:1
evident [1] - 166:1
evolving [1] - 136:8
exact [1] - 80:24
exactly [12] - 13:12, 14:7, 34:23, 37:1, 38:12, 40:1, 40:6, 45:11, 46:6, 78:17, 86:7, 99:4
examine [1] - 164:19
examined [1] - 137:23
examiner [12] - 76:20, 76:25, 77:7, 77:9, 90:5, 90:6, 90:7, 91:10, 92:1, 94:17, 152:11, 152:16
examiner's [2] - 76:21, 152:9
example [35] - 36:7, 38:10, 42:25, 44:24, 45:14, 47:11, 52:4, 54:9, 58:12, 59:10, 82:21, 86:22, 87:8, 93:2, 96:2, 99:1, 105:11, 110:6, 113:19, 116:10, 119:9, 120:3, 122:11, 133:18, 134:24, 138:16, 138:25, 139:18, 141:7, 144:1, 147:8, 170:6, 170:19, 176:21, 180:11

examples [1] - 18:3
Excel [2] - 86:10, 86:23
excellent [1] - 131:4
exception [2] - 122:2, 138:6
exceptions [1] - 169:19
excerpt [1] - 16:12
exclude [2] - 106:4, 137:17
exclusively [1] - 153:17
exclusivity [1] - 153:17
executes [2] - 163:2, 181:15
executing [1] - 11:15
execution [1] - 176:12
exemplary [4] - 40:8, 139:2, 155:14
exhibit [1] - 40:11
exhibits [1] - 64:2
exist [3] - 24:3, 25:16, 27:21
existed [5] - 23:18, 44:19, 44:20, 46:24
existing [5] - 24:10, 25:13, 25:22, 27:11, 153:8
exists [5] - 24:4, 87:11, 169:2, 179:5
expanded [4] - 99:10, 99:15, 99:16, 122:9
expect [1] - 100:2
expected [2] - 135:6, 177:24
expedition [1] - 113:15
experience [5] - 50:11, 83:4, 129:14, 130:21, 169:5
expert [1] - 64:5
expertise [3] - 84:6, 97:6, 142:1
experts [1] - 141:25
explain [9] - 13:12, 50:16, 52:4, 65:12, 65:25, 146:8, 163:7, 163:17, 168:11
explained [10] - 134:21, 135:19, 146:21, 150:18, 155:18, 164:18, 169:11, 174:20, 176:21, 180:12
explaining [2] - 152:9, 168:4
explains [13] - 83:2, 84:5, 99:24, 102:22,

116:20, 139:3, 140:15, 141:9, 141:12, 141:16, 144:8, 166:22, 168:19
**explicitly** [2] - 108:18, 132:15
**explore** [1] - 45:11
**expressed** [1] - 176:5
**expressly** [2] - 116:12, 117:22
**extensive** [1] - 60:20
**extensively** [1] - 58:16
**extent** [6] - 40:10, 81:23, 133:13, 158:4, 160:22, 182:9
**extra** [4] - 31:2, 49:19, 97:25, 101:14
**extraction** [1] - 169:17
**extremely** [1] - 70:11
**eye** [1] - 107:25

**F**

**face** [1] - 80:14
**faced** [1] - 153:15
**facets** [1] - 124:12
**fact** [32] - 7:19, 22:2, 23:19, 27:14, 28:9, 30:17, 41:5, 41:25, 42:3, 53:7, 54:17, 64:23, 65:2, 65:4, 75:7, 77:24, 78:2, 78:7, 79:1, 93:23, 97:16, 100:16, 107:6, 109:4, 109:18, 134:14, 156:18, 158:6, 162:11, 165:15, 176:13, 177:23
**facts** [3] - 52:2, 79:2, 130:23
**factual** [7] - 52:12, 87:21, 146:9, 153:13, 179:14, 179:20, 182:10
**fail** [1] - 168:23
**failing** [1] - 165:7
**failures** [1] - 120:23
**fair** [7] - 16:23, 17:25, 32:6, 70:2, 94:23, 96:21, 96:23
**fairly** [11] - 59:3, 81:20, 82:1, 93:17, 97:21, 98:3, 115:8, 128:20, 150:8, 118:16, 176:5
**fairness** [1] - 30:24
**faithful** [1] - 161:6
**fall** [2] - 157:24, 178:5

**familiar** [2] - 37:12, 44:15
**family** [1] - 183:9
**far** [2] - 25:24, 139:15
**Farnan** [2] - 6:25, 7:2
**FARNAN** [3] - 3:12, 3:13, 7:1
**fashion** [1] - 29:11
**faster** [7] - 11:10, 36:23, 38:22, 39:21, 87:1, 107:1, 107:2
**faulting** [1] - 64:25
**favor** [3] - 69:5, 155:6, 161:25
**favorite** [1] - 40:4
**feature** [1] - 70:23
**features** [1] - 139:22
**Fed** [1] - 69:21
**Federal** [57] - 8:20, 11:23, 12:13, 14:2, 18:10, 35:1, 37:5, 48:25, 49:14, 49:20, 50:14, 50:21, 57:13, 74:23, 75:21, 79:4, 80:6, 80:7, 108:18, 109:2, 111:18, 111:21, 112:1, 113:12, 115:23, 118:14, 118:17, 119:8, 130:19, 134:16, 134:21, 134:25, 135:9, 135:13, 135:18, 137:18, 138:3, 145:22, 146:21, 146:25, 147:22, 149:11, 149:13, 149:16, 154:11, 155:13, 156:1, 156:6, 156:14, 164:18, 165:4, 165:5, 169:10, 169:15, 172:14, 173:10, 177:3
**federal** [1] - 110:22
**feedback** [24] - 68:10, 84:22, 85:1, 85:15, 86:3, 95:8, 95:11, 95:15, 95:20, 95:24, 96:10, 96:13, 98:1, 98:15, 133:8, 133:12, 134:12, 141:1, 142:24, 143:7, 143:17, 145:4, 145:9, 157:19
**fell** [2] - 153:3, 160:11
**few** [11] - 4:12, 31:2, 55:15, 55:21, 81:5, 129:20, 130:22, 139:17, 142:15,

160:2, 161:5
**field** [9] - 29:13, 56:5, 66:5, 153:15, 158:5, 167:16, 168:9, 180:5, 182:8
**fifth** [1] - 133:11
**Figure** [4] - 84:13, 87:6, 95:2, 139:3
**figure** [4] - 9:25, 11:21, 46:8, 67:13
**Figures** [1] - 164:2
**figures** [2] - 164:2, 164:12
**figuring** [2] - 72:19, 124:3
**file** [1] - 77:7
**filed** [4] - 4:25, 12:16, 131:19, 131:24
**fill** [5] - 21:14, 23:25, 41:8, 47:21, 152:5
**filled** [29] - 21:15, 31:9, 31:15, 40:13, 40:15, 40:25, 56:13, 56:17, 56:22, 62:8, 161:12, 161:16, 162:7, 164:24, 166:12, 169:9, 170:4, 170:13, 170:18, 170:20, 171:5, 171:8, 171:14, 175:4, 176:2, 181:10, 181:18, 181:25, 182:7
**filling** [2] - 60:25, 61:15
**filter** [26] - 68:16, 68:17, 68:18, 68:19, 69:17, 71:3, 71:9, 75:3, 82:20, 85:23, 86:12, 88:3, 94:2, 98:14, 103:20, 105:3, 105:21, 136:20, 136:24, 137:15, 139:5, 143:11, 144:3, 145:1, 157:22, 158:2
**filter-based** [1] - 82:20
**filtered** [8] - 74:15, 74:16, 88:15, 88:16, 88:17, 98:12, 104:12, 152:12
**filtering** [80] - 68:8, 68:24, 69:6, 70:18, 70:19, 71:12, 71:15, 71:25, 73:3, 74:2, 74:14, 74:21, 74:24, 76:22, 88:4, 90:9, 90:17, 90:22, 90:23, 90:24, 91:13, 92:14,

93:24, 94:16, 94:21, 97:10, 102:2, 103:13, 103:20, 105:17, 106:13, 106:19, 106:24, 107:7, 107:13, 107:14, 107:18, 107:21, 107:22, 108:23, 133:2, 133:3, 133:5, 134:11, 135:14, 135:25, 136:25, 138:18, 138:19, 138:23, 139:1, 139:5, 139:9, 139:10, 139:19, 140:7, 141:3, 141:6, 143:2, 143:6, 143:16, 145:8, 147:17, 148:9, 148:14, 148:18, 148:25, 151:21, 151:23, 152:23, 153:22, 154:3, 154:23, 154:25, 156:25, 157:17, 157:25
**filtering/analysis** [1] - 71:2
**filters** [9] - 67:11, 68:15, 95:11, 97:22, 136:19, 139:4, 140:20, 142:22, 152:24
**finally** [1] - 141:24
**fine** [3] - 88:16, 88:18, 135:19
**finish** [2] - 4:1, 8:6
**Finjan** [1] - 14:12
**firewall** [2] - 87:7, 152:12
**firewalls** [2] - 82:18, 141:10
**firm** [1] - 6:17
**first** [46] - 4:13, 4:17, 5:5, 5:18, 7:8, 9:11, 13:22, 18:20, 37:21, 57:23, 83:16, 83:20, 85:4, 85:21, 87:11, 87:16, 88:3, 89:25, 90:21, 92:14, 94:25, 96:24, 101:1, 108:9, 110:24, 111:3, 122:2, 129:19, 131:14, 131:16, 132:23, 136:16, 136:18, 137:3, 138:17, 139:4, 140:14, 149:23, 157:25, 162:20,

162:24, 163:6, 163:11, 165:20, 176:7, 176:9
**fishing** [2] - 25:6, 113:15
**fit** [1] - 134:20
**five** [13] - 7:12, 9:15, 33:16, 45:19, 45:20, 45:22, 46:2, 55:9, 62:18, 62:20, 66:12, 67:1, 132:22
**five-minute** [1] - 66:12
**fix** [2] - 60:9, 150:20
**flag** [1] - 127:19
**flawed** [1] - 155:19
**flip** [1] - 57:16
**fluidly** [1] - 23:15
**FLYNN** [3] - 2:2, 2:15, 5:8
**Flynn** [1] - 5:9
**focus** [25] - 10:16, 27:13, 31:12, 32:3, 60:5, 67:24, 73:1, 94:14, 94:19, 100:8, 132:8, 133:15, 133:22, 137:17, 138:10, 140:3, 140:6, 140:13, 142:10, 144:21, 160:7, 164:20, 164:21, 165:25, 172:3
**focused** [7] - 87:10, 91:18, 101:1, 136:14, 138:15, 141:11, 143:4
**focuses** [3] - 76:13, 84:20, 174:21
**focusing** [4] - 10:21, 13:24, 90:7, 96:16
**FOERSTER** [1] - 3:2
**Foerster** [2] - 5:24, 9:13
**folks** [4] - 7:19, 109:10, 128:11, 183:23
**follow** [2] - 131:12, 169:19
**following** [4] - 51:20, 132:21, 145:1, 162:20
**follows** [2] - 12:17, 85:15
**followup** [1] - 55:18
**food** [1] - 32:2
**Footnote** [4] - 53:6, 53:8, 54:10, 54:13
**footnote** [1] - 53:10
**footnoted** [2] - 59:4, 59:7

**Footnotes** [4] - 36:2, 53:5, 54:23, 180:9
**footprints** [1] - 140:19
**FOR** [1] - 1:2
**force** [1] - 117:20
**foregoing** [1] - 184:5
**foremost** [1] - 57:24
**forget** [1] - 91:21
**forgotten** [1] - 8:4
**form** [8] - 27:17, 27:18, 78:14, 90:21, 139:10, 170:21, 170:23, 180:14
**former** [1] - 36:22
**forms** [2] - 25:13, 170:10
**formulas** [1] - 156:8
**formulating** [1] - 130:7
**formulation** [1] - 28:24
**forth** [1] - 44:16
**forward** [6] - 50:24, 95:13, 113:2, 128:16, 175:21, 183:24
**forwarding** [1] - 139:14
**forwards** [1] - 139:7
**founder** [1] - 180:22
**four** [11] - 45:18, 45:22, 46:2, 53:5, 85:20, 85:21, 86:3, 93:19, 94:11, 98:3, 100:25
**fours** [1] - 174:6
**fourth** [3] - 94:5, 133:8, 163:23
**frame** [3] - 47:7, 120:18, 156:20
**framed** [1] - 161:4
**framework** [2] - 145:14, 150:21
**framing** [1] - 34:16
**free** [2] - 22:19, 67:5
**friction** [1] - 23:16
**Friday** [2] - 1:21, 183:21
**friendly** [1] - 65:24
**front** [3] - 67:20, 112:17, 179:21
**full** [1] - 46:12
**fully** [1] - 155:8
**fulsome** [1] - 152:4
**function** [6] - 11:5, 12:3, 35:2, 95:7, 97:17, 123:24
**functional** [4] - 69:20, 70:8, 124:3, 150:8
**functional -sounding**

[1] - 69:20
**functionality** [18] - 11:19, 11:23, 13:13, 36:25, 39:5, 59:9, 85:18, 87:3, 99:7, 116:11, 117:7, 119:19, 143:20, 144:15, 145:21, 151:3, 174:1, 174:19
**functioned** [1] - 175:10
**functioning** [1] - 175:16
**functions** [3] - 99:4, 147:7, 149:7
**fundamental** [2] - 28:19, 71:22
**fundamentally** [2] - 32:24, 36:19
**funny** [1] - 123:13
**Furthermore** [1] - 139:19
**futile** [1] - 113:19
**future** [2] - 141:3, 183:25

**G**

**gallery** [1] - 5:13
**Games** [1] - 165:5
**gateway** [1] - 152:13
**GEDDES** [1] - 2:9
**Geddes** [1] - 6:5
**Gene** [1] - 9:12
**gene** [1] - 5:23
**Genedics** [2] - 131:10, 131:11
**general** [13] - 7:25, 8:9, 47:16, 79:1, 105:25, 109:25, 110:3, 116:9, 134:4, 140:2, 140:7, 164:22, 171:10
**generally** [10] - 8:6, 8:15, 8:19, 110:2, 116:16, 118:8, 128:4, 165:7, 183:18
**generate** [7] - 12:11, 29:8, 43:16, 48:2, 150:1, 150:11, 170:25
**generated** [21] - 16:14, 16:15, 19:25, 31:20, 39:11, 43:9, 61:8, 63:9, 63:14, 88:7, 151:9, 165:16, 165:21, 166:16, 167:8, 167:19, 167:24, 168:2, 171:25, 174:22,

175:18
**Generated** [1] - 166:7
**generates** [1] - 172:5
**generations** [1] - 172:9
**generic** [36] - 21:2, 21:13, 41:6, 41:9, 41:11, 48:14, 48:15, 48:17, 48:19, 48:24, 49:6, 50:3, 50:7, 50:8, 51:4, 51:6, 51:11, 51:13, 56:5, 63:23, 67:10, 72:14, 103:14, 118:22, 121:5, 122:4, 122:5, 122:12, 122:13, 122:15, 122:21, 135:5, 147:5, 174:3, 174:10, 177:7
**genuinely** [1] - 21:10
**genus** [2] - 48:18, 122:15
**given** [3] - 21:2, 47:20, 99:11
**glad** [1] - 62:24
**glean** [1] - 57:8
**gleaned** [1] - 137:4
**Global** [1] - 135:12
**global** [1] - 150:21
**goal** [11] - 34:17, 34:18, 57:23, 61:22, 62:13, 121:5, 128:9, 128:13, 128:14, 128:20, 181:21
**Goldberg** [4] - 6:18, 82:9, 111:4, 118:4
**GOLDBERG** [43] - 3:9, 82:5, 82:8, 82:10, 82:25, 84:4, 85:3, 86:9, 88:1, 88:21, 88:24, 89:5, 89:23, 90:20, 91:15, 91:24, 92:4, 93:1, 93:4, 93:7, 93:13, 94:24, 96:4, 96:9, 96:15, 96:23, 97:24, 98:7, 98:19, 99:18, 100:13, 100:21, 102:4, 102:18, 102:20, 102:22, 103:3, 111:5, 116:4, 116:7, 117:2, 117:16, 118:3
**goldberg** [2] - 6:21, 103:7
**GOTSHAL** [1] - 3:15
**governing** [1] - 155:25
**grant** [3] - 76:11, 79:9, 178:20
**granted** [2] - 91:12,

178:24
**granting** [3] - 113:22, 121:2, 124:2
**granular** [2] - 18:5, 21:18
**graphic** [1] - 14:24
**Graphics** [1] - 147:1
**grapple** [2] - 120:25, 123:9
**grappling** [2] - 23:6, 124:1
**grateful** [1] - 183:16
**great** [8] - 7:21, 76:12, 77:23, 77:25, 78:6, 78:19, 155:1, 157:12
**greater** [1] - 69:23
**Greenberg** [1] - 98:6
**ground** [5] - 7:6, 73:4, 90:13, 136:22, 158:25
**grounds** [2] - 159:3, 182:14
**Group** [3] - 72:6, 134:25, 135:8
**guarding** [1] - 40:2
**guess** [25] - 8:23, 10:12, 17:19, 25:6, 30:22, 31:22, 36:12, 38:14, 39:4, 39:18, 54:3, 55:13, 57:7, 67:20, 68:23, 69:12, 70:2, 74:13, 75:15, 75:25, 93:14, 94:12, 100:10, 115:11, 117:11
**guidance** [3] - 111:18, 137:19, 165:3
**guide** [1] - 69:12
**guided** [1] - 109:2
**guys** [1] - 118:6

**H**

**hacker** [1] - 141:22
**hackers** [1] - 151:18
**hah** [1] - 64:18
**half** [1] - 167:16
**hammer** [1] - 127:16
**hand** [6] - 21:5, 21:7, 57:4, 67:5, 80:10, 82:5
**handicapped** [1] - 63:25
**handle** [1] - 80:11
**handling** [1] - 108:11
**hanging** [2] - 78:24, 114:15
**happy** [1] - 55:12
**hard** [3] - 73:10, 101:7, 154:21

**harder** [1] - 112:8
**hardware** [4] - 19:14, 19:18, 147:13, 155:22
**harm** [1] - 82:23
**hassle** [1] - 23:24
**hat** [1] - 78:24
**hear** [8] - 7:14, 7:15, 7:17, 15:21, 33:18, 62:24, 98:16, 103:8
**heard** [2] - 104:24, 128:13
**hearing** [4] - 14:19, 26:9, 131:16, 183:22
**Hearing** [1] - 1:22
**heart** [4] - 21:10, 28:15, 28:22, 33:7
**Heather** [1] - 184:8
**heavily** [1] - 59:3
**hedging** [1] - 46:15
**held** [2] - 57:13, 80:7
**help** [5] - 19:21, 109:19, 110:21, 119:5, 120:19
**helped** [1] - 156:20
**helpful** [8] - 8:2, 57:3, 94:9, 110:9, 110:18, 130:22, 141:14, 149:18
**helps** [3] - 101:18, 130:23, 131:1
**hereby** [2] - 131:10, 184:5
**herein** [2] - 131:12, 159:4
**HERRINGTON** [1] - 2:11
**hierarchal** [1] - 141:9
**hierarchical** [2] - 92:11, 103:4
**hierarchically** [1] - 149:21
**hierarchy** [1] - 100:5
**high** [3] - 142:19, 143:24, 169:17
**high-level** [1] - 143:24
**higher** [2] - 55:24, 56:1, 180:16
**higher-level** [2] - 55:24, 56:1
**highlight** [7] - 82:12, 93:18, 93:20, 93:23, 93:25, 94:12, 137:1
**highlighted** [8] - 14:19, 28:22, 63:11, 73:13, 73:21, 88:17, 152:3, 166:3
**hint** [1] - 127:4
**history** [2] - 19:6, 77:7
**hit** [3] - 33:6, 68:17,

163:18
**hitting** [1] - 164:12
**hmm** [5] - 91:24, 96:4, 96:9, 97:24, 100:21
**hold** [1] - 28:1
**holding** [1] - 130:15
**Holdings** [4] - 12:1, 12:2, 12:17
**home** [2] - 183:8, 183:23
**honest** [2] - 59:14, 68:16
**Honor** [71] - 5:8, 5:20, 6:4, 6:15, 7:1, 9:12, 14:18, 17:25, 22:25, 23:1, 33:19, 63:20, 67:3, 67:7, 69:1, 74:20, 81:7, 82:5, 82:10, 84:4, 84:13, 85:3, 85:10, 86:9, 87:5, 87:6, 88:2, 88:24, 89:6, 89:15, 89:24, 90:21, 91:8, 91:15, 92:5, 93:1, 94:24, 95:6, 95:20, 96:23, 97:5, 98:19, 98:23, 98:25, 99:18, 100:7, 100:9, 100:13, 100:25, 101:4, 101:10, 101:13, 101:17, 101:25, 102:5, 102:10, 102:14, 102:18, 103:3, 104:8, 108:1, 108:25, 111:6, 111:10, 111:15, 116:3, 116:4, 116:7, 117:2, 117:9, 117:16
**Honor's** [2] - 17:6, 96:15
**HONORABLE** [1] - 1:24
**hope** [1] - 130:12
**hopeful** [1] - 128:9
**hopes** [1] - 168:5
**hosts** [1] - 162:24
**hours** [2] - 130:5, 182:23
**housekeeping** [1] - 81:9
**HTT** [1] - 167:11
**HTTP** [1] - 166:9
**huge** [1] - 127:14
**human** [113] - 23:17, 67:12, 67:24, 68:2, 68:10, 68:18, 69:18, 70:23, 70:24, 70:25, 72:5, 72:13, 72:15, 72:17, 72:19, 72:22,

74:12, 76:9, 76:13, 78:17, 79:5, 79:10, 79:24, 80:1, 80:7, 80:11, 80:12, 80:15, 80:17, 80:20, 80:23, 81:2, 83:21, 83:22, 84:3, 84:10, 84:15, 84:21, 84:24, 85:1, 86:2, 86:3, 86:14, 86:24, 89:1, 89:18, 94:4, 96:3, 96:8, 96:10, 96:13, 97:12, 97:25, 98:1, 98:14, 98:15, 99:2, 100:17, 100:19, 101:9, 101:18, 101:21, 101:22, 101:24, 102:3, 102:10, 102:16, 103:1, 103:15, 103:24, 104:24, 105:3, 105:9, 105:12, 105:19, 105:21, 106:3, 106:6, 106:9, 106:10, 106:23, 107:6, 108:16, 134:12, 134:18, 135:15, 137:5, 140:11, 140:22, 140:25, 142:5, 142:11, 142:23, 143:7, 143:12, 143:16, 144:8, 144:10, 144:16, 144:20, 144:23, 145:3, 154:13, 154:18, 154:19, 154:20, 154:24, 157:19
**human's** [1] - 67:15
**humanly** [1] - 72:8
**humans** [4] - 23:9, 68:6, 94:22, 107:2
**hump** [1] - 146:18
**hundred** [3] - 60:17, 109:14, 130:5
**hurt** [1] - 174:4
**hyper** [1] - 12:11
**hyperlink** [3] - 12:4, 12:6, 12:18
**hyperlinks** [1] - 12:5
**Hypertext** [1] - 166:8

# I

**i.e** [1] - 39:1
**idea** [102] - 13:1, 14:16, 19:20, 20:11, 21:23, 23:8, 24:11, 32:7, 32:9, 32:15,

32:21, 34:6, 34:19, 39:1, 42:24, 47:19, 49:14, 49:25, 50:4, 50:9, 53:10, 54:1, 55:24, 56:1, 56:5, 56:14, 56:21, 57:14, 57:15, 62:7, 74:11, 91:20, 98:4, 98:5, 101:18, 104:18, 105:17, 121:12, 121:15, 121:16, 121:22, 122:6, 125:18, 125:22, 125:25, 126:1, 134:10, 134:14, 134:15, 134:16, 134:19, 134:24, 135:7, 135:11, 135:14, 135:19, 135:22, 136:4, 137:23, 139:16, 143:19, 143:22, 145:1, 145:11, 145:12, 145:16, 145:20, 147:2, 147:14, 148:17, 150:6, 153:14, 155:25, 158:6, 159:24, 160:14, 161:3, 161:5, 161:10, 161:14, 161:20, 161:25, 162:3, 162:8, 162:10, 162:14, 162:16, 165:11, 172:4, 172:7, 172:11, 173:12, 175:21, 176:1, 176:5, 179:15, 181:7, 181:9, 181:18
**ideas** [8] - 31:4, 31:6, 74:22, 74:24, 75:2, 124:3, 148:22, 161:17
**identical** [1] - 159:15
**identified** [11] - 19:3, 46:19, 89:17, 90:13, 94:2, 104:16, 133:7, 149:15, 169:22, 173:3, 174:2
**identifier** [3] - 44:1, 163:4, 163:15
**identify** [18] - 5:4, 5:7, 5:18, 68:15, 70:14, 72:17, 74:8, 78:15, 83:2, 83:5, 89:6, 94:3, 99:21, 117:19, 117:21, 132:25, 140:21, 140:22
**Identifying** [1] - 135:1

**identifying** [4] - 19:5, 85:8, 138:5, 151:18
**ignore** [1] - 177:10
**ill** [1] - 83:2
**immediately** [1] - 54:18
**impactful** [1] - 172:18
**implement** [2] - 23:8, 56:1
**implementation** [3] - 34:20, 55:22, 55:25
**implemented** [3] - 52:21, 120:5, 143:25
**implication** [1] - 52:24
**implicit** [1] - 65:25
**importance** [1] - 174:22
**important** [11] - 55:3, 79:2, 91:11, 93:20, 95:15, 95:21, 95:22, 95:23, 95:24, 138:1, 174:16
**impressive** [1] - 9:19
**improve** [8] - 14:6, 34:25, 95:9, 95:18, 97:13, 101:19, 120:22, 174:23
**improved** [5] - 34:21, 151:3, 162:13, 169:5, 175:16
**improvement** [31] - 10:1, 11:12, 11:18, 11:22, 12:3, 12:5, 36:25, 37:6, 37:13, 38:10, 54:9, 57:20, 67:9, 67:18, 76:6, 76:8, 76:9, 77:11, 77:16, 79:4, 109:1, 109:3, 124:11, 135:2, 143:20, 143:25, 144:15, 153:8, 173:14, 174:18, 175:7
**improvements** [6] - 44:21, 67:22, 173:25, 174:2, 174:3, 179:24
**improves** [3] - 35:2, 95:14, 173:18
**improving** [8] - 12:24, 13:1, 34:19, 86:19, 124:14, 124:23, 124:24, 124:25
**IN** [1] - 1:1
**in-between** [1] - 103:22
**inadequate** [1] - 82:18
**Inc** [22] - 2:7, 2:13, 2:20, 3:4, 4:17, 4:19, 4:21, 4:23, 131:18,

131:24, 134:25, 135:13, 137:20, 147:1, 149:14, 155:12, 158:13, 158:15, 158:19, 165:4
**INC** [6] - 1:4, 1:7, 1:9, 1:12, 1:14, 1:17
**incident** [1] - 108:11
**include** [12] - 32:3, 43:20, 89:11, 138:17, 139:19, 145:23, 168:2, 170:9, 171:24, 179:11, 183:2, 183:4
**included** [3] - 80:20, 148:2, 179:14
**includes** [10] - 44:1, 53:10, 70:17, 116:9, 133:2, 163:13, 163:14, 170:20, 172:4, 175:5
**including** [12] - 13:18, 22:11, 87:11, 101:5, 131:9, 135:20, 150:22, 155:21, 167:11, 167:23, 176:6, 181:5
**inconclusive** [1] - 66:3
**inconsistency** [2] - 28:19, 117:17
**inconsistent** [1] - 118:14
**incorporates** [3] - 131:10, 142:21, 142:23
**incorporating** [1] - 83:21
**incorrect** [1] - 65:5
**increase** [1] - 54:15
**increased** [3] - 54:14, 54:15, 155:21
**increases** [1] - 85:17
**incredibly** [1] - 102:5
**indeed** [6] - 16:5, 106:4, 144:4, 167:5, 174:14, 178:11, 183:3
**independent** [16] - 17:17, 17:21, 17:22, 22:12, 30:25, 89:12, 93:21, 132:13, 132:17, 133:24, 159:6, 159:8, 159:13, 159:18, 160:12
**independently** [2] - 46:1, 145:18
**indicate** [3] - 167:7,

174:25, 179:20
**indicated** [2] - 83:20, 167:6
**indicates** [4] - 140:2, 146:9, 167:18, 175:9
**indication** [7] - 135:5, 143:23, 147:3, 149:5, 152:21, 157:3, 157:15
**indicator** [2] - 130:12, 180:5
**indistinguishable** [3] - 121:15, 121:18, 145:2
**individual** [4] - 19:14, 20:3, 176:19, 177:17
**individualized** [1] - 25:16
**individually** [2] - 22:14, 173:6
**industry** [1] - 146:5
**ineffective** [1] - 83:24
**ineligibility** [1] - 57:21
**ineligible** [2] - 69:20, 113:17
**inertial** [2] - 155:16, 156:2
**inevitable** [1] - 158:6
**infer** [1] - 15:17
**inference** [1] - 65:20
**infiltrate** [1] - 150:23
**info** [2] - 39:9, 60:6
**information** [62] - 19:4, 24:16, 24:17, 24:25, 25:3, 25:17, 27:8, 29:7, 35:14, 43:3, 43:13, 47:22, 49:3, 59:23, 71:24, 72:7, 72:8, 72:12, 83:5, 83:9, 84:22, 85:12, 85:13, 88:6, 88:8, 88:10, 89:8, 91:5, 102:25, 103:15, 103:16, 104:6, 104:10, 104:11, 104:12, 104:16, 107:14, 107:15, 133:6, 133:9, 135:3, 135:4, 135:10, 137:4, 139:6, 139:12, 139:13, 140:17, 141:20, 144:13, 149:1, 158:4, 167:12, 167:15, 167:22, 168:10, 171:2, 171:5, 171:20, 175:14, 181:11
**infringed** [3] - 116:19,

117:20, 117:22
**infringement** [7] - 30:6, 112:24, 113:5, 113:24, 114:15, 116:8, 131:24
**infringes** [2] - 159:6, 159:12
**ingenuity** [1] - 134:18
**inherent** [3] - 48:17, 181:12, 181:20
**initial** [5] - 68:24, 71:3, 133:2, 133:5, 138:18
**innovation** [4] - 25:21, 54:20, 125:19, 137:25
**input** [5] - 101:25, 167:11, 167:15, 168:17, 175:19
**inquiries** [2] - 37:3, 120:4
**inquiry** [14] - 37:5, 37:9, 37:11, 38:8, 38:12, 40:1, 56:10, 137:14, 137:18, 139:24, 165:2, 169:12, 177:4, 181:4
**install** [1] - 180:20
**installation** [1] - 155:22
**instead** [18] - 122:21, 140:6, 140:7, 143:21, 150:15, 151:2, 153:24, 156:1, 158:2, 162:12, 166:14, 171:22, 172:9, 173:14, 174:1, 177:6, 177:10, 178:4
**instructed** [1] - 165:5
**instruction** [1] - 177:10
**instructions** [1] - 135:20
**integral** [2] - 17:10, 160:22
**integrated** [2] - 150:4, 151:11
**integrates** [1] - 23:10
**integrating** [3] - 100:23, 150:13, 151:16
**integration** [27] - 15:1, 15:20, 18:21, 19:24, 22:2, 24:15, 24:20, 25:25, 29:4, 41:14, 41:19, 42:13, 42:16, 42:17, 65:6, 162:21, 162:23, 163:3, 171:16, 175:2, 176:7, 176:12,

176:24, 177:13, 178:6, 181:13, 181:16
**intelligence** [5] - 83:4, 84:6, 103:4, 142:5, 142:6
**intelligent** [1] - 142:7
**intend** [2] - 129:22, 182:25
**intends** [1] - 168:5
**inter** [1] - 150:22
**inter-domain** [1] - 150:22
**interact** [1] - 14:15
**interacting** [2] - 163:8, 169:5
**interaction** [1] - 33:4
**interactions** [1] - 180:1
**interacts** [1] - 176:14
**interchangeably** [1] - 159:21
**interest** [2] - 10:7, 168:24
**interesting** [15] - 75:12, 125:5, 125:7, 126:5, 126:13, 126:17, 127:1, 127:10, 127:13, 127:17, 127:18, 139:6, 139:9, 183:9, 183:16
**interests** [1] - 108:5
**interface** [9] - 15:19, 167:12, 167:13, 167:14, 167:22, 169:3, 169:4, 179:7, 179:8
**internal** [1] - 141:12
**International** [2] - 134:24, 149:14
**Internet** [13] - 11:20, 12:4, 13:2, 18:16, 23:18, 23:22, 47:17, 66:2, 124:1, 124:17, 135:12, 137:19, 137:23
**interval** [1] - 117:25
**introduce** [2] - 37:23, 92:10
**introduction** [2] - 36:7, 58:6
**introductions** [1] - 6:10
**introductory** [1] - 129:20
**intruders** [1] - 151:18
**Intrusion** [1] - 132:5
**intrusion** [6] - 141:11, 141:25, 142:20,

152:12, 152:22, 153:20
**intrusions** [2] - 140:19, 146:15
**invent** [10] - 25:10, 25:12, 27:6, 27:7, 27:10, 28:10, 33:3, 65:13, 97:8, 97:9
**invented** [3] - 12:8, 27:13, 176:23
**inventing** [1] - 28:6
**Invention** [3] - 141:8, 142:14, 144:7
**invention** [40] - 12:2, 12:4, 12:19, 17:11, 30:17, 35:4, 37:10, 38:7, 55:22, 62:13, 62:14, 67:18, 67:23, 68:1, 77:11, 79:12, 79:15, 83:20, 84:17, 85:11, 85:17, 85:18, 87:4, 89:16, 91:6, 101:24, 120:7, 121:1, 122:4, 127:21, 139:23, 142:8, 150:19, 155:20, 168:5, 173:18, 175:9, 175:15
**invention's** [1] - 180:4
**inventions** [4] - 37:15, 119:10, 120:5, 140:15
**inventive** [15] - 23:10, 29:23, 37:13, 38:18, 50:12, 50:15, 97:16, 145:23, 147:25, 148:3, 149:3, 173:25, 177:4, 177:6, 181:5
**inventors** [9] - 9:25, 10:4, 34:23, 52:8, 82:16, 108:3, 108:6, 108:22, 159:15
**invoke** [1] - 52:2
**invoking** [1] - 70:23
**involve** [8] - 4:16, 53:1, 146:3, 154:20, 167:10, 169:7, 169:12, 170:18
**involved** [3] - 35:15, 79:5, 97:13
**involves** [3] - 137:9, 162:14, 169:23
**involving** [1] - 38:11
**IOS** [2] - 16:10, 43:1
**IP** [3] - 105:11, 105:12, 106:24
**IPRs** [1] - 77:13
**Iqbal** [1] - 112:14

**Iqbal-Twombly** [1] - 112:14
**ironically** [1] - 94:16
**isolation** [3] - 42:9, 97:10
**issue** [52] - 16:22, 19:11, 19:12, 28:11, 28:17, 41:5, 42:1, 42:4, 51:16, 52:17, 53:7, 56:15, 64:23, 65:2, 65:4, 77:7, 81:9, 88:18, 100:18, 104:22, 105:14, 106:21, 106:23, 112:13, 112:14, 113:11, 123:4, 124:13, 124:14, 127:15, 129:23, 137:24, 145:22, 155:5, 155:8, 155:12, 156:23, 157:5, 157:11, 157:13, 158:10, 159:23, 161:10, 161:15, 161:18, 162:16, 165:11, 174:7, 174:9, 180:4, 182:21
**issued** [2] - 65:24, 136:4
**issues** [16] - 7:10, 7:20, 9:3, 10:25, 71:15, 109:12, 110:16, 111:1, 113:20, 131:3, 149:9, 161:21, 171:24, 182:20, 183:12
**issuing** [1] - 130:2
**IT** [1] - 3:24
**item** [1] - 55:20
**itself** [21] - 19:21, 41:1, 46:23, 71:23, 72:9, 77:15, 80:5, 84:10, 85:17, 86:19, 88:6, 99:9, 106:19, 135:10, 138:14, 143:22, 155:5, 160:8, 166:2, 177:1, 177:5

## J

**job** [2] - 97:4, 97:5
**JOHN** [1] - 2:9
**John** [1] - 6:4
**JONATHAN** [2] - 2:5, 2:18
**Jonathan** [2] - 5:10, 33:20

**journey** [1] - 180:20
**Judge** [9] - 24:5, 24:9, 25:3, 69:9, 69:16, 97:20, 110:10, 112:2, 120:3
**judge** [2] - 110:22, 116:24
**JUDGE** [1] - 1:24
**judgment** [1] - 64:6
**judicial** [1] - 138:6
**July** [1] - 1:21
**jumping** [1] - 78:19
**junction** [1] - 41:2
**jurisprudence** [4] - 8:13, 8:14, 37:23, 110:2
**justifications** [1] - 154:10

### K

**Katz** [1] - 5:24
**keep** [6] - 7:11, 46:12, 62:19, 116:14, 117:14, 123:12
**keeps** [1] - 32:4
**key** [15] - 7:24, 8:24, 10:11, 46:21, 53:8, 72:2, 82:16, 91:10, 94:17, 119:1, 165:18, 173:23, 174:12, 178:22, 180:25
**keywords** [1] - 82:12
**kids** [1] - 183:11
**kind** [50] - 7:24, 8:9, 8:24, 10:16, 10:24, 14:6, 15:16, 23:24, 26:14, 32:7, 37:17, 37:18, 37:19, 37:25, 39:13, 42:15, 43:2, 43:3, 48:24, 49:19, 54:5, 62:12, 67:22, 68:11, 69:11, 69:20, 70:3, 71:1, 73:4, 75:10, 78:7, 84:9, 86:6, 89:21, 98:11, 100:19, 110:4, 110:18, 112:11, 114:9, 117:18, 119:19, 120:13, 120:15, 141:25, 142:7, 178:7
**kinds** [1] - 61:16
**King** [2] - 1:20, 5:11
**KING** [2] - 2:4, 2:17
**knowledge** [1] - 141:2
**knowledgeable** [1] - 142:6
**known** [77] - 13:5,

13:20, 14:5, 15:1, 15:2, 15:3, 15:5, 16:4, 18:23, 19:2, 19:10, 19:15, 19:18, 20:13, 20:20, 23:7, 24:20, 25:7, 25:8, 26:2, 26:4, 26:7, 26:20, 33:25, 37:12, 37:15, 41:15, 41:17, 41:21, 41:23, 42:13, 42:20, 44:18, 45:2, 47:6, 48:6, 59:20, 63:5, 63:9, 64:21, 65:8, 68:20, 70:18, 71:25, 72:12, 74:18, 75:7, 82:19, 82:21, 83:7, 90:25, 92:19, 95:13, 106:13, 135:15, 146:4, 147:6, 147:12, 147:18, 147:24, 148:4, 152:25, 167:4, 168:6, 168:11, 176:20, 176:22, 177:2, 177:5, 177:7, 177:15, 177:19, 178:9, 179:17
**knows** [6] - 24:18, 107:19, 113:5, 154:9, 157:8, 160:23
**KSR** [1] - 37:14

### L

**LABS** [1] - 1:7
**Labs** [3] - 2:13, 4:19, 158:15
**lack** [4] - 84:5, 84:6, 103:4
**laid** [1] - 36:5
**land** [3] - 121:12, 121:22
**language** [5] - 106:16, 122:8, 138:5, 138:7, 169:18
**large** [5] - 57:16, 80:22, 131:4, 141:19, 144:12
**large-scale** [1] - 80:22
**larger** [2] - 57:18, 91:9
**last** [14] - 4:22, 6:10, 31:3, 49:3, 55:20, 56:9, 65:22, 77:20, 100:10, 108:19, 128:1, 130:22, 131:15, 154:9
**lastly** [2] - 157:8, 181:3
**late** [1] - 183:21

**latter** [4] - 36:24, 37:1, 118:15
**laugh** [1] - 123:21
**law** [30] - 8:1, 8:3, 8:6, 8:16, 8:25, 13:19, 14:2, 18:11, 37:21, 38:9, 38:15, 101:7, 101:15, 101:17, 108:17, 108:18, 109:16, 111:16, 113:8, 113:13, 118:7, 119:8, 121:19, 122:10, 122:23, 124:1, 126:4, 128:4, 130:8, 131:3
**laws** [2] - 35:15, 155:25
**lawyer** [1] - 28:24
**lawyer-created** [1] - 28:24
**lay** [2] - 35:9, 54:11
**layer** [1] - 92:22
**layering** [1] - 145:7
**lead** [3] - 9:14, 75:15, 75:25
**lead-in** [1] - 75:15
**lead-up** [1] - 75:25
**leading** [1] - 76:17
**leap** [2] - 64:19, 178:17
**learned** [1] - 92:18
**least** [54] - 4:14, 14:3, 14:4, 20:12, 22:6, 27:17, 35:5, 35:8, 42:3, 43:14, 44:1, 54:19, 57:1, 63:12, 69:14, 76:21, 77:1, 90:4, 112:9, 112:22, 116:19, 120:15, 123:22, 128:7, 128:25, 132:20, 132:23, 132:24, 147:9, 148:9, 149:24, 151:8, 153:12, 153:13, 153:16, 153:25, 156:22, 157:12, 157:15, 158:7, 159:6, 159:12, 160:18, 160:20, 163:15, 173:2, 173:6, 176:7, 178:12, 179:20, 180:3, 180:8, 182:3, 182:23
**leave** [5] - 33:15, 66:1, 113:18, 122:25, 127:22
**leaving** [1] - 168:20

**led** [1] - 126:1
**left** [4] - 7:12, 55:8, 55:16, 67:2
**leftover** [1] - 78:13
**legal** [3] - 52:16, 131:7, 131:11
**legs** [1] - 66:13
**length** [2] - 54:22, 130:11
**lengthy** [1] - 130:11
**less** [4] - 23:16, 53:2, 62:11, 179:10
**letter** [5] - 12:1, 12:15, 50:12, 86:12, 110:7
**letters** [3] - 7:22, 7:23, 8:2
**level** [34] - 55:24, 56:1, 68:12, 69:8, 71:2, 71:16, 73:6, 74:14, 89:11, 89:25, 92:11, 94:20, 94:25, 95:1, 95:18, 137:2, 137:4, 140:8, 140:13, 142:10, 142:19, 142:20, 143:4, 143:13, 143:24, 144:21, 144:24, 148:7, 151:23, 154:2, 154:5, 156:23, 169:14, 169:17
**levels** [1] - 143:24
**Lieberman** [1] - 5:13
**light** [2] - 90:15, 137:15
**likely** [1] - 182:20
**likening** [1] - 133:22
**limitation** [13] - 40:7, 41:10, 46:23, 48:18, 50:23, 51:13, 56:2, 85:22, 85:24, 96:16, 96:19, 122:12, 122:16
**limitations** [17] - 49:6, 50:3, 50:7, 50:8, 51:5, 51:6, 51:7, 56:6, 85:20, 85:21, 96:20, 96:22, 122:9, 122:19, 123:14, 123:15, 147:13
**limited** [3] - 11:10, 45:9, 83:13
**line** [5] - 53:10, 92:16, 120:23, 121:19, 123:23
**Line** [2] - 58:14, 85:11
**Lines** [1] - 72:3
**lines** [10] - 53:18, 91:4, 101:13, 119:8, 119:20, 123:6,

123:23, 139:17, 155:14, 167:20
**linger** [1] - 21:20
**link** [15] - 12:8, 12:12, 18:10, 20:15, 21:19, 27:11, 29:16, 33:5, 35:13, 47:14, 89:8, 163:4, 164:4, 166:19, 171:3
**linking** [1] - 166:20
**links** [11] - 30:19, 31:20, 41:8, 165:22, 166:16, 166:22, 171:17, 176:13, 176:22, 177:13, 178:7
**List** [1] - 114:2
**list** [9] - 69:7, 95:7, 105:13, 106:20, 106:24, 106:25, 107:16
**listed** [3] - 160:12, 160:13, 164:10
**listing** [1] - 16:7
**lists** [2] - 69:3
**literally** [5] - 13:9, 85:22, 86:5, 107:22, 113:6
**litigants** [2] - 8:15, 8:19
**litigation** [2] - 109:11, 112:21
**lives** [1] - 115:3
**LLC** [5] - 131:10, 135:8, 135:13, 169:11, 172:13
**LLP** [7] - 2:2, 2:11, 2:15, 2:22, 3:6, 3:8, 3:12
**loads** [1] - 176:9
**local** [7] - 83:1, 83:18, 83:22, 97:3, 117:18, 117:23, 173:5
**locally** [5] - 83:1, 83:13, 84:16, 92:8, 99:21
**location** [2] - 164:11, 166:23
**locations** [5] - 86:18, 92:19, 95:3, 98:21, 100:5
**log** [1] - 99:25
**logged** [2] - 83:8, 91:5
**long-standing** [1] - 135:15
**longstanding** [1] - 172:8
**Look** [12] - 11:1, 17:15, 17:22, 22:15, 25:24, 40:2, 44:17,

45:14, 73:22, 75:16, 117:12, 119:20
**look** [61] - 15:10, 15:24, 22:13, 25:2, 25:19, 27:1, 27:2, 28:5, 30:12, 31:17, 32:24, 35:7, 36:14, 36:18, 40:21, 44:25, 45:24, 50:21, 52:14, 53:16, 59:15, 63:10, 63:11, 64:6, 65:14, 66:4, 69:10, 70:3, 70:4, 70:14, 73:10, 75:17, 76:5, 79:8, 82:10, 84:19, 86:15, 87:6, 88:12, 90:9, 93:19, 96:2, 98:10, 98:19, 104:14, 104:15, 105:10, 108:7, 113:15, 123:18, 125:2, 125:9, 125:11, 126:4, 126:9, 126:24, 127:8, 166:5, 183:23
**looked** [6] - 78:1, 78:4, 79:12, 91:6, 150:17, 153:21
**looking** [24] - 3:25, 8:18, 8:20, 9:24, 19:22, 41:13, 48:4, 51:9, 52:9, 52:18, 60:9, 79:13, 87:23, 87:24, 94:14, 124:12, 138:12, 140:14, 140:18, 141:20, 141:22, 149:9, 164:3, 165:7
**looks** [5] - 3:24, 50:22, 91:6, 98:11, 149:13
**lose** [3] - 10:7, 10:8, 60:5
**loss** [1] - 180:19
**lost** [2] - 40:22, 168:23
**love** [1] - 15:21
**lower** [1] - 95:17
**lunch** [2] - 7:18, 109:8
**Luncheon** [1] - 129:11

**M**

**M8** [2] - 28:18, 29:24
**MAC** [1] - 16:10
**machine** [2] - 97:13, 101:19
**machine 's** [1] - 101:25
**machinery** [1] - 34:8
**Machines** [1] - 134:24
**magazine** [1] - 170:12
**magazines** [1] - 170:9

**MAGISTRATE** [1] - 1:24
**Mail** [1] - 63:20
**mail** [1] - 170:23
**mailing** [1] - 170:10
**maintain** [1] - 141:25
**major** [6] - 78:22, 79:6, 81:8, 113:11, 114:17, 180:19
**managed** [6] - 82:25, 83:13, 92:9, 99:20, 99:21
**Management** [1] - 174:10
**MANGES** [1] - 3:15
**manipulate** [1] - 86:25
**manipulation** [2] - 72:7, 135:10
**manner** [5] - 105:22, 135:6, 145:2, 152:4, 180:2
**marketing** [15] - 31:9, 31:15, 34:13, 56:13, 56:16, 161:7, 161:11, 162:6, 164:24, 169:9, 170:3, 171:8, 176:2, 180:18, 182:6
**MARTINELLI** [13] - 2:12, 23:1, 23:4, 24:24, 26:22, 28:3, 30:7, 32:8, 123:3, 123:21, 125:2, 125:18, 127:5
**Martinelli** [6] - 6:6, 22:22, 23:2, 33:15, 127:23, 127:25
**martinelli** [3] - 6:6, 9:15, 26:9
**Martinelli 's** [1] - 26:11
**martintelli** [1] - 41:18
**match** [1] - 102:7
**matching** [3] - 82:21, 90:21, 153:10
**material** [2] - 61:18, 160:23
**materials** [1] - 160:20
**matter** [11] - 34:7, 78:12, 79:1, 87:21, 98:22, 104:21, 104:23, 131:22, 134:4, 137:17
**matters** [4] - 39:2, 69:23, 70:8, 130:9, 131:13
**McRO** [2] - 165:4, 165:5
**mean** [30] - 16:14, 16:20, 17:25, 18:24, 19:7, 20:7, 26:13,

28:4, 46:10, 48:17, 50:20, 55:15, 65:9, 67:25, 70:9, 75:17, 84:19, 84:21, 94:7, 96:22, 102:5, 103:19, 106:9, 110:9, 112:14, 118:1, 136:18, 137:10, 162:19
**meaning** [4] - 47:2, 68:19, 83:4, 135:4
**meaningful** [3] - 102:11, 146:2, 160:4
**meaningfully** [3] - 39:17, 97:13, 145:9
**means** [7] - 22:2, 96:19, 118:25, 119:2, 121:1, 147:14, 149:7
**meant** [5] - 40:6, 95:21, 105:3, 106:4, 129:24
**mechanism** [1] - 120:11
**mechanisms** [1] - 141:10
**meet** [2] - 121:6
**memory** [4] - 58:8, 123:16, 173:16, 174:16
**mention** [6] - 8:10, 109:9, 116:23, 141:5, 142:25, 160:1
**mentioned** [12] - 49:8, 51:14, 56:8, 58:4, 58:7, 90:2, 98:23, 101:3, 108:25, 138:24, 151:9, 152:1
**mentions** [1] - 138:25
**Mentor** [1] - 147:1
**merely** [2] - 72:6, 162:14
**merges** [1] - 27:17
**Merit** [1] - 184:8
**message** [51] - 16:20, 21:14, 21:15, 24:9, 25:11, 26:7, 29:12, 32:14, 32:16, 32:19, 32:22, 35:17, 39:11, 40:15, 40:25, 43:9, 43:17, 43:25, 44:5, 46:20, 48:2, 48:8, 48:11, 61:16, 63:1, 63:4, 63:5, 63:13, 63:18, 163:9, 163:12, 163:14, 163:20, 163:22, 163:25, 164:7, 164:11, 164:14, 165:23, 167:11,

167:23, 170:11, 171:18, 171:19, 172:6, 175:5, 176:15, 182:1
**messages** [8] - 15:5, 20:1, 35:22, 35:25, 63:9, 63:14, 177:1, 180:15
**Messaging** [1] - 166:7
**messaging** [19] - 37:18, 40:25, 47:5, 47:21, 54:16, 163:6, 163:11, 163:12, 163:19, 164:6, 164:7, 164:13, 165:22, 165:25, 167:16, 176:14, 176:17, 179:25, 181:24
**Messaging -Based** [1] - 166:7
**Meta** [1] - 131:10
**Method** [1] - 132:5
**method** [15] - 24:12, 38:11, 57:22, 61:21, 135:15, 144:4, 149:21, 149:23, 150:14, 155:15, 156:3, 156:16, 161:15, 167:1, 180:19
**methodology** [3] - 52:23, 53:1
**Methods** [1] - 166:6
**methods** [13] - 59:20, 134:22, 136:17, 137:2, 146:13, 148:25, 149:5, 155:19, 168:6, 168:11, 169:2, 179:6, 181:7
**Michael** [1] - 5:8
**MICHAEL** [2] - 2:2, 2:15
**Microsoft** [1] - 169:11
**middle** [4] - 21:5, 73:4, 90:13, 136:22
**might** [40] - 10:24, 11:25, 20:24, 20:25, 36:21, 43:3, 46:16, 52:17, 57:3, 57:10, 60:7, 64:4, 65:14, 70:1, 70:4, 71:13, 78:8, 92:5, 92:19, 94:9, 104:11, 104:21, 109:14, 109:23, 112:8, 115:24, 115:25, 117:14, 119:5, 126:25, 140:25,

148:13, 151:24, 153:21, 159:24, 165:14, 171:2, 171:24
**millions** [1] - 91:4
**mind** [11] - 15:25, 55:12, 80:7, 84:10, 100:19, 106:6, 111:5, 130:23, 154:13, 154:18
**mindful** [1] - 165:3
**minds** [3] - 102:10, 106:1, 146:6
**mine** [1] - 123:14
**minimizing** [1] - 175:19
**minimum** [2] - 53:19, 68:5
**mining** [1] - 83:11
**minute** [2] - 66:12, 130:11
**minutes** [15] - 7:9, 7:12, 9:14, 9:15, 31:2, 33:17, 55:8, 55:9, 62:18, 62:20, 66:25, 67:2, 81:5, 103:8, 182:23
**mischaracterization** [1] - 67:16
**missing** [2] - 77:8, 77:14
**mistype** [1] - 60:7
**mistyped** [1] - 168:24
**misunderstood** [1] - 8:24
**mitigate** [1] - 182:10
**mix** [1] - 115:7
**mixing** [2] - 33:22, 113:21
**Mobile** [11] - 2:7, 2:20, 4:17, 5:5, 5:9, 5:14, 7:8, 9:8, 33:20, 158:13, 166:6
**MOBILE** [2] - 1:4, 1:9
**mobile** [44] - 12:21, 19:5, 20:16, 21:12, 22:3, 33:9, 34:7, 34:9, 34:21, 35:5, 47:5, 47:15, 60:1, 60:3, 162:13, 162:23, 163:2, 163:5, 163:8, 163:10, 163:18, 163:19, 163:23, 164:3, 164:5, 166:20, 166:21, 166:23, 167:2, 167:14, 168:7, 168:13, 169:4, 169:6, 171:17,

174:23, 175:10, 176:11, 176:16, 179:8, 179:25
**Mobility** [1] - 135:13
**mode** [1] - 153:21
**modern** [1] - 99:23
**modifications** [5] - 68:9, 134:12, 143:7, 143:17, 157:18
**modify** [2] - 133:11, 135:21
**modifying** [1] - 136:1
**moment** [2] - 35:10, 76:3
**monitor** [3] - 106:10, 141:22, 149:23
**monitored** [2] - 140:18, 173:9
**Monitoring** [1] - 132:5
**monitoring** [5] - 132:18, 133:10, 141:14, 141:17, 149:21
**monitors** [18] - 75:18, 75:19, 75:20, 79:16, 100:20, 105:24, 106:7, 125:14, 132:24, 150:1, 150:4, 150:11, 150:12, 151:6, 151:14, 151:16, 154:14
**monopolize** [1] - 57:17
**months** [1] - 53:11
**moreover** [8] - 134:4, 134:21, 143:18, 144:6, 147:16, 149:6, 178:25, 180:8
**morning** [13] - 4:5, 5:8, 5:20, 6:4, 6:15, 7:1, 7:5, 8:11, 9:12, 23:1, 23:3, 33:19, 67:7
**Morris** [1] - 5:9
**MORRIS** [2] - 2:2, 2:15
**MORRISON** [1] - 3:2
**Morrison** [2] - 5:23, 9:13
**most** [16] - 7:24, 8:24, 37:11, 57:23, 79:2, 94:19, 98:9, 114:11, 119:15, 136:14, 138:1, 149:15, 158:23, 161:6, 172:14, 172:17
**mostly** [1] - 32:6
**motion** [24] - 7:25, 28:18, 46:15, 64:6, 66:23, 68:8, 81:11,

111:12, 114:12, 114:15, 131:9, 131:20, 146:11, 155:19, 155:25, 158:9, 158:11, 158:24, 160:11, 160:24, 178:20, 178:24, 182:17, 182:19
**motions** [19] - 4:25, 9:4, 9:9, 9:10, 77:22, 109:12, 128:15, 129:17, 130:4, 158:23, 159:3, 160:15, 175:21, 176:3, 182:11, 182:14, 182:24, 183:18
**Motions** [1] - 1:22
**mounted** [1] - 155:16
**mousetrap** [4] - 34:18, 34:20, 40:3, 44:19
**mousetraps** [1] - 34:20
**movant** [2] - 67:8, 114:21
**move** [5] - 14:7, 66:11, 128:16, 131:14, 158:12
**moving** [7] - 11:11, 66:11, 99:8, 155:25, 155:17, 156:5, 156:19
**MR** [178] - 5:8, 5:20, 6:1, 6:4, 6:15, 7:1, 9:12, 9:22, 11:8, 14:1, 15:9, 16:18, 16:25, 17:5, 17:18, 17:25, 18:8, 18:24, 20:10, 21:1, 22:25, 23:1, 23:4, 24:24, 26:22, 28:3, 30:7, 32:8, 33:19, 34:14, 34:17, 37:2, 39:18, 40:18, 40:20, 41:25, 42:6, 42:23, 43:11, 43:18, 44:3, 44:8, 44:12, 45:8, 46:11, 46:18, 47:4, 47:8, 47:10, 47:19, 48:7, 48:13, 48:23, 49:2, 49:11, 49:22, 51:1, 52:15, 54:7, 54:25, 55:11, 55:20, 57:12, 58:4, 58:12, 58:22, 58:25, 59:12, 60:16, 61:5, 61:7, 61:10, 61:20, 61:25, 62:4, 62:16, 62:19, 63:17, 64:11, 65:9, 65:23,

67:3, 67:7, 68:7, 68:13, 68:25, 69:13, 70:6, 71:21, 73:12, 73:15, 74:6, 74:20, 76:2, 76:5, 77:6, 78:11, 78:22, 79:17, 79:20, 81:7, 81:24, 82:3, 82:5, 82:8, 82:10, 82:25, 84:4, 85:3, 86:9, 88:1, 88:21, 88:24, 89:5, 89:23, 90:20, 91:15, 91:24, 92:4, 93:1, 93:4, 93:7, 93:13, 94:24, 96:4, 96:9, 96:15, 96:23, 97:24, 98:7, 98:19, 99:18, 100:13, 100:21, 102:4, 102:18, 102:20, 102:22, 103:3, 103:11, 104:2, 104:6, 104:14, 104:23, 105:5, 105:8, 106:14, 107:6, 107:10, 111:5, 111:10, 112:7, 112:13, 113:11, 114:11, 115:4, 115:10, 115:14, 115:17, 115:25, 116:3, 116:4, 116:7, 117:2, 117:16, 118:3, 118:12, 119:2, 120:2, 120:17, 121:24, 122:1, 123:3, 123:21, 125:2, 125:18, 127:5, 127:25
**multi** [1] - 75:9
**multi-step** [1] - 75:9
**multimedia** [2] - 172:25, 173:1
**multiple** [18] - 21:24, 91:7, 92:6, 94:9, 95:4, 95:14, 110:12, 137:12, 139:21, 148:11, 148:15, 151:22, 154:7, 155:20, 157:2, 158:4
**murky** [1] - 120:2
**mush** [1] - 122:22
**must** [14] - 27:1, 27:2, 56:19, 138:4, 143:16, 143:17, 146:3, 146:16, 150:12, 161:15, 162:15, 166:15, 181:12, 181:20

**muster** [1] - 86:6
**mutually** [1] - 113:1

## N

**Namco** [1] - 165:4
**name** [2] - 18:12, 35:24
**narrative** [1] - 35:4
**narrow** [2] - 31:19, 57:14
**narrower** [1] - 161:14
**narrowing** [3] - 71:24, 96:11, 176:6
**nature** [5] - 10:17, 17:1, 145:19, 155:25, 174:13
**near** [1] - 17:15
**nearly** [3] - 57:6, 159:15, 173:18
**Nearly** [1] - 135:9
**necessarily** [14] - 10:24, 17:16, 44:10, 57:20, 90:23, 94:8, 101:12, 112:18, 124:7, 126:20, 144:18, 146:23, 160:15, 181:19
**necessary** [1] - 139:23
**need** [16] - 26:11, 26:18, 31:3, 49:4, 66:14, 83:5, 98:16, 110:4, 115:18, 120:21, 129:14, 160:8, 162:16, 169:1, 179:5, 180:20
**needed** [6] - 26:17, 47:22, 102:25, 108:4, 130:1, 142:3
**needs** [3] - 138:10, 165:15, 170:22
**negates** [1] - 101:10
**negative** [24] - 28:12, 76:22, 88:4, 90:8, 90:14, 90:17, 90:22, 91:13, 92:13, 93:24, 94:2, 106:19, 107:14, 136:19, 139:4, 139:8, 144:2, 152:19, 152:24, 154:23, 156:25, 157:22, 157:24
**negatively** [2] - 90:25, 102:2
**net** [1] - 151:15
**network** [39] - 11:13, 70:10, 71:14, 79:1, 82:24, 83:15, 87:8, 87:10, 90:9, 91:23, 99:23, 102:9, 106:7,

108:21, 132:19, 132:24, 135:5, 140:17, 140:18, 140:22, 141:9, 141:12, 146:14, 149:22, 149:23, 149:25, 150:10, 150:24, 151:6, 151:14, 151:18, 152:11, 153:11, 153:15, 153:20, 154:14
**Network** [3] - 132:5, 137:20, 172:14
**networks** [7] - 80:8, 83:14, 92:10, 136:9, 150:19, 151:4, 151:17
**NETWORKS** [1] - 1:17
**Networks** [5] - 3:18, 4:23, 67:8, 131:18, 131:19
**never** [8] - 26:17, 91:5, 101:7, 101:15, 101:16, 132:15, 136:22, 172:20
**nevertheless** [2] - 150:16, 156:14
**New** [1] - 6:17
**new** [63] - 12:8, 12:11, 12:12, 12:18, 13:13, 13:22, 14:10, 14:13, 14:22, 15:8, 23:10, 24:12, 25:1, 25:13, 27:17, 27:18, 27:20, 28:6, 28:10, 32:11, 34:2, 34:20, 34:21, 37:6, 37:12, 37:17, 37:18, 37:25, 38:3, 38:4, 40:3, 45:5, 54:1, 65:19, 71:17, 75:12, 76:24, 83:3, 87:3, 99:7, 99:20, 99:22, 117:20, 124:8, 124:17, 125:3, 125:10, 126:8, 126:9, 126:12, 136:8, 141:22, 144:3, 147:1, 147:21, 175:16, 180:6, 180:20
**next** [8] - 38:2, 45:4, 45:5, 51:22, 51:23, 162:5, 162:15
**nice** [1] - 65:16
**NICHOLS** [2] - 2:2, 2:15
**Nichols** [1] - 5:9
**Nielsen** [2] - 14:18,

125:13
**no-doubt-about-it** [1] - 26:15
**nobody's** [1] - 24:8
**Nolan** [1] - 6:17
**NOLAN** [1] - 3:9
**non** [11] - 30:6, 41:11, 42:8, 74:16, 126:18, 154:19, 162:18, 177:7
**non-abstractness** [1] - 126:18
**non-conventional** [2] - 41:11, 177:7
**non-conventionality** [1] - 42:8
**non-filtered** [1] - 74:16
**non-generic** [2] - 41:11, 177:7
**non-human** [1] - 154:19
**non-infringement** [1] - 30:6
**non-result** [1] - 126:18
**non-transitory** [1] - 162:18
**none** [2] - 84:20, 106:22
**normal** [1] - 135:6
**normally** [2] - 23:9, 141:18
**North** [1] - 1:20
**note** [11] - 17:9, 130:14, 136:16, 146:12, 146:23, 147:22, 160:17, 161:24, 167:3, 170:9, 177:11
**noted** [18] - 10:15, 11:24, 37:11, 111:14, 117:2, 131:13, 135:13, 142:15, 144:6, 144:14, 151:19, 152:16, 156:1, 157:3, 173:24, 178:15, 179:3, 181:3
**notes** [13] - 93:7, 147:10, 167:10, 168:6, 172:12, 175:23, 180:17, 180:22, 181:8, 182:15, 182:18, 183:4, 184:6
**nothing** [11] - 30:14, 39:1, 50:5, 64:17, 65:17, 79:3, 111:5, 130:8, 143:15,

145:4, 150:13
**notice** [3] - 116:13, 117:4, 117:6
**Notice** [9] - 76:19, 76:20, 77:9, 87:13, 88:10, 90:2, 99:25, 152:10, 152:17
**noting** [3] - 140:25, 142:2, 173:17
**notion** [11] - 11:15, 15:20, 17:7, 18:15, 18:24, 19:8, 21:21, 63:3, 65:10, 178:5, 180:10
**novel** [6] - 53:6, 53:16, 54:6, 146:13, 146:22, 152:8
**novelty** [10] - 53:18, 53:20, 53:24, 54:1, 54:6, 55:2, 55:3, 124:8, 146:17, 146:20
**NOVIKOV** [22] - 3:2, 9:12, 9:22, 11:8, 14:1, 15:9, 16:18, 16:25, 17:5, 17:18, 17:25, 18:8, 18:24, 20:10, 21:1, 22:25, 62:19, 63:17, 64:11, 65:9, 65:23, 127:25
**Novikov** [9] - 5:23, 6:1, 9:13, 18:19, 34:22, 36:13, 65:21, 66:8, 127:24
**Novikov's** [2] - 40:21, 46:19
**nugget** [1] - 125:20
**number** [9] - 35:15, 35:22, 36:9, 51:15, 61:1, 61:15, 109:12, 131:4, 164:10
**Number** [12] - 4:18, 4:20, 4:24, 40:14, 40:22, 107:24, 112:22, 131:25, 132:1, 158:18, 159:7, 159:9, 159:13
**numbers** [3] - 36:8, 36:10, 168:24

---

# O

**object** [3] - 156:5, 156:8, 156:19
**object's** [2] - 155:15, 155:19
**objects** [2] - 155:17, 156:1
**obtained** [2] - 137:12, 148:10

**obtaining** [1] - 158:3
**obtains** [1] - 171:16
**obvious** [1] - 34:1
**obviously** [13] - 7:10, 20:11, 34:3, 52:3, 53:17, 63:24, 77:12, 106:9, 109:15, 110:12, 111:14, 154:19, 171:12
**obviousness** [2] - 34:3, 124:8
**occupy** [1] - 66:5
**occur** [4] - 53:1, 86:18, 140:10, 140:11
**occurred** [1] - 138:19
**occurs** [3] - 87:16, 137:3, 152:14
**OF** [1] - 1:2
**offer** [1] - 24:6
**offered** [2] - 11:12, 142:7
**offering** [1] - 10:2
**offers** [2] - 10:6, 13:2
**Office** [2] - 20:22, 121:2
**often** [8] - 27:1, 38:16, 114:14, 118:18, 126:19, 131:7, 168:12, 168:16
**old** [4] - 24:17, 57:24, 84:15, 166:13
**once** [6] - 44:12, 143:2, 163:2, 163:7, 163:17, 164:5
**one** [173] - 8:7, 8:9, 12:7, 13:7, 13:9, 14:1, 16:6, 17:3, 17:5, 17:21, 18:3, 21:5, 22:1, 22:15, 24:22, 26:1, 26:6, 27:2, 28:17, 30:23, 31:3, 33:25, 36:14, 37:17, 40:3, 40:23, 41:10, 41:16, 42:8, 42:11, 42:19, 44:1, 45:4, 45:15, 45:17, 45:22, 46:1, 46:8, 46:21, 47:3, 47:8, 49:3, 49:8, 49:24, 50:16, 50:20, 51:19, 53:19, 56:20, 58:9, 58:21, 60:10, 60:13, 60:14, 60:24, 62:7, 63:25, 64:17, 65:7, 65:22, 66:22, 69:15, 76:2, 77:20, 78:1, 79:12, 80:10, 81:19, 82:10, 85:22, 86:12, 92:7, 94:8, 94:12,

95:16, 96:16, 97:8, 98:3, 102:6, 102:7, 108:7, 108:19, 109:21, 111:24, 117:9, 119:4, 119:8, 119:9, 119:20, 122:11, 123:23, 128:8, 128:25, 130:4, 130:17, 132:20, 132:23, 132:24, 134:5, 134:9, 134:17, 136:2, 137:14, 137:15, 137:21, 138:7, 138:9, 138:22, 140:10, 142:11, 142:20, 142:23, 144:16, 145:13, 146:6, 146:7, 147:9, 148:13, 148:16, 148:17, 148:23, 149:12, 149:17, 149:23, 149:24, 150:4, 150:5, 150:9, 151:8, 152:24, 153:21, 154:2, 154:9, 154:10, 155:23, 156:15, 157:20, 158:1, 158:2, 160:17, 161:1, 162:2, 163:15, 165:2, 166:13, 166:15, 166:20, 167:2, 169:3, 169:11, 170:7, 170:15, 171:17, 173:2, 173:6, 173:10, 175:17, 175:22, 175:24, 179:3, 179:7, 180:11, 181:12, 181:20, 182:4, 182:14, 182:16
**one's** [1] - 180:21
**ones** [2] - 58:10, 112:10
**ongoing** [1] - 114:16
**online** [3] - 10:6, 10:7, 11:15
**open** [4] - 47:20, 59:21, 59:22, 168:7
**opening** [2] - 144:14, 172:16
**opens** [2] - 33:5, 47:15
**operate** [2] - 155:21, 173:21
**operates** [3] - 29:10,

30:9, 87:2
**operating** [2] - 38:3, 135:6
**operation** [6] - 87:18, 95:18, 101:19, 132:20, 133:10, 147:9
**operative** [2] - 113:16, 158:25
**opinion** [5] - 79:4, 129:24, 131:17, 149:16, 183:1
**opinions** [3] - 118:17, 119:13, 130:18
**opposed** [2] - 70:3, 93:6
**opposite** [2] - 56:2, 80:24
**opposition** [3] - 72:21, 81:12, 81:18
**opt** [1] - 180:25
**opt-in** [1] - 180:25
**optimal** [2] - 11:4, 179:10
**oral** [6] - 107:4, 112:5, 130:10, 131:3, 136:13, 178:11
**orally** [4] - 128:21, 129:21, 129:22, 130:2
**Order** [1] - 14:19
**order** [20] - 35:17, 37:16, 43:6, 49:3, 50:4, 102:25, 137:21, 138:9, 142:7, 145:9, 145:16, 150:20, 156:4, 157:6, 168:8, 168:10, 168:17, 175:13, 182:9, 182:21
**ordered** [15] - 20:6, 44:24, 145:18, 147:24, 148:3, 148:11, 177:19, 177:22, 178:3, 178:6, 178:7, 178:9, 179:1, 179:16, 180:1
**ordinarily** [2] - 12:6, 12:20
**ordinary** [9] - 19:17, 19:20, 20:3, 20:4, 20:8, 100:3, 177:23, 177:24, 178:6
**organizing** [1] - 135:15
**orientation** [3] - 155:15, 156:5, 156:8
**original** [1] - 114:18
**originally** [1] - 95:2,

97:3
**Orrick** [1] - 6:6
**ORRICK** [1] - 2:11
otherwise [14] - 13:20, 55:13, 72:9, 72:15, 73:9, 86:21, 131:13, 133:17, 135:11, 147:24, 153:1, 173:13, 179:17, 182:17
ought [1] - 18:18
ourselves [1] - 123:21
out-of-town [1] - 183:23
outcomes [1] - 130:25
outdated [1] - 180:18
outputs [1] - 155:16
outside [1] - 141:11
overall [1] - 161:17
overlooks [1] - 79:3
overrides [1] - 12:19
oversimplification [1] - 67:17
oversimplifying [2] - 21:11, 165:6
overwrote [1] - 12:18
own [7] - 7:25, 41:10, 61:13, 80:11, 80:20, 122:9, 147:21

## P

**p.m** [3] - 128:9, 129:3, 184:4
package [1] - 45:4
packets [2] - 106:8, 154:15
page [45] - 12:7, 15:14, 15:24, 16:1, 18:25, 19:8, 20:15, 21:6, 24:22, 25:1, 25:2, 27:17, 27:19, 29:4, 39:8, 41:19, 41:20, 42:16, 42:18, 43:14, 43:21, 44:2, 47:11, 47:12, 60:4, 64:22, 65:11, 162:22, 162:24, 163:9, 163:15, 163:25, 164:4, 164:6, 171:3, 171:20, 175:3, 175:6, 176:8, 176:9, 181:14, 181:23
**Page** [7] - 29:3, 54:10, 54:13, 72:21, 79:23, 80:4
**Pages** [2] - 133:18, 136:11
pages [9] - 15:17,

18:21, 24:21, 27:18, 80:4, 175:2, 177:12, 178:5
paid [2] - 23:20, 24:3
**PALAPURA** [1] - 2:23
**Palapura** [1] - 5:23
**PALO** [1] - 1:17
**Palo** [5] - 3:18, 4:23, 67:8, 131:18, 131:19
panel [1] - 118:18
papers [1] - 111:15
**Paragraph** [9] - 35:21, 36:9, 50:18, 54:4, 90:3, 90:18, 136:12, 146:12, 153:5
paragraph [8] - 50:16, 51:22, 51:23, 58:6, 90:6, 91:17, 152:6, 157:20
**Paragraphs** [1] - 52:19
paragraphs [2] - 51:15, 51:19
parameters [1] - 135:21
parents [1] - 122:15
part [47] - 15:25, 16:10, 16:15, 17:11, 25:8, 25:11, 26:25, 30:5, 43:9, 43:22, 45:6, 53:13, 57:17, 58:19, 58:25, 63:6, 64:3, 73:8, 73:14, 73:21, 80:23, 83:3, 83:19, 84:7, 85:11, 87:12, 87:17, 90:3, 92:10, 107:8, 107:10, 107:12, 107:15, 115:14, 116:13, 142:11, 148:5, 159:23, 161:9, 172:1, 172:3, 178:2, 179:21, 182:3
participate [2] - 101:23, 101:24
particular [54] - 11:13, 11:14, 11:19, 12:25, 13:14, 16:22, 17:2, 18:5, 40:17, 43:14, 45:1, 45:2, 49:17, 54:22, 58:19, 59:3, 59:4, 59:6, 59:7, 68:20, 70:5, 70:12, 77:8, 77:14, 84:23, 84:25, 85:14, 97:8, 97:9, 109:23, 114:2, 118:25, 119:16, 123:4, 142:25, 146:22, 149:6, 156:2, 156:3,

156:15, 156:16, 156:21, 166:14, 171:13, 172:5, 172:6, 172:10, 175:1, 177:19, 177:22, 179:16, 182:4, 182:5
particularity [6] - 53:25, 69:23, 119:22, 121:11, 156:17, 156:24
particularized [3] - 14:21, 96:12, 136:5
particularly [13] - 5:6, 8:13, 48:3, 100:15, 110:14, 110:16, 111:13, 138:15, 149:12, 152:6, 160:19, 164:19, 165:3
parties [14] - 4:8, 4:13, 5:4, 7:23, 44:13, 110:9, 111:24, 117:6, 119:6, 128:15, 128:22, 130:3, 131:5, 160:19
parties' [1] - 7:22
partly [1] - 154:2
parts [5] - 82:13, 83:15, 166:1, 166:3
party [3] - 53:12, 128:8, 129:2
pass [4] - 41:11, 82:23, 86:6, 86:14
passed [2] - 43:3, 143:14
passes [1] - 68:23
password [1] - 35:24
past [5] - 15:13, 20:22, 44:13, 46:14, 109:14
**PATEL** [1] - 3:16
**Patel** [1] - 7:3
**Patent** [8] - 20:22, 112:22, 121:2, 131:25, 132:1, 159:7, 159:9, 159:13
patent [178] - 10:1, 11:1, 15:18, 16:8, 16:14, 16:16, 17:16, 22:7, 22:15, 23:5, 24:16, 26:16, 26:17, 26:23, 28:4, 28:5, 28:12, 28:24, 31:13, 31:17, 32:1, 32:4, 32:6, 32:10, 34:6, 36:16, 37:20, 40:3, 40:9, 44:21, 50:22, 52:7, 56:20, 57:17, 59:17, 63:11, 65:10, 69:11, 70:22, 71:12,

72:3, 72:19, 73:21, 74:7, 75:9, 75:11, 75:23, 76:11, 76:19, 77:5, 78:6, 79:11, 80:1, 80:11, 80:14, 82:15, 83:1, 83:18, 83:23, 84:5, 85:6, 87:4, 87:7, 90:14, 91:12, 92:6, 94:14, 94:15, 99:24, 102:22, 105:1, 105:5, 105:8, 106:16, 107:9, 107:10, 107:12, 108:17, 109:1, 109:11, 112:15, 112:20, 112:24, 113:22, 114:14, 114:17, 115:6, 116:19, 123:10, 124:5, 124:6, 124:18, 125:25, 126:23, 126:24, 127:3, 127:6, 130:16, 132:1, 132:2, 132:7, 132:9, 132:10, 132:13, 133:16, 133:23, 133:25, 134:6, 134:8, 136:3, 137:24, 138:2, 138:11, 138:12, 138:14, 138:22, 139:3, 139:18, 140:2, 140:6, 140:15, 141:8, 141:12, 141:16, 142:2, 142:9, 142:14, 143:10, 143:24, 144:5, 144:8, 144:19, 144:25, 145:19, 146:20, 146:23, 147:10, 147:18, 150:17, 151:20, 152:8, 152:10, 156:20, 159:8, 159:10, 159:14, 160:2, 160:7, 164:19, 165:12, 165:16, 165:18, 166:4, 166:15, 167:6, 167:7, 167:18, 168:3, 168:6, 168:19, 169:1, 169:13, 169:14, 172:2, 174:9, 174:12, 174:15, 174:21, 176:21, 177:18, 178:15, 179:3,

183:12
patent's [13] - 31:18, 31:23, 140:3, 140:13, 141:7, 143:3, 144:22, 155:20, 166:5, 166:10, 171:10, 172:3, 174:9
patentability [2] - 77:2, 138:7
patentable [3] - 87:15, 90:4, 98:21
patented [1] - 14:22
patentee [17] - 28:2, 32:4, 50:13, 57:3, 57:7, 59:17, 77:15, 112:5, 113:3, 113:4, 114:22, 114:23, 115:5, 115:20, 137:25, 173:13, 180:12
patentee's [2] - 67:23, 180:22
patentees [1] - 168:4, 176:23
**Patents** [2] - 137:19, 137:23
patents [40] - 9:24, 13:4, 13:10, 21:24, 28:21, 40:7, 46:22, 50:25, 67:9, 67:10, 79:7, 79:22, 81:1, 86:8, 116:9, 121:22, 123:9, 124:2, 131:25, 132:3, 132:14, 133:3, 133:14, 134:6, 136:24, 153:4, 153:20, 159:14, 159:25, 160:16, 164:2, 164:19, 166:1, 167:5, 168:11, 169:1, 170:5, 174:5, 174:7, 174:25
patents-in-suit [1] - 174:5
path [5] - 54:11, 119:21, 119:23, 119:24, 143:9
paths [1] - 119:24
pattern [3] - 82:23, 139:22, 153:10
patterns [1] - 131:1
pause [2] - 60:1, 168:12
payment [1] - 59:23, 168:9, 175:14
pending [3] - 38:25, 39:2, 182:24

**people** [14] - 10:6, 14:7, 19:24, 23:14, 26:25, 66:1, 106:1, 107:19, 124:2, 126:14, 127:8, 172:9, 180:15, 180:21
**per** [3] - 7:9, 43:14, 54:15
**percent** [2] - 54:14, 60:17
**perfect** [1] - 99:1
**perfectly** [4] - 63:23, 65:17, 101:14, 141:13
**perform** [4] - 72:15, 79:24, 99:2, 147:6
**performance** [1] - 146:3
**performed** [2] - 30:17, 137:9
**performing** [2] - 144:4, 149:7
**perhaps** [8] - 12:7, 42:23, 42:24, 43:20, 48:4, 128:23, 157:16, 170:19
**person** [3] - 125:24, 126:20, 126:25
**personal** [1] - 171:5
**personalized** [4] - 18:10, 18:13, 63:22, 108:20
**personally** [1] - 130:4
**personnel** [1] - 108:20
**perspective** [6] - 57:8, 67:23, 76:12, 90:10, 94:13, 126:6
**Phil** [1] - 6:15
**PHILIP** [1] - 3:6
**phone** [11] - 33:9, 35:15, 35:21, 36:8, 36:10, 43:4, 61:1, 61:15, 164:3, 164:10, 180:21
**phrase** [2] - 34:15, 43:19
**phrasing** [1] - 8:23, 35:1
**piece** [21] - 11:14, 16:3, 19:14, 20:12, 32:11, 42:8, 48:7, 49:19, 57:18, 76:18, 76:23, 77:14, 92:1, 92:2, 92:4, 92:8, 95:6, 100:11, 102:6, 121:10
**pieces** [14] - 14:5, 26:20, 42:10, 42:11, 44:19, 46:16, 48:5,

50:21, 64:12, 66:11, 78:1, 93:18, 119:15, 177:8
**pile** [3] - 83:9, 84:8, 100:1
**piling** [1] - 148:16
**place** [13] - 9:22, 11:25, 17:6, 18:16, 20:10, 28:9, 34:23, 36:21, 40:6, 41:17, 52:10, 52:13, 59:16
**placed** [2] - 20:15, 156:19
**places** [5] - 28:6, 87:16, 91:7, 125:15, 136:11
**Plaintiff** [35] - 1:5, 1:10, 2:7, 2:20, 3:11, 4:17, 10:24, 17:23, 33:20, 49:16, 70:1, 70:4, 71:10, 71:23, 111:19, 114:13, 116:21, 117:12, 117:13, 117:19, 117:21, 154:12, 158:14, 159:5, 159:11, 159:23, 160:3, 162:9, 162:12, 167:3, 172:20, 176:25, 180:9, 181:8, 182:3
**Plaintiff's** [15] - 5:6, 31:2, 33:17, 33:18, 62:18, 62:21, 76:12, 81:21, 88:1, 111:2, 118:9, 118:20, 133:19, 147:16, 168:22
**Plaintiffs** [22] - 1:15, 6:16, 131:23, 132:15, 133:14, 134:1, 136:3, 136:6, 136:11, 136:14, 137:1, 137:7, 137:11, 138:14, 140:9, 142:12, 144:1, 146:12, 146:18, 149:15, 149:17, 152:7
**plaintiffs** [1] - 134:13
**plan** [3] - 23:9, 125:8, 128:17
**planned** [1] - 81:23
**platform** [1] - 156:5
**platforms** [1] - 181:1
**plausibility** [1] - 182:20
**plausible** [9] - 52:12, 52:16, 52:17, 52:18, 65:2, 112:23, 148:2,

156:23, 179:20
**plausibly** [3] - 54:19, 113:9, 154:1
**play** [3] - 62:12, 141:17, 154:24
**playing** [1] - 79:10
**PLC** [3] - 1:14, 131:17, 131:23
**plead** [2] - 29:20, 30:15
**pleading** [16] - 28:20, 29:24, 30:7, 30:17, 41:3, 112:14, 113:16, 113:20, 113:21, 113:23, 115:17, 117:4, 131:9, 146:17, 153:25
**pleadings** [11] - 35:3, 36:5, 44:13, 51:8, 51:10, 51:14, 51:16, 53:7, 53:13, 113:14, 155:9
**pled** [4] - 29:23, 30:8, 112:16, 113:17
**plethora** [1] - 74:23
**plug** [1] - 97:11
**plurality** [2] - 132:19, 151:14
**plus** [10] - 39:1, 68:2, 68:6, 71:9, 74:14, 91:14, 98:4, 148:9
**podium** [1] - 6:13
**point** [49] - 11:12, 17:1, 17:7, 18:1, 18:8, 18:9, 18:16, 20:19, 22:10, 28:15, 30:12, 30:21, 40:11, 43:7, 43:9, 44:23, 46:18, 56:7, 57:17, 57:23, 62:5, 63:20, 64:4, 64:17, 65:22, 65:23, 74:8, 76:15, 78:20, 79:20, 81:8, 83:16, 85:6, 88:1, 88:12, 91:9, 102:24, 105:21, 114:18, 117:16, 153:10, 154:9, 155:3, 155:17, 172:15, 172:21, 177:16, 178:1, 180:19
**pointed** [3] - 8:3, 79:23, 105:11
**pointing** [3] - 32:13, 77:13, 161:22
**points** [6] - 30:21, 30:25, 55:17, 91:22, 178:16, 178:22
**poles** [1] - 153:3

**pop** [1] - 170:25
**pop-up** [1] - 170:25
**popcorn** [4] - 31:23, 31:25
**Popcorn** [1] - 31:25
**pops** [1] - 171:4
**populate** [3] - 63:5, 63:13, 163:12
**populated** [9] - 63:19, 164:8, 165:24, 167:15, 167:23, 170:10, 171:1, 171:19, 177:1
**portion** [6] - 10:11, 57:6, 63:10, 73:13, 108:10, 167:20
**portions** [5] - 110:8, 143:10, 174:12, 178:13, 178:25
**posit** [1] - 170:15
**position** [3] - 50:6, 64:24, 156:5
**positions** [1] - 156:19
**positive** [24] - 76:22, 88:4, 90:8, 90:14, 90:17, 90:21, 91:12, 91:13, 92:13, 93:24, 94:2, 106:18, 107:13, 128:10, 136:19, 139:5, 139:10, 144:2, 152:20, 152:24, 154:23, 156:24, 157:22, 157:24
**positively** [2] - 90:24, 102:2
**possible** [9] - 54:11, 89:6, 89:8, 92:15, 96:24, 128:18, 170:2, 170:7, 181:6
**possibly** [2] - 63:3, 139:6
**post** [33] - 37:22, 71:12, 73:10, 74:3, 76:18, 76:24, 77:5, 90:16, 91:14, 94:16, 102:16, 103:13, 103:21, 103:23, 104:11, 108:23, 111:23, 124:1, 127:6, 127:15, 133:3, 136:25, 138:18, 138:23, 139:1, 141:6, 143:2, 147:17, 148:9, 148:14, 148:18, 148:25, 151:21
**Post** [1] - 65:15
**post-Alice** [3] - 37:22, 127:6, 127:15

**post-filtering** [16] - 71:12, 103:13, 108:23, 133:3, 136:25, 138:18, 138:23, 139:1, 141:6, 143:2, 147:17, 148:9, 148:14, 148:18, 148:25, 151:21
**post-Internet** [1] - 124:1
**post-residue** [10] - 73:10, 74:3, 76:18, 76:24, 90:16, 91:14, 102:16, 103:21, 103:23, 104:11
**postage** [5] - 23:20, 24:3, 24:9, 25:16, 170:12
**postage-paid** [2] - 23:20, 24:3
**postcard** [2] - 25:17, 32:16
**postcards** [1] - 33:11
**posted** [1] - 162:22
**Postscript** [17] - 4:21, 5:22, 5:24, 9:13, 35:9, 53:5, 111:25, 158:19, 158:20, 158:21, 158:25, 159:11, 160:3, 161:9, 161:14, 162:3, 180:8
**POSTSCRIPT** [1] - 1:12
**Postscript 's** [7] - 28:25, 31:6, 31:11, 127:24, 161:13, 161:20, 162:1
**potential** [3] - 133:1, 137:5, 151:18
**potentially** [4] - 44:8, 71:19, 89:25, 140:21
**POTTER** [2] - 2:22, 3:6
**Potter** [3] - 5:21, 5:23, 6:16
**Power** [3] - 72:5, 72:6, 135:8
**practical** [1] - 106:2
**practically** [1] - 102:8
**practice** [2] - 172:8, 181:7
**praises** [1] - 54:17
**pre** [59] - 21:14, 21:15, 31:9, 31:15, 31:16, 40:13, 40:15, 40:25, 41:8, 47:21, 56:13, 56:14, 56:17, 56:22, 56:23, 62:8, 63:5, 63:13, 161:12,

161:16, 162:7,
164:24, 164:25,
166:12, 166:13,
167:15, 167:23,
169:9, 169:10,
170:4, 170:10,
170:13, 170:18,
170:20, 170:21,
171:1, 171:8, 171:9,
171:14, 171:15,
175:4, 176:2, 176:3,
177:1, 181:10,
181:18, 181:25,
182:7
**pre-address** [1] -
47:21
**pre-addressed** [19] -
31:9, 31:16, 56:14,
56:17, 56:23,
161:12, 161:16,
162:7, 164:25,
166:13, 169:10,
170:4, 170:13,
170:18, 170:21,
171:9, 171:15,
176:3, 182:7
**pre-fill** [3] - 21:14,
41:8, 47:21
**pre-filled** [28] - 21:15,
31:9, 31:15, 40:13,
40:15, 40:25, 56:13,
56:17, 56:22, 62:8,
161:12, 161:16,
162:7, 164:24,
166:12, 169:9,
170:4, 170:13,
170:18, 170:20,
171:8, 171:14,
175:4, 176:2,
181:10, 181:18,
181:25, 182:7
**pre-populate** [2] -
63:5, 63:13
**pre-populated** [5] -
167:15, 167:23,
170:10, 171:1, 177:1
**pre-typed** [1] - 170:10
**precede** [1] - 96:25
**preceding** [1] - 14:19
**predates** [1] - 120:10
**preempt** [7] - 56:4,
157:12, 157:16,
158:5, 181:6, 182:8
**preempting** [1] -
99:11
**preemption** [8] - 56:8,
57:8, 88:12, 138:7,
157:10, 181:4, 182:3
**preempts** [1] - 56:3
**preformed** [1] -

149:22
**prejudice** [1] - 158:10
**preliminarily** [1] -
57:13
**preliminary** [1] -
142:22
**premised** [1] - 158:25
**prepaid** [1] - 170:12
**prepared** [1] - 129:17
**presence** [3] - 26:15,
146:9, 178:21
**present** [1] - 142:8
**presentation** [1] -
83:18
**presented** [1] - 28:7
**presenting** [2] - 6:7,
135:1
**preset** [1] - 30:19
**press** [1] - 16:8
**pressing** [1] - 114:6
**presumably** [2] - 84:2,
115:11
**pretty** [7] - 12:23,
21:2, 23:12, 60:12,
64:4, 103:19, 138:12
**preventing** [1] -
141:11
**previous** [2] - 153:9,
168:12
**previously** [5] - 84:18,
99:9, 135:16, 146:4,
171:13
**primarily** [1] - 116:5
**principle** [2] - 8:24,
74:6
**print** [2] - 25:15,
170:22
**printed** [3] - 24:4,
25:17, 67:3
**printing** [3] - 24:4,
24:5, 24:10
**printouts** [1] - 82:6
**PRIYATA** [1] - 3:16
**Priyata** [1] - 7:3
**probe** [82] - 67:11,
68:2, 71:2, 71:5,
71:22, 71:23, 72:11,
72:13, 73:5, 74:9,
76:8, 79:13, 80:17,
81:22, 87:11, 87:17,
87:24, 88:3, 88:22,
89:3, 89:7, 89:21,
91:20, 91:25, 92:12,
92:15, 92:23, 93:6,
93:25, 94:6, 94:8,
94:18, 94:21, 102:1,
102:17, 103:23,
104:25, 105:3,
105:18, 105:22,
107:1, 116:11,

132:21, 133:12,
133:17, 133:20,
134:3, 136:17,
136:18, 136:21,
137:4, 137:10,
137:13, 138:17,
138:21, 138:23,
139:16, 139:20,
140:10, 140:16,
140:20, 141:4,
141:6, 142:17,
142:21, 143:1,
143:11, 143:16,
147:9, 147:20,
148:8, 148:19,
152:13, 154:3,
154:25, 156:24,
157:23, 158:2
**probe's** [1] - 154:22
**probes** [21] - 74:7,
76:23, 79:15, 80:17,
90:11, 94:9, 125:14,
137:13, 148:11,
148:16, 149:1,
151:21, 151:22,
153:2, 153:7, 154:7,
156:12, 157:6, 158:4
**problem** [34] - 9:25,
10:3, 10:4, 14:3,
16:4, 23:17, 23:18,
23:22, 32:23, 34:24,
35:20, 36:10, 46:7,
46:12, 51:21, 53:23,
59:2, 74:20, 77:22,
82:15, 90:1, 94:10,
140:23, 141:1,
145:25, 150:20,
151:17, 153:15,
156:22, 157:7,
168:4, 173:22,
180:12, 180:18
**problematic** [2] -
88:17, 90:9
**problems** [6] - 36:4,
36:5, 61:9, 61:14,
92:7, 162:2
**procedural** [3] -
120:11, 120:18,
160:17
**procedurally** [1] -
120:19
**procedures** [2] -
113:24, 135:21
**proceed** [2] - 4:2,
137:18
**proceeding** [1] - 184:7
**proceedings** [2] -
8:11, 41:2
**PROCEEDINGS** [1] -
3:21

**process** [64] - 10:5,
10:17, 11:3, 14:6,
14:9, 25:22, 31:8,
31:14, 34:7, 34:12,
48:21, 51:22, 53:11,
56:12, 56:15, 56:21,
62:7, 62:8, 68:12,
71:2, 72:10, 73:3,
74:14, 84:14, 86:24,
97:13, 99:2, 101:18,
101:21, 101:22,
101:25, 102:25,
106:13, 130:3,
133:2, 133:5, 137:2,
140:8, 140:10,
140:11, 140:14,
142:11, 148:7,
151:24, 156:8,
161:7, 161:10,
162:6, 162:18,
164:1, 164:23,
165:17, 166:12,
167:21, 168:20,
169:8, 170:2,
170:17, 171:7,
171:15, 175:18,
176:1, 179:9, 182:5
**processed** [1] - 98:11
**processes** [4] - 23:7,
124:4, 141:13,
179:18
**processing** [1] - 88:2
**processor** [2] - 38:4,
123:16
**product** [7] - 69:2,
139:20, 163:14,
164:9, 168:8,
168:16, 175:11
**Products** [1] - 174:11
**products** [6] - 69:3,
141:10, 172:25,
173:2, 173:5
**proffered** [3] - 11:10,
134:19, 145:12
**programatic** [1] -
125:10
**programmable** [1] -
173:4
**programmatically** [1]
- 128:6
**programmer** [4] -
125:4, 125:6,
127:12, 127:18
**programs** [1] - 154:7
**prominence** [1] -
167:19
**prominently** [1] -
167:10
**promotion** [20] -
11:16, 21:9, 21:16,

22:3, 31:9, 31:15,
34:13, 56:13, 56:16,
56:22, 161:11,
162:6, 163:24,
164:24, 169:9,
170:3, 171:8, 176:2,
179:9, 182:6
**promotional** [8] -
13:2, 163:9, 163:24,
164:4, 165:20,
170:25, 171:2,
176:15
**promotions** [6] - 10:6,
23:15, 66:2, 161:8,
174:24, 175:19
**proof** [1] - 56:6
**proposed** [1] - 161:25
**proposes** [1] - 70:22
**proposition** [1] -
107:5
**prosecutors** [1] -
123:10
**Proskauer** [2] - 6:17,
6:18
**PROSKAUER** [1] - 3:8
**protect** [1] - 153:20
**protecting** [1] - 87:8
**Protocol** [1] - 166:8
**protocol** [3] - 12:4,
16:8, 21:14
**prove** [1] - 46:14
**provide** [22] - 18:10,
21:22, 59:23, 72:8,
86:3, 96:10, 98:15,
113:4, 128:14,
128:21, 131:17,
142:7, 142:24,
145:4, 145:9,
145:24, 149:2,
149:4, 150:20,
156:11, 168:9,
175:14
**provided** [3] - 51:4,
143:17, 155:20
**provides** [6] - 84:22,
98:1, 137:19,
153:12, 157:15,
179:4
**providing** [21] - 31:9,
31:15, 52:25, 56:13,
129:20, 135:20,
142:10, 161:7,
161:11, 162:7,
164:24, 166:12,
169:9, 170:3,
170:17, 171:8,
171:14, 172:24,
173:1, 176:2, 182:7
**proving** [1] - 28:12
**proxy** [1] - 152:13

**public** [1] - 16:22
**Publications** [1] - 63:10
**Purchase** [1] - 174:11
**purchase** [4] - 167:12, 167:15, 167:21, 168:21
**purchases** [1] - 168:23
**purport** [2] - 25:12, 28:5
**purported** [2] - 134:14, 172:4
**purportedly** [1] - 161:4
**purpose** [3] - 72:4, 86:19, 107:4
**purposes** [17] - 13:19, 22:13, 45:11, 61:19, 96:14, 98:21, 112:12, 118:1, 126:18, 129:23, 132:12, 143:8, 145:11, 149:10, 157:2, 159:20, 160:1
**pursuant** [1] - 131:20
**pushed** [1] - 55:2
**put** [22] - 19:8, 21:5, 25:4, 25:10, 28:13, 29:12, 29:15, 40:4, 46:3, 74:18, 86:25, 108:21, 114:1, 123:15, 123:18, 124:5, 125:12, 125:13, 127:19, 146:25, 175:21, 183:1
**puts** [1] - 118:19
**putting** [11] - 15:7, 15:11, 42:19, 45:3, 45:17, 45:20, 45:21, 45:25, 101:16, 118:16, 181:7

### Q

**quantification** [1] - 38:13
**query** [1] - 17:10
**questions** [9] - 8:6, 9:21, 9:23, 22:21, 44:23, 49:8, 55:13, 55:15, 55:19
**quibble** [1] - 118:15
**quick** [3] - 105:14, 108:2, 111:10
**quicker** [2] - 10:19, 10:23
**quickly** [3] - 99:8, 103:12, 173:21

**quintessential** [1] - 86:24
**quite** [7] - 8:19, 55:2, 57:5, 77:5, 110:3, 118:18, 130:11
**quote** [5] - 55:6, 80:3, 80:5, 80:20, 108:9
**quoted** [1] - 54:25
**quotes** [1] - 108:21

### R

**raise** [1] - 158:10
**raised** [4] - 50:13, 81:20, 82:1, 115:9
**raising** [1] - 65:2, 115:22
**rapid** [1] - 139:23
**rate** [1] - 54:14
**rather** [1] - 12:9
**raw** [1] - 156:3
**re** [1] - 158:10
**Re** [4] - 98:22, 99:17, 100:7, 135:18
**re-raise** [1] - 158:10
**reach** [1] - 77:10
**reacting** [1] - 126:3
**read** [15] - 8:3, 8:4, 25:4, 28:12, 59:5, 60:19, 71:3, 80:3, 97:21, 98:3, 113:13, 119:3, 128:21, 141:19, 144:12
**readable** [1] - 162:19
**reading** [5] - 28:4, 62:21, 90:6, 130:21, 168:13
**readings** [1] - 139:21
**reads** [2] - 138:22, 140:6
**ready** [1] - 4:2
**real** [9] - 23:13, 25:14, 30:19, 99:22, 124:4, 127:21, 130:15, 134:18, 172:11
**Real** [1] - 184:8
**real-time** [1] - 30:19
**Real-Time** [1] - 184:8
**real-world** [5] - 23:13, 25:14, 124:4, 134:18, 172:11
**realize** [1] - 23:24
**realized** [3] - 108:3, 108:6, 108:22
**realizing** [1] - 170:1
**really** [63] - 8:2, 8:16, 8:19, 8:21, 15:16, 16:3, 17:11, 21:10, 23:5, 26:17, 27:13, 27:14, 33:3, 50:16,

50:23, 53:21, 62:9, 63:13, 64:1, 65:16, 68:1, 69:16, 70:8, 71:14, 71:15, 73:2, 73:9, 82:16, 83:10, 89:15, 94:19, 96:3, 100:22, 100:24, 107:25, 108:2, 109:20, 109:22, 110:9, 110:18, 110:25, 117:20, 119:19, 120:13, 120:25, 121:20, 123:25, 124:12, 126:7, 126:9, 126:13, 127:10, 127:17, 130:24, 140:3, 142:19, 152:4, 160:4, 171:10, 180:21, 183:9, 183:16
**realm** [2] - 14:16, 120:1
**reason** [7] - 38:20, 46:12, 49:24, 78:12, 96:24, 107:11, 169:15
**reasonable** [1] - 146:6
**reasonably** [1] - 72:16
**reasons** [5] - 158:8, 159:4, 171:12, 176:4, 182:13
**reassess** [2] - 90:12, 157:23
**rebut** [1] - 116:5
**rebuttal** [10] - 22:10, 22:20, 22:23, 30:20, 30:23, 58:18, 81:5, 81:23, 82:2, 103:8
**receive** [2] - 21:15, 133:8
**received** [5] - 17:8, 133:12, 150:3, 151:10, 173:5
**receiver** [1] - 173:5
**receives** [1] - 163:21
**receiving** [9] - 16:11, 21:7, 49:5, 49:18, 50:2, 61:15, 100:23, 150:13, 181:11
**recent** [2] - 111:19, 115:23
**recess** [6] - 4:3, 66:15, 66:19, 129:9, 129:11, 184:2
**recessed** [1] - 184:4
**recited** [3] - 106:8, 154:15, 155:14
**recites** [1] - 132:18
**recognition** [1] -

150:21
**recognize** [2] - 21:2, 139:21
**recognized** [3] - 23:23, 37:5, 37:14
**recognizing** [1] - 177:4
**reconciling** [1] - 31:23
**record** [50] - 4:11, 4:12, 5:4, 19:16, 19:23, 26:12, 26:18, 26:19, 27:25, 41:22, 42:22, 57:8, 63:4, 64:1, 64:17, 65:3, 65:5, 71:13, 75:6, 75:11, 77:23, 77:25, 78:8, 78:11, 80:19, 83:22, 107:5, 107:8, 129:15, 130:6, 146:9, 148:1, 153:12, 154:17, 155:1, 155:4, 155:8, 156:20, 157:3, 157:14, 158:7, 178:2, 178:16, 178:18, 178:22, 178:25, 182:15, 182:17
**red** [2] - 16:1, 127:19
**redirected** [4] - 58:12, 60:2, 60:4, 168:14
**redirects** [1] - 35:13
**reduce** [3] - 72:4, 72:12, 108:14
**reducing** [1] - 108:16
**refer** [7] - 85:10, 87:5, 136:24, 158:16, 158:20, 159:8, 159:9
**reference** [17] - 32:3, 53:20, 53:21, 58:20, 61:3, 131:11, 133:19, 138:17, 139:16, 139:25, 147:19, 155:17, 156:20, 160:6, 161:19, 168:2, 172:4
**referenced** [6] - 17:21, 19:15, 53:4, 54:23, 112:4, 160:20
**references** [3] - 58:10, 142:15, 152:2
**referred** [1] - 87:20
**referring** [3] - 43:20, 58:14, 91:8
**refers** [2] - 165:16, 166:15
**refined** [1] - 92:21
**refinement** [1] - 139:23
**reflecting** [2] - 133:9,

139:22
**regard** [9] - 8:13, 11:2, 19:21, 77:22, 85:4, 100:18, 116:9, 119:17, 182:19
**regarding** [3] - 131:3, 152:10, 183:12
**regularly** [1] - 74:4
**reinforce** [1] - 130:23
**relate** [3] - 89:19, 89:20, 159:4
**related** [20] - 4:15, 4:16, 7:11, 19:18, 20:2, 26:1, 68:15, 70:14, 72:18, 78:15, 79:1, 92:5, 93:14, 132:3, 133:1, 137:5, 140:21, 158:13, 165:23, 174:1
**relates** [3] - 42:17, 56:20, 88:7
**relating** [1] - 44:5
**relation** [1] - 116:16
**relevance** [3] - 109:24, 111:14, 120:5
**relevant** [14] - 49:20, 53:24, 54:1, 60:12, 98:9, 110:11, 110:15, 110:16, 115:7, 130:1, 131:7, 152:7, 180:5, 182:8
**reliance** [1] - 138:4
**rely** [4] - 28:18, 42:8, 64:1, 155:2
**relying** [5] - 17:23, 26:14, 29:22, 30:16, 59:3
**remainder** [1] - 182:19
**remaining** [2] - 147:3, 167:25
**remote** [2] - 172:25, 173:9
**remotely** [1] - 99:21
**render** [2] - 129:17, 148:2
**rendered** [1] - 167:14
**rendering** [1] - 160:7
**renew** [1] - 24:1
**Rental** [1] - 174:11
**repeatedly** [1] - 174:21
**replete** [1] - 77:16
**reply** [4] - 22:11, 35:17, 35:18, 115:8
**replying** [1] - 61:16
**report** [1] - 100:23
**Reporter** [1] - 184:8
**reporter** [2] - 4:9
**reports** [7] - 150:2, 150:3, 150:11,

150:13, 151:10, 151:11, 151:16
**represent** [1] - 148:11
**representation** [1] - 18:2
**representative** [32] - 43:24, 56:25, 57:2, 57:5, 69:10, 69:17, 81:10, 81:12, 81:17, 85:21, 114:21, 116:17, 128:8, 129:1, 132:8, 132:12, 132:16, 133:24, 134:1, 138:11, 147:4, 148:2, 149:20, 155:10, 155:24, 159:19, 159:25, 160:9, 172:23, 174:6, 174:8
**representativeness** [1] - 115:1
**represented** [1] - 114:19
**representing** [2] - 67:8, 131:5
**represents** [1] - 144:3
**request** [26] - 31:10, 31:16, 40:13, 40:15, 41:9, 56:14, 56:17, 56:23, 62:10, 161:12, 161:17, 162:7, 164:25, 166:13, 170:4, 170:14, 170:18, 170:25, 171:3, 171:5, 171:9, 171:15, 176:3, 181:20, 181:25, 182:7
**requesting** [1] - 111:20
**requests** [5] - 41:8, 62:9, 169:10, 181:10, 181:18
**require** [6] - 29:21, 44:16, 94:3, 96:3, 137:8, 170:8
**required** [7] - 43:12, 50:4, 56:1, 145:15, 150:9, 150:10, 168:16
**requirement** [8] - 17:9, 37:16, 37:22, 37:23, 43:25, 121:6, 133:15, 151:8
**requirements** [5] - 84:24, 96:12, 150:8, 165:8, 182:10
**requires** [10] - 30:2,

136:8
**response** [8] - 28:25, 32:5, 120:23, 141:14, 165:19, 167:10, 167:11, 176:11
**Response** [1] - 132:6
**responses** [1] - 100:25
**rest** [4] - 60:19, 83:8, 142:18, 157:5
**restroom** [1] - 66:13
**result** [10] - 34:6, 34:8, 97:12, 99:4, 101:23, 101:25, 121:12, 126:18, 127:11, 172:19
**resulting** [1] - 16:20
**results** [3] - 41:4, 135:5, 168:20
**retracting** [1] - 155:19
**return** [1] - 181:16
**returns** [1] - 175:3
**revenue** [1] - 54:15
**reverse** [1] - 101:20
**review** [18] - 68:12, 71:24, 72:5, 72:13, 108:17, 131:8, 137:2, 137:6, 140:8, 140:10, 140:11, 140:14, 142:10, 143:1, 143:24, 144:22, 148:7, 149:10
**reviewed** [2] - 152:25, 174:8
**reviewing** [2] - 130:5, 142:13
**revolutionized** [1] - 180:5
**Richard** [2] - 6:5, 23:2
**RICHARD** [1] - 2:12
**rights** [1] - 131:22
**rigidly** [1] - 27:1
**rigorous** [2] - 130:4, 130:12
**rigorously** [1] - 82:15
**rise** [6] - 3:23, 4:4, 66:18, 129:10, 129:12, 184:3
**risk** [1] - 99:11
**robust** [2] - 123:18, 179:14
**ROI** [1] - 54:15
**role** [6] - 79:11, 141:18, 144:8, 146:1, 154:25
**room** [3] - 66:1, 120:21, 128:8
**root** [1] - 122:3

35:21, 93:3, 96:6, 96:7, 101:12, 133:16, 164:18, 177:4, 181:19
**requiring** [4] - 72:7, 105:22, 135:9, 155:22
**requisite** [1] - 148:11
**res** [1] - 105:17
**reserved** [1] - 173:6
**reserving** [1] - 174:16
**residual** [10] - 72:24, 73:6, 87:24, 88:9, 88:20, 89:2, 89:19, 89:20, 157:1, 157:23
**residue** [49] - 71:4, 71:16, 73:10, 73:22, 74:3, 76:18, 76:24, 77:5, 87:12, 87:14, 89:6, 89:14, 89:24, 90:16, 91:3, 91:8, 91:14, 92:18, 92:22, 94:1, 94:4, 100:1, 100:4, 102:16, 103:13, 103:17, 103:21, 103:23, 104:11, 104:17, 108:23, 133:4, 136:25, 138:18, 138:23, 139:1, 139:10, 139:12, 141:6, 143:2, 147:17, 148:9, 148:15, 148:18, 148:25, 151:22, 152:20, 153:4, 154:4
**resolutely** [1] - 174:21
**resolution** [3] - 140:23, 141:1, 158:6
**resolve** [4] - 80:13, 146:6, 182:19, 183:17
**resolved** [1] - 182:23
**resolving** [1] - 160:24
**resource** [1] - 163:4
**resources** [4] - 84:16, 84:17, 84:25, 140:24
**respect** [2] - 81:9, 145:21
**respectfully** [1] - 136:20
**respective** [6] - 5:1, 5:2, 156:10, 159:18, 159:19
**respectively** [1] - 155:17
**respond** [7] - 10:5, 23:15, 28:8, 33:21, 82:18, 123:3, 180:15
**responding** [2] - 21:8,

**rooted** [1] - 153:17
**ROSE** [1] - 3:8
**rose** [1] - 160:11
**rosenberg** [1] - 98:7
**Rosenberg** [5] - 98:8, 98:22, 99:17, 100:7, 135:18
**routine** [5] - 12:3, 70:18, 107:18, 146:4, 179:23
**routinely** [1] - 169:13
**ROVNER** [2] - 3:6, 6:15
**Rovner** [2] - 6:14, 6:16
**Rule** [11] - 8:14, 64:8, 66:23, 77:23, 116:21, 117:1, 126:19, 131:8, 131:20, 158:7, 158:22
**rule** [2] - 117:8, 169:20
**rules** [3] - 7:7, 117:18, 117:23
**run** [1] - 119:3
**run-on** [1] - 119:3
**running** [1] - 86:11
**runs** [1] - 167:20
**Ryan** [1] - 5:10
**RYAN** [2] - 2:6, 2:19

## S

**S.A** [1] - 135:8
**safe** [1] - 183:23
**sake** [3] - 161:21, 175:23, 183:5
**sat** [1] - 62:5
**save** [8] - 9:14, 10:18, 10:24, 36:22, 38:13, 71:19, 81:5, 136:2
**saved** [1] - 75:14
**saving** [3] - 36:16, 36:21
**saw** [2] - 17:13, 171:1
**scale** [2] - 80:22, 106:21
**scenario** [2] - 23:21, 154:16
**SCHMID** [2] - 2:6, 2:19
**Schmid** [1] - 5:10
**score** [1] - 136:6
**screen** [5] - 15:11, 45:15, 168:17, 171:1, 171:4
**seated** [3] - 4:5, 66:20, 129:13
**second** [33] - 13:24, 16:3, 17:6, 17:20, 21:20, 47:8, 66:10,

66:22, 71:4, 71:6, 71:16, 76:23, 87:10, 88:25, 90:16, 97:1, 132:25, 136:21, 137:1, 138:20, 143:13, 148:18, 150:1, 156:25, 158:12, 163:2, 165:22, 167:12, 167:13, 167:14, 167:22, 176:10, 180:24
**second-level** [2] - 71:16, 143:13
**section** [13] - 49:18, 73:18, 141:8, 142:14, 142:16, 142:18, 142:24, 144:7, 167:18, 168:3, 173:7, 173:16, 179:5
**Section** [26] - 4:14, 5:2, 7:20, 8:1, 8:13, 8:25, 10:20, 86:6, 109:11, 110:1, 114:4, 114:6, 131:3, 131:8, 131:21, 132:12, 146:2, 159:1, 159:2, 159:4, 159:20, 160:1, 168:25, 169:19, 181:4, 182:14
**sections** [1] - 55:1
**secure** [3] - 87:18, 132:20, 147:9
**Secured** [1] - 63:20
**securities** [2] - 102:12, 157:7
**Security** [2] - 108:10, 108:19
**security** [1] - 68:15, 70:14, 71:15, 72:18, 77:17, 78:15, 79:2, 80:2, 82:17, 86:20, 87:10, 89:7, 90:10, 92:15, 95:18, 100:8, 108:13, 132:18, 133:1, 133:10, 137:5, 140:21, 141:9, 142:6, 143:5, 148:5, 152:11, 153:8, 153:9, 153:15
**security-focused** [1] - 87:10
**security-related** [7] - 68:15, 70:14, 72:18, 78:15, 133:1, 137:5, 140:21
**see** [27] - 9:4, 9:17, 19:24, 20:7, 25:5,

25:20, 37:21, 52:5, 54:9, 55:21, 63:12, 68:21, 68:25, 70:15, 71:21, 72:2, 76:7, 83:14, 96:2, 114:22, 124:10, 126:4, 130:10, 131:1, 132:7, 145:6
**seeing** [1] - 94:10, 101:7, 183:24
**seek** [1] - 113:18
**seeking** [1] - 5:1
**seem** [8] - 32:2, 46:15, 74:5, 76:20, 143:10, 155:11, 174:13, 177:9
**sees** [1] - 138:22
**select** [3] - 143:1, 168:8, 175:11
**selected** [5] - 89:24, 133:5, 136:23, 139:9
**selecting** [2] - 88:8, 107:14
**selection** [2] - 72:7, 135:10
**selectively** [1] - 82:12
**selects** [2] - 136:20, 139:6
**selling** [1] - 10:13
**seminal** [1] - 76:15
**send** [26] - 19:9, 21:12, 24:18, 24:22, 25:2, 25:17, 27:8, 33:6, 35:16, 35:25, 48:21, 64:22, 68:18, 74:12, 86:1, 89:7, 92:16, 162:20, 162:24, 163:18, 164:13, 170:13, 170:19, 170:22, 181:21
**sendable** [2] - 48:9, 48:11
**sender** [1] - 170:11
**sending** [12] - 40:13, 40:15, 43:7, 47:23, 49:5, 49:13, 50:2, 50:5, 65:10, 167:11, 167:21, 176:11
**sends** [6] - 18:22, 20:16, 24:16, 139:13, 163:3, 163:19
**sense** [8] - 10:21, 16:15, 18:15, 38:5, 76:12, 100:6, 102:11, 121:13
**sensor** [3] - 132:24, 139:21, 152:13
**sensors** [14] - 125:14,

125:17, 132:20, 147:8, 155:16, 156:3, 156:4, 156:10, 156:11, 156:12, 156:13, 156:15, 156:18
**sent** [17] - 19:1, 21:7, 24:8, 26:1, 41:20, 42:18, 65:7, 65:11, 85:13, 89:1, 89:2, 89:18, 103:24, 137:5, 139:11, 152:20, 164:11
**sentence** [1] - 119:3
**sentry** [3] - 139:20, 142:21, 152:13
**separate** [7] - 26:20, 37:4, 37:8, 60:4, 119:22, 124:9, 124:11
**separately** [5] - 119:11, 119:12, 136:21, 138:18, 143:1
**sequence** [3] - 12:19, 12:20, 86:18
**series** [2] - 86:17, 98:20
**serve** [1] - 29:17
**served** [2] - 20:16, 162:21
**server** [44] - 11:13, 12:8, 12:11, 15:15, 18:22, 20:16, 21:13, 21:25, 22:4, 24:18, 24:23, 26:1, 29:6, 37:19, 41:21, 42:18, 43:8, 47:20, 49:18, 65:7, 65:12, 162:20, 162:22, 162:25, 163:1, 163:3, 163:14, 163:20, 163:21, 163:23, 165:21, 173:1, 173:9, 175:3, 176:10, 181:13, 181:14, 181:16, 181:21
**server's** [1] - 168:12
**servers** [3] - 21:24, 44:20, 177:12
**serves** [2] - 15:17, 181:14
**service** [10] - 4:10, 29:10, 30:10, 48:9, 48:12, 63:2, 164:9, 164:15, 168:9, 175:11
**services** [2] - 161:8, 168:16

**Services** [1] - 135:12
**serving** [3] - 16:1, 21:5, 29:13
**set** [8] - 66:22, 122:10, 131:7, 143:13, 159:4, 171:13, 173:23, 178:10
**sets** [1] - 109:7
**setting** [1] - 4:14
**seven** [5] - 9:14, 45:19, 45:20, 45:22, 46:3
**several** [1] - 108:4
**shape** [1] - 78:14
**share** [3] - 111:3, 132:3, 159:15
**short** [4] - 7:16, 10:13, 66:12, 182:21
**shortcomings** [1] - 52:20
**shorter** [2] - 50:17, 126:11
**shortest** [1] - 54:11
**shorthand** [1] - 166:16
**shot** [2] - 117:9, 120:10
**Show** [1] - 19:23
**show** [15] - 20:2, 20:3, 26:18, 28:19, 29:19, 29:22, 30:16, 40:6, 40:12, 56:2, 64:4, 65:5, 107:25, 108:1
**showed** [1] - 80:19
**showing** [1] - 40:5
**shown** [3] - 29:19, 57:1, 84:12
**shows** [2] - 30:15, 30:18
**side** [31] - 5:6, 6:24, 7:9, 13:23, 31:1, 31:2, 33:16, 33:17, 39:13, 51:23, 55:2, 56:11, 57:16, 58:18, 66:25, 68:4, 69:9, 69:16, 69:22, 75:15, 84:20, 96:5, 98:6, 98:9, 103:9, 103:22, 111:2, 111:8, 114:5, 114:7
**side's** [1] - 14:25
**sides** [1] - 66:9
**sides'** [1] - 63:21
**sift** [1] - 142:23
**sign** [19] - 11:2, 12:21, 34:3, 34:7, 34:9, 34:21, 35:5, 35:25, 46:25, 54:11, 62:7, 62:8, 161:7, 162:13, 175:18, 179:9,

179:25, 180:20, 180:23
**sign-up** [13] - 11:2, 12:21, 34:3, 34:7, 34:9, 34:21, 62:7, 62:8, 162:13, 179:9, 179:25, 180:20, 180:23
**sign-ups** [2] - 35:5, 46:25
**signal** [1] - 127:14
**signals** [2] - 156:10, 156:11
**signature** [3] - 82:20, 82:22, 90:21
**significant** [11] - 7:25, 39:2, 39:5, 45:10, 76:25, 79:11, 79:21, 80:23, 153:7, 153:16, 174:18
**signing** [2] - 13:1, 168:15
**silent** [1] - 173:24
**similar** [8] - 31:7, 93:11, 135:16, 154:19, 154:25, 156:23, 161:2, 161:18
**similarly** [1] - 156:22
**simple** [2] - 53:11, 155:22
**simply** [39] - 31:13, 36:16, 44:25, 46:13, 50:8, 52:1, 56:12, 72:14, 77:7, 79:13, 105:8, 106:23, 108:14, 108:16, 119:21, 129:24, 143:5, 143:21, 144:11, 144:15, 144:25, 145:7, 150:6, 150:9, 150:10, 150:15, 151:1, 153:22, 157:21, 164:22, 166:11, 169:12, 173:11, 178:5, 182:4, 182:15, 183:1, 183:4
**single** [5] - 40:6, 108:7, 125:24, 137:13, 153:10
**sit** [1] - 55:17
**site's** [1] - 47:12
**sites** [1] - 99:8
**situation** [3] - 86:10, 98:24, 117:6
**situations** [2] - 23:13, 25:20
**six** [4] - 45:19, 45:20,

45:22, 46:2
**skip** [1] - 15:13
**slice** [1] - 102:13
**Slide** [4] - 14:24, 40:22, 72:3, 107:24
**slide** [8] - 41:13, 46:19, 81:14, 107:24, 107:25, 108:7, 108:22
**slides** [6] - 17:13, 17:14, 18:5, 26:23, 40:21, 103:11
**slightly** [3] - 31:5, 48:16, 161:3
**slower** [1] - 180:14
**small** [1] - 102:12
**smaller** [2] - 84:24, 109:10
**smooth** [1] - 33:4
**smoothly** [2] - 33:1, 33:2
**smoothness** [1] - 33:8
**SMS** [3] - 25:11, 32:14, 32:17, 33:5, 33:10, 63:5, 63:13, 64:14
**SOC** [31] - 67:24, 68:3, 72:24, 84:3, 84:8, 84:11, 84:15, 84:22, 85:6, 87:23, 89:1, 89:9, 89:18, 92:16, 92:17, 92:25, 93:6, 94:22, 96:3, 100:24, 101:6, 101:9, 132:20, 133:7, 133:16, 137:9, 139:7, 139:14, 140:12
**Socrates** [1] - 84:12
**software** [19] - 9:24, 11:14, 13:8, 13:14, 13:18, 13:23, 19:14, 19:17, 20:8, 37:20, 38:24, 44:19, 45:4, 53:22, 119:18, 121:1, 125:6, 126:1, 126:16
**solely** [1] - 144:19
**solution** [28] - 16:3, 20:12, 27:15, 35:2, 48:18, 54:12, 67:10, 67:12, 70:22, 79:5, 81:2, 81:3, 83:24, 84:11, 93:20, 108:4, 144:20, 144:23, 144:24, 144:25, 145:24, 153:14, 153:16, 170:19, 178:13, 180:23,

180:25
**solutions** [2] - 171:11, 180:13
**solve** [12] - 10:1, 10:5, 14:5, 14:8, 46:7, 51:21, 53:23, 82:16, 151:16, 157:7, 168:5, 173:22
**solved** [2] - 150:19, 156:21
**solves** [2] - 92:6, 180:19
**someone** [1] - 42:18
**sometimes** [13] - 7:23, 13:10, 53:15, 53:19, 54:24, 75:5, 75:8, 75:13, 78:1, 112:19, 126:21, 127:1, 168:22
**somewhere** [4] - 17:2, 20:17, 22:10, 153:3
**soon** [1] - 182:20
**sorry** [7] - 62:1, 62:18, 93:19, 98:8, 104:7, 104:8
**sort** [17] - 15:14, 15:18, 21:13, 21:22, 29:12, 65:1, 65:24, 66:3, 82:22, 83:9, 86:13, 86:25, 113:22, 120:18, 122:18, 123:10, 124:8
**sorts** [1] - 9:23
**sound** [2] - 172:7, 172:10
**sounding** [2] - 69:20, 75:10
**sounds** [8] - 26:10, 30:4, 30:5, 53:11, 69:19, 115:23, 172:4, 183:14
**source** [1] - 178:4
**space** [5] - 97:16, 174:17, 175:8, 180:13, 181:2
**Spalding** [1] - 5:11
**span** [1] - 130:22
**spans** [1] - 142:18
**SPAULDING** [2] - 2:4, 2:17
**spec** [10] - 10:11, 79:3, 82:13, 83:23, 99:19, 101:23, 127:7, 127:9, 127:19
**special** [4] - 74:9, 107:21, 112:15, 113:23
**specializes** [1] - 85:8
**specializing** [1] -

108:20
**specific** [51] - 13:12, 14:20, 14:23, 18:4, 25:10, 29:5, 37:4, 37:6, 40:3, 41:5, 46:16, 52:11, 55:11, 55:22, 56:2, 63:6, 80:21, 85:7, 96:11, 98:20, 98:21, 104:18, 116:10, 117:19, 118:18, 118:21, 118:24, 119:4, 121:21, 122:6, 122:20, 123:19, 124:4, 126:8, 135:2, 136:7, 136:10, 138:13, 141:5, 148:7, 151:13, 151:15, 153:14, 154:1, 162:13, 165:8, 166:23, 173:8, 173:24
**specifically** [9] - 8:7, 35:2, 43:20, 60:23, 112:4, 142:25, 165:18, 173:3, 173:7
**specification** [43] - 9:24, 10:4, 20:19, 20:21, 27:7, 35:7, 36:6, 43:20, 58:5, 65:18, 67:19, 76:6, 77:15, 106:16, 108:24, 109:3, 132:4, 134:5, 134:6, 134:7, 134:8, 137:16, 137:23, 137:25, 138:4, 138:12, 138:24, 138:25, 139:16, 140:2, 150:18, 151:20, 152:2, 155:18, 159:16, 164:20, 165:12, 166:19, 173:24, 174:3, 174:15, 174:21
**specification 's** [1] - 110:15
**specifications** [1] - 113:22
**specificity** [14] - 37:4, 37:9, 41:12, 53:25, 119:9, 119:21, 120:6, 120:8, 120:21, 121:6, 121:11, 124:10, 125:19, 126:7
**specified** [3] - 17:6, 117:23, 156:18

**specify** [4] - 151:6, 153:19, 156:2, 156:7
**speed** [2] - 99:3, 174:3
**spell** [2] - 50:8, 147:14
**spent** [2] - 130:5, 130:8
**spot** [1] - 118:17
**spreadsheet** [2] - 86:11, 86:23
**SRI** [43] - 75:17, 76:1, 76:2, 77:18, 78:20, 78:23, 78:24, 79:3, 79:16, 79:22, 80:5, 80:9, 80:12, 80:19, 80:23, 81:1, 81:2, 81:8, 84:9, 92:11, 100:9, 100:18, 102:10, 105:23, 106:5, 106:15, 106:17, 149:14, 149:17, 149:20, 150:5, 150:14, 151:5, 151:12, 151:19, 153:12, 153:18, 153:20, 154:9, 155:10
**staff** [1] - 3:24
**stage** [25] - 8:14, 26:14, 63:25, 64:9, 71:1, 71:4, 77:23, 90:16, 90:17, 116:21, 117:1, 126:19, 131:9, 137:15, 138:19, 146:17, 149:18, 153:25, 155:6, 155:7, 155:8, 155:9, 157:25, 158:7, 158:11
**stamp** [2] - 24:2, 24:10
**stamps** [1] - 25:16
**stand** [2] - 129:8, 184:1
**standard** [6] - 21:14, 25:12, 52:16, 54:19, 117:3, 117:20
**standardized** [3] - 13:5, 16:5, 63:6
**standards** [7] - 113:14, 113:22, 113:23, 115:17, 131:8, 131:12
**standing** [7] - 41:10, 42:6, 134:22, 135:15, 147:4, 176:19, 177:14
**start** [14] - 5:6, 5:18, 6:3, 9:23, 14:3, 34:23, 66:24, 70:7,

85:4, 87:5, 103:12, 166:5, 171:22, 172:10
**started** [3] - 23:5, 34:22, 128:12
**starting** [3] - 6:24, 82:15, 120:24
**starts** [1] - 172:7
**state** [2] - 152:7, 179:22
**statement** [2] - 10:3, 52:11
**statements** [3] - 88:2, 116:8, 182:2
**STATES** [2] - 1:1, 1:24
**States** [7] - 130:18, 130:20, 131:25, 155:13, 159:7, 159:9, 159:13
**states** [4] - 112:23, 139:18, 152:18, 153:6
**static** [1] - 29:16
**stating** [3] - 169:1, 170:11, 178:16
**status** [38] - 19:6, 67:13, 70:9, 70:11, 70:13, 72:17, 72:19, 72:22, 72:25, 79:25, 80:16, 88:3, 88:4, 88:8, 88:9, 90:23, 90:24, 92:14, 105:9, 105:11, 132:23, 132:25, 136:19, 137:12, 138:20, 139:4, 140:8, 140:17, 143:12, 143:25, 144:22, 145:2, 145:4, 148:15, 152:24, 154:1, 157:1, 157:21
**stay** [1] - 6:12
**stenographic** [1] - 184:6
**step** [83] - 13:17, 19:12, 20:6, 27:2, 27:3, 38:16, 42:25, 44:24, 45:9, 45:18, 47:8, 49:22, 49:23, 49:24, 50:12, 50:24, 55:4, 68:24, 71:20, 73:9, 75:9, 76:23, 77:2, 78:2, 82:10, 85:15, 86:1, 86:3, 86:12, 86:13, 88:25, 94:12, 95:15, 95:16, 95:24, 96:17, 96:25, 100:23, 101:9, 101:14, 101:16, 120:18, 134:9,

136:2, 137:14, 137:21, 138:9, 145:13, 145:14, 145:15, 146:1, 146:5, 146:10, 146:19, 147:16, 147:25, 148:7, 148:18, 148:20, 149:17, 149:18, 150:5, 153:24, 155:23, 158:9, 160:18, 161:1, 161:2, 162:2, 165:2, 169:11, 173:10, 174:16, 175:22, 175:24, 176:4, 182:11, 182:14, 182:16, 182:17
**Step** [5] - 45:15, 45:16, 50:17, 104:15
**steps** [31] - 18:20, 19:17, 19:18, 42:19, 42:20, 45:17, 45:19, 45:25, 50:19, 56:1, 70:8, 74:2, 74:18, 75:7, 75:11, 75:20, 85:16, 86:17, 93:15, 95:4, 96:25, 98:20, 99:4, 106:1, 123:12, 149:2, 150:7, 157:4, 178:9, 179:1, 179:16
**still** [13] - 3:24, 24:11, 57:14, 60:24, 61:1, 103:4, 147:2, 147:25, 176:3, 177:18, 179:19, 182:16
**Stodge** [3] - 3:4, 4:21, 158:19
**STODGE** [1] - 1:12
**stop** [7] - 9:20, 17:12, 22:21, 25:23, 36:12, 62:2, 175:23
**storage** [3] - 50:19, 173:7, 174:17
**store** [4] - 50:13, 61:11, 173:15, 174:14
**storing** [2] - 162:19, 173:8
**straight** [2] - 22:3, 86:16
**strategy** [2] - 58:20, 59:8
**streamline** [4] - 56:15, 56:21, 62:10, 161:7
**streamlined** [1] - 53:11
**streamlining** [20] - 31:8, 31:14, 32:25,

34:9, 34:10, 34:12, 56:12, 62:7, 62:8, 161:10, 161:15, 162:5, 164:23, 166:11, 169:8, 170:2, 170:16, 171:7, 176:1, 182:5
**Street** [1] - 1:20
**stretch** [1] - 66:13
**structural** [1] - 173:25
**structure** [4] - 103:5, 113:1, 125:10, 126:12
**struggling** [1] - 97:19
**stuff** [7] - 3:25, 50:11, 60:7, 70:20, 102:5, 120:8, 126:2
**subject** [4] - 79:1, 98:22, 131:21, 137:17
**submits** [3] - 105:25, 118:20, 118:22
**subscribe** [15] - 29:15, 30:11, 35:17, 46:21, 47:22, 47:23, 48:9, 48:11, 63:2, 64:14, 66:1, 164:9, 170:11, 170:13
**subscribed** [2] - 35:18, 164:14
**subscription** [4] - 23:25, 24:1, 41:9
**subset** [5] - 74:15, 89:5, 89:24, 92:21, 103:25
**substance** [1] - 59:7
**substantially** [1] - 122:18
**subsystem** [4] - 139:5, 139:9, 139:10
**successful** [1] - 108:4
**suffer** [1] - 162:1
**sufficient** [5] - 18:14, 46:14, 146:10, 156:17, 174:17
**sufficiently** [3] - 14:20, 60:24, 121:21
**suggest** [3] - 71:13, 152:19, 179:1
**suggested** [5] - 49:17, 109:21, 134:1, 137:11, 147:20
**suggesting** [4] - 58:9, 119:25, 122:10, 171:9
**suggestion** [1] - 179:4
**suggests** [5] - 53:14, 54:19, 65:18, 144:5, 176:22
**suit** [2] - 131:24, 174:5

**Summary** [1] - 142:14
**summary** [2] - 64:6, 167:18
**super** [2] - 84:24, 106:5
**superficial** [1] - 78:25
**supplemental** [2] - 12:15, 172:12
**supplemented** [1] - 76:10
**supplements** [1] - 144:16
**support** [8] - 78:2, 153:13, 154:11, 155:1, 157:4, 172:18, 173:23, 180:10
**supported** [1] - 179:15
**supporting** [1] - 101:8
**supposed** [5] - 8:14, 21:21, 22:5, 40:1, 40:2
**supposedly** [1] - 64:13
**Supreme** [7] - 8:21, 37:14, 38:9, 38:23, 120:24, 130:19, 157:8
**surely** [5] - 46:3, 170:5, 170:15, 172:2, 177:2
**surprising** [1] - 172:16
**suspicious** [7] - 80:8, 106:6, 149:24, 150:2, 151:7, 151:10, 154:13
**SUTCLIFFE** [1] - 2:11
**switch** [2] - 37:10, 104:7
**switched** [1] - 7:16
**switching** [1] - 16:5
**Synopsys** [1] - 147:1
**System** [2] - 132:5, 174:10
**system** [57] - 16:9, 16:10, 29:3, 29:22, 30:9, 30:14, 34:3, 34:22, 35:12, 35:16, 38:4, 39:7, 39:10, 52:25, 53:6, 54:8, 54:18, 83:1, 83:19, 83:25, 84:1, 84:2, 84:12, 84:15, 84:25, 85:5, 86:19, 87:19, 89:9, 95:10, 95:19, 97:3, 99:9, 99:19, 101:3, 132:18, 132:19, 133:10,

135:20, 137:11, 139:4, 139:20, 141:16, 142:3, 142:20, 142:21, 143:4, 144:9, 144:10, 148:5, 152:23, 154:3, 154:5, 162:13, 172:24, 174:1
**system's** [1] - 173:15
**Systems** [2] - 72:6, 149:14
**systems** [30] - 12:22, 35:3, 35:5, 35:10, 39:6, 39:22, 41:7, 51:10, 52:20, 52:21, 61:17, 72:23, 90:8, 91:21, 136:16, 137:2, 141:4, 141:20, 142:16, 146:13, 148:25, 149:5, 152:11, 152:16, 152:22, 153:1, 153:9, 153:19, 179:25, 181:6

---

# T

**table** [1] - 7:17
**tactics** [1] - 141:22
**tag** [15] - 15:20, 18:22, 22:2, 24:15, 25:25, 29:4, 42:17, 162:21, 162:23, 175:2, 176:12, 177:13, 181:13, 181:14, 181:16
**tags** [14] - 15:1, 18:21, 19:24, 24:21, 41:14, 41:19, 42:13, 42:16, 65:6, 171:16, 175:2, 176:7, 176:24, 178:6
**talks** [17] - 16:14, 24:16, 35:20, 54:13, 59:20, 73:9, 73:16, 73:17, 90:4, 100:16, 100:17, 107:16, 110:10, 114:23, 116:22, 125:16
**tap** [5] - 54:8, 54:12, 54:18, 180:23, 180:25
**taps** [2] - 35:19, 36:17
**Taranto** [1] - 120:4
**targeted** [3] - 49:15, 173:12, 173:19
**tasks** [1] - 174:4
**taught** [1] - 28:21
**tech** [3] - 47:20, 48:11,

172:6
**technical** [18] - 37:10, 37:22, 37:23, 38:7, 65:19, 67:9, 81:2, 84:8, 102:5, 120:6, 120:7, 120:12, 124:10, 125:19, 126:6, 126:12, 144:20, 149:7
**technically** [2] - 126:13, 126:17
**technique** [2] - 151:13, 154:1
**techniques** [1] - 72:1
**technological** [14] - 25:21, 27:15, 40:11, 74:10, 119:10, 145:24, 145:25, 150:20, 151:17, 156:22, 173:22, 177:17, 178:9, 179:24
**technologically** [1] - 181:1
**Technologies** [1] - 172:13
**technology** [55] - 13:1, 13:4, 13:18, 14:4, 16:17, 19:21, 20:4, 21:4, 23:11, 24:4, 24:10, 24:13, 27:6, 27:13, 27:19, 27:21, 28:6, 28:10, 32:11, 33:1, 33:4, 33:12, 34:1, 37:6, 37:7, 39:12, 44:15, 46:7, 46:24, 47:16, 47:24, 48:1, 48:25, 51:21, 74:17, 78:3, 119:24, 121:10, 121:20, 125:4, 147:11, 147:21, 151:25, 153:8, 153:17, 167:1, 170:8, 172:5, 175:7, 177:22, 178:14, 179:3, 179:12, 180:4
**TecSec** [1] - 120:3
**TELECOMMUNICATI ONS** [1] - 1:14
**Telecommunication s** [2] - 131:17, 131:23
**telegraph** [1] - 33:11
**ten** [2] - 32:18, 51:18
**tend** [3] - 106:4, 106:5, 119:7
**tended** [1] - 154:12
**tenfold** [1] - 54:15
**terms** [11] - 14:24, 15:10, 36:15, 48:15,

54:1, 67:21, 69:4, 71:14, 77:1, 109:13, 121:7
**test** [2] - 41:12, 44:21
**tests** [1] - 120:9
**text** [48] - 15:4, 15:15, 16:11, 20:1, 21:7, 21:8, 21:14, 21:15, 25:10, 26:7, 29:6, 35:16, 37:18, 39:11, 40:24, 43:9, 43:17, 44:5, 46:20, 47:21, 48:2, 48:8, 61:15, 63:1, 63:4, 63:9, 63:14, 63:18, 162:19, 162:25, 163:20, 164:7, 164:8, 165:21, 166:2, 167:16, 167:17, 167:20, 167:23, 171:19, 175:4, 176:10, 177:1, 180:14, 180:18, 181:13, 182:1
**text-based** [1] - 180:18
**texts** [1] - 180:16
**Thales** [3] - 155:12, 155:13, 156:12
**THE** [181] - 1:1, 1:2, 1:24, 3:24, 4:5, 5:15, 5:25, 6:2, 6:8, 6:22, 7:4, 9:19, 10:10, 13:6, 14:23, 16:12, 16:19, 17:3, 17:12, 17:19, 18:7, 18:19, 19:11, 20:24, 22:8, 23:3, 24:20, 25:23, 27:23, 30:4, 30:20, 33:14, 34:9, 34:16, 36:12, 38:14, 40:16, 40:19, 41:13, 42:3, 42:10, 43:7, 43:12, 43:23, 44:4, 44:11, 44:22, 45:10, 46:17, 47:1, 47:5, 47:9, 47:18, 47:25, 48:10, 48:20, 48:24, 49:7, 49:16, 50:17, 51:14, 53:15, 54:21, 55:8, 55:15, 56:8, 58:2, 58:7, 58:17, 58:23, 59:2, 59:14, 61:2, 61:6, 61:18, 61:24, 62:1, 62:15, 62:17, 63:8, 63:24, 65:3, 65:21, 66:8, 66:20, 67:5, 67:20, 68:11, 68:19, 69:8, 69:14,

70:25, 73:1, 73:14, 73:16, 74:13, 75:5, 76:4, 76:11, 77:20, 78:19, 79:9, 79:19, 81:4, 81:19, 81:25, 82:4, 82:7, 82:9, 83:25, 84:19, 85:19, 87:21, 88:14, 88:22, 88:25, 89:17, 90:2, 91:9, 91:16, 91:25, 92:23, 93:2, 93:5, 93:11, 93:14, 95:25, 96:5, 96:10, 96:18, 97:18, 97:25, 98:8, 99:14, 100:10, 100:14, 102:1, 102:16, 102:19, 102:21, 103:1, 103:6, 103:19, 104:4, 104:10, 104:20, 105:2, 105:7, 105:20, 107:3, 107:7, 109:5, 111:7, 111:22, 112:8, 112:17, 114:1, 114:18, 115:5, 115:11, 115:16, 115:20, 116:1, 116:6, 116:14, 117:11, 117:24, 118:4, 118:24, 119:17, 120:13, 121:8, 121:25, 122:24, 123:20, 124:22, 125:16, 126:15, 127:22, 128:2, 129:13
**themselves** [6] - 5:4, 5:7, 5:18, 122:19, 151:4, 177:17
**theoretically** [1] - 128:18
**theories** [1] - 114:3
**theory** [1] - 114:13
**therefore** [4] - 34:1, 41:8, 142:2, 175:20
**therein** [6] - 130:7, 139:2, 140:16, 152:7, 152:10, 165:8
**thereto** [1] - 64:2
**they've** [7] - 29:23, 40:22, 105:10, 114:4, 115:9, 115:15, 169:22
**thinking** [5] - 8:17, 9:2, 110:21, 118:8, 183:8
**Third** [1] - 65:6
**third** [11] - 48:7, 53:12,

66:21, 92:22, 133:6, 137:7, 150:3, 150:12, 158:12, 163:21, 176:13
**third-party** [1] - 53:12
**THOMAS** [1] - 3:16
**thoughtful** [3] - 7:20, 26:10, 110:4
**thoughts** [7] - 8:8, 8:9, 9:6, 110:23, 128:3, 172:20, 183:17
**threaded** [1] - 142:22
**threads** [1] - 119:10
**threat** [5] - 67:14, 70:15, 72:20, 72:25, 80:12
**threatening** [1] - 153:1
**threats** [12] - 82:19, 83:3, 83:5, 85:8, 92:7, 95:11, 99:20, 99:22, 133:1, 143:5, 150:21
**three** [31] - 4:14, 16:10, 21:23, 22:12, 40:7, 42:11, 42:19, 45:16, 45:18, 45:22, 46:2, 48:1, 48:5, 55:7, 64:12, 80:4, 86:1, 89:12, 89:15, 93:18, 95:17, 98:3, 100:5, 104:14, 114:5, 129:21, 136:14, 159:14, 159:24, 160:12, 182:23
**threshold** [1] - 18:18
**throughout** [2] - 37:21, 159:21
**throw** [1] - 124:19
**tie** [1] - 181:6
**tied** [3] - 83:15, 93:7, 95:4
**tiered** [1] - 136:17
**tightly** [1] - 96:16
**time-consuming** [1] - 10:17
**tiny** [1] - 78:1
**tips** [1] - 168:17
**title** [8] - 31:18, 31:23, 132:4, 159:15, 166:5, 166:6, 166:10, 174:9
**TLI** [2] - 18:11, 19:19
**today** [38] - 4:7, 4:13, 4:25, 5:10, 5:12, 5:22, 9:4, 15:21, 20:25, 59:3, 109:9, 110:3, 111:1, 128:15, 128:19,

129:18, 129:20, 129:22, 129:25, 130:2, 130:10, 130:17, 131:3, 131:6, 131:13, 131:16, 136:13, 160:8, 161:19, 178:11, 180:15, 181:3, 182:24, 182:25, 183:4, 183:7, 183:10, 183:22
**together** [26] - 15:8, 27:18, 34:2, 42:11, 42:15, 42:19, 45:3, 45:17, 45:20, 45:22, 45:23, 45:25, 46:2, 46:3, 46:4, 48:1, 48:5, 68:3, 74:18, 95:5, 97:12, 122:22, 145:8, 157:4, 182:12
**Tom** [1] - 7:3
**ton** [1] - 71:11
**tonight** [1] - 183:8
**took** [4] - 53:11, 64:24, 65:24, 159:23
**tool** [9] - 23:7, 33:5, 75:3, 78:17, 86:16, 105:16, 125:20, 151:2, 173:20
**tools** [8] - 25:22, 27:21, 83:4, 84:5, 85:9, 102:24, 141:22, 143:21
**top** [1] - 47:14
**topic** [1] - 179:11
**total** [1] - 132:10
**totally** [3] - 64:6, 64:11, 64:16
**touched** [1] - 49:23
**tough** [3] - 33:21, 60:5, 60:6
**tout** [1] - 174:13
**touted** [1] - 138:13
**towards** [1] - 16:16
**town** [1] - 183:23
**track** [2] - 7:11, 156:1
**traditional** [3] - 35:12, 69:7, 179:25
**traffic** [4] - 83:8, 83:10, 88:6, 88:7
**trafficking** [2] - 149:25, 150:10
**trained** [1] - 108:13
**transaction** [6] - 59:24, 168:10, 168:18, 168:21, 173:1, 173:9
**transcribe** [1] - 129:25
**transcript** [2] - 183:2,

184:6
**Transfer** [1] - 166:8
**transferring** [2] - 15:4, 41:16
**transform** [3] - 72:9, 135:11, 145:19
**transition** [7] - 66:10, 163:10, 167:2, 169:3, 176:16, 177:14, 179:7
**transitioning** [1] - 47:2
**transitions** [1] - 164:6
**transitory** [1] - 162:18
**transmit** [4] - 103:16, 104:6, 133:6, 181:13
**transmits** [1] - 67:12
**transmitted** [4] - 19:3, 98:11, 140:22, 152:15
**transmitting** [6] - 68:9, 104:15, 134:11, 135:25, 143:6, 157:18
**transporting** [1] - 12:10
**travel** [2] - 183:23
**treat** [2] - 22:12, 125:7
**treated** [2] - 95:12, 159:21
**treating** [1] - 133:23
**trends** [1] - 141:23
**trial** [1] - 33:22
**trials** [1] - 99:12
**tried** [1] - 62:25
**tries** [2] - 56:4, 80:5
**triggered** [1] - 12:20
**Triozzi** [1] - 184:8
**trouble** [2] - 31:22, 160:8
**Troy** [1] - 5:13
**true** [11] - 19:1, 34:14, 53:14, 64:4, 87:14, 138:16, 146:17, 149:4, 178:18, 178:23, 184:5
**truly** [1] - 170:1
**try** [18] - 7:18, 9:1, 9:14, 9:17, 10:18, 11:21, 38:17, 56:21, 62:19, 102:12, 109:17, 116:14, 127:7, 127:18, 127:19, 128:14, 129:3
**trying** [15] - 9:2, 10:1, 10:5, 14:22, 34:6, 38:14, 40:12, 44:22, 45:11, 46:8, 82:16, 102:7, 120:17,

122:4, 126:24
**tune** [1] - 135:20
**TUNNELL** [2] - 2:2, 2:15
**turn** [11] - 9:9, 66:21, 66:24, 75:6, 77:18, 96:25, 98:22, 110:24, 145:14, 157:10, 161:1
**turns** [1] - 126:15
**two** [120] - 4:6, 4:15, 4:16, 7:9, 13:17, 18:3, 19:12, 20:6, 21:23, 25:20, 26:19, 27:2, 27:3, 27:18, 30:24, 35:5, 37:3, 38:16, 42:11, 44:7, 44:24, 45:9, 45:16, 49:4, 49:22, 49:23, 50:12, 50:17, 54:8, 54:12, 54:18, 55:4, 57:24, 58:10, 60:11, 60:17, 61:3, 61:8, 61:16, 61:20, 62:5, 68:3, 68:12, 71:1, 71:20, 74:18, 78:2, 85:24, 86:13, 87:16, 88:2, 89:12, 89:15, 90:20, 94:20, 94:25, 95:1, 95:17, 98:3, 100:4, 114:3, 119:8, 119:19, 119:24, 120:4, 120:18, 123:23, 124:11, 124:12, 125:14, 125:15, 131:25, 134:5, 136:18, 137:2, 140:4, 140:8, 140:13, 142:10, 142:20, 143:4, 143:24, 144:21, 144:24, 145:8, 145:14, 145:15, 146:1, 146:5, 146:10, 146:19, 147:25, 148:7, 149:18, 151:23, 153:3, 153:24, 154:2, 154:5, 155:14, 155:16, 156:1, 156:10, 156:19, 158:9, 159:12, 160:13, 160:18, 161:2, 161:17, 176:4, 180:23, 180:25, 182:11, 182:17
**two-level** [1] - 68:12, 94:20, 94:25, 95:1,

137:2, 140:8,
140:13, 142:10,
142:20, 143:4,
144:21, 144:24,
148:7, 151:23,
154:2, 154:5
**two-stage** [1] - 71:1
**two-step** [1] - 160:18
**two-tap** [5] - 54:8,
54:12, 54:18,
180:23, 180:25
**Twombly** [1] - 112:14
**tying** [1] - 27:1
**type** [31] - 12:8, 12:12,
12:18, 13:13, 36:8,
39:9, 60:6, 68:20,
68:24, 70:12, 73:23,
73:24, 78:16, 89:1,
104:22, 106:3,
107:7, 107:21,
136:22, 143:17,
144:4, 144:9,
147:18, 152:13,
162:2, 163:4,
166:19, 172:5, 172:6
**typed** [1] - 170:10
**types** [5] - 19:2, 85:8,
136:18, 140:24,
151:15
**typical** [1] - 101:20
**typically** [2] - 47:10,
179:8
**Typically** [1] - 152:11
**typing** [1] - 36:16
**typos** [4] - 36:10,
52:24, 53:1, 183:3

**U**

**U.S** [3] - 132:1,
170:23, 184:9
**ultimately** [2] - 33:24,
37:15
**unable** [1] - 99:20
**unasserted** [1] -
111:20
**unauthorized** [1] -
140:19
**uncertainty** [2] -
111:13, 178:16
**unclear** [2] - 27:25,
178:22
**uncontroverted** [1] -
178:20
**unconventional** [43] -
13:9, 13:20, 38:24,
41:3, 41:4, 45:13,
45:25, 46:1, 46:2,
46:3, 46:6, 46:16,
46:21, 48:12, 48:13,

50:24, 51:9, 51:20,
52:1, 52:4, 52:13,
53:2, 53:22, 62:22,
74:17, 75:8, 75:23,
78:3, 92:2, 119:23,
120:15, 121:10,
121:20, 148:4,
151:24, 152:8,
157:6, 174:13,
177:20, 178:14,
179:12, 179:17,
180:2
**unconventionality** [4]
- 51:17, 52:11,
119:22, 180:11
**unconventionally** [1]
- 13:19
**under** [4] - 62:19,
86:6, 86:12, 116:13
**underlining** [2] -
120:20
**underlying** [2] - 86:19,
120:11
**undersizing** [1] -
173:8
**understandable** [1] -
171:23
**understood** [6] -
68:23, 93:5, 100:13,
146:3, 162:14,
179:23
**undue** [1] - 57:2
**unearthing** [1] -
146:14
**unfortunately** [2] -
93:8, 172:19
**uniform** [1] - 163:3
**unique** [3] - 28:18,
113:23, 126:8
**unit** [2] - 173:5, 173:6
**UNITED** [2] - 1:1, 1:24
**United** [7] - 130:18,
130:20, 131:25,
155:12, 159:7,
159:9, 159:13
**unknown** [9] - 78:13,
83:10, 91:5, 92:7,
92:19, 95:11, 95:12,
99:22, 106:13
**unless** [2] - 131:13,
183:20
**unlike** [1] - 151:19
**unpack** [1] - 57:12
**unsure** [1] - 27:25
**untethered** [2] -
134:18, 169:18
**unusual** [2] - 75:20,
76:25
**up** [53] - 4:1, 6:12,
7:11, 11:2, 12:1,

12:21, 13:2, 14:24,
15:11, 18:12, 22:9,
22:19, 33:5, 34:3,
34:7, 34:9, 34:21,
35:25, 40:4, 45:15,
47:15, 47:20, 54:11,
56:25, 57:2, 57:5,
57:10, 62:7, 62:8,
67:5, 70:7, 75:25,
82:5, 89:8, 89:14,
97:20, 101:14,
103:11, 104:15,
113:21, 161:7,
162:13, 167:16,
168:16, 170:25,
171:4, 175:19,
179:9, 179:25,
180:20, 180:23,
181:6, 183:2
**update** [2] - 141:2,
141:3
**updated** [2] - 95:12,
144:12
**updating** [3] - 67:14,
80:17, 141:19
**ups** [2] - 35:5, 46:25
**URI** [21] - 15:2, 16:13,
26:5, 43:6, 163:4,
163:5, 163:10,
165:20, 166:18,
166:22, 166:25,
167:11, 167:21,
171:17, 176:11,
176:13, 176:15,
177:13, 181:21,
181:22, 181:23
**URIs** [5] - 16:17,
16:23, 19:25, 175:4,
176:22
**URL** [2] - 18:13, 63:22
**useful** [1] - 72:9
**user** [102] - 12:10,
15:19, 16:2, 16:22,
17:8, 18:25, 19:2,
19:4, 19:5, 19:6,
19:9, 20:1, 21:6,
21:8, 21:12, 21:15,
24:18, 24:19, 24:25,
26:1, 27:8, 29:5,
29:6, 35:21, 35:24,
41:16, 41:20, 42:17,
43:7, 43:8, 43:13,
43:19, 44:2, 44:4,
44:6, 46:20, 48:4,
48:25, 49:13, 49:15,
50:11, 59:20, 62:11,
63:1, 63:15, 63:19,
64:13, 64:22, 71:24,
135:2, 162:24,
163:8, 163:16,

163:18, 163:25,
164:3, 164:5, 164:9,
164:13, 165:19,
165:23, 165:24,
167:10, 167:12,
167:13, 167:14,
167:22, 167:23,
168:7, 168:9,
168:11, 168:15,
168:16, 169:3,
169:4, 169:5,
170:24, 171:1,
171:2, 171:3, 171:4,
171:16, 171:19,
173:2, 173:12,
175:3, 175:5, 175:6,
175:12, 175:19,
176:8, 176:14,
179:7, 179:8, 181:16
**user's** [3] - 25:2,
164:3, 171:2
**user-related** [1] - 26:1
**users** [7] - 10:5, 20:2,
29:17, 72:9, 168:20,
168:22, 175:18
**uses** [4] - 32:20,
64:22, 136:18, 154:3
**utilization** [3] - 20:4,
38:24, 175:4
**utilize** [7] - 13:8,
13:18, 14:20, 93:24,
93:25, 136:17,
161:20
**utilized** [4] - 15:4,
39:6, 157:2, 175:17
**utilizes** [3] - 132:19,
133:17, 142:5,
147:8, 154:2
**utilizing** [11] - 13:19,
16:21, 26:5, 39:10,
65:5, 84:24, 91:22,
134:22, 147:11,
151:14, 171:15

**V**

**vague** [1] - 112:18
**validity** [1] - 110:13
**Vanessa** [1] - 5:24
**variances** [1] - 40:11
**variety** [1] - 120:9
**various** [6] - 99:8,
129:18, 130:16,
131:2, 131:5, 166:3
**vendor** [15] - 10:7,
35:6, 36:2, 52:23,
57:25, 58:2, 58:16,
59:13, 60:20, 60:23,
61:4, 61:10, 72:18
**vendor's** [8] - 58:13,

59:21, 60:2, 168:7,
168:8, 168:15,
175:12, 175:13
**verification** [3] -
35:16, 53:7, 53:12
**versus** [6] - 19:15,
43:1, 61:4, 77:14,
113:23, 124:25
**via** [8] - 16:17, 59:23,
76:22, 140:8,
161:16, 162:24,
171:16, 176:9
**view** [16] - 31:5, 76:21,
88:13, 96:19, 114:9,
116:24, 119:19,
147:3, 148:1,
153:23, 157:14,
165:9, 169:21,
174:5, 177:9, 182:2
**viewed** [3] - 57:21,
145:18, 153:25
**viewing** [2] - 19:5,
168:13
**VINTI** [1] - 3:9
**Vinti** [2] - 6:18
**virus** [2] - 82:21, 82:22
**viruses** [1] - 83:7
**vis-à-vis** [3] - 39:2,
39:6, 39:12
**visibility** [1] - 83:13
**visible** [1] - 102:8
**Visionix** [1] - 155:12
**visited** [1] - 165:24
**volume** [4] - 72:4,
97:5, 106:21, 108:14
**volumes** [1] - 180:16
**vs** [13] - 4:23, 131:10,
131:17, 134:25,
135:8, 135:13,
137:19, 147:1,
149:14, 155:12,
165:4, 169:11,
172:14

**W**

**Wait** [1] - 17:20
**waived** [1] - 22:18
**waiver** [1] - 22:9
**Wang** [1] - 6:18
**WANG** [1] - 3:10
**wants** [2] - 29:17,
30:10
**warrant** [1] - 146:10
**water** [1] - 129:14
**ways** [24] - 13:7,
13:25, 24:25, 38:15,
40:24, 41:7, 53:22,
56:19, 56:21, 61:21,
62:6, 68:6, 90:20,

95:14, 110:13, 145:8, 148:21, 157:6, 161:5, 165:13, 170:2, 170:7, 170:15, 170:16
**weaknesses** [1] - 150:19
**web** [50] - 15:17, 15:24, 16:1, 18:21, 18:25, 19:8, 20:15, 21:6, 24:21, 25:1, 26:3, 27:17, 27:18, 29:4, 33:25, 37:24, 41:19, 41:20, 42:16, 42:18, 43:14, 43:21, 44:2, 47:11, 47:12, 64:22, 65:11, 162:22, 162:24, 163:9, 163:15, 163:25, 164:3, 164:4, 164:6, 171:3, 171:20, 175:2, 175:3, 175:6, 176:8, 176:9, 177:12, 178:5, 181:14, 181:23
**website** [34] - 12:10, 12:12, 16:22, 20:1, 25:25, 35:6, 35:12, 35:14, 41:22, 44:6, 48:4, 52:22, 52:25, 57:24, 58:13, 59:13, 59:21, 59:23, 59:24, 60:3, 60:25, 61:4, 61:11, 61:15, 65:7, 165:24, 167:24, 168:8, 168:13, 168:15, 175:5, 175:13, 176:15, 176:16
**website's** [1] - 165:19
**websites** [5] - 15:1, 19:25, 41:15, 171:16, 177:2
**weed** [1] - 50:7
**weeks** [1] - 130:22
**WEIL** [1] - 3:15
**weinberg** [2] - 64:21, 64:23
**Weinberg** [9] - 5:10, 5:12, 9:16, 33:20, 55:9, 62:24, 65:25, 118:11, 122:25
**WEINBERG** [56] - 2:5, 2:18, 33:19, 34:14, 34:17, 37:2, 39:18, 40:18, 40:20, 41:25, 42:6, 42:23, 43:11, 43:18, 44:3, 44:8,

44:12, 45:8, 46:11, 46:18, 47:4, 47:8, 47:10, 47:19, 48:7, 48:13, 48:23, 49:2, 49:11, 49:22, 51:1, 52:15, 54:7, 54:25, 55:11, 55:20, 57:12, 58:4, 58:12, 58:22, 58:25, 59:12, 60:16, 61:5, 61:7, 61:10, 61:20, 61:25, 62:4, 62:16, 118:12, 119:2, 120:2, 120:17, 121:24, 122:1
**welcome** [3] - 5:15, 6:22, 129:1
**well-known** [6] - 70:18, 71:25, 72:12, 135:15, 147:6, 147:18
**well-understood** [1] - 146:3
**whereas** [2] - 19:2, 122:16
**whereby** [1] - 46:20
**wherein** [2] - 133:1, 164:3
**white** [4] - 69:3, 106:20, 106:24, 107:16
**whole** [14] - 56:4, 56:24, 57:3, 57:6, 57:9, 82:11, 91:25, 121:10, 121:18, 137:16, 137:22, 140:3, 164:21, 164:22
**wholly** [1] - 155:2
**widely** [1] - 58:1
**Wilmington** [1] - 1:20
**winning** [1] - 178:21
**wipes** [1] - 26:16
**wish** [5] - 8:25, 55:17, 55:19, 81:5, 183:22
**wishes** [3] - 166:13, 170:11, 179:13
**wonder** [5] - 10:12, 41:18, 56:24, 64:3, 64:9
**wondering** [2] - 39:4, 62:20
**word** [6] - 29:15, 29:16, 30:11, 56:3, 118:21, 128:1
**words** [20] - 28:4, 59:15, 62:12, 63:11, 63:12, 63:18, 69:24, 99:16, 118:24, 121:17, 123:12,

123:20, 124:6, 124:19, 140:9, 142:9, 148:17, 156:17, 161:13, 166:25
**works** [9] - 12:25, 13:14, 30:18, 61:14, 99:23, 112:20, 124:25, 164:1, 179:10
**world** [7] - 23:13, 25:14, 33:9, 56:19, 124:4, 134:18, 172:11
**worse** [1] - 162:2
**worth** [2] - 35:9, 69:11
**worthy** [2] - 108:15, 139:13
**write** [5] - 62:25, 123:10, 124:18, 125:22, 126:8
**writing** [2] - 123:6, 125:8
**written** [3] - 110:16, 129:24, 183:1

## Y

**years** [3] - 32:18, 120:8, 170:9
**yield** [1] - 138:4
**York** [1] - 6:17
**you-all** [1] - 110:21
**younger** [1] - 123:14
**Yu** [1] - 7:3
**YU** [1] - 3:16

## Z

**Zillow** [1] - 134:25